IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

BEVERLY MICHELLE MOORE, )
 )
   Petitioner, )
 )
v. ) Case No. CIV-09-985-C
 )
WARDEN MILLICENT NEWTON- )
EMBRY, )
 )
   Respondent. )

**Proposed Findings of Fact and
Conclusions of Law:  Timeliness of the Petition**

Ms. Beverly Moore was convicted of first degree murder for a homicide involving her boyfriend's son (A.S.), only one year and ten months old, by shaking him to death on January 13, 2004.  She seeks habeas relief based on ineffective assistance of her trial attorney.  Her threshold obstacle is the Respondent's limitations defense.  Federal law imposes a one-year limitations period[1] and Ms. Moore acknowledges that more than one year had passed by the time that she filed the habeas petition.[2]  However, federal common law recognizes an exception to the time-bar when a habeas petitioner demonstrates actual innocence.[3]  Ms. Moore invokes this exception and contends that based on new evidence, the boy could not

---

[1] *See* 28 U.S.C. § 2244(d)(1) (2006).

[2] Petitioner's Response to Respondent's Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56(F) or, Alternatively, Motion for Extension of Time at p. 3 (Oct. 4, 2010) (acknowledging Ms. Moore's "failure to meet the one-year filing requirement").

[3] *See Lopez v. Trani*, 628 F.3d 1228, 1230-31 (10th Cir. 2010), *petition for cert. filed* (Apr. 28, 2011).

have died from her actions on January 13, 2004, and her admission about shaking the boy had been untrue.  The Court has expanded the record for the reexamination of Ms. Moore's innocence.  With the new evidence, the Court should apply an exception to the time-bar because Ms. Moore has proven her actual innocence.

The Standard for a Demonstration of Actual Innocence

On the issue of actual innocence, the Petitioner bears the burden to show that "in light of the new evidence, no juror, acting reasonably, would have voted to find [her] guilty beyond a reasonable doubt."[4]  This inquiry involves a determination about the probable outcome with reasonable jurors, proper instruction, and an opportunity to consider the new evidence.[5]

The State's Trial Evidence on the<br>Cause and Timing of A.S.'s Injuries

The key issue, for purposes of the claim of actual innocence, is whether a reasonable jury would have attributed the death to Ms. Moore's actions on January 13, 2004.  The three medical experts, who testified at the trial, were Dr. Johnny Griggs, Dr. David Korber, and Dr. Chai Choi.  Dr. Griggs opined that A.S. had died as a result of "shaken baby syndrome,"[6]

---

[4]      *See Schlup v. Delo*, 513 U.S. 298, 329 (1995).

[5]      *See Schlup v. Delo*, 513 U.S. 298, 329 (1995); *House v. Bell*, 547 U.S. 518, 538 (2006).

[6]      2 Transcript of Trial Proceedings at pp. 186-87, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 14, 2005).

and Dr. Korber reported findings that were consistent with this diagnosis.[7]  Similarly, Dr.

Choi concluded that the boy had died from head trauma with blunt force.[8]

I.      Dr. Griggs' Testimony

Dr. Griggs is a physician who treated A.S. at the hospital[9] and opined that the boy had

died from shaken-baby syndrome.[10]   For this opinion, Dr. Griggs relied on subdural

hemorrhages in both eyes, massive swelling of the brain, and some bleeding into the brain.[11]

He explained that the subdural hemorrhages would suggest intentional injury:

> As I have done my cursory exam on this child, I've noticed no evidence
> of trauma to the skin, no bruising, no cuts, no scrapes, nothing that looks like
> there's any external signs of trauma that I can see on my just flesh exam,
> number one.
>
> Number two, the history does not go along with the clinical findings
> that I'm seeing.  A normal, well two-year old doesn't roll off the sofa and now
> he's unconscious and he's got evidence of brain injury.  So that concerns me;
> that the history does not go along with what I'm actually seeing.
>
> And then, thirdly, when I look into the back of the eyes and I see
> evidence of hemorrhages on both sides, that keys me in to that I should

---

[7]      2 Transcript of Trial Proceedings at pp. 261-62, *Oklahoma v. Moore*, Case No. CF-2004-351
(Okla. Co. Dist. Ct. Sept. 14, 2005).

[8]      3 Transcript of Trial Proceedings at p. 95, *Oklahoma v. Moore*, Case No. CF-2004-351
(Okla. Co. Dist. Ct. Sept. 15, 2005).

[9]      2 Transcript of Trial Proceedings at p. 148, *Oklahoma v. Moore*, Case No. CF-2004-351
(Okla. Co. Dist. Ct. Sept. 14, 2005).

[10]      *See supra* p. 2.

[11]      2 Transcript of Trial Proceedings at pp. 153-54, 156, 215, *Oklahoma v. Moore*, Case No. CF-
2004-351 (Okla. Co. Dist. Ct. Sept. 14, 2005).

consider this as a brain injury and that's consistent with shaken baby syndrome which heightens my awareness that this is an intentional injury to this child.[12]

The physician added that Ms. Moore and her boyfriend had not described any prior difficulties that could have led to A.S.'s collapse.[13]  The doctor explained that a simple fall to the floor could not have caused the type of brain injury reflected by the massive brain swelling and subdural hemorrhages.[14]

Dr. Griggs also testified that he thought the symptoms would have begun immediately after the shaking "[b]ecause of the degree of injury" reflected in the CT scan and "the history that this child [had been] perfectly fine up until the point of a history of a fall."[15]  He explained:

> Well, one of the most important things that I'm looking for is I'm trying to query, most importantly, when was this child last felt to be normal.  And I got nothing in the history that said he was unsteady or he was confused, he had difficulty breathing.  There was nothing there to suggest that there was any

---

[12]    2 Transcript of Trial Proceedings at pp. 154-55, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 14, 2005).

[13]    2 Transcript of Trial Proceedings at p. 164, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 14, 2005).

[14]    2 Transcript of Trial Proceedings at pp. 166-67, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 14, 2005).

[15]    2 Transcript of Trial Proceedings at pp. 178-79, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 14, 2005); *see also id*. at p. 194 (Dr. Griggs' testimony that he would know the amount of time between the shaking and the collapse "based upon the history that's obtained surrounding the events that [had] led up to the injury"); *id*. at p. 218 (Dr. Griggs' testimony that he was basing the rapidity of the injury "around the fact that this child [had been] normal" roughly five minutes before he "was in full-blown cardiopulmonary arrest").

problem prior to the interval of the child being sick or injured in this case.  So that's important.[16]

## II.   Dr. Korber's Testimony

Dr. David Korber is an ophthalmologist who treated A.S. on January 14, 2005.[17]  As noted above, Dr. Korber concluded that his findings were consistent with shaken baby syndrome.[18]  These findings involved "thousands" of retinal hemorrhages,[19] a "massive amount of blood all over the retina,"[20] and two detached retinas.[21]  For the level of eye damage Dr. Korber saw, he initially stated that he thought the injuries would probably have been sustained between "a few days" to "a week" before January 13, 2004.[22]  Later in his

---

[16]    2 Transcript of Trial Proceedings at p. 164, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 14, 2005); *see also id.* at p. 194 (Dr. Griggs' testimony that his knowledge of the time between the shaking and collapse was "based upon the history . . . surrounding the events" leading to the injury).

[17]    2 Transcript of Trial Proceedings at pp.  235, 245, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 14, 2005).

[18]    *See supra* p. 3; *see also* 2 Transcript of Trial Proceedings at pp. 235, 245, 261-62, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 14, 2005).

[19]    2 Transcript of Trial Proceedings at pp.  241-42, 251-52, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 14, 2005).

[20]    2 Transcript of Trial Proceedings at pp.  250-51, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 14, 2005).

[21]    2 Transcript of Trial Proceedings at p. 252, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 14, 2005).

[22]    2 Transcript of Trial Proceedings at pp.  235, 265, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 14, 2005).

testimony, however, Dr. Korber appeared to question the ability of anyone to estimate how much time had passed between the injuries and the loss of consciousness.[23]

III.   Dr. Choi's Testimony

A forensic pathologist, Dr. Chai Choi, performed the autopsy on A.S. and attributed the death to head trauma with blunt force.[24]  At trial, Dr. Choi testified that prior to July 13, 2004, A.S. had been "essentially . . . a normal child" without any "known medical specific history."[25]   At the time of the autopsy, however, the boy had a massive brain edema

---

[23]      Dr. Korber was asked:

> . . . .  Based upon your review of the eyes and particularly the blood vessels and the hemorrhages, would – would an eye like that having gone through that trauma typically in a person would they have to lose consciousness immediately?

2 Transcript of Trial Proceedings at p.  268, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 14, 2005).

> He answered:

> I cannot – I cannot answer that one because I do not know that.  It would have to be how much brain injury and everything else, and I just can't go there.  And I don't know the specifics exactly of if you shake them, cause retina damage, if there is brain damage, how much swelling has to go before they lose consciousness.  I mean, there's a whole cascade of events that has to happen before someone loses consciousness, and I can't put the time frame on things like that because I don't know them probably well enough to do that.  And I think if any medical doctor was going to answer would probably be reaching to be able to even to answer that.

*Id.*

[24]      3 Transcript of Trial Proceedings at p. 66, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 15, 2005); *see supra* p. 3.

[25]      3 Transcript of Trial Proceedings at p. 68, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 15, 2005).

(swelling), tearing of the bridging veins, retinal hemorrhages, periserosal mesenteric hemorrhages of a duodenum, subscapular bruises, subarachnoid hemorrhages, a subdural hematoma, and a subgaleal hematoma.[26]   Based on these newly-acquired conditions, the physician concluded that the brain injury had been caused by shaken baby syndrome with impact.[27]

Like Dr. Griggs and Dr. Korber, Dr. Choi was asked how much time would have elapsed between the shaking and the boy's loss of consciousness.[28]   Dr. Choi answered that the time-period would depend on how the child tolerated the shaken impact, but would usually have taken only minutes.[29]   Similarly, Dr. Choi stated that if the impact had been "very violent," the brain-swelling would immediately have resulted in an inability to breathe and a loss of consciousness.[30]

---

[26]     3 Transcript of Trial Proceedings at pp. 75, 78, 82-84, 86-87, 89-90, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 15, 2005).

[27]     3 Transcript of Trial Proceedings at pp. 84, 88, 90, 98-99, 104, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 15, 2005).

[28]     3 Transcript of Trial Proceedings at pp. 99-100, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 15, 2005).

[29]     3 Transcript of Trial Proceedings at pp. 99-100, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 15, 2005).

[30]     3 Transcript of Trial Proceedings at p. 110, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 15, 2005).

<u>The Petitioner's New Medical Evidence</u>

Ms. Moore presents reports by five medical doctors expressing expert opinions:

- Julie Mack, M.D., a radiologist,

- Janice Ophoven, M.D., a pathologist,

- Waney Squier, M.D., a neuropathologist,

- Horace Gardner, M.D., an ophthalmologist, and

- Patrick Barnes, M.D., a neuroradiologist.

The reports reflect two broad categories of opinions:

- criticism of the conclusions expressed by Doctors Griggs, Korber, and Choi, tying the boy's death to trauma or shaken baby syndrome and

- expression of a belief that if the death had involved trauma, the injury would have been inflicted days, weeks, or months before January 13, 2004.

The Respondent argues that the new reports create a classic "battle of the experts."[31]

She is partially correct.  Part of the Petitioner's submissions involve a straightforward

disagreement between expert witnesses on the ability to tie A.S.'s injuries to trauma.  But the

State had to prove at trial that the trauma was caused by Ms. Moore's unreasonable use of

force against the boy.[32]  For this element of its *prima facie* case, the State relied solely on Ms.

---

[31]     Sur-Reply on the Issue of Timeliness, Response to Petitioner's Motion to Expand the Record, and Response to Petitioner's Request for Evidentiary Hearing at pp. 30-31 (June 14, 2011).

[32]     Instruction Nos. 4-5, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 16, 2005).

Moore's confessed act of shaking the boy minutes before he collapsed.[33]  If the boy did not die from this alleged episode, her actions in the hours preceding death could not have constituted a homicide.

I.      Causation:  Attribution of the Death to Traumatic Injury

At trial, Doctors Griggs and Choi expressed the opinion that A.S. had died from a traumatic injury.[34]  This conclusion is criticized in various ways by Doctors Mack, Ophoven, Squier, Gardner, and Barnes.  However, the test for actual innocence requires proof that no reasonable jury would have found guilt.[35]  The evidentiary conflict would have allowed a reasonable jury to attribute A.S.'s death to intentional infliction of trauma notwithstanding the contrary opinions by Doctors Mack, Ophoven, Squier, Gardner, and Barnes.

The parties' experts disagree on:

●      whether A.S.'s retina had been detached[36] and

●      whether the death could be blamed on trauma without a differential diagnosis.[37]

---

[33]     4 Transcript of Trial Proceedings at pp. 7-33, 64-90, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 16, 2005) (prosecutor's closing arguments).

[34]     *See supra* pp. 2-3.

[35]     *See supra* p. 2.

[36]     *See* Petitioner's Exhibit 17 at p. 5 (Dr. Gardner's stated disagreement with Dr. Korber's opinion).

[37]     *See* Petitioner's Exhibit 30 at pp. 6-9 (Dr. Ophoven's opinion); Petitioner's Exhibit 17 at p. 7 (Dr. Gardner's opinion); Petitioner's Exhibit 28 at pp. 4-5 (Dr. Mack's opinion).

The Respondent argues that the Petitioner's experts lack credibility because they had been "well-compensated" after being retained by Ms. Moore.[38] Ms. Moore's counsel states that "a good number" of the experts are working *pro bono*.[39] The assertions by both attorneys should be disregarded, as a lawyer's statements in a brief are not considered part of the habeas record.[40]

Even if the credibility dispute were supported, both sides have misconstrued the impact of believability at the present stage. As the adjudicator of actual innocence, the Court is not acting as a fact-finder at the present stage. Instead, the Court examines only whether any reasonable jury could find Ms. Moore guilty after reviewing the aggregate of new and old evidence.[41] By definition, a jury could reasonably rely on either side's expert witnesses when resolving the evidentiary conflicts on the existence of trauma.

II.    Timing: Attribution of the Death to a Traumatic Episode that Had Taken Place Only Minutes Before the Loss of Consciousness

The same is not true of the resulting issue involving the timing of the traumatic episode. The State's theory was that Ms. Moore had shaken A.S. roughly within roughly

---

[38]    Sur-Reply on the Issue of Timeliness, Response to Petitioner's Motion to Expand the Record, and Response to Petitioner's Request for Evidentiary Hearing at p. 52 (June 14, 2011).

[39]    Reply in Support of Motion for Leave to Expand the Record and Hold Evidentiary Hearing on Actual Innocence at p. 8 (June 23, 2011) (citation omitted).

[40]    *See* LCvR 7.1(j).

[41]    *See supra* p. 2.

thirteen minutes of the time that he lost consciousness.[42]  There was no evidence of any abuse by Ms. Moore prior to January 13, 2004, the day that A.S. died.  And, the Information was specific in charging Ms. Moore with the commission of a murder "on or about" January 13, 2004.[43]  Thus, if Ms. Moore had not caused the injuries on January 13, 2004, the jury would have had no reason to blame her for the trauma or for murder.  In these circumstances, the timing of the death provided a critical link in the prosecution's theory of guilt.  With the new collection of expert reports, that link appears unsupportable because of the undisputed scientific evidence that the trauma would have preceded the collapse by days, weeks, or months.

A.    The Existence and Significance of Prior Injuries

As noted above, Dr. Griggs and Dr. Choi opined at trial that the traumatic injury would have immediately resulted in a loss of consciousness.[44]  But they relied at least in part on the absence of any prior traumatic episodes.[45]  The new scientific data indicates that some

---

[42]    Mr. Todd Snyder told the police on January 13, 2004, that he had left the house "around 2:45."  2 Transcript of Trial Proceedings at p. 67, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 14, 2005).  Similarly, Ms. Moore testified that she had awoken at 2:45 and that Mr. Snyder left the house within about two minutes.  3 Transcript of Trial Proceedings at pp. 173-74, 178-79, 182-83, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 15, 2005).  The fire department was contacted at 2:58 p.m. on January 13, 2004.  1 Transcript of Trial Proceedings at p. 139, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 12-13, 2005).

[43]    Information, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. filed Jan. 21, 2004).

[44]    *See supra* pp. 4-5, 7.

[45]    *See supra* pp. 4-7.

of the signs of trauma, which Dr. Griggs and Dr. Choi relied upon, had been caused days, weeks, or months before the collapse.

Indeed, the evidence is undisputed regarding:

- a prior diagnosis of a "failure to thrive,"[46]

- the existence of significant developmental delays,[47]

- a fall from a porch in October 2003, resulting in edema, contusions, and a hematoma,[48]

- two falls in December 2003, one involving a landing on a tile and concrete floor,[49]

- a fall in a cast iron tub roughly one week before A.S. died,[50] and

- observations that A.S. had appeared to be lethargic in the week preceding his death.[51]

---

[46]     Petitioner's Exhibit 31.

[47]     Petitioner's Exhibit 21 at pp. 1-2 (sworn statements by a childcare provider regarding A.S.'s developmental delays); Petitioner's Exhibit 26 at pp. 1-3 (sworn statements by a former employee of A.S.'s childcare provider about his developmental delays); Petitioner's Exhibit 38 at p. 2 (allegation by the boy's father that the "minor child [had] significant developmental and speech delays"); Petitioner's Exhibit 39 (referral from SoonerStart, Oklahoma State Department of Education, because of "motor and speech concerns" in June 2003).

[48]     Petitioner's Exhibit 11.

[49]     Petitioner's Exhibit 16; Petitioner's Exhibit 10.

[50]     Petitioner's Exhibit 6 at p. 1 (declaration of Beverly Moore).

[51]     Petitioner's Exhibit 6 at p. 1 (declaration of Beverly Moore); Petitioner's Exhibit 41 at p. 3 (declaration of Terri Moore); Petitioner's Exhibit 13 at pp. 1-2 (declaration of Edward Roth); Petitioner's Exhibit 21 at pp. 4-5 (declaration of Janus Roth); Petitioner's Exhibit 26 at p. 4 (declaration of Michelle Jones).

The Respondent does not question the existence of the falls.[52] But she does question their severity,[53] relying on:

- Ms. Moore's failure to mention the prior falls at trial and

- her "denial" to Dr. Griggs of any kind of medical history that could have explained the collapse.[54]

Ms. Moore presumably did not mention the prior falls at trial because the trial judge had specifically barred her from doing so in a ruling on the State's motion *in limine*.[55]

The Respondent's focus on the dialogue with Dr. Griggs does not affect the seriousness of the prior falls.  At trial, Dr. Griggs testified that he had asked about the boy's behavior, level of consciousness, gait, fever, and vomiting.[56]  The Petitioner reportedly answered "no" to each question.[57]  This excerpt does not supply any reason to question the

---

[52]  Sur-Reply on the Issue of Timeliness, Response to Petitioner's Motion to Expand the Record, and Response to Petitioner's Request for Evidentiary Hearing at p. 51 n.26 (June 14, 2011).

[53]  Sur-Reply on the Issue of Timeliness, Response to Petitioner's Motion to Expand the Record, and Response to Petitioner's Request for Evidentiary Hearing at p. 51 n.26 (June 14, 2011) ("Respondent submits . . . that [the prior falls] were not nearly as severe as the Petitioner now claims.").

[54]  Sur-Reply on the Issue of Timeliness, Response to Petitioner's Motion to Expand the Record, and Response to Petitioner's Request for Evidentiary Hearing at p. 51 (June 14, 2011).

[55]  *See* 3 Transcript of Trial Proceedings at p. 121, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 15, 2005); *see also* 1 Transcript of Trial Proceedings at pp. 25-26, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 12-13, 2005).

[56]  2 Transcript of Trial Proceedings at pp. 161-62, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 14, 2005).

[57]  2 Transcript of Trial Proceedings at pp. 161-62, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 14, 2005).

severity of the prior falls.  But, as discussed above, Dr. Griggs did not simply assume the absence of any significant falls in the past.  He assumed that the "child [had been] perfectly fine" until his collapse on January 13, 2004.[58]

Even if the fact-finder were to view the evidence of prior falls with a skeptical eye, it could not possibly regard A.S. as a boy in "perfectly fine" condition until January 13, 2004. If Ms. Moore had improperly downplayed A.S.'s prior problems to Dr. Griggs, she may have contributed to his and Dr. Choi's inaccurate assumptions about the boy's prior condition. But these assumptions would still be inaccurate.

The Petitioner has presented new scientific evidence suggesting that the falls in October 2003, December 2003, and early January 2004 could have resulted in the kinds of injuries relied upon by Doctors Griggs, Korber, and Choi.

As noted above, these physicians relied largely on:  (1) subdural and retinal hemorrhages, and (2) swelling of the brain.[59]  But, in an article published in 2011, Patrick Barnes, M.D. concluded that these hemorrhages and swelling could "be associated with a lucid interval."[60]

---

[58]     2 Transcript of Trial Proceedings at pp. 178-79, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 14, 2005); *see supra* p. 4.

[59]     2 Transcript of Trial Proceedings at pp. 154-57, 166, 177-78, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 14, 2005) (Dr. Griggs' testimony); *id.* at pp. 242-44, 251-54, 256-57 (Dr. Korber's testimony); 3 Transcript of Trial Proceedings at pp. 75, 82-90, 99-100, 110-11, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 15, 2005) (Dr. Choi's testimony).

[60]     Petitioner's Exhibit 30-2 at pp. 214-15, 217.

The potential for a lucid interval becomes critical with Ms. Moore's new scientific evidence that the traumatic injuries, which ultimately proved fatal, had taken place before Ms. Moore and the boy were left alone on January 13, 2004.[61] Thus, even if the jury had attributed the death to trauma, it would have had no reason to single anyone out as the caretaker who was present when the fatal injury took place.

B.    Presence of Hemosiderin and Papilledema

The age of the trauma is reflected in part in the newly expressed opinions about the presence and significance of hemosiderin and papilledema.

---

[61]    Petitioner's Exhibit 30-2 at p. 215 (observation by Dr. Barnes that "the lucid interval invalidates the premise that the last caretaker is always responsible in alleged [nonaccidental injury]"). One student commentator recently explained the significance of the timing to a conviction based on shaken-baby syndrome:

> SBS proponents maintain that any person is capable of inflicting this type of abuse "[i]n the flick of an instant," even someone of "flawless character." If this is truly the case, then evidence regarding timing of the injury is essential to a sound conviction. If an even-tempered individual with no prior history of violence is capable of such an act, and if such significant injury can in fact be produced in as little as two or three seconds, then anything but the most precise and reliable timeline leaves the possibility that someone other than the accused could be responsible. The potential for a lucid interval between injury and presentation of observable symptoms creates a possibility for alternate theories that should rise to the level of reasonable doubt in perhaps a significant number of cases. Where new science has thus created debate where near-unanimity previously existed, the potential to affect the jury verdict is high.

Comment, *Shaken to the Core:  Emerging Scientific Opinion and Post-Conviction Relief in Cases of Shaken Baby Syndrome*, 42 Ariz. St. L.J. 1305, 1324-25 (2011) (footnotes omitted).

<u>Hemosiderin:  Timing of the Bruises on the Scalp</u>

"Hemosiderin is an iron-storage protein complex found within cells."[62]  According to the Petitioner, the presence of hemosiderin shows that the trauma could not have been caused on January 13, 2004.  To evaluate this contention, the Court should consider the presence and significance of the hemosiderin.

The presence of hemosiderin appears to be undisputed, as the Respondent does not question its existence.[63]  In her microscopic examination during the autopsy, Dr. Choi noted "scattered hemosiderin" in the back of the head.[64]  Dr. Janice Jean Ophoven, who is board-certified in anatomic pathology and forensic pathology, examined the histological slides and found bruising on the back of the boy's head which "contained abundant hemosiderin containing cells."[65]

In evaluating the hemosiderin, the Court should consider its significance.  Again, the parties do not appear to disagree.  Dr. Ophoven stated under oath that the abundance of

---

[62]    Petitioner's Supplemental Reply on the Merits of the Issue of Actual Innocence, Exhibit 2 at p. 1 (June 29, 2011).

[63]    *See*, *e.g.*, Sur-Reply on the Issue of Timeliness, Response to Petitioner's Motion to Expand the Record, and Response to Petitioner's Request for Evidentiary Hearing at pp. 32-33 (June 14, 2011) (disputing the timing of the hemosiderin, but not its eventual presence).

[64]    Petitioner's Exhibit 5 at p. 11.

[65]    Petitioner's Exhibit 30 at p. 3.

16

hemosiderin containing cells indicates that the bruising "was many days or more old."[66] This

physician explained:

> [Hemosiderin] is most commonly found in macrophages, a form of white
> blood cells, and is especially abundant in situations following hemorrhage.
> When blood leaves a ruptured blood vessel (bleeding), the red blood cell dies
> and the hemoglobin of the cell is released into the extracellular space.
> Macrophages engulf the hemoglobin, which contain iron, and recycles the iron
> by creating hemosiderin. Hemosiderin-laden macrophages therefore are a sign
> of past hemorrhage and, because of the time necessary for the body to produce
> this protein complex, are indicators as to the time of the original hemorrhage.[67]

Similarly, a board certified radiologist, Dr. Julie Mack, stated that the hemorrhage on the

back of the head "appear[ed] to be an older injury given the presence of hemosiderin."[68] The

inference by Doctors Ophoven and Mack is supported by a medical textbook authored by Jan

Leestma, M.D., M.M. For example, she states that "[m]acrophages containing hemosiderin

may appear in small numbers as early as about 5 days postinjury but are generally not very

obvious until 7 days or later."[69]

Indeed, in one passage, the Respondent apparently agrees that hemosiderin would only

appear within 5-7 days of the injury.[70]

---

[66]   Petitioner's Exhibit 30 at p. 3.

[67]   Petitioner's Supplemental Reply on the Merits of the Issue of Actual Innocence, Exhibit 2
at pp. 1-2 (June 29, 2011).

[68]   Petitioner's Exhibit 28 at p. 3.

[69]   Petitioner's Exhibit 24 at p. 509.

[70]   Sur-Reply on the Issue of Timeliness, Response to Petitioner's Motion to Expand the Record,
and Response to Petitioner's Request for Evidentiary Hearing at p. 20 n.12 (June 14, 2011)
("hemosiderin can appear within five to seven days of the injury.") Elsewhere, the Respondent
suggested that she was simply assuming that hemosiderin would take five days. *See id.* at p. 20

Together, the undisputed medical evidence would indicate that the hemosiderin had taken at least days to develop. Because Dr. Choi conducted the autopsy only about 1½ days after Ms. Moore's assumed act of shaking A.S.,[71] this incident could not have caused the bruising on the back of the head.

The Respondent questions the timing of the appearance of the hemosiderin. For this line of attack, the Respondent points out that Dr. Choi had conducted the microscopic analysis on February 10, 2004, which was 28 days after the assumed act of shaking the boy.[72] However, based on the evidence comprising the habeas record, the fact-finder could not possibly conclude that the hemosiderin had appeared between Dr. Choi's beginning of the autopsy on January 15, 2004, and her microscopic examination of samples 28 days later.

Dr. Janice Ophoven provides the only evidence on this issue. She stated under oath:

> One important reason autopsies are performed as soon as possible after death is to preserve the quality of the body's tissues and get as accurate a picture as possible of the body's state at the time of death. During an autopsy, samples of biological tissue are collected. These samples are "fixed" to preserve the cells/tissue in as natural a state as possible and prevent post-mortem decay . . . . .[73] The fixation process is a multi-step process, which,

---

("even assuming that it is true that hemosiderin only appears after five days following an injury"); *id*. at p. 33 ("even assuming *arguendo* that hemosiderin only appears five days post-injury").

[71]     *See* Petitioner's Exhibit 5 at p. 1.

[72]     Sur-Reply on the Issue of Timeliness, Response to Petitioner's Motion to Expand the Record, and Response to Petitioner's Request for Evidentiary Hearing at pp. 20, 33 (June 14, 2011); *see* Petitioner's Exhibit 5 at p. 11 (Dr. Choi's signature on Feb. 10, 2004, for the microscopic examination).

[73]     Dr. Choi testified about her use of this process:

once completed, results in the creation of samples that can be examined at any point in the future and, if fixed properly, will show the biological structures in a state as close to that of the living tissue as possible - regardless of whether it is being examined one week, one month, or seven months after the autopsy.

Even if there were a problem in the fixation process, the tissue sample would not continue to produce a protein like hemosiderin because the blood cells cannot eat and metabolize after death. If anything, the samples would become degraded and the cellular structure unidentifiable.[74]

In analyzing the impact of the hemosiderin, the Court must determine the probable effect of the new evidence on the trier of fact.[75] The jury was exposed to evidence involving the presence of hemosiderin because it was noted in the report of Dr. Choi's microscopic examination as part of the autopsy.[76] But, the hemosiderin was never mentioned in opening statements, the testimony, or closing arguments.

---

So I made a fixed, which is a chemical solution, put it in there to brain tissue become a little firmer to able cut without the artifacts. So I fixed in the brain and formalin, which is chemical name is formalin solution, and then about week later I re-examined and take a section. And I see nothing inside the brain.

3 Transcript of Trial Proceedings at p. 87, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 15, 2005).

[74]    Petitioner's Supplemental Reply on the Merits of the Issue of Actual Innocence, Exhibit 2 at pp. 2-3 (June 29, 2011) (footnote omitted); *see also Gouleed v. Wengler*, 589 F.3d 976, 979 n.2 (8th Cir. 2009) ("Under a microscope, an iron stain reveals the presence of hemosiderin containing macrophages that generally appear in the area of a hemorrhage several days after an injury." (citation omitted)).

[75]    *See supra* p. 2.

[76]    *See supra* p. 16.

Together, the old and new evidence would compel the trier of fact to conclude that hemosiderin was present in a substantial quantity.  And, the Petitioner's new evidence is undisputed with respect to its significance as a sign that the bruising had been caused days earlier.

The only real question presented by the Respondent is whether the hemosiderin could have arisen after Dr. Choi's collection of tissue samples on January 15, 2004.  On this issue, the Petitioner presents unrebutted evidence from Dr. Ophoven that the hemosiderin could not have been generated after the collection of tissue samples.  Accordingly, the trier of fact would presumably credit the unrebutted evidence and conclude that the bruising on the boy's scalp had been caused by something taking place days before Ms. Moore's assumed act of shaking the boy on January 13, 2004.

<u>Papilledema:  Timing of the Abuse</u>

The term "papilledema" refers to "optic disc swelling."[77]  The Petitioner contends that papilledema was present and would have shown that the injury could not have been caused on January 13, 2004.  To evaluate this claim, the Court should consider whether papilledema was present and, if so, whether it would have shown the age of the trauma.

The presence of papilledema is undisputed.  For example, Dr. Ophoven reviewed the histapathology slides and found papilledema.[78]  There is no contrary evidence.

---

[77]    *See* Petitioner's Exhibit 17 at p. 4 (identifying papilledema as "optic disc swelling").

[78]    Petitioner's Exhibit 30 at pp. 4-5.

Indeed, Dr. Ophoven's conclusion is consistent with the trial evidence.  For example, an unidentified pediatric neurologist stated, shortly before A.S. was declared to be brain-dead, that his "[f]undi [interior surfaces of the eye] [were] remarkable for disc swelling."[79] This physician did not say whether the swelling had involved the optic nerves, which is necessary for a finding of papilledema.[80]  But, the Petitioner has presented expert testimony stating that this notation of swollen "fundi" was "consistent" with a finding of papilledema.[81] The Respondent has not pointed to any contrary evidence.

The resulting inquiry involves the significance of the papilledema.  The Petitioner presents unrebutted evidence that the eye injury had taken place at least days before the assumed shaking episode on January 13, 2004.

For example, Dr. Ophoven stated under oath:

Papilledema typically takes days to develop and is associated with prolonged increase in intracranial pressure.  The presence of papilledema is not typically seen in cases of acute head injury and is consistent with the symptomology reported by witnesses in the days prior to [A.S.'s] collapse.[82]

Similarly, Dr. Gardner stated under oath:   "Papilledema takes time to develop, generally at least three days and oftentimes longer.  It is therefore not associated with acute

---

[79]     Petitioner's Exhibit 20 at p. 12.

[80]     *See supra* p. 20.

[81]     Petitioner's Exhibit 17 at p. 4 (report by Horace Gardner, M.D., J.D.); *cf. Porter v. Whitehall Laboratories, Inc.*, 9 F.3d 607, 609 (7th Cir. 1993) (defining "papilledema" as "swelling of the fundi of the eyes").

[82]     Petitioner's Exhibit 30 at p. 5.

injuries."[83]  Thus, Dr. Gardner inferred that the boy's injury had taken place "several days" before his admission to the hospital.[84]

Finally, Jan Leestma, M.D., M.M.  stated:

> The forensic significance of papilledema is one of aging and dating intracranial processes.  Because it generally takes a week or more of increased intracranial pressure to produce papilledema, its presence, often with collateral observations of mass lesions or intracranial pressure increase, indicates chronicity of the process.  This issue often arises in cases of alleged child abuse where injuries are thought to be acute and may not be when papilledema is encountered.[85]

Doctors Ophoven, Gardner, and Leestma present opinions that were not addressed by the State at the trial or by the Respondent in these habeas proceedings.  Thus, the jury would presumably credit the undisputed opinions of the three medical experts and conclude that the optic swelling would have shown that the trauma had taken place days before Ms. Moore and the boy were left alone on January 13, 2004.

C.    Perl's Positive Material

The age of the trauma is also reflected in the undisputed presence of Perl's positive material in the blood when A.S. collapsed.  The parties appear to agree that A.S. had experienced subdural bleeding.  For example, at the trial, Dr. Choi testified that the boy had a "subdural hematoma," which she described as bleeding between the brain's surface and a

---

[83]    Petitioner's Exhibit 17 at p. 4.

[84]    Petitioner's Exhibit 17 at pp. 6-7.

[85]    Petitioner's Exhibit 24 at p. 365.

protective membrane.[86] Dr. Waney Squier, a neuropathologist, reviewed the tissue samples from the autopsy and expressed the opinion that the blood on the subdural surface was positive for "Perl's" material.[87] This physician stated that "Perl's positive material" usually implies bleeding at least two to three days before the death.[88]  Doctors Squier and Mack elsewhere explained:

> Blood clot in the subdural compartment induces a series of tissue responses.  In the first days after bleeding macrophages enter the clot and lysis begins.  Red cells lose their shape.  Haemoglobin is converted to haemosiderin which can be identified with Perl's stain from about 2 to 4 days.[89]

With the presence of Perl's positive material, Dr. Squier concluded that the dural bleeding indicated that the fatal impact had taken place "at least several days" before January 13, 2004.[90]

Again, there is no evidence in the habeas record to dispute Dr. Squier's conclusions based on the presence of Perl's positive material.  These conclusions - along with the undisputed presence of hemosiderin and papilledema - would leave the jury without any scientific basis to believe that the fatal trauma could have been inflicted on January 13, 2004, when Ms. Moore and the boy were left alone.

---

[86]     3 Transcript of Trial at p. 82, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 15, 2005).

[87]     Petitioner's Exhibit 40 at p. 5.

[88]     Petitioner's Exhibit 40 at p. 5.

[89]     Petitioner's Exhibit 28 at p. 5.

[90]     Petitioner's Exhibit 40 at p. 9.

D.  Vitreous Hemorrhaging

The age of the trauma is also reflected in the undisputed evidence of vitreous hemorrhaging.  As noted above, the State's trial evidence included testimony by Dr. David Korber.[91]  Dr. Korber testified that there was bleeding into the vitreous cavity[92] in both eyes.[93]  Dr. Gardner opined that vitreous hemorrhaging takes time to develop and would indicate that the fatal injury had preceded the ocular examination on January 14, 2004, by "days, if not longer."[94]  Again, the habeas record is devoid of any evidence to the contrary.

E.  Breakdown of the Auto-Regulation System

The age of the trauma is also reflected in the undisputed scientific evidence of the complete breakdown of the boy's auto-regulation system.  The State's trial evidence reflected a breakdown of A.S.'s auto-regulation system by the time he had arrived at the hospital.[95]  Dr. Janice Ophoven opined that the child's auto-regulation system typically would take much

---

[91]  *See supra* pp. 5-6.

[92]  "The vitreous is a gelatinous body of matter that fills the part of the human eyeball between the lens and retina."  *Teller v. Schepens*, 518 N.E.2d 868, 869 n.1 (Mass. App. Ct. 1988); *see also* 2 Transcript of Trial Proceedings at p. 248, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 14, 2005) (Dr. Korber's trial testimony that the "vitreous" is the "[j]elly material").

[93]  2 Transcript of Trial Proceedings at pp. 243, 250-51, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 14, 2005).

[94]  Petitioner's Exhibit 17 at pp. 6-8.

[95]  2 Transcript of Trial Proceedings at pp. 149-50, 173-74, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 14, 2005) (Dr. Griggs' testimony that by the time of his arrival at the hospital, A.S. had stopped breathing, the heart had stopped, and there was no blood pressure).

longer to fail after an injury to the brain.[96]  Thus, she concluded that the brain injury would have been sustained one or more days before January 13, 2004.[97]

Again, there is no evidence to rebut Dr. Ophoven's conclusions.  The trial evidence did not cover this issue, and the Respondent has not presented any opposing evidence.  Thus, Dr. Ophoven's opinion is undisputed regarding the likelihood that the auto-regulation system had failed prior to January 13, 2004.

> F.    The Aggregate Assessment of the Timing Based on the Combination of Old and New Evidence

When the new and old testimony is considered together, the record is uncontested regarding the passage of days between any traumatic episode and the boy's death.  Three witnesses addressed the issue at trial.  Two - Doctors Griggs and Choi - indicated that the boy would have lost consciousness quickly after a traumatic episode.  But both doctors assumed

---

[96]    Petitioner's Exhibit 30 at p. 3.

[97]    Petitioner's Exhibit 30 at p. 3.  Dr. Ophoven also concluded that the level of brain swelling would have taken days to develop.  *Id*.  She explained that brain swelling following serious brain damage typically peaks at 48 to 72 hours.  *Id*. at p. 6. Dr. Squier provided a similar opinion, stating that "brain swelling following trauma may take between 24 - 72 hours to reach its maximum." Petitioner's Exhibit 40 at p. 8 (citation & footnote omitted).  At trial, Dr. Choi had apparently drawn the opposite conclusion from the advanced stage of brain swelling.  She was asked: "And you feel comfortable with that within a reasonable medical certainty that we're talking rapidly within minutes?"  3 Transcript of Trial Proceedings at p. 99, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 15, 2005).  She answered: "That's what I – yes, minutes. In this particular case amount of the brain swelling that could have be quickly may come." *Id*. at p. 100.  At the trial, this testimony went undisputed.  The new declarations by Dr. Ophoven and Dr. Squier would contradict Dr. Choi on a key piece of medical evidence that had gone undisputed at the trial.  With her testimony, the jury had uncontradicted evidence that would have suggested the passage of only minutes between the injuries and the loss of consciousness.  The new declarations by Dr. Ophoven and Dr. Squier would create a classic "battle of the experts" on whether the advanced stage of brain-swelling would have suggested days, rather than minutes, before A.S. lost consciousness.

that A.S. had not experienced any significant falls prior to January 13, 2004.[98]  That belief

is mistaken in light of the undisputed evidence of falls in October 2003, December 2003, and

early January 2004 and reports of lethargy following the latest fall.[99]

The Petitioner's new evidence involves uncontroverted evidence regarding the

complete breakdown of the boy's auto-regulation system and the presence of hemosiderin,

papilledema, Perl's positive material, and vitreous hemorrhaging.  All of this evidence would

have reflected trauma days, weeks, or months before the shaking incident on January 13,

2004.

The Respondent questions the new experts' credibility based on:

- their bias to the Petitioner because she was the one responsible for their payment and

- they never saw or touched A.S., unlike Dr. Choi, Dr. Korber, and Dr. Griggs.

In projecting the impact of the new medical reports, the Court can consider vulnerabilities

to the credibility of Doctors Mack, Squier, Ophoven, Barnes, and Gardner.[100]  But here, the

credibility challenges are unsupported or irrelevant.

The Respondent lacks any evidence regarding whether Doctors Mack, Squier, and

Barnes are being paid or are waiving compensation.  The Respondent's attorneys imply that

---

[98]     *See supra* pp. 4-7.

[99]     *See supra* pp. 12-14.

[100]    *See supra* p. 10.  As discussed above, the age of the trauma is also shown by the published work of Jan Leestma, M.D., M.M.  *See supra* p. 22.  Dr. Leestma was not engaged by the Petitioner, and there has been no criticism of this physician's opinions.

the experts are being paid, but a lawyer's statements in a brief are not part of the habeas record.[101]

The Court could arguably take judicial notice of the fact that it had authorized payment to Dr. Gardner and one forensic pathologist under the Criminal Justice Act.[102] But these payments came from the federal government rather than Ms. Moore or her attorney. It is difficult to see how the federal government's advance payments to two of the expert witnesses would have induced them to favor Ms. Moore in their opinions.

The new experts presumably never examined or touched A.S., as the Respondent says.[103] However, three of the experts did examine parts of the boy's body. For example, Doctors Ophoven and Squier stated that they had examined A.S.'s tissue samples.[104] And Dr. Gardner examined the slides from the eyes which had been removed during the autopsy.[105]

---

[101]   *See supra* p. 10.

[102]   Order (Nov. 18, 2010); Order (Mar. 4, 2011).  The Respondent has not referred to these orders, and the Court has not notified the parties of the possibility of judicial notice.  *See* Fed. R. Evid. 201(e) ("A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed.").  The Court need not decide the propriety of judicial notice in these circumstances.  *See supra* text accompanying note.

[103]   Sur-Reply on the Issue of Timeliness, Response to Petitioner's Motion to Expand the Record, and Response to Petitioner's Request for Evidentiary Hearing at p. 32 (June 14, 2011).

[104]   Petitioner's Exhibit 30 at pp. 1, 8; Petitioner's Exhibit 40 at p. 3.

[105]   Petitioner's Exhibit 17 at p. 5.

For the remaining experts, the Petitioner's criticism is misguided because the Respondent has not presented any evidence to rebut the new proof regarding the age of the trauma. The undersigned has not questioned any of the trial witnesses' testimony about the presence of traumatic injury or even the diagnosis of shaken baby syndrome.[106] On the issue of timing, however, Doctors Mack, Barnes, Squier, Gardner, and Ophoven have taken the medical findings from the State's expert witnesses, who had examined A.S., and opined about the time that would have elapsed between the infliction of a traumatic injury and death. The Respondent has not supplied any reason to question these opinions based on the new experts' inability to examine or touch the boy.

This undisputed evidence of hemosiderin, papilledema, vitreous hemorrhaging, Perl's positive material, and complete breakdown of the auto-regulation system would prevent any reasonable jury from finding beyond a reasonable doubt that A.S. had died from traumatic injuries inflicted on January 13, 2004. Without such a finding, the jury would have had no basis to find that Ms. Moore had done anything to cause the boy's death.[107]

III.   Impact of Ms. Moore's Admissions to the Police

In a police interview, Ms. Moore admitted that she had shaken A.S. three to four times while the two were alone on January 13, 2004.[108] The Petitioner challenges the believability

---

[106]    *See supra* pp. 3-7.

[107]    *See supra* p. 15 & note 61.

[108]    Court's Exhibit 1, State's Exhibit 48, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct.); Petitioner's Exhibit 29 at pp. 32-33.

28

of this admission with new evidence involving sexual abuse that she had suffered as a child,[109] empirical data regarding the unreliability of police-induced confessions,[110] testimony regarding the unreliability of Ms. Moore's admissions to police,[111] and reference to an incident in which she had accepted the blame for something done by another person.[112]  The Petitioner's argument is unconvincing because:   (1) her version of the shaking was inconsistent with the law enforcement officers' suggestions about what had taken place; (2) the new explanation for her admissions conflicted with her sworn testimony; and (3) the jury could reasonably believe her admissions to law enforcement even with the newly presented evidence.

The Petitioner stated in a declaration that her psychological make-up had made her vulnerable to acquiesce in the policemen's version of events.[113]  But her account differed from the version of events suggested in the policemen's questioning.  They suggested that Ms. Moore had lost her temper and repeatedly shaken A.S. out of frustration.[114]  But Ms.

---

[109]     Petitioner's Exhibit 34 at p. 7; Petitioner's Exhibit 6 at pp. 4-5.

[110]     Petitioner's Exhibit 27.

[111]     Petitioner's Exhibit 34.

[112]     Petitioner's Exhibit 6-C at p. 1.

[113]     Petitioner's Exhibit 6 at pp. 4-5.

[114]     Court's Exhibit 1, State's Exhibit 48, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct.); Petitioner's Exhibit 29 at p. 21.

Moore insisted that she had not lost her temper and had shaken the boy mildly only three or four times.[115]

The Petitioner's current explanation also appears inconsistent with the one she had given at trial.  There she was asked why she had told the police that she had shaken A.S.[116] Ms. Moore answered that she had admitted to shaking the boy so that Mr. Snyder could return to the hospital to remain with his son as he lay dying.[117] Thus, if the jury had the new evidence together with the old, it could reasonably regard Ms. Moore's explanations as inconsistent.

Ms. Moore's current explanation for her admissions to law enforcement, even if believed, would not have compelled an acquittal.  If a reasonable jury were to disregard the inconsistencies between Ms. Moore's accounts, it could conceivably disbelieve her admission that she had shaken A.S. on January 13, 2004.  But, as noted above, the present issue is whether any reasonable juror could have found guilt with the old and new evidence.[118] Notwithstanding the Petitioner's new evidence, a jury could reasonably believe Ms. Moore's admission to the police.

---

[115]    *See* Court's Exhibit 1, State's Exhibit 48, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct.); Petitioner's Exhibit 29 at p. 37; *see also supra* p. 28.

[116]    3 Transcript of Trial Proceedings at p. 156, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 15, 2005).

[117]    3 Transcript of Trial Proceedings at pp. 156, 158-60, 202, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 15, 2005).

[118]    *See supra* p. 2.

The resulting question is how Ms. Moore's admission could have affected the jury's determination of guilt or innocence.  On the videotape, Ms. Moore illustrated the three or four shakes that she had admittedly administered on January 13, 2004.[119]  With the new medical evidence, no reasonable jury could have found beyond a reasonable doubt that A.S. had died from these three or four shakes.  Indeed, at the trial, the prosecution elicited testimony from Dr. Griggs that even he did not believe that A.S. could have died from these three or four shakes.[120]

Still, the Petitioner's admissions to law enforcement could not have supported a guilty verdict if the jury were to have the benefit of the new evidence on the timing of A.S.'s fatal injuries.  With Ms. Moore's admissions, the jury could have believed that she had shaken the boy three or four times on the day that he died.  For murder, however, the jury would have needed to tie an action by Ms. Moore to the traumatic injury that had ultimately caused A.S.'s death.[121]  The sole reason for the jury to find this connection was, as the police told Ms. Moore in the interrogation, the fact that she had been the last person to be alone with A.S. before he died.[122]  That fact bore relevance only because the jury had uncontested

---

[119]    3 Transcript of Trial Proceedings at p. 46, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 15, 2005); Court's Exhibit 1, State's Exhibit 48, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct.).

[120]    2 Transcript of Trial Proceedings at pp. 192, 226-27, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 14, 2005).

[121]    *See* Okla. Stat. tit. 21 § 701.7(A) (2001) (definition of first-degree murder).

[122]    Court's Exhibit 1, State's Exhibit 48, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct.); Petitioner's Exhibit 29 at pp. 20-21.

evidence that the traumatic injuries would have caused the death within minutes to a perfectly healthy child.  A reasonable jury would not possibly regard A.S. as perfectly healthy or regard the loss of consciousness as immediate with the benefit of Ms. Moore's new evidence of the breakdown of the auto-regulation system and the significance of A.S.'s hemosiderin, papilledema, Perl's positive material, and vitreous hemorrhaging.

IV.    Impact of Ms. Moore's Other Alleged Admissions and Actions

At trial, Ms. Moore admitted that she had apologized to Mr. Todd Snyder[123] and the State presented evidence of her reluctance to go to the hospital for fear that she would be arrested and be unable to see her son,[124] that she insisted on changing her shirt before going to the hospital,[125] that she had not performed CPR on A.S. as she testified,[126] that she was stoic when the ambulance personnel arrived,[127] that she had lied about being asleep before

---

[123]    3 Transcript of Trial Proceedings at pp. 146, 188, 193, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 15, 2005).

[124]    1 Transcript of Trial Proceedings at pp. 72-73, 95-96, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 12-13, 2005).

[125]    1 Transcript of Trial Proceedings at p. 73, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 12-13, 2005); *see also* 3 Transcript of Trial Proceedings at p. 148, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 15, 2005) (Ms. Moore's admission that she had changed her shirt before she went to the hospital).

[126]    1 Transcript of Trial Proceedings at pp. 136, 148, 160-61, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 12-13, 2005).

[127]    2 Transcript of Trial Proceedings at pp. 16, 19-20, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 14, 2005).

Mr. Snyder left the house,[128] and that she had lied to paramedics about leaving the boy's body where it had been when he fell.[129]

This evidence could lead a fact-finder to infer consciousness of guilt, which ordinarily would be incriminating. But her innocence does not turn on whether Ms. Moore had shaken A.S. on January 13, 2004. As discussed above, she told the police she had shaken the boy and the fact-finder could believe that admission even with her new evidence.[130] Still, no reasonable jury could have found guilt of murder without some reason to believe the actions on January 13, 2004, had contributed to the death. Doctors Mack, Barnes, Squier, Ophoven, and Gardner have uniformly opined, based on the medical findings of the State's own expert witnesses, that the fatal injuries would have preceded January 13, 2004, by days, weeks, or months.

The only persons to express a different conclusion were Doctors Griggs and Choi, and both assumed for their opinions that A.S. had been a perfectly healthy child before January 13, 2004.[131] And, of course, they thought so only because Dr. Griggs had either misunderstood or Ms. Moore had given misinformation.[132] But no one disputes the evidence

---

[128]    1 Transcript of Trial Proceedings at p. 78, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 12-13, 2005).

[129]    2 Transcript of Trial Proceedings at pp. 21-22, 54-56, *Oklahoma v. Moore*, Case No. CF-2004-351 (Okla. Co. Dist. Ct. Sept. 14, 2005).

[130]    *See supra* pp. 28-30.

[131]    *See supra* pp. 3-7.

[132]    *See supra* pp. 13-14.

of: (1) falls in October 2003, December 2003, or January 2004; (2) the existence of significant developmental delays; and (3) lethargy in the week preceding A.S.'s death. With this undisputed evidence, no reasonable juror would have accepted the testimony of Doctors Griggs and Choi regarding the immediacy of the fatal injuries. Without this testimony, the jury would have had no basis to tie A.S.'s death to anything that Ms. Moore had done on or about January 13, 2004, as charged in the Information.[133] The omission of any such evidence on this crucial link in the prosecution's case would have required any reasonable jury to find Ms. Moore not guilty with the benefit of the old and new evidence. Thus, Ms. Moore has shown her actual innocence on the charged offense and that innocence entitles her to avoid the time-bar.

## Notice of the Right to Object

The parties can object to the present report and recommendation. Any such objection must be filed with the Clerk of this Court by September 26, 2011.[134] The failure to timely object would foreclose appellate review of the suggested ruling.[135]

---

[133]    *See supra* pp. 10-11, 15.

[134]    *See* Fed. R. Civ. P. 6(a)(1)(C), 6(d), 72(b)(2); 28 U.S.C. § 636(b)(1) (2009 supp.).

[135]    *See Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991); *cf. Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996) ("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived.").

<u>Status of the Referral</u>

This referral is discharged.  If the proposed findings and conclusions are adopted, the undersigned would suggest recommitment for consideration on the merits.

Entered this 7th day of September, 2011.


_____
Robert E. Bacharach
United States Magistrate Judge

35