## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

BEVERLY MICHELLE MOORE,   )
         )
      Petitioner,  )
         )    Case No. CIV-09-985-G
vs.         )
         )
DEBBIE ALDRIDGE, WARDEN,   )
         )
      Respondent.  )

## BRIEF IN SUPPORT OF SECOND AMENDED PETITION
## FOR WRIT OF HABEAS CORPUS

Respectfully Submitted,


s/Christine Cave
Christine Cave, OBA #19774
Employers Legal Resource Center
3500 S. Boulevard, Suite 14-B
Edmond, OK 73013
Phone: 405-702-9797
Fax:    405-576-3956
Email:
mainoffice@okemployerlaw.com
**ATTORNEY FOR PETITIONER**

**TABLE OF CONTENTS** ...................................................................................ii.

**TABLE OF AUTHORITIES**..........................................................................iii

**FACTUAL BACKGROUND** ............................................................................1

**PROCEDURAL HISTORY** .............................................................................20

**PROPOSITIONS** ..............................................................................................27

1. Petitioner has exhausted her claims ..............................................27

2. Petitioner is entitled to de novo review of her claims.................27

3. Effect of previously-found facts and law to review ....................29

    a.   Factual findings and legal conclusion of this Court.................29

    b.   Factual findings of the state court ...........................................30

    c.   Effect of state factual findings ...............................................33

        i.   Because the OCCA found that the claim was procedurally barred, the state trial judge was in error when it made factual findings ......................................................33

        ii.   If the presumption of correctness applies to the state's factual findings, Petitioner can rebut the presumption by clear and convincing evidence...................34

4. Petitioner can establish facts sufficient to support her constitutional claims ............48

    a.   Deficient Performance of Trial Counsel....................................48

    b.   Conflict of Interest of Trial Counsel ........................................65

    c.   Brady claim..................................................................................76

    d.   Deficient Performance of Appellate Counsel Claims..............77

**CONCLUSION**................................................................................................81

# TABLE OF AUTHORITIES

Cases

*Alexander v. Rice,*
264 F.3d 878, 886-87 (9th Cir. 2001) .................................................................. 71, 79

*Allen v. State,*
1994 OK CR 30, ¶ 11; 874 P.2d 60, 64 ............................................................... 67

*Alverson v. Workman,*
595 F.3d 1142, 1146 (10th Cir. 2010) ................................................................. 28

*Banks v. State,*
1991 OK CR 51, ¶ 34, 810 P.2d 1286, 1296. ...................................................... 67

*Barton v. Warden,*
786 F.3d 450, 462-464 (6th Cir. 2015) ............................................................... 28

*Bourjaily v. United States,*
483 U.S. 171 (1987). ........................................................................................... 67

*Brady v. Maryland,*
373 U.S. 83 (1983) .............................................................................................. 77

*Cave v. Singletary,*
971 F.2d 1513, 1518 (11th Cir. 1992) ................................................................. 31

*Commonwealth v. Epps,*
53 N.E.3d 1247, 1259-1262 (Mass. 2016) .......................................................... 56

*Cuyler v. Sullivan,*
446 U.S. 335 (1980) ............................................................................................ 66

*Cuyler v. Sullivan,*
466 U.S. 335, 344 (1980) .................................................................................... 66

*Dendel v. Washington,*
647 Fed. Appx. 612 (6th Cir. 2016) .................................................................... 58

*Douglas v. Workman,*
560 F.3d 1156, 1170 (10th Cir. 2009) ................................................................. 28

*Harrington v. Richter*,
562 U.S. 86, 106 (2011) ................................................................................................. 56

*Herrera v. Lemaster*,
225 F.3d 1176, 1178 (10th Cir. 2000) ......................................................................... 31

*Hinton v. Alabama*,
 __ U.S. __, 134 S.Ct. 1081, 1088 (2014) .................................................................... 49

*Hobdy v. Raemisch*,
 ___ F.3d ___, Case No. 18-1047, p. 30 (10th Cir. Feb. 19, 2019) ........................... 31

*Hooks v. State*,
902 P.2d 1120, 1124 (Okla. Crim. App. 1995) .......................................................... 78

*In re Trombadore*,
 201 B.R. 710, 713 (D.N.J. 1996) ................................................................................ 31

*Jackson v. Oklahoma*,
2001 OK CR 37, ¶ 24, 41 P.3d 395, 400 .................................................................... 49

*Johnson v. Williams*,
568 U.S. 289, 302 (2013) .............................................................................................. 28

*Jones v. Barnes*,
463 U.S. 745, 754 (1983) .............................................................................................. 78

*Kyles v. Whitley*,
514 U.S. 419, 437 (1995) .............................................................................................. 77

*Lambert v. Blackwell*,
175 F. Supp. 2d 776, 787 (E.D. Pa. 2001) ................................................................ 33

*Laschewitsch v. Lincoln Life & Annuity Distribs., Inc.*,
 47 F. Supp. 2d 327, 334 (E.D.N.C. 2014 .................................................................. 31

*Livingston v. State*,
1995 OK CR 68, ¶ 11, 907 P.2d 1088, 1091 ............................................................ 67

*McLuckie v. Abbott*,
337 F.3d 1193, 1198 (10th Cir. 2003) ....................................................................... 64

*Mickens v. Taylor*,
240 F.3d 348, 360 (4th Cir. 2001),
*aff'd*, 535 U.S. 162, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002) ............................................68

*Mickens v. Taylor*,
535 U.S. 162, 172 n.5 (2002)...................................................................................67

*New Jersey v. Cottle*,
946 A.2d 550, 559 (2008) .......................................................................................71

*Paine v. Massie*,
339 F.3d 1194, 1200 (10th Cir. 2003) ....................................................................50

*People v. Ackley*,
870 N.W.2d 858, 863 (Mich. 2015) ........................................................................56

*People v. Edebohls*,
944 P.2d 552, 556 (Colo. App. 1996) .....................................................................68

*Quintero v. United States*,
33 F.3d 1133, 1135 (9th Cir. 1994) .........................................................................74

*Rompilla v. Beard*,
 545 U.S.  374, 390 (2005) ......................................................................................48

*Schlup v. Delo*,
513 U.S. 298, 329 (1995)........................................................................................64

 *In re Priceline.com Inc. Securities Litigation*,
342 F. Supp. 2d 33, 47 (D. Conn. 2004) ................................................................31

*Silva v. Woodford*,
279 F.3d 825, 835 (9th Cir. 2002). .........................................................................29

*Smith v. State*,
2006 OK CR 38, ¶ 38, 144 P.3d 159, 167...............................................................51

*State v. Aragon*,
216 P.3d 279, 281 (N.M.C.A. 2009) .......................................................................55

*Stoia v. United States,*
22 F.3d 733 (7th Cir. 1994) .....................................................................................66

*Stouffer v. Reynolds,*
168 F.3d 1155, 1161 (10th Cir. 1999) ..................................................67

*Strickland v. Washington,*
466 U.S. 668, 698 (10th Cir. 1984) .....................................................30

*Strickler v. Greene,*
527 U.S. 263, 283 n. 23 (1999) ............................................................77

*Thomas v. Horn,*
570 F.3d 105, 114-15 (3d Cir. 2009) ....................................................28

*United States v. Arny,*
831 F.3d 725, 732 (6th Cir. 2016) .......................................................50

*United States v. Bowie,*
892 F.2d 1494, 1500 (10th Cir. 1990) ..................................................76

*United States v. Bowie,*
892 F.2d 1494, 1500 (10th Cir. 1990). ................................................68

*United States v. DeFalco,*
644 F.2d 132, 134 (3d Cir. 1980) .................................................. 71, 79

*United States v. Levy,*
25 F.3d 146, 156 (2nd Cir. 1994) ................................................. 71, 79

*United States v. McKeighan,*
685 F.3d 956, 966 (10th Cir. 2012) .....................................................68

*United States v. Monsisvais,*
946 F.2d 114 (10th Cir. 1991) ..............................................................29

*United States v. Pizzonia,*
415 F. Supp. 2d 168, 176 (E.D.N.Y. 2006). ........................................69

*United States v. Rodrigues,*
347 F.3d 818 (9th Cir. 2003) ................................................................76

*United States v. Trent,*
884 F.3d 985 (10th Cir. 2018) ..............................................................29

*Wheat v. United States,*
486 U.S. 153, 158-159 (1988) ..............................................................66

*Wiggins v. Smith*,
539 U.S. 510, 511, (2003)...........................................................................48

*Williams v. Alabama*,
791 F.3d 1267, 1273 (11th Cir. 2015) .......................................................28

*Williams v. Taylor*,
529 U.S. 362, 391 (2001).............................................................................48

*Williamson v. Ward*,
110 F.3d 1508, 1513 (10th Cir. 1997) ........................................................30

*Wood v. Allen,*
558 U.S. 290, 291 (2010) .............................................................................30

*Wood v. Georgia*,
450 U.S. 261, 2710 (1981).............................................................................65

*Wood v. Milyard*,
721 F.3d 1190, 1194 (10th Cir. 2013) ........................................................28

*YIst v. Nunnemaker*,
501 U.S. 797, 799-800 (1991) .....................................................................28

**Rules**

*Oklahoma Rules of Professional Conduct*  Okla. Stat. tit. 5, Ch.1, App. 3-A (2001)..... 74, 81

*American Bar Association Criminal Standards for the Defense Function, 4th ed* ................75

*Rules Governing Disciplinary* Proceedings, Okla. Stat. tit. 5, Ch. 1, App. 1-A.  (2001) ......76

## FACTUAL BACKGROUND

At 2:58 p.m. on January 13, 2004, Beverly Moore frantically called 911, telling the emergency workers that her boyfriends' son, A.S., had fallen, had a bump on the back of his head, and was only "sort of" breathing.  Her boyfriend, Todd Snyder, had left their home only a few minutes prior, sometime around 2:45 or shortly thereafter. A.S. had been upset that his father left so Ms. Moore held him, attempting to comfort him. He was still fussy when Ms. Moore set him down and told him to go play with his toys, hoping that would distract him. Instead, A.S. walked into the kitchen, around a corner. About the time Ms. Moore called to him to come out of the kitchen, she heard a noise. She went into the kitchen and found A.S. lying on the floor with his tongue clenched between his teeth.  She tried to arouse him but he was unresponsive.  She unclenched his tongue and began rounds of CPR and mouth to mouth. When that was unsuccessful, she carried him to the living room, grabbed the phone, and called 911.

The fire department, and then EMSA, quickly responded.  Within about fifteen minutes of the time the 911 call was placed, A.S. was loaded in the ambulance and was speeding towards Baptist Integris Medical Center (IBMC).  En route, A.S.'s heart stopped beating, resuming only after the administration of CPR and heart-stimulating drugs, and just as the ambulance arrived at IBMC at 3:22 p.m.

At approximately 3:37 p.m., a CT scan was performed on A.S.'s brain, which showed diffuse loss of gray/white differentiation consistent with diffuse cerebral edema. Also noted on the CT scan was a "tiny posterior interhemispheric central hematoma". There was no evidence of any skull fracture or external trauma. Although the treating

1

physician believed he felt a bump on the back of A.S.'s head, he later concluded that this was a normal skull formation. Family and close friends were called into a conference with A.S.'s primary physician. During this meeting, A.S.'s daycare provider, Ms. Janus Roth. specifically asked the doctor whether A.S.'s injuries could be attributed to prior falls or a possible seizure disorder, to which the doctor replied that they "just didn't know." A.S. did not recover and was pronounced brain dead approximately 26 hours after hospital admission.

The medical providers immediately suspected child abuse. Dr. Griggs, A.S.'s treating physician, began suspecting that A.S. was the victim of shaken baby syndrome (SBS) while conducting his initial examination of A.S. – based on the absence of external trauma, a history presented by the intake nurse (relating a story of unknown origin regarding A.S. rolling off a couch), and the presence of bilateral retinal bleeding. Shortly after A.S.'s admission, the police were contacted.

Merely hours after Ms. Moore called 911 – and after the homicide detectives met with the treating pediatrician at his insistence – Ms. Moore and Mr. Snyder were transported to the police station for questioning. Prior to beginning the interview with Ms. Moore, the police read Ms. Moore her *Miranda* rights. In response to whether Ms. Moore understood the rights, she answered, "I guess." Neither officer followed up to see why gave an unequivocal response. Similarly, when asked if, in light of her rights she wanted to waiver her rights and speak with the detectives, Ms. Moore did not answer, instead asking if she was under arrest. The detective's response, "Not Yet."

During the interview of Mr. Snyder and the interrogation of Ms. Moore, the police repeatedly maintained that A.S.'s injuries were definitely caused by SBS, and that Ms. Moore was the perpetrator because the shaking would have caused *immediate* brain damage. Ms. Moore repeatedly denied any wrongdoing, but the police told her she was lying and that what she reported was a medical impossibility.  Ms. Moore remarked that it appeared from the interrogation that she'd "be in jail no matter what [she] told" the detectives.  To which the police responded that "the truth is what . . . determines that." Throughout the interrogation, the police suggested that Ms. Moore would be "better off" if she told the detectives "the truth" (that she shook A.S.) and would "end up better off" if she did so.  The detectives also stressed that she should show her love to Todd and A.S. by "acknowledging what occurred."

At some point during the interview, Ms. Moore succumbed to the police pressure to provide a version of events that included her having shaken A.S. In this version, she says that she sent A.S. to "the room" and when he didn't stop crying, she "shook him" about 3 or 4 times.  Upon inquiry about how the knot got on A.S.'s head (the one later determined to be part of A.S.'s normal skeletal formation), Ms. Moore suggests that A.S. was laying on the floor when she shook him and "guess[es]" that his head hit the floor once or twice. Throughout the interrogation, Ms. Moore offers little, if any additional "details" that would independently corroborate her story, instead just responding to the cues given to her by the officers.  Notably, Ms. Moore repeatedly denies ever having lost her temper or having shook A.S. hard.

Ms. Moore was arrested for A.S.'s murder.  She was charged via Information with First Degree Murder by, "on or about the 13th day of January 2004 . . . willfully or maliciously injur[ing] . . . or using unreasonable force upon a child under the age of eighteen, specifically": A.S., thereby causing his death.

Ms. Moore's defense was initially assigned to then-assistant public defender, Jennifer Richard ("Attorney Richard"). After reviewing the police file and meeting with Petitioner, Attorney Richard conducted extensive research into shaken baby cases and consulted with an organization in California that assisted lawyers in defending those types of cases, Second Chair Services. Based on the recommendation from Second Chair Services, Attorney Richard secured funds to hire an expert witness; she also interviewed witnesses with knowledge of both the child's family and Ms. Moore, took steps to secure a copy of relevant 911 calls, and collected medical records and day-care records on A.S.

In approximately January 2005, Petitioner's mother contacted Attorney Funderburk at his father's behest and discussed him representing Petitioner; at that time Attorney Funderburk cut his fee from a previously-quoted (in January 2004) $75,000 to $35,000. Petitioner met with Attorney Funderburk and decided to hire him after he expressed unwavering confidence that he would be driving her home to San Antonio at the conclusion of the trial. Attorney Funderburk told Petitioner that he believed she was innocent and assured Petitioner and her mother that he would get a favorable outcome.  On February 10, 2005, Petitioner executed a contract to retain Isaac Funderburk and Attorney David Slane ("Attorney Slane") to defend her in the State v. Beverly Michelle Moore, Case No. CF-2004-0351.

Isaac Funderburk had been admitted as an attorney member of the Oklahoma Bar Association in the fall of 2001 and practiced primarily criminal defense. Prior to becoming a lawyer, Attorney Funderburk had served approximately three years' in federal prison for conspiracy to distribute cocaine and a firearm charge, the latter of which was later voided. Attorney Funderburk never disclosed his prior felony to Petitioner.

When Mr. Funderburk agreed to represent Petitioner, he had never before tried a child murder case.  He solicited the assistance of Attorney Slane. Attorney Funderburk told the Oklahoma Bar Association that he, and he alone, was involved in preparing Petitioner's case for trial; Mr. Slane was to assist at the trial itself.  According to Attorney Funderburk and consistent with the understanding of Petitioner and her family, Attorney Slane was not involved in the pretrial stages of the case.  Neither the family nor Petitioner's appointed contact person, Janus Roth, had any communication with Attorney Slane prior to trial, nor did they have his contact information to have made such contact.

When Attorney Funderburk and Attorney Slane entered their appearances as counsel for Petitioner, Attorney Richard provided Attorney Funderburk the documents she collected from her own investigation and those received from the District Attorney's Office, and provided the information about the expert witness she had contacted, but she did not meet with Attorney Funderburk or Slane because they did not request she do so.

At the time Petitioner hired Mr. Funderburk, she was not only unaware of his prior felony conviction, but also unaware that the State of Oklahoma was prosecuting him – indeed out of the exact same office prosecuting her – for drug-related charges.  Nor was she aware that he was taking benzodiazepines and other medication well in excess of any

5

therapeutic benefit.  Although Mr. Funderburk would repeatedly contact Petitioner's family and indicate that more money was needed for Petitioner's defense, Petitioner had no idea that the money would never be used for the purposes earmarked and that the tens of thousands of dollars raised by her family and their friends would instead go directly towards Mr. Funderburk and his personal needs.

On the day Petitioner retained Attorney Funderburk, February 10, 2005, he spent about a half an hour with Petitioner discussing the facts related to the case before he had to leave. During this brief time, Petitioner disclosed what she believed was relevant information about A.S.'s medical condition, including symptoms, prior injuries, time lines, and the medical records she believed existed that would assist in exploring an alternative cause of death. Petitioner understood from this meeting that Attorney Funderburk would, at a minimum, take the same steps that the public defender had with respect to Petitioner's defense, including investigate whether A.S. died from a health issue or fall versus having been murdered. When Attorney Funderburk left Petitioner after their February meeting, Petitioner believed Attorney Funderburk would return to visit her to explore the facts and potential medical issues in more detail; however, neither Attorney Funderburk nor any other attorney on the defense team returned to see Petitioner until the Friday before Petitioner's trial began in September 2005. During Mr. Funderburk's representation of her, Petitioner was able to speak to Attorney Funderburk via phone only once.  She made other attempts but was told by Attorney Funderburk's father that Attorney Funderburk was busy. Petitioner and her family left many messages and wrote many letters begging Mr. Funderburk to come see her.

In the letters Petitioner wrote to her attorney, Petitioner again provided information about A.S., including symptoms he had prior to his fatal collapse; information pertaining to A.S.'s father and questionable history; possible witnesses; and other information she believed relevant to her defense.  In these letters, she inquired about whether Attorney Funderburk had issued subpoenas for medical records and requested to review discovery. Attorney Funderburk did not respond to Petitioner's letters.  Petitioner never got to see any of the State's discovery.

Attorney Funderburk told Petitioner's family that part of the pre-trial investigation was to speak to Dr. Griggs, the physician attending A.S. when he died.  Ms. Roth had relayed to Attorney Funderburk that while A.S. was in the hospital, Dr. Griggs had indicated that they just didn't know what caused A.S.'s brain to swell (and ultimately his death). However, the physician was never interviewed and would later testify against Petitioner at trial.  Similarly, no member of the defense team spoke to the medical examiner before trial. Ms. Roth and Petitioner had informed Attorney Funderburk that A.S.'s father, Todd Snyder, a State witness, had indicated that he was willing to exhume A.S.'s body for testing that may point to another cause of death, and that A.S.'s mother expressed concern regarding A.S. suffering from genetic abnormalities. Petitioner also notified Attorney Funderburk that she suspected drug use by Todd Snyder, and that he had previously shaken her son, A.M. Attorney Funderburk did not contact either of these witnesses. None of Petitioner's attorneys interviewed the police officers, emergency response providers, medical personnel, or any other State witness prior to trial.

Petitioner specifically identified for Mr. Funderburk records relevant to A.S. she

7

believed should be subpoenaed in connection with a defense that explored alternative explanations for the child's death, and witnesses.  Similar information as to potential areas of inquiry was provided by other family members and supporters.  Ms. Roth provided, on several occasions, a packet of information that contained a chronology and timelines, daycare records, witness statements, potential witness lists, summaries of prior falls, and research from a shaken baby defense website.  She also provided Mr. Funderburk a member-only access to the defense section of the website to aid in his defense.  The defense team did not use these resources.

Petitioner, via her family, had requested and provided funds for Mr. Funderburk to retain an expert willing to look past the traditional beliefs inherent in shaken baby syndrome and who would examine the evidence for other potential causes of death.  In 2004, the concept of shaken baby syndrome was becoming controversial, with some doctors breaking away from the mainstream view that shaking along could cause the catastrophic injuries associated with a typical case, and that other injuries, such as short falls, could inflict similar injuries.  Doctors also began recognizing that a lucid interval could occur between the time of injury and the time the child's brain swelling to the point of collapse.  The approach of these "minority" or "evidence-based" experts was different than "mainstream" doctors.  Petitioner specifically discussed with Attorney Funderburk her desire that he consult medical experts willing to challenge SBS as a diagnosis and look at all of the medical evidence before reaching a conclusion as to A.S.'s cause of death. She asked Attorney Funderburk to contact experts recommended by SBSDefense, the shaken baby defense website to which Ms. Roth had obtained a membership.  Ms. Roth also emphasized this

point to Attorney Funderburk, specifically requesting he consult with experts with experience in the shaken baby field that were a bit more progressive – i.e., not "mainstream".  Petitioner's family even provided the names and contact information of potential experts, including one Dr. Plunkett – however, Mr. Funderburk refused to contact Dr. Plunkett or any of the experts identified by Petitioner or her family.

Approximately three weeks before trial, Attorney Funderburk contacted Ms. Carmichael and requested they meet, along with Ms. Fran Vanderventer, a family friend who was financing much of Petitioner's defense, while Attorney Funderburk was vacationing with his family in San Antonio.   Attorney Funderburk presented Ms. Carmichael with a packet of information containing a character witness list, focus points, and time line to Ms. Carmichael and Fran Vanderventer; however, these were documents created by Ms. Roth, not Attorney Funderburk. Attorney Funderburk requested that Ms. Carmichael and Ms. Vanderventer review the materials and provide feedback to him, which they did.  However, nothing in the packet or the additional information provided was used at trial.

As of the time he came to San Antonio, Attorney Funderburk had not hired any experts. Ms. Carmichael expressed concern to Attorney Funderburk that there was insufficient time before trial for experts to prepare for trial, and requested he delay the trial. Attorney Funderburk did not want to delay the trial to obtain expert review.

Around that same time, Ms. Roth also learned that no medical expert had been retained; consequently, she reached out to Bob Estrada, a Wichita Falls, Texas, attorney who had handled a high-profile shaken baby case. Ms. Roth sought advice, as well as

referrals for experts, and then spoke to potential experts herself about working on the case. In his call with Ms. Roth, Mr. Estrada was adamant that experts would be needed for a successful defense, and that a continuance would be needed to secure the services of experts. Mr. Estrada provided names of defense-friendly experts that may be able to help, including John Plunkett and Ron Uscinski and Fred Van Tac – a forensic pathologist, a pediatric surgeon, and a biomechanical expert -- as well as provided the name of an experienced SBS consultant.  Mr. Estrada specifically steered Ms. Roth to doctors in the "minority" view to see if there was an innocent explanation for what would typically be ascribed to shaking. He specifically recommended against hiring a "mainstream" or local doctor because he believed that they would fall trap to that traditional medical view and finding shaking as the cause of injury when the triad of injuries (injury to the eyes, bleeding on the brain, and swelling of the brain) were present. Mr. Estrada had previously worked with Dr. Plunkett and was familiar with the prosecutor's "packet", or compilation of prior testimony, that they would use against him. Mr. Estrada testified that he himself had received this "packet" and reviewed it with Dr. Plunkett and, after having done so, Mr. Estrada comfortably recommended Ms. Roth contact Dr. Plunkett for assistance in Petitioner's case.  Mr. Estrada also extended an offer to Attorney Funderburk, through Ms. Roth, to discuss experts and strategies in defending a shaken baby case but did not receive a call from him or any of her trial attorneys.

Ms. Roth relayed what she learned from her call with Mr. Estrada and the experts to Attorney Funderburk; specifically, that there were resources available that willing to help and could provide experts, but additional time and information, including the hospital x-rays

and medical slides, would be needed. Attorney Funderburk was not agreeable to using the resources, asking for a continuance, or obtaining the additional records. Notably, despite being very angry at Ms. Roth for her interference, Attorney Funderburk did not indicate that he already had an expert reviewing the case. Attorney Funderburk also did not appear to know who Dr. Plunkett was or express any familiarity with his name.

Less than two weeks before trial, Mr. Funderburk contacted a "mainstream" doctor who, as Mr. Estrada indicated would happen, saw the traditional pattern associated with shaken baby syndrome and agreed with the State that the child died from SBS. Dr. May was from the Kansas City area, close by where Attorney Funderburk had family. Mr. Funderburk had intentionally sought out an expert from that area, having learned of Dr. May after contacting the pathology department at the University of Kansas School of Medicine. Dr. May was *not* asked to consider alternative causes of death or focus on the timing of the injuries. Attorney Funderburk did not provide Dr. May with any documents or other information about several falls A.S. had in the week prior to his death, nor did Attorney Funderburk relay that A.S. had been lethargic and unable to get comfortable except in a specific position, or that A.S. had been previously diagnosed with failure to thrive. Dr. May did not receive relevant incident reports from the child's daycare, nor any of the information Petitioner had provided regarding the child's potential seizures and other medical issues, timelines created by Petitioner, records from the child's pediatrician, or any radiology images or histological slides. However, unless specifically requested to review microscopic slides, Dr. May does not review them. Dr. May acknowledged, however, that the slides may have been useful in answering questions about timing.

11

Dr. May gave a copy of her report to Attorney Funderburk Sunday evening, where she met Attorney Funderburk at Applebee's in Kansas City with Mr. Funderburk accompanied by his girlfriend and children. Dr. May again relayed her conclusions in a phone call between Dr. May and Attorney Funderburk, with Attorney Reynolds also in attendance, the Tuesday evening *after* trial began. Attorney Slane received Dr. May's conclusions on the first day of testimony and did not meet or talk to Dr. May until after the second day of testimony. After consulting with Dr. May, Attorney Slane recognized that they would "be in trouble real quick like if [they] didn't get a doctor." The defense lawyers did not consult with any other doctors after receiving Dr. May's opinion, however, although a third member of Petitioner's defense team – Attorney Eric Reynolds -- believes they should have done so.

Dr. May suggested to Petitioner's attorneys that they conduct medical follow-up, including consultations with specialists such as a neuropathologist, but they did not do so. Dr. May's report also suggested that special stains would better document the presence of intracellular iron, which could be helpful in determining the timing of certain injuries.

Although the allegations of SBS were rampant, including from the expert actually consulted by Mr. Funderburk, the reason Attorney Funderburk gave to the Oklahoma Bar Association to justify not hiring a "shaken baby defense expert" (also referred to as "defense-minded", "minority view" or "evidence-based" shaken baby expert) was that he did not do so because there was no evidence that A.S. had died from being shaken.

In addition to requesting an evidence-based shaken baby expert, Petitioner also requested and provided funds for Mr. Funderburk to hire a biomechanical expert, a false

confession expert, and an experienced investigator. Mr. Funderburk had indicated that these experts would be necessary to Petitioner's defense. The family also provided additional funds that could have been used for additional experts, had they been identified. Although in conversations in which Mr. Funderburk was attempting to secure additional funds from the family, he led the family to believe that he had hired a confession expert and an experienced investigator, he had not and did not.

Prior to trial, the defense working theory of the case was that A.S. had been injured at some time before Petitioner was the exclusive caregiver: therefore, either the child was injured from a prior fall, or someone other than Petitioner intentionally injured the child. Both theories required medical evidence, including evidence to expand the timeframe between injury and time of collapse. Dr. May's conclusions gutted the original defense chosen by defense counsel, that the child died from prior falls, making it much less likely that they would succeed at trial. Additionally, prior to the trial beginning, the State filed a motion in limine to exclude admission of testimony and evidence regarding the child's prior falls absent medical evidence that such falls could be connected to A.S.'s death. Attorney Funderburk did not attend initial argument on this motion. Attorney Slane requested that he be able to defer the response to Attorney Funderburk because Attorney Funderburk was the party who could "more appropriately answer that". Attorney Slane had no personal knowledge as to the details of the child's behaviors, including the extent of head injuries associated with tantrums, which the defense was contending was related to the child's death. The following day, immediately before opening statements, the Court again took up argument on the motion in limine. Attorney Funderburk represented that one theory of the

defense to be presented is that the injuries to the child could be "self-inflicted" and that Ms. Roth could testify that the child had temper tantrums and throw himself down over and over. When asked about any medical evidence linking these incidents to the child's death, Attorney Funderburk indicated that the child had been taken to the doctor but that Attorney Funderburk did not "know exactly the details of the injury to the child." When pressed further about a medical link between the child's prior injuries and his death, Attorney Funderburk surmised that the medical examiner could testify it was possible that the incidents were relatable, but then admitted that he hasn't talked to the medical examiner to know whether she would say that. Because Attorney Funderburk did not offer any medical evidence that either the falls or various actions of the father could have caused A.S.'s death, the Court excluded it subject to reconsideration upon presentation of such evidence.

Attorney Funderburk also represented to the trial court that one defense was that A.S.'s father could have caused the fatal injuries, and further represented that Dr. May could support this defense. The State objected and claimed that Attorney Funderburk had failed to give any notice that the father's actions could have caused the child's death; the court agreed that notice had not been given and excluded this evidence.

Absent medical evidence to challenge the timing of the injuries, the only witness the defense had to rebut the State's medical testimony with respect to timing was Petitioner. Counsel for the defense did not request a continuance to pursue any other medical evidence. Defense counsel did not decide right away whether Dr. May would testify. Although Attorney Slane disputed that he would have turned it over, the record is clear that Petitioner's attorneys provided the State with a copy of Dr. May's complete report, which

14

was two pages and included Dr. May's suggested questions for the medical examiner.  That same report would be entered as evidence against Petitioner in the course of the trial.

The medical "evidence" that A.S. suffered abuse was the focal point of the trial.  The state presented three treating physicians who all testified that the retinal hemorrhaging was "highly suggestive of", "consistent with" or "ha[d] to be" the result of a violent shaking injury.  Dr. Choi also testified that the child suffered from a subdural hematoma, which was caused by tearing the bridging veins that connect the brain to the sagittal sinus – something she contended could only be caused by shaking. In part because of Beverly's admission during interrogation to A.S.'s head having hit the floor, as well as bruising on the inside of the scalp, Dr. Choi concluded that a combination of shaking and impact led to A.S.'s death.[1]

The prosecution relied entirely on medical evidence to confirm that A.S. died from abuse and that Ms. Moore was the one to inflict the abuse.  Drs. Grigg and Choi both testified that the interval between the time A.S. was shaken and the time of collapse would have been "immediate" or "within minutes" – at most, five.   Dr. Korber, the ophthalmologist, initially disagreed, stating that it would be rare to see this extent of retinal hemorrhaging for an injury that occurred in such a short time frame, and suggested that the injuries were within a week old.  However, on redirect, he was quick to defer to Dr. Griggs' analysis on the time frame between the time of injury and collapse. As Ms. Moore was the only person with A.S. at the time of his collapse or in the five minutes before calling 911, she *had* to be the person who inflicted the injury.

The defense, like the prosecution, accepted the SBS diagnosis as medical fact,

---

[1] Referred herein to Shaken Baby Syndrome/Shaken Impact Syndrome (SBS/SIS)

offering no alternative theory as to the cause and timing of A.S.'s death. Like the police and the medical professionals, the defense did not explore the possibility that A.S. died from accidental or natural causes, or that, even if intentional, that the injury was sustained *prior* to 2:45 p.m. on January 13, 2004, when A.S. had been in the care of others. Ultimately, the defense team went to trial just hoping to use the State's doctors (which they had not interviewed) to help establish their case that it was possible that the injury occurred earlier. However, Attorney Slane did not question A.S.'s father about having previously shaken Petitioner's son, A.M., nor did Attorney Reynolds elicit that testimony from Janus Roth who witnessed said shaking.

Attorney Slane did not question the doctors about the alternative injuries or the question about timing raised by his expert. Attorney Slane did not question the treating physician about his prior statements expressing uncertainty about the cause of A.S.'s injuries. Although Dr. May had even provided information pertaining to medical evidence to refute timing and provide alternative explanations, he didn't understand her report to "mean" that, so he did not ask the medical examiner about the findings noted by Dr. May that could have impacted the timing of the injury.

In making the decision to proceed without medical experts, Attorney Slane believed no doctor would support an alternative causation defense and doubted whether even Dr. Plunkett would. However, neither he nor any other member of the defense team had talked to Dr. Plunkett or any other doctor when they reached this conclusion. Moreover, if Attorney Slane had understood Dr. May's report indicated that the injury may have been older, he stated that you could "bet your bottom dollar [he'd have] put her on."

16

Attorney Slane conducted the cross-examinations of the medical witnesses because he wouldn't have trusted the others lawyers with that task.  However, Attorney Slane was unaware of all relevant medical evidence in the case.  For example, the trial transcript reveals that Slane did not have a copy of the EMSA report prior to trial (originally claiming it was not provided in discovery); and failed to go see pictures in the file. During the trial, Petitioner asked Attorney Slane if he had reviewed the Deaconess records regarding the fall off the front porch; he revealed that he had not.  Petitioner also questioned Attorney Slane about the Sooner Start therapist and records, and Attorney Slane had no knowledge about those records.   At the evidentiary hearing, Attorney Slane admitted that he did not previously know that A.S. was born at home to a drug-dependent mother, or that A.S. suffered from positional discomfort in the weeks prior to his death and he was unaware of other particulars regarding A.S.'s health.  When Petitioner questioned Attorney Funderburk about Attorney Slane's lack of knowledge about the Deaconess Hospital records, Attorney Funderburk himself was unaware that they existed (although they had been provided to him by Attorney Richard. When Petitioner questioned Attorney Funderburk about Attorney Slane's lack of familiarity with other documents, including the incident report showing Todd Snyder shook A. M., and A.S.'s medical information, Attorney Funderburk indicated that Attorney Slane simply knew what Attorney Funderburk had told him.   Attorney Funderburk essentially admits this in his response to Petitioner's 2006 grievance to the Oklahoma Bar Association when he stated that "Attorney Slane did everything he could with the facts of the case *provide[d] to him.*" (emphasis added)

At one point in the trial, Attorney Slane left the trial; another time he was late.  As a

result, Attorney Reynolds, a brand-new baby lawyer, was required to cross-examine the police detective who interrogated Petitioner and to whom she made inculpatory statements. This witness is one whom Attorney Funderburk had highlighted to the jury in opening statement, identifying him as a key witness. Attorney Reynolds was unaware that he would be conducting this cross-examination until immediately before he was required to do so and was given no advice on how to conduct the cross-examination.

Attorney Slane admits that Petitioner's testimony would have been most critical. However, Petitioner did not learn that she would be testifying until she was in the courtroom on the day she ended up testifying.  Previously, she had told Attorney Funderburk that she did not wish to testify because she was scared. When told mid-trial that her attorneys felt she needed to testify, Petitioner expressed concern about not being prepared; Attorney Funderburk told Petitioner that he didn't want to prepare her because he didn't want her testimony to appear rehearsed.  Petitioner's lawyers did not prepare her at all to testify. Therefore, at the time she testified, Petitioner had not discussed her prior statement to the police with her lawyers since February.  Petitioner had not ever reviewed with her lawyers the timeline of events from the day A.S. collapsed and died, had not discussed the more damaging parts of the State's case, or discussed any further the conclusions and findings of Dr. May. Also, because she believed Dr. May was a *defense* SBS expert and had fully reviewed *all* medical records, and because she was unaware of the recommendations of Dr. May with respect to follow up and timing, Petitioner took the stand believing that the medical evidence established that A.S. had died from shaking and blunt force trauma.

Ms. Moore was convicted of first-degree murder of a child. The conviction rested solely on the SBS medical theory provided by the State's medical expert on both timing and cause, as well as the claimed consistency between Ms. Moore's admissions during the police interrogation and the unchallenged medical findings. There was no evidence presented that Ms. Moore had ever previously abused A.S. or any other child, nor any physical evidence outside the diagnostic triad in SBS/SIS cases (i.e., the presence of subdural hemorrhage, retinal hemorrhage, and cerebral edema (brain swelling)) – to confirm that Ms. Moore had shaken A.S. – no grip marks on his chest or arms, no injuries to his neck or spine. The contusions on the back of A.S.'s head provided the only evidence of impact, and the defense failed to challenge the date of these injuries.

This Court has acknowledged that the timing of the child's death was a critical link in the prosecution's theory of guilt. (ECF No. 135 at 10-11, 139.) However, the Court has found that link unsupportable because Petitioner has presented undisputed scientific evidence that the trauma would have preceded the child's collapse by days, weeks, or even months. (*Id.*) The Court found that there was evidence of prior trauma suffered by the child, including a prior diagnosis of "failure to thrive", significant developmental delays, prior falls, and observations that the child had been lethargic the week preceding his death. (ECF No. 135 at 12, 139.) These types of injuries could have resulted in the kinds of injuries noted by the State's experts at trial. (ECF No. 135 at 14, 139.) Additional evidence, including the presence of hemosiderin (an iron-storage complex found in cells), papilledema (swelling of the optic nerve), and vitreous hemorrhaging (bleeding into the vitreous cavity) – none of which occur until days after an injury – when considered in connection with the

evidence presented at trial "would prevent any reasonable jury from finding beyond a reasonable doubt that A.S. had died from traumatic injuries inflicted on January 13, 2004". Absent such a finding, "the jury would have had no basis to find that Ms. Moore had done anything to cause the boy's death."  (ECF No. 135 at 11-28, 139.)

## PROCEDURAL HISTORY

**January 1, 2004:**  Petitioner was charged by Information with the crime of Murder in the First Degree in Oklahoma County Case No. CF-2004-351.   Petitioner was initially represented by Assistant Public Defender, Jennifer Chance.

**February 10, 2005**: Isaac Funderburk and David Slane filed their entry of attorney appearance.

**September 12-16, 2005**: Petitioner, represented by attorneys Isaac Funderburk, David Slane, and Eric Reynolds, was tried by jury for the crime as alleged, the Honorable Susan P. Caswell, presiding.  The jury returned a verdict of guilty and set punishment without the possibility of parole.

**October 11, 2005:** A Judgment and Sentence in the District Court of Oklahoma County is entered against the Petitioner consistent with the jury's recommendation.

**November 9, 2005:**  Attorney David Slane files an Application for Post-Conviction Relief, seeking to Appeal Out of Time, which was granted.

**January 20, 2005:**  Petitioner, by and through counsel, files a Notice of Intent to Appeal, with the following Proposed List of Errors:

    a. Defendant was not allowed to put on evidence of her theory of the case, which was crucial to her defense.
    b. Defendant's witnesses were limited to character testimony only.

    c.   Defendant was not allowed to introduce a taped police interview of Todd Snyder
    d.   Potential ineffective assistance of counsel.
    e.   Any additional error found by Appellate Counsel.

**September 11, 2006:**  Petitioner, through her appellate attorney, files her Appellant Brief alleging the following propositions:

> Proposition I      The jury should have been instructed on the definition of Life Without Parole and that if sentenced to Life With Parole, Ms. Moore would have to serve 85% of her sentence; and

> Proposition II     Defense counsel rendered ineffective assistance of counsel by not requesting argument or instruction on parole ineligibility or application of the 85% Rule to any sentence given to Ms. Moore.

**June 11, 2007:** The Oklahoma Court of Criminal Appeals affirms the Petitioner's conviction on direct appeal, Case No. F-2006-63, in an unpublished opinion, but modifies her sentence to Life Imprisonment *with* the Possibility of Parole for failure to instruct the jury on the 85% Rule.

**September 26, 2008:**  Petitioner, proceeding *pro se*, filed her first Application for Post-Conviction Relief, alleging a single proposition for relief:

> Proposition I  Defense counsel rendered ineffective assistance of counsel by failing to have a medical expert testify to medical evidence proving child was not killed by shaking.

**October 23, 2008:** Petitioner's first Application for Post-Conviction Relief is denied by the Oklahoma County District Court based on her claims being procedurally barred. The Order notifies Petitioner of her right to appeal to the Court of Criminal Appeals and the manner in which to invoke that right.

**January 16, 2009:**  Petitioner, again proceeding *pro se*, filed a Petition in Error in the

Oklahoma Court of Criminal Appeals alleging ineffective assistance of counsel based on the

following actions by Attorney Isaac Funderburk:

      f.   Counsel failed to communicate with co-counsel as to the existence of two favorable exculpatory witnesses that [she] explicitly requested to be put on the stand in [her] defense.

      g.   Co-counsel was never made aware of the fact that there was over $40,000 in a trust account for expert witnesses and investigators, which he complained to [her] about after [her] trial.

      h.   Because of counsel's flawed defense, he excluded valuable foundational evidence.

      i.   Counsel failed to elicit evidence from character witnesses who would have been vital defense witnesses, because it did not fit with his flawed defense.

      j.   Counsel did not try to exclude the coerced confession, which was the sole evidence for prosecution.

      k.   Counsel did not give an alternative theory for my defense that further compounded his flawed defense and his lack of strategy in clearing me of the charge of Murder in the 1st Degree.

      l.   [She] had insufficient counsel which resulted in sufficient prejudice to warrant a retrial.

      m.   The crib sheet that was admitted as evidence was not disputed by counsel even though the father's testimony told the court that the stain was not current.

      n.   The daycare provider was brought in as a character witness, which limited her testimony. Had she been brought in as an exculpatory witness, her testimony would have been beneficial to the outcome of the trial.  Her testimony was vital to my defense.

      o.   Counsel did not even counter any of the prosecution's assertions.

      p.   Counsel forced me on the stand without adequate preparation and told me that I would definitely be convicted in I upheld my adamant reluctance to testify. Counsel did not prepare me adequately before I took the stand.

      q.   It would behoove counsel for me to be found guilty so that his financial misconduct would not be brought to light.

      r.   Counsel's failure to focus attention on the actual preparator, the victim's father, resulted in sufficient harm for reversible error per *Strickland v. Washington*.

**March 9, 2009:** The Oklahoma Court of Criminal Appeals dismissed Petitioner's appeal of

the denial of post-conviction relief, noting that Petitioner did not allege that she had filed an

application for post-conviction relief in the district court or received a final judgment on

such an application, nor does she provide a certified copy of the district court's order. The court dismisses Petitioner's matter for failure to present the court with anything that would invoke its appellate jurisdiction.

**September 4, 2009:**  Petitioner, still proceeding *pro se*, filed a Petition for Writ of Habeas Corpus in the United States District Court for the Western District of Oklahoma, alleging ineffective assistance of counsel.

**October 30, 2009:**  The State filed a Motion to Dismiss the Petition on the grounds that it was not timely filed.  The motion was converted into one for summary judgment on November 4, 2009.

**December 9, 2009**:  Petitioner files a Motion for leave to amend her Petition, which was granted. Petitioner was granted until January 26, 2010, to file her amended petition.

**February 2, 2010**: Petitioner filed her Amended Petition and Brief in Support, alleging the same proposition of error as the first Petition and claiming that she was entitled to equitable tolling because she was factually innocent of the crime for which she was convicted.

**February 23, 2010**:  The State files a Motion to Dismiss the Amended Petition and Brief in Support, claiming that the Amended Petition is time-barred. On February 16, 2011, the court converted the State's motion to a limited Answer, to which Petitioner replied and the State filed a sur-reply.

**September 7, 2011:**  United States Magistrate Judge Robert Bacharach issued Proposed Findings of Fact and Conclusions of Law regarding the timeliness of the Petition.  Judge Bacharach proposed that Petitioner had met the exception to the time-bar by proving her actual innocence.

23

**September 26, 2011:** The State objected to Magistrate Judge Bacharach's Findings of Fact and Conclusions of Law.

**October 28, 2011:** United States District Judge Robin Cauthron overruled the State's objections and concludes that the evidence Petitioner presented of her actual innocence is sufficient to overcome the time bar. The court adopts the Proposed Findings of Fact and Conclusions of Law in full.

**April 6, 2012:** United States District Judge Robin Cauthron stayed the federal proceedings pending Petitioner's exhaustion of state remedies on grounds of comity and federalism.

**June 5, 2012:** Petitioner, by and through her attorney, filed a Second Petition for Post-Conviction Relief in the Oklahoma County District Court and Brief in Support, along with a Motion for Evidentiary Hearing, Motion for Discovery, and Motion for Appointment of Counsel. In her Petition, she raised six propositions for relief.

> Proposition 1: Ineffective Assistance of Trial Counsel for (a) failure to fully investigate the cause of death and the timing of the injuries attributed to Petitioner, including the failure to timely consult with and retain expert witnesses, and (b) failure present testimony from expert witnesses as to the cause and timing of the fatal injuries.

> Proposition 2: Ineffective Assistance of Trial Counsel due to trial counsel suffering from conflicts of interest.

> Proposition 3: The State of Oklahoma Deprived Petitioner of her Right to Due Process When it Failed to Disclose Exculpatory Evidence.

> Proposition 4: Ineffective Assistance of Appellate Counsel due to failure to raise the claim of ineffective assistance of trial counsel arising out of failure to investigate medical issues and present medical testimony.

> Proposition 5: Ineffective Assistance of Appellate Counsel due to failure to uncover the conflict of interest of trial counsel and raise the claim of ineffective assistance of trial counsel arising from the conflict.

Proposition 6: Ineffective Assistance of Appellate Counsel due to discovery the violation of Brady v. Maryland and raise the claim on direct appeal

**June 14, 2012:** State District Judge Kenneth C. Watson granted Petitioner's motion to appoint Christine Cave as counsel in the state post-conviction proceedings.

**August 16, 2012:** After a hearing, Judge Watson grants Petitioner's motion for discovery and ordered the State to make its file in this case and, after review for privileged information, that of *State v. Funderburk*, CF-2003-6954, and permitted discovery of the medical examiner's file and the financial records of Isaac Funderburk. After a subsequent hearing on September 12, the Court permits discovery of Isaac Funderburk's medical records.

**September 4, 2012:** The State filed a Response to Petitioner's Second Application for Post-Conviction Relief, arguing in part, that Petitioner's claims were procedurally barred by the doctrines of waiver and *res judicata*, and were, nonetheless, without merit. To the extent that the Court felt that the merits of the Petitioner's claims should be addressed the merits, the State joined in Petitioner's request for an evidentiary hearing.

**July 9, 2013:** Judge Watson at a hearing announces that he doesn't feel that Petitioner should be time barred from raising her claims and overrules the State's request for dismissal based on procedural bar.

By agreement of the parties, Petitioner's claims were divided into two separate parts: the first to consider whether trial counsel rendered deficient performance or labored under a conflict of interest, the second to determine whether Petitioner suffered resulting prejudice, and to address Petitioner's *Brady* claim and ineffective assistance of counsel claims

25

**December 1-5, 2014, January 8 & 22, 2015, March 2-6, 2015, & April 14, 2015, & August 4, 2015:**  The Court held a post-conviction evidentiary hearing on the issue of whether Petitioner's trial counsel rendered deficient performance or labored under a conflict of interest. Petitioner appeared and was represented by appointed counsel Christine Cave and Assistant Public Defender Andrea Miller, and the State represented by Assistant District Attorneys Gayland Gieger and Jennifer Hinsperger.

**January 17, 2017**: After a lengthy delay in obtaining transcripts of said hearings, the parties filed their Proposed Findings of Facts and Conclusions of Law.

**March 23, 2018**:  Petitioner respectfully requested this Court to lift the current stay and excuse her from having to further exhaust her claims contending the lengthy state court proceedings, coupled with the anticipated further proceedings, effectively strip Petitioner of her due process rights (ECF No. 213).

**March 27, 2018:**  The Oklahoma County District Court filed its Findings of Facts and Conclusions of Law. The findings and conclusions sections followed word-for-word, typo-for-typo, the State's proposed findings from January 2017 (with three minor changes noted in footnote five below). The findings purport to dispose of Petitioner's post-conviction application.

**April 5, 2018:**  Petitioner filed her Notice of Appeal.

**May 11, 2018:** The Court of Criminal Appeals denied Petitioner's motion to file a brief of greater length.

**August 1, 2018:** Petitioner filed her brief in support of her post-conviction appeal with renewed request to file brief of greater length (granted).

26

**October 12, 2018:** Court of Criminal Appeals entered its decision affirming denial of Petitioner's subsequent application for post-conviction relief.

**November 9, 2018:**  Petitioner notified this Court that the Court of Criminal Appeals of the State of Oklahoma rendered its decision, resolving the appeal from the District Court. Accordingly, Petitioner exhausted all State court remedies (ECF No. 218).

**January 18, 2019:** For good cause shown, this Court granted Petitioner's Motion to Lift Stay (ECF No. 219).

**March 20, 2019:** This Court granted petitioner's unopposed motion to extend deadlines for filing an amended petition.

<u>**PROPOSITIONS**</u>

### 1. *Petitioner has exhausted her claims*

Petitioner has presented all claims raised in the Second Amended Petition to the highest Oklahoma court with jurisdiction over said claims.  She has no further right under state law to raise the questions presented in the petition. Therefore, she has exhausted her claims.

### 2. *Petitioner is entitled to de novo review of her claims*

The Court of Criminal Appeals rejected Petitioner's claims, concluding that they were procedurally barred.  Order Affirming Denial of Subsequent Application for Post-Conviction Relief, Oklahoma Court of Criminal Appeals, Case No. PC-2018-403 (Oct. 12, 2018), Att. A.  Because the claim was not "adjudicated on the merits", as that phrase is used in 28 U.S.C. § 2254(d), but instead rejected by the Oklahoma Court of Criminal Appeals on

procedural grounds,[2] section 2254(d) is inapplicable and Petitioner's claims are entitled to *de novo* review. *See Johnson v. Williams,* 568 U.S. 289, 302 (2013)*; Wood v. Milyard*, 721 F.3d 1190, 1194 (10th Cir. 2013); *Alverson v. Workman*, 595 F.3d 1142, 1146 (10th Cir. 2010). The fact that the state district court purported to resolve portions of Petitioner's claims on the merits is immaterial given the Oklahoma Court of Criminal Appeals having decided the case on procedural grounds. *See YIst v. Nunnemaker*, 501 U.S. 797, 799-800 (1991) (courts are to look to last reasoned decision for the basis on which claim was rejected)*; Williams v. Alabama*, 791 F.3d 1267, 1273 (11th Cir. 2015) (even if state post-conviction court purported to decide claims on the merits, petitioner was entitled to de novo review of his petition for habeas corpus where the court of appeals affirmed holding that the claims were procedurally barred for review); *see also Barton v. Warden*, 786 F.3d 450, 462-464 (6th Cir. 2015) (even if discussion by state trial court was considered an adjudication on the merits, it was stripped of preclusive effect under the last-reasoned decision rule in *YIst*); *Thomas v. Horn*, 570 F.3d 105, 114-15 (3d Cir. 2009). Of course, it is also well-recognized that 2254(d) does not apply to issues not actually reviewed and decided by the state court, such as Petitioner's *Brady* claim. *See Douglas v. Workman*, 560 F.3d 1156, 1170 (10th Cir. 2009).

---

[2] The state court's determination does not bar federal review in this case because of this Court's prior finding under *Schlup v. Delo*, 513 U.S. 298, 329 (1995), finding that Petitioner has demonstrated her actual innocence by a preponderance of the evidence and has overcome the procedural bar (ECF Nos. 135, 139). *Murray v. Carrier,* 477 U.S. 478, 496 (1986); *Lopez v. Trani*, 628 F.3d 1228, 1230-31 (10th Cir. 2010).

On de novo review, Petitioner need only show by a preponderance of the evidence that her custody violates the Constitution of the United States. *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002).

### 3. *Effect of previously-found facts and law to review*

Although this Court's review of the state court's determinations (and mixed fact/law conclusions) is *de novo*, the case has procedural history that affects the relevant law and facts to which this Court is constrained. Outside of the application of the doctrine of law of the case to prior federal findings and conclusions and any presumption of correctness this Court may apply to prior factual findings by the state court, this Court may make any additional findings necessary to resolve this case through a review of the record or any additional evidence presented.

### a. *Factual findings and legal conclusion of this Court*

First and foremost, the factual findings and legal conclusions previously established by this Court are law of the case. *See, e.g., United States v. Trent,* 884 F.3d 985 (10th Cir. 2018); *United States v. Monsisvais*, 946 F.2d 114 (10th Cir. 1991). Thus, among the numerous other findings and conclusions, the Court's findings with respect to the medical evidence and the impact said medical evidence would have on the timing of the injuries suffered by A.S, as well as the Court's conclusion that the medical evidence "would prevent any reasonable jury from finding beyond a reasonable doubt that A.S. had died from traumatic injuries on January 13, 2004" or that "the jury would have had no basis to tie A.S.'s death to anything that Ms. Moore had done on or about January 13, 2004." (ECF No.

135, 139.) Lastly, it is law of the case that the probability of Petitioner's actual innocence overcomes the fact that her initial Petition was untimely. (*Id.*)

### b. *Factual findings of the state court*

The state trial judge in the second post-conviction proceeding issued an Order Denying Application for Post -Conviction Relief After Evidentiary Hearing (Att. B).  The state court's Order sets forth the Procedural History of the case, reviews Petitioner's allegations and discusses some of the evidence presented during the evidentiary hearing, and then sets forth eighteen "specific findings of fact and conclusions of law."  (*Id.* at Conclusion ("the Court makes the following specific findings of fact and conclusions of law").)  It fails to address many material facts, which remain for this Court's resolution regardless of whether the presumption of correctness attaches to those actually found by the state court judge.

Only findings of pure historical fact are potentially subject to any presumption of correctness under 2254(e)(1), *Williamson v. Ward*, 110 F.3d 1508, 1513 (10th Cir. 1997); mixed findings of fact and conclusions of law are subject to de novo review for the reasons set forth in Proposition 2 above.  Accordingly, it is critical to determine which findings of the state court judge qualify as findings of historical fact.  Questions regarding the reasonableness of any alleged trial strategy and determinations with respect to whether counsel was ineffective are questions of law or mixed questions of law and fact. *Strickland v. Washington,* 466 U.S. 668, 698 (10th Cir. 1984) (determination of the performance of counsel is a mixed question of law and fact); *Wood v. Allen,* 558 U.S. 290, 291 (2010) (distinguishing between the factual determination as to whether a decision was strategic and

the legal determination as to whether that decision was reasonable); *Hobdy v. Raemisch,* ___ F.3d ___, Case No. 18-1047, p. 30 (10th Cir. Feb. 19, 2019) (court's determination on the first prong of *Strickland* is not a factual finding subject to 2254(e)(1)'s presumption of correctness); *see also Herrera v. Lemaster*, 225 F.3d 1176, 1178 (10th Cir. 2000) (recognizing that the presumption of correctness does not apply to questions of law); *Cave v. Singletary*, 971 F.2d 1513, 1518 (11th Cir. 1992). Moreover, the conclusion regarding whether trial counsel "misappropriated" funds is a mixed question of fact and law as it requires the application of law (including conclusions with respect to the materiality of representations or omissions, etc.) to facts to reach the conclusion[3] *see In re Priceline.com Inc. Securities Litigation*, 342 F. Supp. 2d 33, 47 (D. Conn. 2004) (materiality of omission in fraud allegation is mixed question of law and fact); *In re Trombadore,* 201 B.R. 710, 713 (D.N.J. 1996) (whether specific facts constitute fraud is a question of law), and therefore not a question of pure historical fact to which a presumption of correctness applies. *See also Laschewitsch v. Lincoln Life & Annuity Distribs., Inc.*, 47 F. Supp. 2d 327, 334 (E.D.N.C. 2014) (whether a particular act is deceptive is a question of law for the court). Removing these questions of law or mixed law/fact from the state court's "specific findings of fact and conclusions of law" results in the following purported *factual* findings (numbering follows that of the state trial judge in Att. B):

1. Isaac Funderburk associated with David Slane because he was an experienced trial and criminal defense attorney familiar with the types of issues involved in

---

[3] Indeed, during the evidentiary hearing, expert witness CPA Jeffrey Trevillion testified that the failure of a fiduciary to spend funds consistent with the instructions provided can be explained three different ways – either the funds were co-mingled, simply converted, or misappropriated. The latter requires some kind of fraud or deceit. (Tr. 105-106, Mar. 3, 2015.)

Petitioner's case. Eric Reynolds joined the defense team two weeks before trial as an investigator and attorney on Petitioner's behalf.

2. David Slane and Isaac Funderburk shared responsibility for consulting with and retaining medical expert witnesses in relation to this case. Mr. Reynolds had no decision-making responsibilities in this regard.

3. Petitioner's attorneys received all relevant medical records for the victim, A.S., either from the State through the discovery process of by subpoena to the custodians of those records.

4. The defense did consult with two "mainstream" medical experts, Dr. Corrie May and an unnamed male doctor, prior to Petitioner's trial. Both doctors indicated that they would be harmful to Petitioner's defense.

5. The defense first retained Dr. May's services on September 1, 2005 and were aware of her opinion that the victim's injuries were consistent with child abuse by September 9, 2005.

6. Dr. Corrie May had all relevant medical records which were in the defense's possession available for her review and had adequate time in which to form her opinion.

7. OMITTED AS REASONABLENESS IS QUESTION OF LAW

8. The decision not to present Dr. John Plunkett or other similar "SBS expert" defense witnesses was a tactical decision based on such witnesses' reputations. REMAINDER OMITTED AS REASONABLENESS IS QUESTION OF LAW

9. OMITTED AS REASONABLENESS IS QUESTION OF LAW

10. OMITTED AS REASONABLENESS IS QUESTION OF LAW

11. While Mr. Funderburk was prosecuted by the Oklahoma County District Attorney's Office at the same time Petitioner's case was pending, there has been no evidence that he advanced his own case to the detriment of Petitioner's. In fact, there has been no evidence presented that Mr. Funderburk's representation of Petitioner was impacted in any manner by his own criminal prosecution.

12. There has been no evidence presented that Mr. Funderburk was impaired or under the influence of intoxicating substances at the time he represented Petitioner in this matter. On the contrary, witness testimony supports that Mr. Funderburk was functioning normally throughout the course of his representation.

13. While the evidence presented supports that Mr. Funderburk did not provide an adequate accounting for Petitioner's client-trust fund. REMAINDER OMITTED AS MIXED QUESTION OF LAW AND FACT

14. OMITTED AS QUESTION OF LAW OR MIXED QUESTION OF LAW AND FACT

15. OMITTED AS QUESTION OF LAW OR MIXED QUESTION OF LAW AND FACT

16. OMITTED AS QUESTION OF LAW OR MIXED QUESTION OF LAW AND FACT

17. OMITTED AS QUESTION OF LAW OR MIXED QUESTION OF LAW AND FACT

18. OMITTED AS QUESTION OF LAW OR MIXED QUESTION OF LAW AND FACT

### c. *Effect of state factual findings*

#### i. *Because the OCCA found that the claim was procedurally barred, the state trial judge was in error when it made factual findings*

The Oklahoma Court of Criminal Appeals concluded that it was "improper" to consider Petitioner's claims on the merits because they were procedurally barred. (Att. A, p.5.)  Petitioner was not "entitl[ed] . . . to review by the District Court . . . on the merits." (*Id.* at p.8.)  If it was improper to consider Petitioner's claims on the merits, any factual findings flowing therefrom are "improper" and, therefore, should not be entitled to the deferential presumption of correctness afforded "properly" found findings. *See, e.g., Lambert v. Blackwell*, 175 F. Supp. 2d 776, 787 (E.D. Pa. 2001) (state court findings owed no deference when state court without jurisdiction to issue the findings).

***ii. If the presumption of correctness applies to the state's factual findings, Petitioner can rebut the presumption by clear and convincing evidence***

To the extent the Court determines that the state district court's findings of fact are entitled to a presumption of correctness under 2254(e)(1), Petitioner contends that she can overcome said presumption by clear and convincing evidence. It is first worth recognizing that the state court's order – both the discussion and actual specific findings were a word-for-word (with three minor changes noted in the footnote below),[4] punctuation-for-punctuation, typo-for-typo, replication of the state's proposed findings of fact and conclusions of law.  They were issued four days after Petitioner filed a request in this Court to have this court lift the stay based on the state court's lack of timely findings.  There is strong reason, therefore, to question the reasonableness and correctness of the findings, even before turning to specific contrary evidence, which Petitioner does below.[5]

Specifically, Petitioner contends that the following evidence, produced or offered at the state evidentiary hearing, rebuts any presumption of correctness with respect to the specific enumerated factual findings of the state court judge.

With respect to the finding number one:

1.  Petitioner contends that the following evidence rebuts the factual finding that Mr.

    Slane was "familiar with the types of issues involved in Petitioner's case" at the

---

[4] With the exception of  a couple of minor word changes on page 21 from "meritless" to "denied"; and the addition of  "(now Judge Williams)".  As well as the change in language from "It is Therefore Ordered, Adjudged, and Decreed" to "It is Therefore Ordered By the Court" on page 23).

[5] The evidence proffered below is limited that elicited during the evidentiary hearing in state court and/or identified by Petitioner and which Petitioner attempted to introduce at the hearing. To the extent this Court determines it is proper, Petitioner recognizes that she may discover and present additional evidence.

time he became involved in her case: Petitioner's case revolved around whether the child, A.S., had died from shaking (either in combination with impact or alone) and the science challenging such the evidentiary basis for such a diagnosis. Also critical was the science surrounding whether the child had suffered from a lucid interval – a period between the time of injury and the time of the child's brain swelling. (Tr. at 14, Apr. 14, 2015.) [6]  David Slane testified at the evidentiary hearing that he wasn't sure he had tried *any* shaken baby cases before Petitioner's and, although he thought he may have, he couldn't identify any. (Partial Tr. Vol. IV at 70, Dec. 4, 2014 (May 26, 2015).)  A review of the court records regarding the cases handled by Mr. Slane do not reveal *any* in which the alleged manner of the death of a child involved shaking.  The only "familiarity" he had was through review of scholarly articles and medical journal about shaken baby syndrome. (*Id.* at 70-71.)

2.  Petitioner contends that the following evidence rebuts the factual finding that Mr. Reynolds joined the defense team as an attorney on Petitioner's behalf:  The testimony at the evidentiary hearing from Mr. Reynolds was that, at the time of his initial involvement, he was not going to play any role at all at the trial. (Tr. at 8, 16, Dec. 3, 2014.)  Time reveals that Mr. Reynolds' role ultimately changed and he attended trial and examined witnesses.  (Tr. at 16-18, Dec. 3, 2014; Trial Tr. Vol. 3 at 30-53, 59-61 (Sept. 15, 2005).)

---

[6] Citations to evidence in this section are citations to the state court evidentiary hearing record.

With respect to finding number three, Petitioner contends that the following evidence rebuts the factual finding that Petitioner's attorneys received "all" relevant medical records for the victim: The evidence presented at the evidentiary hearing was that the defense did not obtain recuts of histological slides taken by the medical examiner, or the radiology images showing the alleged bleeding on A.S.'s brain at the time of his final hospital admittance.  (Ex. 35; *see also* Ex. 32 at 51 (detailing records provided to defense expert, Dr. May, which did not include radiology images from Baptist Medical Center).) The defense also did not issue any subpoenas or obtain any pregnancy records, birth records, treatment records from OU Medical Center (which had diagnosed the child with failure to thrive), or reports from well child check-ups. (Official Record, Case No. 04-351.)

 With respect to finding number four, Petitioner contends that the following evidence rebuts the factual finding that the defense consulted prior to trial with "two" medical experts, to include "an unnamed male doctor":  Although Attorney Slane thinks the defense consulted with a male forensic pathologist prior to receiving Dr. May's opinion, (Partial Tr. Vol. IV at 26-27, Dec. 4, 2014 (May 26, 2015)), his testimony on this point is not credible. By Attorney Slane's own admission, his cases run together, (Partial Tr. Vol. IV at 24, Dec. 4, 2014, (May 26, 2015)), and because Attorney Slane disposed of his file, he was unable to refresh his memory before testifying (Partial Tr. Vol. IV at 27, Dec. 4, 2014 (May 26, 2015).)  Attorney Slane did not know whether the prior doctor was "mainstream" or held a minority view or know *anything* else about the doctor other than he was a forensic pathologist from somewhere other than Oklahoma.  (Partial Tr. Vol. IV at 47, Dec. 4, 2014, (May 26, 2015).) Part of the reason Attorney Slane believed that they consulted with

another doctor is because he believes there was a second doctor paid $1,000 for a review, (Partial Tr. Vol. IV at 27, 85, Dec. 4, 2014, (May 26, 2015), when in fact there is no record of a $1,000 payment for such a purpose or payment to any physician.[7] (Ex. 39; Partial Tr. Vol. IV. at 86, Dec. 4, 2014, (May 26, 2015).)   Moreover, Attorney Slane's testimony on other points related to expert consultation – specifically his alleged pretrial interactions with Dr. May -- were completely wrong s they were inconsistent with the testimony of Dr. May and her contemporaneously maintained records, (*Compare* Vol. IV, Partial Tr. at 30, 32, Dec. 4, 2014, (May 26, 2015) *with* Tr. at 26-28, 51, Jan. 22, 2015; Ex 32 at 53-55), which suggests that Attorney Slane's memory with respect to any interactions with any experts in this case, is unreliable. Finally, Attorney Slane did not mention any other expert witness when previously executing an affidavit in this case. (Partial Tr. Vol. IV at 83-84, Dec. 4, 2014, (May 26, 2015).) The alleged hiring of a second, unnamed male doctor, also is inconsistent with statements by Attorney Funderburk to the family and the Oklahoma Bar Association.   As of the time Mr. Funderburk came to San Antonio – approximately three weeks before trial, Attorney Funderburk had not hired *any* experts. (Tr. at 176-777, Dec. 1, 2014; Tr. at 36, Mar. 2, 2015.)  Approximately two weeks prior to trial, when arguing with a witness, Janus Roth, about whether to delay to the trial due to his failure to hire a medical expert, Mr. Funderburk made no mention of having had a medical review conducted.  (Tr. at 37-40, 42-43, Mar. 2, 2015.) Indeed, when Attorney Funderburk met with Petitioner the

---

[7] Further calling Attorney Slane's recollection in to doubt is the fact that Attorney Slane remembers Attorney Reynolds was to be paid $2,500; however, Attorney Reynolds was *not* paid $2,500 for his services, but rather $650 for his services as investigator and $5,000 for his services as an attorney. (Ex. 39 at 35, 45, 47; *see also fact¶I.158 internally*.)

Friday before trial and they discussed the medical evidence, Attorney Funderburk did not indicate that any medical expert had reviewed the case – just that the review by Dr. May was underway.  (Tr. at 53-54, Mar. 5, 2015.)   Consistently, in Attorney Funderburk's response to the grievance filed with Oklahoma Bar Association that challenges, in part, his failure to use experts, he identifies only Dr. May as a medical expert consulted. (Tr. at 23-24, Mar. 20, 2015; Ex. 45 at 3-6, 18-20.)

 With respect to finding number five, Petitioner contends that the following evidence rebuts the factual finding that the defense "were aware of [Dr. May's] opinion that the victim's injuries were consistent with child abuse by September 9, 2005:" The testimony at the evidentiary hearing was that Dr. May faxed a copy of her report on September 9. However, there has been no testimony that Mr. Funderburk or any member of the defense actually read the report or were aware of its contents until Mr. Funderburk met with Dr. May on the evening of September 11, the night before the trial began. (Tr. at 19, 21, 24-30, Dec. 3, 2014; Tr. at 25-26, 35-36, Jan. 22, 2015.)  In fact, there was testimony presented at the evidentiary hearing, that on the Friday before trial – September 9, 2005, Mr. Funderburk met with Petitioner and, although they discussed Dr. May, Mr. Funderburk did not indicate that there was no medical support for an alternative cause of death. (Tr. at 52-53, Mar. 5, 2015.)  The evidence presented from Dr. May indicate that she had no dealings before trial with anyone other than Mr. Funderburk, and that she *met* with him the night before jury selection at Applebee's in Kansas City. (Tr. at 17, 26, 28-30, 35-36, 50, 52, Jan. 22, 2015; Ex. 32.)  Attorney Slane received Dr. May's conclusions on the first day of testimony, (Trial Tr. Vol. I at 14, Sept. 13, 2005, (Attorney Slane: "Today . . . Mr. Funderburk got here and

gave . . . the two-page letter of what the doctor's summary is")) and did not meet or talk to Dr. May until after the second day of testimony, (Ex 32 at 3; Tr. at 181-82, Dec. 1, 2014; Tr. at 26-27, 29-30, Jan. 22, 2015).

With respect to finding number eight, Petitioner contends that the following evidence rebuts the factual finding that the decision not to present the identified expert witnesses "was a tactical decision based on such witness's reputations": Although Attorney David Slane testified that he considered and rejected Dr. Plunkett specifically or minority-view doctors generally as a consultant or expert in Petitioner's case, his testimony is not credible. First, Attorney Slane never expressed any concern to Petitioner about a potential backlash or negative impact that using a non-mainstream doctor might have on the trial. (Tr. at 67, Mar. 5, 2015.) Second, according to Attorney Slane, his concern was that Dr. Plunkett had testified so frequently, Dr. Plunkett was vulnerable on cross-examination, and that could hurt Petitioner's otherwise favorable credibility with a jury.  (Partial Tr. Vol. IV at 36-37, 48, Dec. 4, 2014, (May 26, 2015).) However, Attorney Slane's personal experience with Dr. Plunkett, on which Attorney Slane allegedly relied in making this decision, occurred in a trial years *after* that of Petitioner's. (Partial Tr. Vol. IV at 40-41, 46-47, Dec. 4, 2014, (May 26, 2015)); (Okla.'s Req. for Lewis/Daubert Hr'g Regarding the Test. Of John Plunkett, MD., *Okla. v. Fabinski*, CF-2005-1769, (Nov. 2, 2007).) Attorney Slane did not contact Plunkett directly, nor did any other member of the defense team, but allegedly made the decision not to use him based on Attorney Slane's general awareness of a reputational problem in that Dr. Plunkett was a "hired gun" and was subject to cross-examination based on testimony in previous cases. (Tr. at 159, Dec. 1, 2014; *see also, e.g.,* Partial Tr. Vol. IV

at 36-37 (May 26, 2015.) Dr. Plunkett had less baggage at the time of Petitioner's trial than he did at the time of the evidentiary hearing.  (Tr. at 28-29, Apr. 14, 2015.)  Fourth, Attorney Funderburk makes no mention of even having considered using Dr. Plunkett when responding to Petitioner's grievance to the Oklahoma Bar Association criticizing him for not using an expert.  (Ex. 45.)  Surely if he had been considered and rejected these doctors for some strategic reason, Attorney Funderburk would have mentioned it when his bar license was at stake.  Indeed, Attorney Funderburk admitted to the Oklahoma Bar Association that he did *not* hire a shaken baby defense expert, but, unlike the story told by Attorney Slane at the Evidentiary Hearing about why those experts were not even consulted, Attorney Funderburk said he did not because there was no evidence that A.S. had died from being shaken.[8]  (Tr. at 80-81, Mar. 5, 2015.)

With respect to finding number eleven, Petitioner contends that the following evidence rebuts the factual finding that "there has been no evidence that [Mr. Funderburk] advanced his own case to the detriment of Petitioner's" or that "there has been no evidence presented that Mr. Funderburk's representation of Petitioner was impacted in any manner by his own criminal prosecution": The evidence presented included evidence that Mr. Funderburk was concerned enough about his criminal case that he attempted to communicate directly and often with the ADA assigned to the case, rather than go through his attorney.  (Tr. at 115, 119, 137, Dec. 2, 2014; Tr. at 115, Dec. 3, 2014.)  Ultimately, Mr. Funderburk reached out to *the* District Attorney for assistance (Tr. at 118, 129, Dec. 2,

---

[8] This explanation is also unsupported.  In fact, the State's experts at trial testified that A.S. had suffered injuries that could *only* be explained by shaking. (*See, e.g.,* Trial Tr. Vol. II 155, 169-175, 261, 253-54, 258, 260-63; Trial Tr. Vol. III 81-85, 88-89, 111.).

2014; Tr. at 114-17, 120, Dec. 3, 2014).  Moreover, because the prosecution was one of a lawyer, it would have been well-known and talked about within the office (Tr. at 113, 122; 124, 129, Dec. 3, 2014).  Mr. Funderburk's actions on his own behalf stand in stark contrast to the lack of diligence in his representation of Petitioner.

Shortly before Petitioner's trial, Mr. Funderburk's criminal case took a turn for the worse when the state completely debunked his defense (Tr. at 113-14, 123-24, 126, Dec. 2, 2014, Ex. 105.)  The state revealed its discovery at a time in which Mr. Funderburk was suffering a number of additional, significant, personal and professional stressors (*see, e.g.,* Exs. 100, 104, 108-109, 110, 112, 123-24,133-36), which were in addition to the potential prison time and loss of his bar license.  While Mr. Funderburk's attention was predictably focused on his criminal matter, he failed to pursue an alternative strategy (which was clearly plausible, *see* ECF Nos. 135, 139), failed to timely consult with expert witnesses and investigate matters pertaining to the cause and timing of the death of the child, failed to reasonably consult with his client, and failed to request a continuance when he requested to do so by the family and/or when he received Dr. May's adverse report with additional areas for follow-up.

Not only did the defense not advise Petitioner of the existence of the conflict (Tr. at 89, Mar. 5, 2015), it failed to advise the court.  Similarly, the prosecution in Petitioner's case failed to bring the matter to the court's attention, despite the fact that prosecution of a lawyer was well known in the office (Tr. at 113, 122; 124, 129, Dec. 3, 2014) and the prosecution of Mr. Funderburk was known by the DA himself (Tr. at 118-19, 134, Dec. 2, 2014; Tr. at 114, Dec. 3, 2014).

With respect to finding number twelve, Petitioner contends that the following evidence rebuts the factual finding that "there has been no evidence that Mr. Funderburk was impaired or under the influence of intoxicating substances at the time he represented Petitioner in this matter and that "Mr. Funderburk was functioning normally throughout the course of his representation": The evidence presented at the evidentiary hearing includes evidence that the Oklahoma County District Attorney's office believed, for the period during Mr. Funderburk's representation of Petitioner, that Mr. Funderburk was in need of in-patient substance abuse treatment.  (Tr. at 112-113, Dec. 2, 2014; Tr. at 114, 128, Dec. 3, 2014.)   The undisputed evidence indicates that Mr. Funderburk was missing a lot of appointments around the time of Petitioner's trial (Ex. 100 at 10-11, 104), was suffering from significant professional, financial, and personal problems (*see, e.g.,* Exs. 100, 104, 108-109, 110, 112, 123-24,133-36), was filling competing prescriptions for drugs that, as their very function, depress the central nervous system receptor that controls motor skills and cognitive ability (Tr. at 12-14, Jan. 8, 2015.)  During the period in which he represented Petitioner, Mr. Funderburk filled prescriptions for 1,000 pills of benzodiazepines and seven bottles of promethazine with codeine (Tr. at 29-30, Jan. 8, 2015; Ex. 59-62, 100) – a commonly abused drug that increased the risk of side effects such as confusion and sleepiness from the benzodiazepines.  (Tr. at 191-92, Dec. 3, 2014; Partial Tr. at 37, Dec. 4, 2014 (June 23, 2016); Tr. at 111-12, Jan. 8, 2015; Exs. 53, 58,59, 60, 61, 62.) Based on Mr. Funderburk's prescription history, his supply of benzodiazepines was cut drastically in August 2005, after the State of Oklahoma subpoenaed his medical records from one of his prescribing doctors. (Tr. at 32-33, 117-18, Jan. 8, 2015; Partial Tr. at 56-57, Dec. 4, 2014

(June 23, 2016); Exs. 53, 58-62, 100.) The significant change would have caused him to suffer from withdrawal symptoms.

Although expert testimony indicated that the type of drug dependency from which Mr. Funderburk suffered would not necessarily make him appear impaired to others (Partial Tr. at 16-18, Dec. 4, 2014, (June 23, 2015); Tr. at 36, Jan. 8, 2015), there actually were signs of impairment.  During the trial itself, the evidence presented was that Attorney Funderburk was distracted, inattentive, and fidgety. (Tr. at 184, Dec. 1, 2014.)  He did not take notes and seemed "almost too" relaxed.  (Tr. at 184, Dec. 1, 2014; Tr. at 156-57, 178, Dec. 2, 2014; Tr. at 68, Mar. 5, 2015.) He did very little, did not seem engaged, and was not very helpful to Petitioner's defense. (Tr. at 31-32, Dec. 3, 2014.)  He would either be leaning back in his chair or forward with his hand on his face.  (Tr. at 68, Mar. 5, 2015.) Although Attorney Reynolds backed off somewhat from this statement since going to work for Attorney Slane, he previously characterized Attorney Funderburk's demeanor during Petitioner's trial as "semi-catatonic". (Tr. at 31-32, 40-41, 55, Mar. 5, 2015.) Attorney Reynolds, who officed with Attorney Funderburk and was also friends with him, began living on the same floor in the Lakeview Towers apartment building around the trial or shortly thereafter: Based on his observations around that time period, Mr. Reynolds believed Attorney Funderburk had a drug problem.  (Tr. at 5-6, 32-34, 37, 85, 102-103, 105-107, 140-141, 152, Dec. 3, 2014; Lakeview Towers check, Pet'r**'s** Ex. 39, at.37.)  From early 2004 through the spring of 2006, Attorney Funderburk's personal assistant noticed changes in Attorney Funderburk's physical and mental state, as well as his attitude.  (Tr. at 135-39, Dec. 3, 2014). With respect to his mental state, one day Attorney Funderburk would be

"rush, rush, rush," and the next day, he simply wouldn't show up for work.  (Tr. at 140, Dec. 3, 2014.)  The change began gradually, but accelerated rapidly: By the spring of 2006, it was like the world was falling apart.  (Tr. at 139-40, Dec. 3, 2014.)

Moreover, Attorney Reynolds testified that Mr. Funderburk suffered from a severe alcohol problem.  Shortly around or after Petitioner's trial in 2005,[9] Attorney Reynolds noted that Attorney Funderburk had begun drinking an awful lot and became dependent on Attorney Reynolds to take care of Attorney Funderburk's basic life stuff. (Tr. at 33, 80, 85, 152, Dec. 3, 2014, Ex 39 at 37.) It was "really shocking . . . how bad he had become." (Tr. at 33, Dec. 3, 2014.)  Attorney Funderburk would become extremely inebriated for extended periods of time.  (Tr. at 106, Dec. 3, 2014.) When Attorney Funderburk directed Attorney Reynolds to go to the liquor store for him, Attorney Reynolds ceased office sharing with Attorney Funderburk.  (Tr. at 32-33, 85, 102-103, 105, 107, Dec. 3, 2014.)  This was not something that just developed post-trial, however.  In May 2004, Attorney Funderburk himself reported to one of his physicians, Dr. Prater, that Attorney Funderburk was taking shots to assist in sleeping, and that he was concerned about developing an alcohol problem. (Ex. 100 at 5.)

Mr. Funderburk had been characterized as drug-seeking – specifically for Valium (a/k/a/ as Diazepam) as early as 2001 (Ex. 54 at 2,4). Mr. Funderburk tested positive for benzodiazepines, carisoprodol, and opiates – specifically meprobamate, carisoprodol,

---

[9] Although Mr. Reynolds testified that he thought Mr. Funderburk moved into Lakeview Towers in 2006 (and tied his drinking problem to about the time he moved in), Mr. Funderburk's testimony and the relevant bank records indicates that Mr. Funderburk moved to LakeView Towers around the time of the trial.  (Tr. at 102, 140-41, 151-52, Dec. 3, 2014; Ex. 39 at 37 (showing check for Lakeview Towers on Sept. 8, 2005).

codeine, diazepam, nordiazepam, and zolpidem – when he was arrested in December 2003 (Funderburk's Mot. to Suppress Quash and Dismiss, Att. A, Case. No. CF-2003-6954 (June 29, 2005); (Tr. at 45-49, 50-54, Mar. 3, 2015).  Once again, these are the very drugs he was taking during the pendency of Ms. Moore's case – drugs he was getting from different doctors and filling at different pharmacy, and for which he was paying cash – all classic drug-seeking behaviors (Tr. at 194, Dec. 3, 2015; Partial Tr. at 36, 45, Dec. 4, 2014, (June 23, 2016); Tr. at 26-27, Jan. 8, 2015; Exs. 58-62).  Mr. Funderburk sought medical attention for withdrawal from these same drugs in April 2004 (Tr. at 8-9, Mar. 3, 2015; Ex. 55R), prompting the physician to suggest he go to detox (Tr. at 9-10, Mar. 3, 2015; Ex. 55R). Instead, Mr. Funderburk's prescription records show *increased* use of these drugs from spring 2004 until August 2005 (*See, e.g.,* Tr. at 188-89, Dec. 3, 2014; Partial Tr. at 56-57, Dec. 4, 2014 (June 23, 2016); Tr. at 32-33, Jan. 8, 2014; Exs. 53, 58-62, 100) – during the very time period he is handling Petitioner's case.  Several months after Petitioner's trial, Mr. Funderburk asked his personal assistant to go to his former doctor, Dr. Yang, and try to obtain pills for him.  Ultimately, Mr. Funderburk died of a drug overdose from these very drugs in January 2010 (Tr. at 58:7-18, Dec. 4, 2014, (June 23, 2016)).  It defies all logic to suggest that Mr. Funderburk was not taking these drugs during the pendency of Petitioner's case – or that he wasn't impaired.  Moreover, his behavior suggests that he was suffering from an addiction problem, in that he was missing appointments (Ex. 100 at 10-11), having significant professional, financial, and personal problems (*See, e.g.,* Exs. 100, 104, 108-109, 110, 112, 123-24,133-36, and was taking on fewer and fewer cases (Ex. 138).  The evidence clearly indicates that Mr. Funderburk was suffering – during the period he was handling

Petitioner's case – from a later stage substance use disorder (Partial Tr. at 14-18, Dec. 4, 2014, (June 23, 2016)) and that he would have been physically and cognitively impaired while he was representing Petitioner (Partial Tr. at 16-18, Dec. 4, 2014 (Jun. 23, 2015); Tr. at 36, 69, Jan. 8, 2015).

With respect to finding number thirteen, although Petitioner contends that whether Mr. Funderburk "misappropriated" funds for his own benefit is a mixed question of law and fact, should the Court determine that it is a matter of historical fact, Petitioner contends that the following evidence rebuts this finding: The evidence presented at the evidentiary hearing indicates that, in addition to the $35,000 paid to the defense lawyers consistent the contract executed by Petitioner, Petitioner's family paid over $43,500 into Attorney Funderburk's client trust fund for a particular type and caliber of experts and investigators. (Tr. at 133-34, Dec. 1, 2014; Tr. at 27, Mar. 2, 2015; Tr. at 101, Mar. 3, 2015; Ex. 6; 45, 83.) Petitioner's mother – the person to whom Petitioner authorized to make such decisions on her behalf -- memorialized final authorizations for client monies held in Attorney Funderburk's client trust account on behalf of Petitioner on August 28, 2005; she authorized $6,000 for investigators, $5,000 for travel expenses for a Judge Stinson to assist with the trial, and $20,000 for four expert witnesses (a pathologist, a confession expert, a psychologist, and a shaken baby syndrome expert). (Tr. at 149-50, Dec.1, 2014; Ex. 15.) In total, Ms. Carmichael, authorized only $35,500 of the funds held in trust for experts and investigators.  (Tr. at 102, Mar. 3, 2015.) This left additional funds available for other experts or matters, should they be needed (such as the neuropathologist suggested by Dr. May). Petitioner consented to these authorizations.  (Tr. at 56, Mar. 19, 2015.) Petitioner did

not agree to Attorney Funderburk to taking any money earmarked for experts and spending it on anything else.  (Tr. at 51-52, 56-59, Mar. 19, 2015.)  Of the funds disbursed from the trust account, only $650 paid to Eric Reynolds for investigative work and $390 to former police officer Lyn McCumber for a review of Petitioner's interrogation tape correspond at all with any documented authorizations.  (Tr. at 103, 112, Mar. 3, 2015; Tr. at 9, Mar. 4, 2015.)  Although Mr. Funderburk's client trust account records do not directly trace what Mr. Funderburk *actually* spent the money on, instead of Petitioner's case as directed, the evidence indicates that he wrote numerous checks to himself and/or his secretary/girlfriend – well in excess of the contract and even any alleged modifications, made checks out to cash (Tr. at 100, Dec. 3, 2014, and Ex. 39 at 14, 17, 30),[10] and paid numerous personal expenses out of the account (Tr. at 100, Mar. 3, 2015), including: checks for pizza and other food (*e.g.,* Ex. 39 at 31-32); rent at Lakeview Towers (Ex. 39 at 37); department stores and electronics (Ex. 39 at 18-19 (attributing the Circuit City purchase to "paperwork Beverly Moore")), and credit card payments (*e.g.,* Ex. 39 at 67).  Mr. Funderburk's own statements to the Oklahoma Bar Association and his bank records support by clear and convincing evidence that he did *not* use the funds to hire the experts requested and that he used at least a significant portion of that money for himself.  Moreover, expert witness, Jeff Trevillion, CPA, testified that Attorney Funderburk misappropriated the trust funds designated for Petitioner's defense. (Tr. at 105-06, Mar. 3, 2015; Tr. at 9-10, Mar. 19, 2015.)  His

---

[10] Some of these even bear a memo designation that they were related to Petitioner's case. However, Mr. Funderburk did not include them in his accounting to the Oklahoma Bar Association, which suggests that the reference to Petitioner's case may not be accurate. (*see. e.g.,* Ex. 39 at 17, 30; Tr. at 110-111, Dec. 3, 2015.)

conclusion rested primarily on (1) evidence that Attorney Funderburk made a false statement to Petitioner's family regarding the amount of Dr. May's outstanding bill; (2) Attorney Funderburk made, or failed to correct, false statements regarding funds designated for Judge Stinson; (3) Attorney Funderburk made false statements to the Oklahoma Bar Association, including providing inaccurate reports as to the total amount of funds paid to himself and by providing records showing that funds had been taken before alleged authorizations had been made (putting his testimony as to the subsequent authorization in question). (Tr. at 106, Mar. 3, 2015; Tr. at 10, Mar. 19, 2015.)

### 4.  *Petitioner can establish facts sufficient to support her constitutional claims*

#### a.  *Deficient Performance of Trial Counsel*

Defense counsel's function "is to make the adversarial testing process work in the particular case." *Strickland v. Washington*, 466 U.S. 668, 690 (1984).  To prevail on a claim of ineffective assistance of counsel, Petitioner must show that counsel's representation fell below an objective standard of reasonableness, and that she was prejudiced by the deficient performance, *Strickland*, 466 U.S. at 693, thus creating a "reasonable probability" of a different result.  *Id.* at 694; *Rompilla v. Beard*, 545 U.S.  374, 390 (2005); *Wiggins v. Smith*, 539 U.S. 510, 511, (2003); *Williams v. Taylor*, 529 U.S. 362, 391 (2001).

Deficient performance is "measured against an objective standard of reasonableness under prevailing professional norms." *Rompilla*, 545 U.S. at 380-381. Courts "long have referred" to the American Bar Association standards on the performance of counsel "as guides to determining what is reasonable." *Id.; Wiggins*, 539 U.S. at 524; *Strickland*, 466 U.S. at 688-689. Additionally, the Oklahoma Rules of Professional Conduct are "pertinent

to any discussion of attorney conduct when the rules touch on subjects raised in a claim of ineffectiveness. *Jackson v. Oklahoma*, 2001 OK CR 37, ¶ 24, 41 P.3d 395, 400. In *Hinton v. Alabama*, __ U.S. __, 134 S.Ct. 1081, 1088 (2014), the United States Supreme Court observed that the "deficient performance" prong of *Strickland* is "necessarily linked to the practice and expectations of the legal community." Counsel's performance is deficient if it was "outside the wide range of professionally competent assistance" and "fell below an objective standard of reasonableness." *Id.* at 688-89.

Counsel's deficient performance causes prejudice when there is a reasonable probability that the outcome of the proceeding would be different. *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Prejudice is evaluated by considering the totality of the circumstances. *Id.* at 703.

### *Failure to investigate*

Standard 4-4.1 of the American Bar Association Criminal Justice Standards for the Defense Function, 3rd Ed. (1993), relating to counsel's duty to conduct an independent investigation of cases states:

(a) Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty.

Although Ms. Moore "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy", *Strickland*,

466 U.S.668, 690 (1984), simply labeling an action taken by trial counsel as "trial strategy" does not insulate the attorney's performance from further review.  *See Paine v. Massie*, 339 F.3d 1194, 1200 (10th Cir. 2003); *Hardwick v. Crosby*, 320 F.3d 1127, 1186 (11th Cir. 2003).  Indeed, the relevant question is whether counsel's choices were *reasonable*, rather than whether they were strategic.  *See United States v. Arny,* 831 F.3d 725, 732 (6th Cir. 2016).  Strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limits on investigation."  *Strickland*, 466 U.S. at 690-91.  A lawyer is obligated to explore all avenues leading to facts relevant to the merits of the case.  *Rompilla*, 545 U.S. at 387.

In *Wiggins*, the Supreme Court articulated the analysis as to whether counsel has fulfilled the duty to adequately investigate a case such that decisions to forego certain evidence can be considered "tactical", as the analysis asks whether the investigation supporting the decision not to present certain evidence was reasonable.  *Wiggins*, 539 U.S. at 523.  Ultimately, the Court found that counsel's investigation into available mitigation for Mr. Wiggins was unreasonable as counsel did not follow the steps to develop potential mitigation evidence that were standard practice in the State of Maryland at the time.  *Id.* at 524-527.  In finding counsel deficient in failing to conduct an adequate investigation into mitigating evidence, the *Wiggins* Court considered counsel's own statements in the opening statement of the penalty phase of trial with what counsel actually did to follow through with the production of evidence.  In looking at the contrast between what was said in opening statement verses what evidence was actually put on during the penalty phase of trial the Court noted that, "When viewed in this light, the strategic decision the state courts and

50

respondents all invoke to justify counsel's limited pursuit of mitigating evidence resembles more a post-hoc rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing." *Id.* at 526-527.

In *Smith v. State*, 2006 OK CR 38, ¶ 38, 144 P.3d 159, 167, the Oklahoma Court of Criminal Appeals found counsel's performance deficient because counsel did not adequately educate himself on the defense of Battered Women's Syndrome (BWS) so as to better represent his client. Instead, counsel left it to his client and her family to find a BWS expert. Counsel contacted a single BWS expert, but only found out that expert's fee. When his client indicated hopelessness that an expert wouldn't make a difference because she was going to be convicted anyway so there was no point in spending the money, counsel failed to counsel his client as to the importance of raising the BWS defense and getting her evaluated by an BWS expert. Further, the *Smith* Court faulted counsel with making decisions about the BWS defense being "less than fully informed of the pertinent facts and circumstances." *Id.* at ¶ 41, 144 P.3d at 168. Counsel's decision to forego the assistance of an expert was not part of any reasonable trial strategy. *Id.*

The record establishes that Mr. Funderburk did not take advantage of any of the resources at his disposal to educate himself on issues related to Shaken Baby Syndrome or Shaken Impact Syndrome. From the time he entered his appearance in the case, he was given a considerable amount of medical records and other records on A.S.'s history, including information about prior falls and possible genetic abnormalities. He was given resources, including access for consultation with Petitioner's uncle, who was an experienced child abuse investigator, and $6,000 for experienced investigators. None of these records or

51

resources were utilized in Ms. Moore's defense. In fact, the transcript of the trial reveals that counsel was not even familiar enough with this information (and its obvious relevance to the issues related to A.S.'s cause of death and potential timing issues) to answer the trial court's questions about relevance when deciding on whether to grant the State's motion in limine preventing the presentation of any of that information. Counsel's inability to articulate any defense related information during the argument on the State's motion in limine constitutes deficient performance. (As in *Wiggins*, Respondent's assertion that counsel's actions were reasonable trial strategy "resembles more a post-hoc rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing." *Wiggins*, 539 U.S. at 526-527.)

Mr. Funderburk also was provided information about an SBS defense website and given the name of the expert witness Assistant Public Defender Jennifer Richard had contacted who was ready to evaluate the case in February 2005. He apparently did not follow up on any of the information he was provided by Ms. Richard. Failure to use the information he obtained from previous counsel (who had begun to educate herself on issues related to SBS) constitutes deficient performance.

Mr. Funderburk also refused to use the information provided to him by witnesses Janus Roth, Terri Moore, Donna Carmichael, Gordon Carmichael, and, indirectly, Todd Snyder relating to A.S.'s previous falls, medical history, developmental delays, and behavioral issues. His failure to use the information that was given to him on multiple occasions to investigate a cohesive theory of defense constitutes deficient performance. Moreover, no one on the defense interviewed any of the State's medical or fact witnesses or

subpoenaed the child's medical records, including hospital records, radiology images, and histological stains.

Mr. Funderburk, who had the primary responsibility for Ms. Moore's defense during the pre-trial phase of the case, failed to take those steps that reasonable attorneys did at the time to investigate and develop a defense theory. The steps a reasonable lawyer would have taken in 2005 to investigate a case like this are illustrated by those things Assistant Public Defender Jennifer Richard did while she represented Ms. Moore. Not only did Mr. Funderburk, and by extension, the rest of the trial team not take those steps, he didn't even make use of the information and records he received from Ms. Richard and others when he entered his appearance in this case.

Instead of conducting a reasonable investigation with plentiful resources available to do so, Mr. Funderburk waited until two weeks before trial to retain Dr. May, whom he had not bothered to determine was actually suited to be a consulting expert on this case. Waiting until two weeks before trial was unreasonable, and therefore, deficient, because it did not leave any time to follow up on any of Dr. May's suggestions regarding other experts to contact. This includes a referral to a neuropathologist who could have shed light on the timing of A.S.'s injuries relating directly to the alternative defense theory that Todd Snyder injured the child before leaving A.S. in Ms. Moore's sole care. Mr. Funderburk also failed to provide to Dr. May everything she needed to conduct a complete review of the case and he did not provide her a complete medical history of the child, including records from previous that had been provided to Mr. Funderburk.

Attorney Robert Wyatt testified at the evidentiary hearing regarding what steps are necessary to conduct a reasonable investigation in a murder case involving SBS/SIS.  He concluded that the failure of trial counsel in Ms. Moore's case to conduct any meaningful investigation into the case was not reasonable strategy.

Given the testimony at the evidentiary hearing relating to the lack of any meaningful investigation until two weeks prior to trial, and the lack of following up on information received from Dr. May the weekend before trial began, counsel's investigation was not reasonable.  Therefore, none of the decisions made when trial began that related to the presentation of a defense can be deemed reasonable.

### Failure to interview witnesses

Related to defense counsel's failure to investigate a theory of defense was counsel's failure to interview both lay and expert witnesses necessary to prepare to confront the State's case. Without interviewing witnesses, including the State's expert medical witnesses, counsel cannot make reasonable trial strategies. Even the trial court recognized the necessity of interviewing the medical examiner in a case like this.  (Trial transcript Tr. II 17) It is clear from the trial record that Mr. Funderburk had never spoken to the Medical Examiner to determine whether she could support the defense's timeframe theory. Moreover, Attorney David Slane testified at the evidentiary hearing that he had not done so. Mr. Slane, who conducted the cross-examination of all the medical witnesses at trial, stated on the first day of trial that he had no personal knowledge as to the details as to the child's past behavior including previous head injuries associated with tantrums which was the crux of the defense's original defense.  It is clear from his contemporaneous statements that Mr.

Slane had not interviewed either lay witnesses or medical witnesses who had such knowledge.

Additionally, defense counsel failed to interview any of its own witnesses until the eve of trial.   Eric Reynolds, a baby attorney with no prior experience interviewing witnesses, was tasked with interviewing "character" witnesses yet some of those witnesses, particularly Terri Moore and Janus Roth, had much more information to offer relating to A.S. and his medical and developmental history. There is no reasonable trial strategy in waiting to interview known witnesses until the weekend before trial begins. Likewise, there is no reasonable trial strategy in not spending time with the witnesses who did testify on Ms. Moore's behalf preparing those witnesses for testimony.

In *State v. Aragon*, 216 P.3d 279, 281 (N.M.C.A. 2009), the New Mexico Court of Appeals found that counsel's failure to interview State's medical witnesses in child abuse trial amounted to a prima facie case of ineffective assistance of counsel.   The Court observed, "Although the failure to retain a defense expert will not establish in every case the prejudice necessary to make a claim for ineffective assistance of counsel, under the facts of the present case it is clear that without an expert to either assist in trial preparation or to testify on Defendant's behalf, Defendant was deprived of his only avenue of defense." *Id.*

If the defense strategy was to turn the State's witnesses into defense witnesses, such strategy was unreasonable in light of the fact that none of the defense attorneys interviewed any of the State's medical witnesses and/or provided them with A.S.'s medical history. Accordingly, the failure to conduct such interviews constitutes deficient performance.

### *Failure to consult with and present testimony from qualified expert witnesses*

The Supreme Court has recognized that, "[c]riminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence." *Harrington v. Richter*, 562 U.S. 86, 106 (2011). The *Hinton* Court noted that Hinton's case was such as case because the core of the State's case against Hinton was the state ballistics expert's conclusion that six bullets fired in that case were fired from Hinton's revolver. *Hinton*, 134 S.Ct. at 1088. The Court reasoned that the only way to rebut that evidence was through a competent expert on the defense side. *Id.* This is such a case.

In *People v. Ackley*, 870 N.W.2d 858, 863 (Mich. 2015), the Supreme Court of Michigan held that counsel rendered deficient performance in a child abuse case by only consulting with a single expert relating to whether the child's injuries could have been accidental, and failing to follow up with a second expert recommended to counsel as a more qualified expert on that issue. "While an attorney's selection of an expert witness may be a paradigmatic example of trial strategy, for purposes of ineffective assistance claim, that is so only when it is made after thorough investigation of the law and facts in a case." *Id.* at 390-391. The *Ackley* Court found that, "Counsel did not have sufficient information to legitimate this 'choice.'" *Id.* at 391.

Similarly, in *Commonwealth v. Epps*, 53 N.E.3d 1247, 1259-1262 (Mass. 2016), the Supreme Judicial Court of Massachusetts found that counsel rendered ineffective assistance of counsel where counsel failed to present evidence that the child did not die from Shaken Baby Syndrome but from the result of a series of short falls. In so finding, the *Epps* Court

found that counsel's performance was deficient because "counsel chose not to consult with any further experts after speaking with one expert who he knew did not question the validity of shaken baby syndrome and who, without having viewed the medical records, offered the opinion that Veronica's injuries could not possibly have been caused by the accidental falls described by the defendant." *Id.* at 1259-1260.   Ultimately the *Epps* Court found that counsel's actions were unreasonable because at the time of the trial (July 2007), "there was substantial scientific evidence and medical literature that recognized the possibility that accidental short falls can cause serious head injuries in young children of the type generally associated with Shaken Baby Syndrome." *Id.* at 759.   The Court observed, "Numerous studies had also been published at the time of trial challenging the view that shaking alone can produce the types of injuries associated with shaken baby syndrome.   Although these issues were hotly contested in the relevant medical and scientific fields, and although the experts who would support the positions beneficial to the defense were in the minority in this debate, there was significant medical and scientific support for these minority positions." *Id.* at 760 (citations omitted).

This case is similar to *Ackley* and *Epps* because after finding out that Dr. May did not question the validity of Shaken Baby Syndrome or Shaken Impact Syndrome, counsel did not consult any other experts who could inform the jury about the medically and scientifically founded "minority" view.   The failure to consult with any expert that could actually assist in Ms. Moore's defense resulted in deficient performance by counsel.

Moreover, Dr. May was not provided with key evidence provided by the client, including histological slides that were critical in determining the timing of the injuries A.S.

57

sustained. This is a key omission because one of the defense theories mentioned at trial, but for which the defense team was unable to provide support, was the timing of the injuries. Additionally, the defense team failed to provide key medical records or timelines, important anecdotal information relating to the child that had been identified by Petitioner and her supporters. Failure to provide (complete) medical records and evidence identified by a client believed to be relevant to explain the cause of death is unreasonable. *See Dendel v. Washington*, 647 Fed. Appx. 612 (6th Cir. 2016)

When Dr. May told counsel she could not help Ms. Moore's case, she recommended different specialists whom counsel never contacted. For example, Dr. May suggested consulting with a neuropathologist and ophthalmic pathologist but counsel never followed up because at that point there was not time as trial was to begin the next day. Although Dr. May gave counsel a list questions to use in cross-examining the State's medical witnesses including questions that relate to the presence of intracellular iron, those questions were not asked.

In addition to defense counsel's failure to timely consult with medical experts who could inform them and the jury about the evidence-based "minority" view on SBS/SIS, counsel failed to consult with other experts recommended by experienced counsel and requested by Petitioner and her family, including a pathologist (which would have included a neuropathologist, as recommended by Dr. May), a biomechanical expert to identify whether the state's theory as to shaking was physically possible, and an expert with experience on false confessions to help provide context for Petitioner's inculpatory statements to the police.

### *Failure to present a cohesive theory of defense*

Pages 7-20 of Volume I of the trial transcript are instructive on the issue of whether counsel was ready and able to present a cohesive theory of defense on behalf of Ms. Moore. Those pages reflect a trial team in disarray who were confused about what the defense was going to be at trial and how they were going to support the defense with evidence. The attempts by counsel to articulate a defense were stymied by the State's assertion that no notice had been given to the State about the defense theories or the evidence proffered to support them. When the State's motion in limine was first discussed, Mr. Slane was clearly not able to "accurately depict" what the defense was going to be in relation to presentation of testimony. (Tr. I 10.) The next day, when Mr. Funderburk was present, it was clear that critical decisions had not yet been made such as whether Dr. May would testify and what she might testify about. Likewise, Mr. Funderburk indicated that Dr. Choi could establish that it was possible that previous injuries to A.S. could have caused his death but upon inquiry by the trial judge it became obvious that Mr. Funderburk had not spoken to Dr. Choi and did not know whether she could support the defense theory about previous falls. At one point in the discussion, Mr. Funderburk stated that Dr. May would not testify. However, when pressed by the court about how the defense was going to prove that it was Todd Snyder, not Ms. Moore, who injured the child Mr. Funderburk contradicted himself and stated that Dr. May "could testify to that."

Despite counsel's inability to articulate a coherent defense theory, the trial court's ruling relating to the State's motion in limine was based on counsel's lack of notice to the State about what key witnesses would testify to in order to support the defense. (Tr. I 25)

The absence of adequate notice illustrates that ten-days before trial when such notice must be filed the defense had not arrived at a defense theory, let alone a strategy, for putting on evidence in support of that defense.

There can be no reasonable trial strategy in failing to give adequate notice of defense witnesses and evidence. Furthermore, there is no reasonable trial strategy in not being able to articulate a defense and who is going to testify in support of that defense, on the second day of trial. Counsel's performance also was deficient because counsel completely failed to present a cohesive and coherent defense during trial. This is particularly true in this case where counsel had adequate time and resources at their disposal for that purpose.

> ### *Failure to request a continuance to have time to consult other experts and interview the State's medical witnesses in order to present a cohesive theory of defense*

Because the use of experts was critical to rebut the State's case against Ms. Moore, counsel was deficient in not asking for a continuance when asked by the Petitioner's family so that counsel could review the case with experts before identifying witnesses on a final witness list, and again when necessary to consult with other experts such as a neuropathologist and ophthalmic pathologist like Dr. May recommended.

It is clear from the trial record that none of the lawyers were ready to present any kind of meaningful defense for Ms. Moore. The argument on the State's motion in limine reflects that counsel could not even articulate a cohesive defense theory, let alone articulate the evidence that was going to be used to defend their client. Mr. Reynolds testified at the evidentiary hearing that he did not know he would be tasked with the cross-examination of the detective that sponsored Ms. Moore's custodial statement—a piece of evidence that was

critical to the case and therefore was not prepared.  None of the attorneys spent time with

Ms. Moore to fully explore the case and prepare her to testify; therefore, she was unprepared

and put on the stand with no preparation.

Under the circumstances of this case, no counsel could have rendered effective

assistance of counsel with the minimal amount of preparation that occurred before trial

began.  Counsel should have asked for a continuance to better prepare a defense for Ms.

Moore so as to subject the State's case to the adversarial testing demanded by the United

States Constitution.

### *Failure to act diligently on Ms. Moore's behalf*

Standard 4- 3.6 of the American Bar Association Criminal Justice Standards for the

Defense Function, entitled "Prompt Action to Protect the Accused", states:

 Many important rights of the accused can be protected and preserved only by prompt legal
action. Defense counsel should inform the accused of his or her rights at the earliest
opportunity and take all necessary action to vindicate such rights. Defense counsel should
consider all procedural steps which in good faith may be taken, including, for example,
motions seeking pretrial release of the accused, obtaining psychiatric examination of the
accused when a need appears, moving for change of venue or continuance, moving to
suppress illegally obtained evidence, moving for severance from jointly charged defendants,
and seeking dismissal of the charges.

Similarly, the version of Rule 1.3 of the Oklahoma Rules of Professional Conduct in
effect in 2005 stated "A lawyer shall act with reasonable diligence and promptness in
representing a client."

Many of the deficiencies set forth above can be directly attributed to counsel's failure

to act diligently on Ms. Moore's behalf.  From the beginning of his representation, Mr.

Funderburk was provided with essential information that needed to be followed up on in a

timely manner in order to present a cohesive theory of defense.  However, none of the steps

necessary to present such a defense were taken until just before trial began which was too late to present a meaningful defense or adequately challenge the State's case.

There is no reasonable trial strategy in neglecting to investigate and prepare a defense in a timely manner.  That is particularly true in this case where the issues were complex but adequate resources were available to counsel during the entirety of his representation. Counsel's failure to act diligently constitutes deficient performance.

### *Failure to communicate with client*

Standard 4-3.9 of the American Bar Association Criminal Justice Standards for the Defense Function, 3rd Ed. instructs:

(a) Defense counsel should keep the client informed of the developments in the case and the progress of preparing the defense and should promptly comply with reasonable requests for information.
(b) Defense counsel should explain developments in the case to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

In 2005, Rule 1.3 of the Oklahoma Rules of Professional Conduct stated:

(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.
(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

The facts developed at the evidentiary hearing establish that Ms. Moore spent approximately thirty (30) minutes with Mr. Funderburk discussing the facts of the case on February 10, 2005, when she signed the engagement contract. Ms. Moore did not see Mr. Funderburk, nor any other attorney, again until the Friday before trial, when she spent approximately one (1) hour discussing the case.  Ms. Moore also spoke to Mr. Funderburk one time by telephone between February 10th and the beginning of trial.  Although she

wrote Mr. Funderburk several letters between February 10th and the beginning of trial, Ms. Moore never received any written correspondence from Mr. Funderburk or any other attorney.

Mr. Funderburk, who had the primary duty of preparing the case for trial, did not communicate with Ms. Moore in any meaningful way during his representation. Accordingly, Ms. Moore was not kept apprised of any efforts to prepare a defense on her behalf, or the absence of such preparation.  Ms. Roth and Ms. Carmichael expressed concern for the lack of communication between Ms. Moore and Mr. Funderburk did not improve counsel's communication with his client. The lack of meaningful communication with Ms. Moore by Mr. Funderburk is consistent with his apparent failure to act diligently on her behalf. The absence of communication by Mr. Funderburk or any other attorney on the team was unreasonable given the complex nature of Ms. Moore's case and constitutes deficient performance.

### *Prejudice*

The prejudice flowing from trial counsel's ineffectiveness in not properly investigating and consulting with and presenting appropriate medical experts has already been established, such that this Court has found previously that the undisputed medical evidence uncovered by Petitioner in the habeas petition that speaks to the timing of the child's injuries (the hemosiderin, papilledema, vitreous hemorrhaging, Perl's positive material, and complete breakdown of the auto-regulation system) would prevent any reasonable jury from finding beyond a reasonable doubt that A.S. had died from traumatic injuries inflicted on January 13, 2004. Without such a finding, the jury would have had no

basis to find that Ms. Moore had done anything to cause the boy's death. The issue under *Strickland* – whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would be different," *Strickland*, 466 U.S. at 694 – is actually *less onerous* than, but subsumed within, the one already decided–"whether no reasonable juror, in light of the new evidence, would have voted to find [her] guilty beyond a reasonable doubt" *Schlup v. Delo*, 513 U.S. 298, 329 (1995); *see also McLuckie v. Abbott*, 337 F.3d 1193, 1198 (10th Cir. 2003) (discussing how the prejudice prong of *Strickland* is actually *less* than a preponderance of the evidence). The latter issue was fully and fairly litigated and is now law of the case, as to what effect the failure to present the medical evidence had on the outcome of the trial, prejudice already has been established.

To the extent that the doctrine of the law of the case does not apply, Petitioner contends that the same arguments and evidence presented in support of her actual innocence claim clearly support a finding that there was a reasonable probability that, had counsel fulfilled their constitutional obligations, the result of the proceeding would be different.

Viewing the totality of the circumstances, the failure to investigate a reasonable alternative strategy – which includes a failure to timely consult with experts who may have been in the "minority" view with respect to the science on SBS/SIS and failure to obtain complete and necessary medical records, interview the state's witnesses, interview any fact witnesses, meet and communicate with Petitioner, follow-up on recommendations from the doctor with which they consulted, request a continuance to pursue additional evidence, adequately cross-examine the state's medical experts, or prepare Petitioner to testify – likely affected the outcome of her trial in that she previously was not able to offer any cogent

defense, much less one that offered an alternative explanation for the child's death, offered a *medically-supported* basis for the theory that someone else could have caused the child's trauma. Petitioner also suffered prejudice in that her credibility, the lynchpin of the case defense counsel did present, was negatively impacted due to the incomplete and misleading information provided by counsel as to the medical evidence and the absence of preparation leaving her unprepared for cross examination and the assault on her credibility. For example, in *Commonwealth v. Millien*, 50 N.E.3d 808 (Mass. 2016), the failure to present "minority" view experts at trial (indeed, one suggested to Mr. Funderburk), could have caused the jury to doubt whether the child died from shaking or shaking plus impact, and could have pointed to medical evidence that provided medical support that the prior falls suffered by the child could have produced the injuries the state attributed to unreasonable force. Moreover, in *Commonwealth*, had the defense consulted with a medical expert, said expert, said expert could have assisted a competent defense attorney in preparing for the challenge to their options on cross examination. *Id.* at 823. *See also Cavazos v. Smith*, 565 U.S. 1 (2011) (Ginsburg, J., dissenting) (citing biomechanical and other studies raising doubt about shaken baby syndrome).

### b. *Conflict of Interest of Trial Counsel*

It is an assailable tenant of the law that a criminal defense attorney owes an absolute duty to render conflict free representation to his client. The Sixth Amendment's right to counsel includes the "correlative right to representation . . . free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 2710 (1981). Under the Sixth Amendment, counsel has a duty to avoid conflicts of interest. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). The

Sixth Amendment's guarantee to effective assistance of counsel applies equally to cases involving retained counsel as to cases involving appointed counsel. *Cuyler v. Sullivan,* 466 U.S. 335, 344 (1980) ("The vital guarantee of the Sixth Amendment would stand for little if the often-uninformed decision to retain a particular lawyer could reduce or forfeit the defendant's entitlement to constitutional protection.") Petitioner's Sixth Amendment rights are impaired when just one of her attorneys is burdened by a conflict of interest. *Stoia v. United States,* 22 F.3d 733 (7th Cir. 1994).

Petitioner is entitled to relief if she can demonstrate by preponderance of the evidence that her counsel suffered from an actual conflict of interest that adversely affected his performance. *Cuyler v. Sullivan*, 446 U.S. 335 (1980). In *Wheat v. United States,* 486 U.S. 153, 158-159 (1988), the United States Supreme Court Supreme Court stated:

> The Sixth Amendment to the Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." ... [t]he purpose of providing assistance of counsel "is simply to ensure that criminal defendants receive a fair trial," *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984), and that in evaluating Sixth Amendment claims, "the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such." *United States v. Cronic,* 466 U.S. 648, 657, n. 21, 104 S.Ct. 2039, 2046 n. 21, 80 L.Ed.2d 657 (1984). Thus, while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers....

An actual conflict exists when the attorney's interests diverge on a material factual or legal issue or course of action. *Livingston v. State*, 1995 OK CR 68, ¶ 11, 907 P.2d 1088, 1091; *Allen v. State*, 1994 OK CR 30, ¶ 11; 874 P.2d 60, 64. The conflict occurs when the

attorney owes duties to the defendant and any other person, including the attorney himself. *Allen* at ¶ 11.

If a defendant failed to object to a conflict at trial, she must show that the conflict adversely affected the representation, such that the attorney was not as "effective" as he could have been had the conflict not existed. *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002); *Allen* at ¶ 12; 874 P.2d at 64. "Counsel cannot be effective if conflicts of interest, no matter how subtle, dull the zeal of undivided loyalty." *Banks v. State*, 1991 OK CR 51, ¶ 34, 810 P.2d 1286, 1296. However, when, as here, a defendant was not made aware of a conflict and was therefore deprived of the opportunity to object to it, she is not required to show she was adversely affected by it. *Allen* at¶ 12, 874 P.2d at 63-64. *See also Glasser* 315 U.S. 60, 76 (1942).

When determining if a conflict affected the representation, the court may infer that the conflict was the reason for certain, potentially adverse, trial decisions. *Glasser v. United States*, 315 U.S. at 72 (Due to conflict, counsel failed to pursue a line of cross-examination), *superseded by statute on other grounds as recognized in Bourjaily v. United States*, 483 U.S. 171 (1987). "When . . . counsel operates under an actual conflict of interest, we presume the adversarial balance has been altered and prejudice inures to the defendant, affecting the adequacy of the representation." *Stouffer v. Reynolds*, 168 F.3d 1155, 1161 (10th Cir. 1999). Moreover, failing to take actions "that are clearly suggested by the circumstances" can indicate an adverse effect. *Id.* An adverse effect can arise at any stage of the litigation including pretrial investigation or entry of a plea." *Mickens v. Taylor*, 240 F.3d 348, 360 (4th Cir. 2001), *aff'd*, 535 U.S. 162, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002).

Petitioner also may establish that a conflict affected the representation where there was some plausible alternative defense strategy that could have been pursued but was not. *United States v. Bowie*, 892 F.2d 1494, 1500 (10th Cir. 1990).

A prosecutor aware of a potential or actual conflict is duty-bound to bring it to the court's attention. "The prosecution's duty to alert the court to defense counsel's potential and actual conflicts of interest is rooted not only in the defendant's right to effective and conflict-free representation, but also in the prosecutor's role as "an administrator of justice, an advocate, and an officer of the court." ABA Standards for Criminal Justice 3–1.2(b) (3d ed.1993);" *see also United States v. McKeighan*, 685 F.3d 956, 966 (10th Cir. 2012)

Similarly, defense counsel have an ethical obligation to advise the court of any conflict in addition to explaining the conflict and potential implications to the client. *Cuyler*, 446 U.S. at 346. *See also People v. Edebohls*, 944 P.2d 552, 556 (Colo. App. 1996). Once a trial court is aware, or reasonably should know, of a possible conflict of interest, it must initiate an inquiry. *Culyer v. Sullivan*, 446 U.S. at 347; *Wheat*, 486 U.S. 153, 160.

The 2005 version of Rule 1.7 (b) of the *Oklahoma Rules of Professional Conduct*, Okla. Stat. tit. 5, Ch. 1, App.3-A governing conflicts of interests of current clients stated:

> (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
>
> (1) the lawyer reasonably believes the representation will not be adversely affected; and
>
> (2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation

> shall include explanation of the implications of the common representation and the advantages and risks involved.

In that regard, the accompanying Comment to the rules stated:

> The lawyer's own interests should not be permitted to have adverse effect on representation of a client. For example, a lawyer's need for income should not lead the lawyer to undertake matters that cannot be handled competently and at a reasonable fee. See Rules 1.1 and 1.5. If the probity of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client detached advice.

Rule 4-1.7 (b) of the *American Bar Association Criminal Standards for the Defense Function, 4th ed.* states:

> Defense counsel should not permit their professional judgment or obligations regarding the representation of a client to be adversely affected by loyalties or obligations to other, former, or potential clients; by client obligations of their law partners; or by their personal political, financial, business, property, or other interests or relationships.

A serious problem arises when "there is a substantial risk that the lawyer's representation of the client would be materially and adversely affected by the lawyer's own interests or by the lawyer's duties to another current client, a former client, or a third person." Restatement (Third) of the Law Governing Lawyers § 121 (2000) *as cited by United States v. Pizzonia*, 415 F. Supp. 2d 168, 176 (E.D.N.Y. 2006).

The evidence presented by Petitioner shows that Isaac Funderburk was harboring under actual conflicts of interest during the entirety of his representation of Ms. Moore in this case. The various conflicts of interest had a cumulative effect on the case and adversely affected his representation.

**Pending Oklahoma County Criminal Charges**

Mr. Funderburk was being prosecuted by the Oklahoma County District Attorney's Office for a felony drug possession charge and a misdemeanor driving under the influence charge throughout his representation of Ms. Moore.  At the time of Ms. Moore's prosecution, conviction of any criminal charge would have resulted in professional discipline by the Oklahoma Supreme Court. Rule 7.1, *Rules Governing Disciplinary Proceedings*, Okla. Stat. tit. 5, Ch. 1, App. 1-A.  (2001). The elected District Attorney, Wes Lane, was actively involved in the negotiations of Mr. Funderburk's case. The primary Assistant District Attorneys assigned to the case were Cassandra Williams and Jennifer Chance.  When the Okla. County District Attorney's Office prosecutes a lawyer, it is well-known in the office.  Knowledge of the pending criminal charges against Mr. Funderburk are therefore imputed to the entire District Attorney's Office under those circumstances and should have prompted the District Attorney's Office to disclose the conflict to the trial judge so the judge could have inquired about the matter on the record.  This duty was all the more important given the fact that the members of the District Attorney's Office prosecuting Mr. Funderburk's case believed that Mr. Funderburk needed in-patient treatment for his drug problem, indicating the Office's belief that he was harboring under a drug problem and was in need of treatment.

Mr. Funderburk did not advise Ms. Moore of the pending charge when she hired him and at no time did he or his co-counsel disclose the charge to either Ms. Moore or the court. A defense attorney with a pending criminal charge in the same jurisdiction has an actual conflict of interest because counsel "might not have the zeal to engage in a bruising battle

with the very prosecutor's office that would be weighing his fate." *New Jersey v. Cottle*, 946 A.2d 550, 559 (2008); *see also United States v. Levy*, 25 F.3d 146, 156 (2nd Cir. 1994); *United States v. DeFalco*, 644 F.2d 132, 134 (3rd Cir., 1980); *Alexander v. Rice*, 264 F.3d 878, 886-887 (9th Cir. 2001).  Because Ms. Moore was not made aware of the conflict of interest, she could not contemporaneously object to it and prejudice is presumed.  *Allen*, 874 P.2d at 64.

Even if prejudice is not presumed, Petitioner can show that the conflicts had an adverse effect.  For instance, while harboring under this conflict of interest, Mr. Funderburk failed to subject the State's case to meaningful adversarial testing through his failure to do such basic things as introduce evidence of A.S.'s medical history of head injuries, interview the medical doctor who expressed skepticism that A.S.'s death was caused by SBS, follow-up on recommendations by Dr. May relating to better developing the time-line of injuries so as to establish someone else could be responsible for A.S.'s injury, and put on fact witnesses who could have described A.S.'s physical condition in the days and weeks prior to his death.  All of this information was at Mr. Funderburk's disposal yet he failed to utilize any of it, and apparently failed to share significant pieces of it with co-counsel.

Moreover, when Dr. May told Mr. Funderburk that she could not help the defense, Mr. Funderburk should have asked for a continuance to consult specialists as recommended by Dr. May.  However, by September 2005, Mr. Funderburk's criminal charges had been pending since December 2003.  On September 1, 2005, Assistant District Attorney Jennifer Chance endorsed a pharmacist who would testify that the pills Mr. Funderburk possessed at the time of his arrest where different than the pills for which he had presented a prescription

to support a Motion to Quash.  The hearing on the Motion to Quash was scheduled for mid-October, less than a month after Mr. Moore's trial.  Were he to continue Petitioner's trial, Mr. Funderburk may not be able to continue representation (such that he was facing jail time and potential revocation of his bar license), and there was a significant chance that his lack of diligence and his financial misconduct (set forth below) would be uncovered.

Mr. Funderburk's advocacy of his own case stands in stark contrast to the representation he gave Petitioner.  He approached ADA Chance so many times to talk about his own case that she had to write a letter to his attorney requesting that Mr. Funderburk stop talking directly to her about his case because it created an ethical issue for her.  Such behavior indicates where Mr. Funderburk's focus was in the fall of 2005 – not on Petitioner's case but his own.

Because an actual conflict of interest existed, prejudice to Ms. Moore is presumed, her conviction must be vacated.  Even if prejudice is not presumed, under the facts identified above, Petitioner has demonstrated that the conflict had an adverse effect on the defense of her case.  *See Levy*, 25 F.3d at 158 (showing that the lawyer's conflicts prompted him to forgo a viable line of defense is sufficient to establish that the conflict had an "adverse effect" upon the representation); *DeFalco*, 644 F.2d at 137 ("even without proof of an actual conflict of interest, legitimate decisions of counsel were rendered suspect because of the potential for conflicting loyalties to himself and a client").

### *Counsel's Drug Use, Financial Struggles, and Misappropriation of Petitioner's Client Trust Funds*

Another facet of the conflict of interest was created by counsel Funderburk's struggle

with drug addiction and his increasing financial struggles during his representation of Petitioner.  Evidence adduced at the evidentiary hearing established that Mr. Funderburk was engaging in drug seeking activity in 2004 and 2005 and received prescriptions for several medications that overlapped in therapeutic purpose and together would have exceeded the maximum therapeutic dosage. Such behavior indicates that he was using a level of prescription narcotics suggesting physical and psychological addiction.  His closest colleague around the time of Ms. Moore's trial, Mr. Reynolds, believed Mr. Funderburk had a drug problem and described him drinking "an awful lot." In fact, Mr. Reynolds decided to quit office sharing with Mr. Funderburk when he was asked to go to the liquor store by Mr. Funderburk.  He described Mr. Funderburk's state around and following September 2005, the month of trial, as a "downward spiral." (Tr. 85, Dec. 13, 2014.)

During the time of his representation of Petitioner Mr. Funderburk defaulted on his mortgage, fell delinquent in paying income and property taxes, was being sued for indebtedness, and was facing contempt charges for unpaid child support.  Additionally, during the timeframe in which he represented Ms. Moore, the number of cases he was handling was dwindling indicating that Ms. Moore's case became Mr. Funderburk's primary source of income leading up to the trial.

Mr. Funderburk's motivation to obtain money from Petitioner and her supporters was not for the benefit of Petitioner's case, but because Mr. Funderburk was struggling financially and needed the money; a circumstance caused, no doubt, by his addiction to prescription medication.  Ultimately, the record bears out that Mr. Funderburk received $43,500.00 earmarked for expert witnesses and investigators. As a direct result of his

personal financial needs, Mr. Funderburk did not pay any experts to evaluate the State's case against Ms. Moore, to testify in trial, or to offer an alternate theory in her defense. Mr. Funderburk also took money for an expert to testify about the custodial interview but never utilized one.   Further, no meaningful investigation was conducted into the case though money for investigators was included in the money he was paid.

Under Rule 1.7 (b) it is evident that Mr. Funderburk placed his own monetary interest above the demands of Petitioner's case spending the money for personal purposes (i.e. obtaining narcotics; placing a deposit on an apartment) instead of spending the money to adequately investigate Petitioner's case, interview witnesses and hire experts as counsel had promised and was ethically obligated to do.   Mr. Funderburk's personal financial interest and use of narcotics created a conflict of interest wherein he placed his needs over the needs of his client.   Instead of spending money allocated for Ms. Moore's defense, counsel spent the money for his personal benefit making Petitioner's defense at trial non-existent.   Because of this actual conflict of interest adversely affected counsel's representation, Petitioner's conviction must be vacated.

### Conflict arising from Third Party Payment Arrangement

Third-party fee arrangements create a conflict of interest.  *Wood*, 450 U.S. at 268-69, 101 S.Ct. at 1101-02, 67 L.Ed.2d 220; *Quintero v. United States*, 33 F.3d 1133, 1135 (9th Cir. 1994).  The rationale is that such payments create a conflict is that the lawyer is put in position where the third-party may be allowed to make decisions relating to the litigation instead of the client.

The version of Rule 1.8 of the *Oklahoma Rules of Professional Conduct*, Okla. Stat.

74

tit. 5, Ch.1, App. 3-A (2001) in effect in 2005 stated in relevant part that:

> (f) A lawyer shall not accept compensation for representing a client from one other than the client unless:
>
> (1) the client consents after consultation;
>
> (2) there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and
>
> (3) information relating to representation of a client is protected as required by Rule 1.6.

Without Ms. Moore's knowledge, attorney Funderburk communicated with supporter Fran Vanderventer and made an agreement in August 2005 that she would pay Mr. Funderburk an additional $15,000.00. The arrangement in this case constitutes an actual conflict of interest because, after accepting the supplemental $15,000.00 payment, Attorney Funderburk let Ms. Vanderventer tried to direct the strategy of the case by redirecting funds dedicated to investigators and experts to himself. All of this was done without Petitioner's knowledge and consent. Further, it was accomplished by the use of fraudulent statements by Mr. Funderburk regarding the reason more money was being requested, pitting Ms. Moore's family and supporters against each other with Mr. Funderburk in the middle. To the extent Mr. Funderburk relied on instructions from Ms. Vanderventer that resulted in the diversion of funds away from experts and investigators as Petitioner desired, and towards Mr. Funderburk and/or his office personally, this created an actual conflict of interest, which adversely affected Petitioner. *See United States v. Rodrigues,* 347 F.3d 818 (9th Cir. 2003).

***Counsel failed to pursue a reasonable plausible alternative theory***

An actual conflict affects counsel's representation where there was some plausible alternative defense strategy that could have been pursued but was not due to counsel's own personal interests. *United States v. Bowie*, 892 F.2d 1494, 1500 (10th Cir. 1990). As established above, defense counsel had a reasonable alternative theory to present to the jury that would have exculpated Ms. Moore for the homicide of A.S.  Those theories include an alternate explanation for A.S.'s death and also that the injuries sustained by A.S. were sustained earlier in the day when Todd Snyder, not Beverly Moore, was with A.S.  Because counsel had misappropriated money that was intended to be used for expert witnesses as discussed above, he had to forego presenting any evidence of an alternative theories.

### c.  Brady claim

As demonstrated by the prior factual findings and conclusions of law issued by this Court (ECF Nos. 135, 139), the actual radiological images and histological slides played a key role in dating the child's fatal injuries. Although this material was clearly available, it was not disclosed to the defense. Moreover, the Office of the Chief Medical Examiner (a state agency) has indicated that not only were the basic histological slides never produced, but also that the medical examiner had actually conducted an iron stain (for Perl's positive material) of the injury she concluded was the fatal injury.  Neither the slides, images thereof, nor the report of the findings from the slide were ever disclosed.

The State was under the affirmative duty to disclose evidence favorable to the defense.  *Brady v. Maryland*, 373 U.S. 83 (1983); Okla. Const. art. 2 § 7. This obligation applies *regardless of request* by the defense and the State cannot hide behind an "open file"

policy. *Strickler v. Greene*, 527 U.S. 263, 283 n. 23 (1999).  It is incumbent on the State to learn of favorable evidence known to others working on the state's behalf and to disclose it. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

The State failed to disclose the histological slides and the special iron stain conducted by the Office of the Chief Medical Examiner.  Compounding the error created by the State's nondisclosure was the introduction of vague and misleading (and incorrect) testimony at trial about the significance of the histology (the review of these slides) on the timing of the injuries – testimony that went unchallenged because Defendants were not provided the actual slides for review.  *See* Trial Tr. Vol. 3, 91, 94, 109-110.   Had such evidence been disclosed, it would have revealed that nothing Ms. Moore did or did not do caused the child's death.  (*See* ECF Nos. 135, 139.) Obviously, given this Court's prior findings about the significance of the outcomes of these medical tests, there is more than a "reasonable probability" that, had the evidence been disclosed to the defense, the outcome would have been different.[1]   Therefore, the conviction cannot stand and Ms. Moore is entitled to a new trial.

### d.  *Deficient Performance of Appellate Counsel Claims*

### *Failure to Raise IAC – Deficient Performance of Trial Counsel*

Appellate counsel was informed by Janus Roth, the child's daycare provider, that she had previously provided trial counsel with information regarding the deceased child's

---

[1] Ms. Moore contends that the role of this specific evidence and the results of its examination (the presence of papilledema, hemosiderin, and Perl's positive material) was critical to the determination of actual innocence, which is more stringent than, yet encompassed within, the prejudice analysis.

extensive and troublesome medical and behavioral history, and that trial counsel had not followed up on it. Ms. Moore also informed appellate counsel that her supporters had provided monies for the hiring of expert witnesses, but that Mr. Funderburk did not use that money for those purposes.  Presumably, appellate counsel obtained a copy of the trial file, including Dr. May's report, which criticized the Medical Examiner's office for failing to consult with specialists and conducting special stains to test the suggestion in the medical records that the allegedly fatal injury was "old".  A review of the trial transcript against the report of Dr. May and her suggested examination of Dr. Choi would have revealed that trial counsel failed to follow up on legitimate issues that would have demonstrated Ms. Moore's innocence.

Appellate counsel, while not required to advance every nonfrivolous argument that could be made, *see Jones v. Barnes*, 463 U.S. 745, 754 (1983), is expected to raise all issues that would have warranted reversal, modification of the sentence, or remand for resentencing. *Hooks v. State*, 902 P.2d 1120, 1124 (Okla. Crim. App. 1995).

Had counsel raised the issue on appeal that trial counsel was ineffective for failing to consult with, retain, and present expert testimony on the medical issues presented in this case, and requested an evidentiary hearing, appellate counsel could have elicited the medical testimony that was developed and presented in the federal habeas action and demonstrated both the ineffectiveness of counsel and the obvious prejudice that resulted. See *Smith*, 144 P. 3d 159 (Okla. Crim. App. 2006). Ms. Moore was denied her right to effective appellate counsel.

### *Failure to Raise IAC of Trial Counsel for Conflict Claims*

Appellate counsel was on notice that Ms. Moore believed Mr. Funderburk to have "swindled" the monies placed in her client trust fund for payment of investigators and experts. Appellate counsel could have discovered, with very little effort (by running a search of Mr. Funderburk's name on OSCN), that trial counsel, Mr. Funderburk, had entered into a plea with the Oklahoma County District Attorney's office to reduce his felony possession of a controlled substance charges to that of a misdemeanor. Had that search been run, appellate counsel would also have learned of Mr. Funderburk's significant financial difficulties.

Appellate counsel was therefore deficient in failing to undertake this investigation in light of the accusations against trial counsel and the information learned from Ms. Roth about trial counsel's failure to conduct any investigation/retain any experts. The law on conflicts of interest and the presumptive prejudice associated with Ms. Moore's ignorance of the conflict was well-established at the time of Ms. Moore's appeal. *Strickland,* 466 U.S. at 688; *Allen,* 874 P.2d at 64; see also *United States v. Levy*, 25 F.3d 146, 156 (2nd Cir. 1994); *United States v. DeFalco*, 644 F.2d 132, 134 (3d Cir. 1980); *Alexander v. Rice*, 264 F.3d 878, 886-87 (9th Cir. 2001). Therefore, had appellate counsel raised this issue, there is a reasonable probability that Ms. Moore would have had her conviction overturned and a new trial ordered.

***Failure to Uncover and Raise the Brady Violation***

As alleged previously, appellate counsel was on notice that there were medical issues that went completely unexplored by trial counsel. Appellate counsel also presumably received a copy of the trial file (or the failure to do so would be deficient in and of itself). A review of the trial file and that of the records reviewed by Dr. May, when compared against the microscopic examination in the Autopsy Report, would have revealed that Ms. Moore was never provided copies of the slides. Moreover, there was an indication in Dr. May's written report that the initial examination of these slides revealed an older injury. The failure to recognize the exculpatory nature of these slides is deficient performance given the report of Dr. May and the information from Ms. Roth that there was something else going on with this child, medically speaking.

The Autopsy Report does not indicate that any special stains were conducted. However, the microscopic examination section of the Autopsy Report does reveal that Dr. Choi was able to see "neutrophils infiltration in the hemorrhagic area of the back of the head, along with scattered hemosiderin laden macrophages present in the contusion." If she was able to see this without the benefit of special stains, then that suggests even more strongly that the injury was old and the slides were clearly exculpatory (moreover, the slides could have been compared, as they were by Ms. Moore's habeas experts, to each other to determine the relative amount of hemosiderin in the allegedly fatal injuries versus those known to have been associated with the medical injury or other injuries that occurred at or shortly after the time of the child's collapse).  Dr. Choi from the Office of the Chief Medical

Examiner has claimed to have conducted a single iron stain on this particular injury. As an iron stain is used to detect the amount of iron storage complex being held in cells and the amount of iron is extremely probative to the age of the injury, that stain, too, would be clearly exculpatory (*See* ECF Nos. 135, 139). Regardless of whether a special stain was made or just the basic slides were made, the material was exculpatory and not disclosed. Appellate counsel was deficient in failing to discover that this material had not been turned over, was exculpatory, and by failing to raise the Brady claim on appeal.

Had the *Brady* violation been presented on direct appeal, Ms. Moore would have been entitled to a new trial because the failure to disclose was clearly prejudicial. The (unstained) slides would have demonstrated that the allegedly fatal blow to the child's head was much older than the medical injuries or the tongue injury sustained at the time of collapse. The iron stains (if they existed) would have demonstrated this even more clearly. Because the State's case hinged on the theory that Ms. Moore shook the child (applying unreasonable force) during a thirteen-minute window in which she was alone with the child, the evidence contained within the slides dating the injury as being one that was days, weeks, or even months old would have conclusively disproved the State's case. Because presentation of this claim on appeal would have warranted reversal, Ms. Moore is now entitled to a new trial based on the ineffectiveness on her trial counsel.

## CONCLUSION

Petitioner has and can present facts demonstrating that the performance of her trial and appellate counsel fell below that guaranteed by the United States Constitution, and that the state unlawfully withheld exculpatory evidence. Petitioner respectfully requests that the

Court grant her writ of habeas corpus and order her released from her unlawful confinement

and any other remedy to which she is entitled.

Respectfully Submitted,

s/Christine Cave
Christine Cave, OBA #19774
Employers Legal Resource Center
3500 S. Boulevard, Suite 14-B
Edmond, OK 73013
Phone: 405-702-9797
Fax:    405-576-3956
Email:
mainoffice@okemployerlaw.com
**ATTORNEY FOR PETITIONER**

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of April 2019, I electronically transmitted the attached document to the Court Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Tessa L. Henry,
Diane Slayton,
Assistant Attorney General

s/Christine Cave
 Christine Cave

82