**No. CIV-09-985-G**

---

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

---

**BEVERLY MICHELLE MOORE,**

**Petitioner,**

**–vs–**

**ABOUTANAA EL HABTI, Warden,**

**Respondent.**

---

**SUPPLEMENTAL RESPONSE TO
SECOND AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

---

**MIKE HUNTER
ATTORNEY GENERAL OF OKLAHOMA**

**CAROLINE E.J. HUNT, OBA #32635
ASSISTANT ATTORNEY GENERAL**

**313 NE 21st Street
Oklahoma City, OK  73105
(405) 521-3921; (405) 522-4534 (FAX)
Service email:  fhc.docket@oag.ok.gov**

**ATTORNEYS FOR RESPONDENT**

---

**June 15, 2020**

# TABLE OF CONTENTS

Page

**STATEMENT OF FACTS.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

**STANDARD OF REVIEW.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

**ARGUMENT AND AUTHORITY.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**

**GROUND ONE**

      **PETITIONER DID NOT RECEIVE THE INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL WITH REGARD TO EITHER COUNSEL'S PRETRIAL INVESTIGATION OR COUNSEL'S PERFORMANCE AT TRIAL.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**

**A.**     *Strickland* **Standard.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

**B.**     **State District Court's Findings.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**

**C.**     **Trial Counsel Conducted a Reasonable Pretrial Investigation and Presented a Reasonable Defense at Trial.** . . . . . . . . . . . . . . . . . . . . . . **40**

**D.**     **Conclusion.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **103**

**GROUND TWO**

      **TRIAL COUNSEL ISAAC FUNDERBURK WAS NOT OPERATING UNDER ANY ACTUAL CONFLICTS OF INTEREST.** . . . . . . . . . . . . . . . . . . . **105**

**A.**     **Conflict of Interest Standard.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **106**

**B.**     **State District Court's Findings.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **107**

**C.**     **Petitioner Has Not Demonstrated An Actual Conflict of Interest.** . . . . . . . . **112**

**D.**     **Conclusion.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **129**

i

**GROUND THREE**

      **THE STATE DID NOT COMMIT A *BRADY* VIOLATION.** . . . . . . . . . . . . . . . . **129**

**A.**     ***Brady* Standard.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **129**

**B.**     **The State Did Not "Suppress" Evidence.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **131**

**C.**     **Conclusion.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **134**

**GROUND FOUR**

      **APPELLATE COUNSEL DID NOT RENDER INEFFECTIVE ASSISTANCE IN FAILING TO RAISE THE CLAIM OF INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL ALLEGED IN GROUND ONE.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **134**

**A.**     ***Strickland* Standard.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **135**

**B.**     **Appellate Counsel Was Not Ineffective.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **136**

**C.**     **Conclusion.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **137**

**GROUND FIVE**

      **APPELLATE COUNSEL DID NOT RENDER INEFFECTIVE ASSISTANCE IN FAILING TO RAISE THE CLAIM OF INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL ALLEGED IN GROUND TWO.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **137**

**A.**     ***Strickland* Standard.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **138**

**B.**     **Appellate Counsel Was Not Ineffective.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **138**

**C.**     **Conclusion.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **140**

<u>**GROUND SIX**</u>

**APPELLATE COUNSEL DID NOT RENDER INEFFECTIVE ASSISTANCE IN FAILING TO RAISE THE *BRADY* CLAIM ALLEGED IN GROUND THREE.**..................................... **140**

**A.**    ***Strickland* Standard.**............................................... **141**

**B.**    **Appellate Counsel Was Not Ineffective.**............................... **142**

**C.**    **Conclusion.**...................................................... **142**

<u>**CONCLUSION**</u>...................................................... **142**

<u>**CERTIFICATE OF SERVICE**</u>............................................ **143**

## TABLE OF AUTHORITIES

## FEDERAL CASES

*Alexander v. Rice*,
    264 F.3d 878 (9th Cir. 2001) ....................................................................... 123

*Berryman v. Morton*,
    100 F.3d 1089 (3d Cir. 1996) ......................................................................... 64

*Bishop v. Warden, GDCP*,
    726 F.3d 1243 (11th Cir. 2013) ................................................................. 26, 63

*Bradford v. Williams*,
    No. 12-6016, 479 F. App'x 832 (10th Cir. May 7, 2012) .................................. Passim

*Brady v. Maryland*,
    373 U.S. 83 (1963) .................................................................................. Passim

*Brecht v. Abrahamson*,
    507 U.S. 619 (1993) ................................................................................. 24, 25

*Browning v. Trammell*,
    717 F.3d 1092 (10th Cir. 2013) ..................................................................... 130

*Bullock v. Carver*,
    297 F.3d 1036 (10th Cir. 2002) .......................................................... 28, 42, 82

*Burt v. Titlow*,
    571 U.S. 12 (2013) ....................................................................................... 73

*Coleman v. Thompson*,
    501 U.S. 722 (1991) ..................................................................................... 49

*Com. v. Epps*,
    53 N.E.3d 1247 (Mass. 2016) ......................................................................... 85

*Consalvo v. Sec'y for Dep't of Corr.*,
    664 F.3d 842 (11th Cir. 2011) ................................................... 50, 54, 61, 64

*Cullen v. Pinholster*,
    563 U.S. 170 (2011) .................................................................................. 6, 48

*Cuyler v. Sullivan*,
    446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) ............................................... 107

*Davis v. Sharp*,
    943 F.3d 1290 (10th Cir. 2019) ........................................................................ 69, 70, 89

*DeLozier v. Sirmons*,
    531 F.3d 1306 (10th Cir. 2008) ................................................................................ 69, 82

*Efurd v. Norris*,
    No. 5:04CV00117 JLH, 2006 WL 1646166 (E.D. Ark. June 9, 2006) ........... 133, 142

*Ellis v. Raemisch*,
    872 F.3d 1064 (10th Cir. 2017) ...................................................................................... 92

*Estelle v. McGuire*,
    502 U.S. 62 (1991) ........................................................................................................ 124

*Faretta v. California*,
    422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed. 2d 562 (1975) .................................................. 31

*Fish v. Schwab*,
    957 F.3d 1105 (10th Cir. 2020) .................................................................................... 104

*Flick v. Warren*,
    465 F. App'x 461 (6th Cir. 2012) .................................................................................. 85

*Forest Guardians v. Babbitt*,
    174 F.3d 1178 (10th Cir. 1999) ...................................................................................... 43

*Garrett v. Selby Connor Maddux & Janer*,
    425 F.3d 836 (10th Cir. 2005) .............................................................................. Passim

*Grant v. Royal*,
    886 F.3d 874 (10th Cir. 2018) ..................................................................... 6, 25, 40, 48

*Grant v. Trammell*,
    727 F.3d 1006 (10th Cir. 2013) ........................................................................... Passim

*Harmon v. Sharp*,
    936 F.3d 1044 (10th Cir. 2019) ...................................................................................... 48

*Harrington v. Richter*,
    562 U.S. 86 (2011)..................................................................................Passim

*Harvin v. Mahally*,
    No. CV 15-3395, 2019 WL 7606221 (E.D. Pa. Dec. 30, 2019)............. 52, 63, 117, 118

*Hayes v. Brown*,
    399 F.3d 972 (9th Cir. 2005) ...................................................................... 24

*Hinton v. Alabama*,
    571 U.S. 263 (2014)........................................................................... 81, 83, 84

*Hooks v. Workman*,
    689 F.3d 1148 (10th Cir. 2012)..............................................................Passim

*In re James*,
    940 F.2d 46 (3d Cir. 1991) ......................................................................... 45

*Johnson v. Williams*,
    568 U.S. 289 (2013)............................................................................... 49, 51

*Kimmelman v. Morrison*,
    477 U.S. 365 (1986)............................................................................... 29, 71

*Knowles v. Mirzayance*,
    556 U.S. 111 (2009).................................................................................... 31

*Kyles v. Whitley*,
    514 U.S. 419 (1995).................................................................................. 129

*Lambert v. Blackwell*,
    175 F.Supp.2d 776 (E.D. Pa. 2002) ............................................... 44, 45, 47

*Littlejohn v. Royal*,
    875 F.3d 548 (10th Cir. 2017)................................................... 24, 28, 104

*Littlejohn v. Trammell*,
    704 F.3d 817 (10th Cir. 2013)................................................... 24, 28, 104

*Maharaj v. Sec'y for Dep't of Corr.*,
    432 F.3d 1292 (11th Cir. 2005)................................................................ 130

*Marshall v. Lonberger*,
    459 U.S. 422 (1983)...................................................................... 50

*Mickens v. Taylor*,
    535 U.S. 162 (2002).................................................... 106, 121, 123

*Miller v. Fenton*,
    474 U.S. 104 (1985)................................................................ 42, 44

*Miller v. Mullin*,
    354 F.3d 1288 (10th Cir. 2004)............................................ 134, 135

*Miller-El v. Cockrell*,
    537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) ................. 41

*Miller-El v. Dretke*,
    545 U.S. 231 (2005)....................................................................... 25

*Miranda v. Arizona*,
    384 U.S. 436 (1966)....................................................................... 19

*Moore v. Gibson*,
    195 F.3d 1152 (10th Cir. 1999)............................................... Passim

*Moore v. Johnson*,
    194 F.3d 586 (5th Cir. 1999)........................................................ 51

*Moore v. Marr*,
    254 F.3d 1235 (10th Cir. 2001)..................................................... 28

*People v. Ackley*,
    870 N.W.2d 858 (Mich. 2015)...................................................... 84

*Pippin v. Dretke*,
    434 F.3d 782 (5th Cir. 2005)........................................ 51, 54, 61, 65

*Porter v. Wainwright*,
    805 F.2d 930 (11th Cir. 1986)..................................................... 128

*Postelle v. Carpenter*,
    901 F.3d 1202 (10th Cir. 2018)........................................ 70, 72, 87

*Register v. Thaler*,
    681 F.3d 623 (5th Cir. 2012) ................................................................. 25, 64, 136, 138

*Rompilla v. Beard*,
    545 U.S. 374 (2005) ....................................................................................... 29, 72, 83

*Rountree v. Balicki*,
    640 F.3d 530 (3d Cir. 2011) ...................................................................... 51, 63, 117, 118

*Saunders v. Comm'r, Dep't of Correction*,
    No. 10 CV 410 MRK, 2011 WL 572313 (D. Conn. Feb. 15, 2011) ........................... 97

*Schlup v. Delo*,
    513 U.S. 298 (1995) .............................................................................................. 40, 42

*Sellers v. Ward*,
    135 F.3d 1333 (10th Cir. 1998) ............................................................................. 26, 70

*Seymour v. Walker*,
    224 F.3d 542 (6th Cir. 2000) ............................................................................. Passim

*Sharpe v. Bell*,
    593 F.3d 372 (4th Cir. 2010) ............................................................................. Passim

*SIL-FLO, Inc. v. SFHC, Inc.*,
    917 F.2d 1507 (10th Cir. 1990) .......................................................................... Passim

*Smith v. Gibson*,
    197 F.3d 454 (10th Cir. 1999) ................................................................................. 135

*Smith v. Robbins*,
    528 U.S. 259 (2000) ..................................................................................... 135, 138, 141

*State v. Aragon*,
    216 P.3d 276 (N.M. App. Ct. 2009) ........................................................................ 80

*State v. Cottle*,
    946 A.2d 550 (N.J. 2008) ................................................................................ 122, 123

*Strickland v. Washington*,
    466 U.S. 668 (1984) ........................................................................................... Passim

*Sumner v. Mata*,
  449 U.S. 539 (1981) ............................................................................... **26**

*Thompkins v. Pfister*,
  698 F.3d 976 (7th Cir. 2012) .............................................. **53, 63, 117, 118**

*Trice v. Ward*,
  196 F.3d 1151 (10th Cir. 1999) .............................................................. **26**

*U.S. ex rel. Jackson v. Chambers*,
  No. 07 DC 546, 2007 WL 2713374 (N.D. Ill. Sept. 13, 2007) .............. **52, 63, 117, 118**

*United States v. Alvarez*,
  137 F.3d 1249 (10th Cir. 1998) .......................................................... **Passim**

*United States v. Bowie*,
  892 F.2d 1494 (10th Cir. 1990) ........................................................... **128**

*United States v. Brown*,
  650 F.3d 581 (5th Cir. 2011) .............................................................. **130**

*United States v. DeFalco*,
  644 F.2d 132 (3d Cir. 1979) ............................................................... **123**

*United States v. Flood*,
  713 F.3d 1281 (10th Cir. 2013) ........................................................... **126**

*United States v. Harms*,
  371 F.3d 1208 (10th Cir. 2004) ............................................................ **98**

*United States v. Levy*,
  25 F.3d 146 (2d Cir. 1994) ................................................................. **123**

*United States v. Soto Hernandez*,
  849 F.2d 1325 (10th Cir. 1988) ........................................................... **106**

*Wainwright v. Sykes*,
  433 U.S. 72 (1977) ....................................................................... **48, 128**

*Wheeler v. Chesny*,
  No. CIV. A. 98-5131, 2000 WL 124560 (E.D. Pa. Jan. 27, 2000) ....... **52, 63, 117, 118**

*Williams v. Taylor*,
    529 U.S. 420, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000) ............................... 41

*Wilson v. Sellers*,
    138 S. Ct. 1188 (2018) ...................................................................... 26

*Winfield v. Roper*,
    460 F.3d 1026 (8th Cir. 2006) ........................................................... 69

*Wood v. Georgia*,
    450 U.S. 261 (1981) ......................................................................... 126

*Ybarra v. Aramant*, No. 16-CV-0,
    5039-EMC, 2018 WL 1745720 (N.D. Cal. Apr. 11, 2018)................... 52, 63, 117, 118

## STATE CASES

*Allen v. State*,
    874 P.2d 60 (Okla. Crim. App. 1994) ....................................................... 139

*Mayfield v. State*,
    1987 OK CR 125, 738 P.2d 555.............................................................. 107

*Moore v. Gibson*,
    27 P.3d 483 (Okla. Crim. App. 2001) ........................................................ 45

*Pickens v. State*,
    1996 OK CR 6, 910 P.2d 1063................................................................ 107

*Smith v. State*,
    306 P.3d 557 (Okla. Crim. App. 2013) ...................................................... 46

*Valdez v. State*,
    46 P.3d 703 (Okla. Crim. App. 2002) ................................................... 46, 47

## FEDERAL STATUTES

28 U.S.C. § 2244 ................................................................................... 2

28 U.S.C. § 2254 .......................................................................... Passim

## STATE STATUTES

OKLA. STAT. tit. 22, § 1084 ......................................................................... 38

OKLA. STAT. tit. 22, § 1086 ................................................................. 45, 46

## RULES

10th Cir. R. 32.1(A) ...................................................................................... 8

Fed. R. App. P. 32.1 ...................................................................................... 8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **BEVERLY MICHELLE MOORE,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-09-985-G** |
| | ) | |
| **ABOUTANAA EL HABTI, WARDEN,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## SUPPLEMENTAL RESPONSE TO SECOND AMENDED
## PETITION FOR WRIT OF HABEAS CORPUS

The Attorney General of the State of Oklahoma, Mike Hunter, appearing on behalf of the above-named Respondent, in response to the Second Amended Petition for Writ of Habeas Corpus on file herein shows the court as follows:

1.      Petitioner, Beverly Michelle Moore, an inmate in the custody of the Oklahoma Department of Corrections, appearing with counsel, has filed with this Court a petition seeking federal habeas corpus relief.

2.      Petitioner is currently incarcerated pursuant to a judgment and sentence entered in the District Court of Oklahoma County, for First Degree Murder, with a sentence of Life with the Possibility of Parole, for the murder of 22-month-old A.S.

3.      This case has a long procedural history after conviction that will be set forth below:

1

On September 16, 2005, a jury found Petitioner guilty of First Degree Murder and sentenced Petitioner to Life without the Possibility of Parole.   On June 11, 2007, the Oklahoma Court of Criminal Appeals ("OCCA") affirmed Petitioner's conviction on direct appeal but modified her sentence to Life with the Possibility of Parole (Doc. 234, Exhibit 1 - Opinion Case No. F-06-63; Doc. 234, Exhibit 2 - Amended Judgment and Sentence).   On September 26, 2008, Petitioner filed her first Application for Post-Conviction Relief in Oklahoma County District Court (Doc. 234, Exhibit 3 – First Application for Post-Conviction Relief).   On October 23, 2008, the Oklahoma County District Court denied Petitioner's Application for Post-Conviction Relief (Exhibit 4 - Order Denying First Post-Conviction Relief).   On January 16, 2009, Petitioner filed a "Petition in Error" with the OCCA, Case No. HC-09-33 (Exhibit 5 - Petition in Error). On March 9, 2009, the OCCA declined jurisdiction and dismissed the appeal (Exhibit 6 - Order Declining Appellate Jurisdiction and Dismissing Petition in Error).

On September 4, 2009, Petitioner filed her Petition for Writ of Habeas Corpus (Doc. 1).   Petitioner was later granted permission to file an amended habeas petition, which she filed on February 3, 2010 (Docs. 21, 22, 23), and this amended petition superseded her petition filed on September 4, 2009 (Doc. 21).   On October 30, 2009, Respondent filed a Motion to Dismiss the Petition under 28 U.S.C. § 2244(d) on the ground that the petition was filed after Petitioner's one-year statute of limitations under the Antiterrorism and Effective Death Penalty Act ("AEDPA") expired (Docs. 10, 11). This motion was denied by the Magistrate Judge, and the denial was affirmed by the

District Court on the basis that Petitioner had presented newly discovered medical evidence that expanded the time frame for the death of the victim and, therefore, "had made a sufficient showing of the probability of actual innocence sufficient to permit her case to overcome the [time] limitations bar" (Doc. 135, 139 at 2).   Respondent then moved to dismiss the amended petition as unexhausted (Docs. 142, 143).  The Magistrate Judge denied Respondent's motion to dismiss; however, the District Court granted the motion and administratively closed this case to allow Petitioner time to exhaust her ineffective assistance of counsel claim in light of her alleged newly discovered evidence in State court (Docs. 162, 163, 182).

On June 5, 2012, Petitioner proceeded to State court and filed a Second Post-Conviction Application (Exhibit 7 - Second Application for Post-Conviction Relief; Exhibit 8 - Brief in Support of Application (Second) for Post-Conviction Relief) and was afforded an evidentiary hearing that spanned more than twenty days.  At the close of the evidentiary hearing, the parties entered into a Joint Statement of Procedural History (Exhibit 9 - Joint Statement of Procedural History).   The Honorable Timothy R. Henderson, hereinafter referred to as the "state district court,"[1] thereafter issued Findings of Fact & Conclusions of Law after Post-Conviction Hearing and denied relief (Exhibit 10 - Order Denying Application for Post-Conviction Relief after Evidentiary Hearing). Petitioner appealed the denial of post-conviction relief to the OCCA, Case No. PC-18-

---

[1] Judge Henderson was not the judge who presided over Petitioner's jury trial; to avoid confusion, Respondent therefore refers to him as the state district court instead of the trial court.

403 (Exhibit 11 - Original Brief for and on Behalf of Beverly Michelle Moore Petitioner). The OCCA affirmed the denial of post-conviction relief by finding all the claims raised were procedurally barred under State law (Exhibit 12 - Order Affirming Denial of Subsequent Application for Post-Conviction Relief).

Petitioner filed a Motion to Lift the Stay to Resume Habeas Proceedings (Doc. 218).  This Court granted the motion (Doc. 219).  Petitioner was ordered to file an "amended pleading" (Doc. 219).  On April 19, 2019, Petitioner filed a Second Amended Petition for Writ of Habeas Corpus and Brief in Support (Docs. 226, 227).  On July 18, 2019, Respondent filed a Response to Second Amended Petition for Writ of Habeas Corpus, asserting that Petitioner's claims were partially unexhausted and all procedurally barred (Doc. 234).  On August 15, 2019, Petitioner filed Petitioner's Reply to Respondent's Response to Petitioner's Second Amended Petition for Writ of Habeas Corpus (Doc. 239).

On December 12, 2019, the Magistrate Judge issued a Report and Recommendation ("R&R"), recommending that Respondent's procedural arguments be rejected on the basis of Petitioner's actual innocence claim and that Respondent be ordered to respond to the merits of Petitioner's constitutional claims as raised in her Second Amended Habeas Petition (Doc. 244).  On January 2, 2020, Petitioner filed a limited objection to the R&R claiming that Respondent should not be allowed to file an answer on the merits to her habeas petition (Doc. 245).  On January 14, 2020, Respondent responded in opposition to Petitioner's objection, asserting that Respondent

should be allowed to respond on the merits to Petitioner's constitutional claims (Doc. 247).

On May 14, 2020, the District Court adopted the R&R in its entirety and ruled that Respondent should be permitted to respond on the merits to Petitioner's constitutional claims (Doc. 248). On May 15, 2020, the Magistrate Judge ordered Respondent to file a response addressing the merits of Petitioner's Second Amended Habeas Petition (Doc. 249). Respondent hereby files this Supplemental Response to Petitioner's Second Amended Habeas Petition.

4.     Although Respondent maintains that the Second Amended Habeas Petition is untimely, Respondent acknowledges that the District Court previously agreed with the Magistrate Judge's finding that Petitioner "had made a sufficient showing of the probability of actual innocence sufficient to permit her case to overcome the limitations bar" (Doc. 139 at 2).

5.     Petitioner has not exhausted all of her claims, and the unexhausted claims would be procedurally barred if she were to return to State court. Again, however— without waiving exhaustion, *see* 28 U.S.C. § 2254(b)(3)—Respondent recognizes that the District Court previously adopted the Magistrate Judge's finding that Petitioner's "actual innocence claim" allows her to bypass these procedural bars (Doc. 248 at 2-3).

6.     A federal evidentiary hearing should not be granted in this case. To begin with, this Court previously denied Petitioner's motion for an evidentiary hearing (Doc. 243). Although this Court did so without prejudice, Petitioner has not renewed her

motion.  Even assuming Petitioner does so, she is not entitled to an evidentiary hearing.
As discussed more below in Respondent's discussion of the merits of Petitioner's claims,
Petitioner received an evidentiary hearing in the state district court.  Given the application
of 28 U.S.C. § 2254(e)(1)—which mandates a presumption of correctness as to any of the
state district court's factual findings—Petitioner is not entitled to a second bite at the
apple in the form of a federal evidentiary hearing.  *See Sharpe v. Bell*, 593 F.3d 372, 379
(4th Cir. 2010) ("Section 2254(e)(1) plainly seeks to conserve judicial resources and
reflects Congress's view that there is no reason for a do-over in federal court when it
comes to facts already resolved by state tribunals."); *see also Cullen v. Pinholster*, 563
U.S. 170, 185-86 (2011) ("Section 2254(e)(2) continues to have force where § 2254(d)(1)
does not bar federal habeas relief. For example, . . . § 2254(e)(2) still restricts the
discretion of federal habeas courts to consider new evidence when deciding claims that
were not adjudicated on the merits in state court."); *(Donald) Grant v. Royal*, 886 F.3d
874, 889 (10th Cir. 2018) (Section 2254(e)(1)'s presumption of correctness applies "even
in the setting where [a federal court] lack[s] a state court merits determination").  To the
extent that Petitioner asserts that her claims require further factual development, she was
not diligent in failing to do so in state district court.  *See* 28 U.S.C. § 2254(e)(2).  A
federal evidentiary hearing is not warranted.

7.     Respondent's previous Response, Doc. 234, attached the relevant
documents from the original record in the direct appeal, Case No. F-2006-63; attached
and identified each document as a separate exhibit if relevant; and attached the relevant

portions of the trial transcripts as Exhibit 19.   References to exhibits in the present Response refer to those attached to the previous Response and are referred to herein as (Doc. 234, Exhibit [Number]).   Furthermore, the trial transcripts are referred to as (Tr. Vol. I, Vol. II, Vol. III, or Vol. IV).   All relevant exhibits from the trial are referred to herein as (Tr. Ex.) and were attached as a separate exhibit to the State's previous response if relevant.

Respondent's previous response, Doc. 234, also attached the relevant documents from the original record from the post-conviction proceedings, Case No. PC-18-403; attached and identified each document as a separate exhibit if relevant; and attached the relevant portions of the evidentiary hearing transcripts as Exhibit 20.   The transcripts for Petitioner's state court post-conviction evidentiary hearing before the state district court are referred to as (E.H. Tr. [Date]).   All relevant exhibits from the post-conviction evidentiary hearing are referred to as (E.H. Pet's Ex. or E.H. State's Ex.).

The trial transcripts, original record, and trial exhibits are already before this Court filed on March 8, 2011 (Docs. 101, 102).   All post-conviction evidentiary hearing transcripts, the post-conviction record, and evidentiary hearing exhibits were previously forwarded to this Court through a Motion to Transfer from the District Court of Oklahoma County (Doc. 240 (Notice of Conventional Filing)).   Counsel for Respondent, as counsel for the State of Oklahoma in the post-conviction proceedings, was not ordered to respond to the post-conviction proceedings before the OCCA, and therefore, did not have an original file from the post-conviction proceedings to send conventionally to this

Court.

Respondent has not moved to redact the deceased baby's name from the attached transcript pages as this Court previously granted Petitioner's motion to excuse compliance with the redaction requirement, thereby excusing redaction of the child's name (Docs. 84, 87).

## STATEMENT OF THE FACTS

Petitioner has presented a "Factual Background" in her Brief in Support of Second Amended Habeas Petition consisting of twenty pages (Doc. 227 at 1-20).  This alleged factual background has no citation to the record and should be stricken from the brief and not reviewed or considered by this Court.  The Tenth Circuit has made it clear that a habeas court will not consider unsupported and undeveloped issues.  *See Moore v. Gibson*, 195 F.3d 1152, 1180 n. 17 (10th Cir. 1999).  Indeed, "the court cannot take on the responsibility of serving as the litigant's attorney in constructing arguments and searching the record."  *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005); *see also Bradford v. Williams*, No. 12-6016, 479 F. App'x 832, 835 (10th Cir. May 7, 2012) (unpublished)[2] (it is not for the court to make a petitioner's argument or analyze issues not adequately presented).  Petitioner's "Factual Background" is entirely too long for Respondent to fact-check it in the absence of citations; therefore,

---

[2] All unpublished decisions cited in this Response are cited for persuasive value only pursuant to Fed. R. App. P. 32.1 and 10th Cir. R. 32.1(A).

Respondent will provide a relevant factual background with citations to the record for this Court.

Todd Snyder, the father of A.S., testified first for the State (Tr. Vol. I 62). According to Mr. Snyder, on January 13, 2004, Mr. Snyder left A.S. with Petitioner while Mr. Snyder went to a pawn shop (Tr. Vol. I 66-67).  Before Mr. Snyder left, Petitioner had been on the phone with a credit card company and "was upset" and "raised her voice a couple of times" (Tr. Vol. I 68).  As Mr. Snyder got into the car to leave, he saw A.S. "looking out the window crying his eyes out" because he wanted to go to the shop with Mr. Snyder (Tr. Vol. I 69).  Mr. Snyder returned to the house half an hour later (Tr. Vol. I 70).  When he arrived, he saw an ambulance and a fire truck parked in front of his house (Tr. Vol. I 70).  There was also a gurney (Tr. Vol. I 70).  Inside the house, Mr. Snyder saw A.S. lying on the floor surrounded by paramedics (Tr. Vol. I 71).  A.S. was unconscious (Tr. Vol. I 71).  Petitioner was walking around the house crying (Tr. Vol. I 71).  Petitioner repeated over and over again, "I'm sorry, I'm sorry, I am so sorry" (Tr. Vol. I 71).  At some point, Mr. Snyder asked Petitioner what happened (Tr. Vol. I 71).  Petitioner said that A.S. cried when Mr. Snyder left, and could not be consoled (Tr. Vol. I 71-72).  Petitioner told Mr. Snyder that she "put [A.S.] on the floor and . . . told him to go play" (Tr. Vol. I 71-72).  According to Petitioner, A.S. then "walked into the kitchen," and she "heard him hit the floor" (Tr. Vol. I 72).

Shortly thereafter, the paramedics loaded A.S. into the ambulance and took him to the hospital (Tr. Vol. I 72).  According to Mr. Snyder, when it was time for Mr. Snyder

9

and Petitioner to follow A.S. to the hospital, Petitioner did not want to go (Tr. Vol. I 72-73).   When Mr. Snyder asked her why, Petitioner stated: "You know how they take people to jail for stupid shit like this" (Tr. Vol. I 73).   Petitioner also stated that "she didn't want to never see her son again" (Tr. Vol. I 73).[3]   Before leaving for the hospital, Petitioner decided to change clothes, since she had A.S.'s blood on her shirt (Tr. Vol. I 73).   As they drove to the hospital, Petitioner kept telling Mr. Snyder that she was sorry (Tr. Vol. I 73-74).

When they arrived at the hospital, it was immediately clear that A.S.'s condition was extremely serious (Tr. Vol. I 74).   In fact, according to Mr. Snyder, although he wanted to believe that A.S. would survive, he knew "in [his] heart" that he was going to die (Tr. Vol. I 74).   Ultimately, detectives were summoned to the hospital and asked to speak with Mr. Snyder and Petitioner (Tr. Vol. I 74-75).   The couple was taken to a police station, where they were questioned in separate rooms (Tr. Vol. I 75-76).   Afterward, Mr. Snyder was released to return to the hospital, where he spent the last few hours of A.S.'s life by his side (Tr. Vol. I 76-77).

Corporal Mark Rolling, a paramedic working for the Oklahoma City Fire Department, testified next.   According to Corporal Rolling, on January 13, 2004, he responded to a call at 4225 Northwest 15th Street in Oklahoma City (Tr. Vol. I 115).   The nature of the call was "a pediatric fall" (Tr. Vol. I 115-16).   In the living room of the

---

[3] In referring to her "son," Petitioner was referring not to A.S., but to her own biological son, A.M.   (Tr. Vol. I 64, 73).

house, Corporal Rolling and his colleagues saw A.S. lying on the floor in front of the couch (Tr. Vol. I 118). A.S.'s head was turned slightly to the right, and "he was having agonal-type respirations," meaning that while the child's body was trying to breathe, "there was no air exchanged" (Tr. Vol. I 118). A.S. had blood coming from his nose, and had "a small amount" of blood on his left sleeve (Tr. Vol. I 125). A.S. appeared "lifeless," and he had blue lips with a pale face (Tr. Vol. I 119). Corporal Rolling and his colleagues began mechanical breathing for A.S. with an "ambu bag" (Tr. Vol. I 120). They then prepared to insert an endotracheal tube into A.S.'s airway by opening his mouth (Tr. Vol. I 121-22). As they did so, they found blood in the back of A.S.'s throat (Tr. Vol. I 121-22). They suctioned the blood out, then inserted the endotracheal tube (Tr. Vol. I 122). The tube they initially inserted turned out to be too small, so the team used a larger one (Tr. Vol. I 123). As they were doing so, the ambulance service Emergency Medical Services Authority ("EMSA") arrived and took over A.S.'s care (Tr. Vol. I 126). EMSA started an intravenous tube (IV), and firefighters and EMSA loaded A.S. into the ambulance (Tr. Vol. I 127-29).

On the way to Integris Baptist Medical Center ("Integris"), A.S.'s condition deteriorated (Tr. Vol. I 129). A.S.'s heart rate began to slow, and Corporal Rolling began performing chest compressions (Tr. Vol. I 129-30). Another team member continued squeezing the "ambu bag" (Tr. Vol. I 130). A.S. was given epinephrine to restore his heart rate, but he "continued to deteriorate to the point where he had no heartbeat whatsoever" (Tr. Vol. I 131). The team began a transcutaneous pacer to electrically

shock the heart into activity (Tr. Vol. I 131-32).  As they arrived at the hospital, A.S.'s pulse returned (Tr. Vol. I 132).

In addition to testifying to the care of A.S., Corporal Rolling testified regarding his interactions with Petitioner.  According to Corporal Rolling, when he and his colleagues arrived at the Petitioner's house, they met an adult female (Petitioner), who identified herself as the mother of the patient (Tr. Vol. I 135).  When Petitioner was asked what happened, she stated that A.S. had been throwing a tantrum "as usual," and "threw himself down on the floor striking his head" (Tr. Vol. I 135).  At no time did Petitioner tell anyone that she had performed CPR on the child (Tr. Vol. I 135-36).

The next witness for the State was Aaron Kennedy, an EMSA paramedic (Tr. Vol. I 149).  According to Mr. Kennedy, on January 13, 2004, he responded to a call that a child had fallen (Tr. Vol. I 150-51).  On the way to the scene, Mr. Kennedy was under the impression that the "fall" was not serious (Tr. Vol. I 151).  As Mr. Kennedy and his colleagues turned onto 15th Street, however, dispatch updated them that the call involved "a pediatric full [cardiac] arrest" (Tr. Vol. I 151-52).  Upon entering the house, Mr. Kennedy was informed by Mr. Rolling that he was told that "the baby fell down and hit his head" (Tr. Vol. I 154).  Mr. Kennedy observed A.S. lying on the floor with blood coming from his nose (Tr. Vol. I 155).  The child's pupils were unequal in size, indicating a head injury (Tr. Vol. I 155).  Based upon this evidence, Mr. Kennedy believed that Petitioner's story "didn't really add up, because you have to fall really hard for that" (Tr. Vol. I 155).  Petitioner told Mr. Kennedy "that the child would always pitch

12

a fit when the dad would leave and throw himself onto the floor" (Tr. Vol. I 156).

Mr. Kennedy started an IV on the child, and prepared to immobilize the child for transport (Tr. Vol. I 157). As Mr. Kennedy did so, he saw, out of the corner of his eye, a man "flying" toward him, asking, "What's going on?" (Tr. Vol. I 158). Mr. Kennedy's partner, Angela Reed, blocked the man from getting too close, and Mr. Kennedy continued his work (Tr. Vol. I 158). With the help of his team, Mr. Kennedy placed A.S. in the ambulance and drove to the hospital (Tr. Vol. I 158-59). On the way, A.S.'s condition deteriorated, and the team attempted CPR and the use of cardiac drugs (Tr. Vol. I 159-60). A.S. eventually lost his heartbeat entirely, but it came back as they arrived at the hospital (Tr. Vol. I 160-61).

In addition to testifying regarding his care for the little patient, Mr. Kennedy testified regarding his interactions with Petitioner. According to Mr. Kennedy, Petitioner never said that she performed CPR on the child (Tr. Vol. I 161). In fact, Mr. Kennedy knew that he was the first person to perform CPR, as he felt the child's bones break (Tr. Vol. I 160). At the hospital, Mr. Kennedy spoke with Petitioner again, and asked her what happened (Tr. Vol. I 162-63). Petitioner repeated her story that the child just threw himself on the floor (Tr. Vol. I 163). Based upon his training and experience, Mr. Kennedy believed Petitioner was lying (Tr. Vol. I 163).[4]

---

[4] In fact, Mr. Kennedy had responded to calls where children had fallen from a second-story window, and the children were just fine afterward (Tr. Vol. I 169). Thus, based upon his training and experience, Mr. Kennedy believed that a fall of a few feet would simply not cause the type of injury A.S. sustained (Tr. Vol. I 163, 172).

The next witness for the State was EMSA medic Angela Reed (Tr. Vol. II 7). According to Ms. Reed, she responded to a pediatric call on January 13, 2004, that she will never forget (Tr. Vol. II 8-9). As Ms. Reed and her partner turned onto the street of the residence, dispatch updated them "that it was a priority one pediatric full arrest" (Tr. Vol. II 9). Upon arriving at the scene, Ms. Reed spoke with Petitioner, who indicated "that the child always got upset when the dad left and that he had thrown a fit and that was normal" (Tr. Vol. II 11). Petitioner stated that the child threw himself back onto the floor in the kitchen, and that she found him on the floor in the kitchen (Tr. Vol. II 11-12). Petitioner also told Ms. Reed that she had not moved the child (Tr. Vol. II 12). Because the child was found in the living room, Ms. Reed found the Petitioner's statements to be contradictory: how could the child be found by Petitioner in the kitchen, yet end up in the living room, if Petitioner had not moved him? (Tr. Vol. II 12).

At some point, Ms. Reed heard screeching tires, and she saw a man bound up three stairs at once (Tr. Vol. II 13). The man ran into the living room, jumped over the couch, and exclaimed, "I've only been gone a little while. What the hell just happened here?" (Tr. Vol. II 13). The man was "beside himself" with panic (Tr. Vol. II 13). Ms. Reed tried to calm the man down (Tr. Vol. II 14-15). Ms. Reed noted that while the father of the child was panicking, Petitioner was "stoic and nonchalant" (Tr. Vol. II 16).

The next witness for the State was police officer Keith Medley (Tr. Vol. II 45-46). According to Officer Medley, on January 13, 2004, he was dispatched to Integris for possible child abuse (Tr. Vol. II 47-48). Upon arriving in the emergency room, Officer

14

Medley met with some of the staff, and learned that the ambulance crew who brought the child in believed that "things didn't add up on scene" (Tr. Vol. II 48-49). Officer Medley was also told that the child had retinal hemorrhages and had been moved to the pediatric intensive care unit (Tr. Vol. II 49). Officer Medley then went to talk with Petitioner and Mr. Snyder (Tr. Vol. II 49). Officer Medley spoke with Petitioner first (Tr. Vol. II 50). Petitioner told Officer Medley that after Mr. Snyder went to the pawn shop, A.S. "started to throw a tantrum" (Tr. Vol. II 54). Petitioner also told Officer Medley that she "held him on the couch and then let him down so that he could go play with toys and calm down" (Tr. Vol. II 54). According to Petitioner, A.S. walked into the kitchen, and "two seconds later" Petitioner told him to come back, and she heard a thud (Tr. Vol. II 54). Petitioner claimed she then walked into the kitchen and saw A.S.'s "jaw clenched" with his tongue between his teeth (Tr. Vol. II 55). Petitioner initially stated that she did not move A.S., but that she left him in the kitchen (Tr. Vol. II 55). Petitioner later stated that she did move A.S. into the living room (Tr. Vol. II 55). Petitioner also told Officer Medley that she started CPR even before she called 911, and continued to perform CPR until the fire department arrived (Tr. Vol. II 55-56). Petitioner further told Officer Medley that A.S. had not had any kind of trauma earlier in the day (Tr. Vol. II 56).

The next witness for the State was Oklahoma City CSI Officer David Feskanich (Tr. Vol. II 89). According to Officer Feskanich, on January 13, 2004, he was dispatched to work a crime scene at 4225 Northwest 15th Street in Oklahoma City (Tr. Vol. II 90). Officer Feskanich took numerous photographs of the house (Tr. Vol. II 96-97). Officer

15

Feskanich also located a white shirt in the bathroom, which apparently belonged to Petitioner (Tr. Vol. II 102-03). The shirt had blood on the left sleeve (Tr. Vol. II 103). Officer Feskanich also found what appeared to be blood in A.S.'s crib (Tr. Vol. II 107-09).

The next witness for the State was Dr. Johnny Griggs, medical director of the pediatric intensive care unit at Integris (Tr. Vol. II 140). According to Dr. Griggs, on January 13, 2004, he was working at Integris when A.S. arrived in the emergency room (Tr. Vol. II 148). Dr. Griggs came to the emergency room to find that A.S. had suffered from cardiopulmonary arrest en route to the hospital (Tr. Vol. II 148-50). Dr. Griggs checked A.S.'s vitals and adjusted his breathing tube (Tr. Vol. II 151-52). Dr. Griggs checked A.S.'s eyes and noted bilateral hemorrhages (Tr. Vol. II 153). A.S. was given radiological examinations that revealed massive brain swelling and bleeding on the surface of the brain (Tr. Vol. II 155-56). A.S. also had a small amount of dried blood coming from his nose, but he had no evidence of external trauma (Tr. Vol. II 156-57).

Dr. Griggs spoke to Mr. Snyder and Petitioner regarding A.S.'s medical history (Tr. Vol. II 160). Mr. Snyder and Petitioner told Dr. Griggs that A.S. "was a well functioning, well developed two-year old" (Tr. Vol. II 161). Dr. Griggs was specifically told that A.S. "was a very well and healthy child" (Tr. Vol. II 161).[5] In fact, the *only*

---

[5] Obviously, these accounts stand in stark contrast to Petitioner's claim in habeas that there "was evidence of prior trauma suffered by the child, including a prior diagnosis of 'failure to thrive', significant developmental delays, prior falls, and observations that the child had been lethargic the week preceding his death" (Doc. 227 at 19).

16

issue of any significance was that A.S. had diarrhea for a few weeks (Tr. Vol. II 161).

Petitioner and Mr. Snyder specifically denied that A.S. had been acting or behaving

abnormally in any way (Tr. Vol. II 161-62).   A.S., they insisted, was perfectly normal

right up until Mr. Snyder went to the pawn shop, when, according to Petitioner, A.S.

threw a temper tantrum (Tr. Vol. II 162).   According to Petitioner, she tried to comfort

A.S., by holding him in her arms and sitting him on her lap (Tr. Vol. II 163).   A.S. was

inconsolable (Tr. Vol. II 163).   Petitioner claimed she tried to distract A.S. with his toys,

and he walked into the kitchen (Tr. Vol. II 163).   Petitioner told Dr. Griggs that she then

heard a "thud" and went into the kitchen (Tr. Vol. II 163).   According to Petitioner, she

immediately noticed that A.S.'s pupils were different sizes, he was gasping to breathe,

and there was blood in his nose (Tr. Vol. II 163).   Petitioner told Dr. Griggs that she then

started CPR and called 911 (Tr. Vol. II 163).   Petitioner did not tell Dr. Griggs that she

was asleep and that Mr. Snyder woke her up before he left for the pawn shop (Tr. Vol. II

165).

Eventually, A.S. was diagnosed as brain dead (Tr. Vol. II 181-84).   A.S.'s doctors

withdrew life support, and A.S. died on January 14, 2004 (Tr. Vol. II 185-86).   Based

upon all of the medical evidence before him, Dr. Griggs diagnosed the cause of death as

shaken baby syndrome (Tr. Vol. II 185-86).

The next witness for the State was ophthalmologist Dr. David Korber (Tr. Vol. II

235).   According to Dr. Korber, on January 14, 2004, he was asked to consult on A.S.'s

case (Tr. Vol. II 239, 245-26).   Dr. Korber used an indirect opthalmoscope to view A.S.'s

17

eyes (Tr. Vol. II 241).   Dr. Korber noted bilateral retinal hemorrhaging, as well as bilateral vitreous hemorrhaging (Tr. Vol. II 242, 250, 252-53).   A.S.'s right eye had a partially detached retina, and part of the vitreous material was displaced (Tr. Vol. II 243, 248, 252).   With respect to the retinal hemorrhaging, Dr. Korber noted thousands of hemorrhages (Tr. Vol. II 251).   In fact, A.S.'s eyes had "the most blood [Dr. Korber had] ever seen in the back of an eye before for a kid this age" (Tr. Vol. II 251).   Dr. Korber specifically testified that these types of eye injuries simply cannot be caused by "a single blow." (Tr. Vol. II 260).   Rather, A.S.'s eye injuries had to have come from a "shak[ing] type of injury" (Tr. Vol. II 261).

The next witness for the State was Oklahoma City Police Detective Randy Kirby (Tr. Vol. III 7).   According to Detective Kirby, on January 13, 2004, he was contacted at home by his supervisor to investigate a suspected shaken baby case at Integris (Tr. Vol. III 9).   Detective Kirby and his partner, Scott Dupy, went to the hospital, where they met Dr. Griggs (Tr. Vol. III 10-11).   After hearing Dr. Griggs' suspicions, Detectives Kirby and Dupy brought Mr. Snyder and Petitioner to the police station (Tr. Vol. III 11-13).   Both Mr. Snyder and Petitioner were questioned (Tr. Vol. III 14, 17).   Mr. Snyder was questioned first (Tr. Vol. III 14).   Mr. Snyder's answers were consistent with what A.S.'s doctors knew about A.S.'s injuries (Tr. Vol. III 15).

Petitioner was interviewed next (Tr. Vol. III 17).   Petitioner was specifically told

she was not under arrest (Tr. Vol. III 17).  Nevertheless, Petitioner was given *Miranda*[6]

warnings (Tr. Vol. III 32: Tr. Ex. 48 13:45-14:50[7]).  Petitioner was not threatened in any

way, nor was she promised anything in exchange for her cooperation (Tr. Vol. III 19).

After having been given a *Miranda* warning, Petitioner expressly and unequivocally

indicated that she wanted to talk to the police about what happened (Tr. Ex. 48 14:50-

15:15).

The entire interview with Petitioner was videotaped (Tr. Vol. III 19-20; Tr. Ex.

48).   The jury viewed the video of the Petitioner's police interview during the

presentation of Detective Kirby's testimony (Tr. Vol. III 27).  Petitioner initially told the

detectives that when Mr. Snyder left the house, A.S. started crying, so she held him on

the couch to calm him down (Tr. Ex. 48 24:00-25:45).  A.S., however, was inconsolable

(Tr. Vol. III 15).  According to Petitioner, she told A.S. to go play with his toys; A.S.

walked into the kitchen, then Petitioner heard a thud and came into the kitchen to find

A.S. unresponsive on the floor (Tr. Ex. 48 25:40-29:00).  When the detectives confronted

Petitioner with the fact that A.S.'s physicians seemed to agree that A.S.'s retinal

hemorrhaging could not have been caused by a simple fall, Petitioner insisted that she did

nothing wrong and that she "loved" A.S. (Tr. Ex. 48 29:00-42:00).  After a few minutes,

however, Petitioner admitted what really happened: A.S. "threw a fit" after Mr. Snyder

left, and would not calm down, even when Petitioner held him (Tr. Ex. 48 41:30-42:30).

---

[6] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[7] The videotape of Petitioner's confession contains no time counter, so Respondent cites to the videotape player's display counter.  All timestamps are approximate.

Petitioner sent A.S. to his room, where he continued to cry inconsolably (Tr. Ex. 48 42:20-42:40).  Petitioner eventually went into A.S.'s room and told him to stop crying (Tr. Ex. 48 42:30-43:15).  When he did not do so, Petitioner shook him "three or four times" by the shoulders against the floor (Tr. Vol. III 30-35; Tr. Ex. 48 43:10-45:10, 46:00-46:40, 49:00-51:45).  After shaking him, Petitioner laid A.S. in his crib, and went back into the living room (Tr. Vol. III 33; Tr. Ex. 48 46:10-46:20).  A.S. was finally quiet (Tr. Vol. III 34; Tr. Ex. 47:10-47:20).  However, Petitioner then returned to A.S.'s room to find A.S.'s "jaw [] clenched and his tongue [] sticking out." (Tr. Vol. III 31-32).  Petitioner "freaked out" (Tr. Vol. III 32; Tr. Ex. 48 45:10-45:40).

Throughout her interview, Petitioner never inquired about A.S.'s condition (*see generally* Tr. Ex. 48).  Petitioner did, however, ask about seeing her own son, and stated that she did not want his father to have custody of him (Tr. Vol. III 28, 37-39).  She also asked, "Am I ever going to get out of jail?" (Tr. Ex. 48 57:40-58:00).  Petitioner further inquired if she would be segregated at the Oklahoma County Jail, since she was a former reserve deputy sheriff (Tr. Vol. III 41-42; Tr. Ex. 48 58:00-58:40).

The jury also heard the 911 tape during Detective Kirby's testimony (Tr. Vol. III 25-27).  During the 911 call, Petitioner told the dispatcher her address, and stated, "he's 18 months old, he's my boyfriend's son and he fell.  He isn't even – I don't even know if he's breathing or not.  He's got a bump on the back of his head." (Tr. Ex. 51).  Petitioner said that A.S. "throws these fits and he threw himself backwards on the kitchen floor and he has a bump on the back of his head . . ."  Petitioner asked the dispatcher if she

"need[ed] to do anything," and the dispatcher said, "No."   Petitioner did not state that she was performing or had performed CPR (Tr. Ex. 51).

The last witness for the State was forensic pathologist Dr. Chai Choi (Tr. Vol. III 61).   According to Dr. Choi, she conducted an autopsy of A.S.'s body on January 15, 2004 (Tr. Vol. III 66-67).   A.S.'s body was at the 50th percentile for height, and was thin for a child of his age, but still within the range of normal (Tr. Vol. III 71-72).   A.S.'s body had several indications of medical treatment, such as needle puncture marks (Tr. Vol. III 72).   A.S. had bruises on his face, the back of his head, and on his right knee (Tr. Vol. III 73). Upon opening the head, Dr. Choi noted a small bruise on A.S.'s temple and "major injury" to the back of A.S.'s head, near the left side midline (Tr. Vol. III 74-75). Specifically, A.S. had subarachnoid hemorrhaging on the back of his head (Tr. Vol. III 75).   Dr. Choi also noted massive edema of A.S.'s brain, along with subdural hematoma (Tr. Vol. III 81-84).   Dr. Choi described A.S.'s injuries as "violent." (Tr. Vol. III 85).   Dr. Choi took a sample of A.S.'s brain tissue, which she reexamined microscopically "about [a] week" later (Tr. Vol. III 87-88).

Dr. Choi also noted "extensive" bilateral retinal hemorrhaging in A.S.'s eyes (Tr. Vol. III 88).   In A.S.'s abdomen, Dr. Choi noted periserosal mesenteric hemorrhaging of the duodenum, which Dr. Choi described as being a common finding in child abuse cases (Tr. Vol. III 88).   Dr. Choi opined that this mesenteric bleeding near the intestines was typically caused by "forceful" trauma of this membrane "against the bone" (Tr. Vol. III 89-91).   It appeared to be the same age histologically as the head injury (Tr. Vol. III 91).

Further, Dr. Choi opined that this type of injury was not likely caused by CPR or resuscitative efforts; rather, it was more consistent with blunt force trauma (Tr. Vol. III 93). In fact, in all of the numerous autopsies she had performed since she started doing so in 1983, Dr. Choi did not recall having ever seen a case where CPR caused such injuries (Tr. Vol. III 63, 93).[8]  The tip of A.S.'s tongue also had a red contusion (Tr. Vol. III 94). Inside of A.S.'s mouth Dr. Choi found a small injury that could have been caused by intubation (Tr. Vol. III 94). As a result of Dr. Choi's findings, she concluded that the cause of death was blunt force head trauma, and the manner of death was "child abuse, homicide" (Tr. Vol. III 95-96).

For her part, Petitioner testified in her own defense (Tr. Vol. III 124). According to Petitioner, on January 13, 2004, she called her credit card company regarding an issue she was having with them (Tr. Vol. III 126, 130-131). She then took a nap, and Mr. Snyder woke her up to tell her he was going to the pawn shop (Tr. Vol. III 131-132). A.S. apparently thought he was going with Mr. Snyder, and when he found out he was staying home, he became "upset," and Petitioner tried to console him (Tr. Vol. III 133-35). Petitioner then repeated her story from before: she tried to hold A.S., but he would not be consoled, so she told him to go play with his toys (Tr. Vol. III 135). A.S. allegedly walked into the kitchen, and Petitioner heard a sound (Tr. Vol. III 135).

---

[8] Even at the evidentiary hearing, Petitioner denied that she did CPR "hard" enough to cause A.S.'s abdominal injuries (E.H. 03/05/2015 143-44; *compare* Doc. 88-31 at 3 n. 1 (habeas expert's attempt to dismiss significance of abdominal injury by claiming it "was most likely caused when Ms. Moore performed CPR on the child")).

22

According to Petitioner, she then "immediately" saw that A.S.'s tongue was clenched between his teeth, and he was not moving (Tr. Vol. III 135). According to Petitioner, she called A.S.'s name, and he did not respond, so she began CPR (Tr. Vol. III 135, 138). Petitioner testified that she then picked A.S. up, moved him into the living room, and called 911 (Tr. Vol. III 138). According to Petitioner, she continued to perform CPR as she talked to the 911 operator (Tr. Vol. III 138). Petitioner testified that she continued performing CPR until the fire department arrived (Tr. Vol. III 138). According to Petitioner, she told Mr. Snyder she was "sorry" because she performed CPR but was unable to revive A.S. (Tr. Vol. III 146).

According to Petitioner, she confessed to shaking A.S. because she wanted Mr. Snyder to be able to go back to the hospital (Tr. Vol. III 156, 158-160). Petitioner testified, however, that her confession was a lie (Tr. Vol. III 159). Petitioner testified that Mr. Snyder must have harmed A.S. when she was asleep (Tr. Vol. III 140-146, 211). When asked what Mr. Snyder did, Petitioner answered, "I don't know" (Tr. Vol. III 165). Petitioner agreed, however, that A.S. died from shaken baby syndrome (Tr. Vol. III 166).

In addition to testifying for herself, Petitioner presented the testimony of the former pre-kindergarten teacher of Petitioner's son, a PTA friend, Petitioner's son's babysitter, Petitioner's ex-mother-in-law, and Petitioner's ex-husband, each of whom testified that, with the possible exception of lying during her confession to murder, Petitioner was an honest person (Tr. Vol. III 224-49).

Additional facts will be presented below as they become relevant.

23

## **STANDARD OF REVIEW**

Generally, the AEDPA requires deference by a federal court to a state court's adjudication of a claim on the merits.  *See* 28 U.S.C. § 2254(d).  "Claims not 'adjudicated on the merits' in state court are entitled to no deference."  *Harmon v. Sharp*, 936 F.3d 1044, 1057 (10th Cir. 2019).  However, even on *de novo* review, a habeas petitioner faces significant hurdles.

For starters, as Petitioner concedes (Doc. 227 at 29), she carries the burden of showing entitlement to habeas relief, *see, e.g.*, *Littlejohn v. Trammell*, 704 F.3d 817, 859 (10th Cir. 2013) (*de novo* review of ineffective assistance claim); *Smith v. Gibson*, 197 F.3d 454, 458 (10th Cir. 1999) (*de novo* review of prosecutorial error claim).  As the Supreme Court has explained,

> When the process of direct review—which, if a federal question is involved, includes the right to petition this Court for a writ of certiorari—comes to an end, a presumption of finality and legality attaches to the conviction and sentence.  The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials.

*Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993) (quotation marks omitted); *Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005) (*en banc*) (even under pre-AEDPA standards, "[o]n habeas review, state court judgments of conviction and sentence carry a presumption of finality and legality and may be set aside only when a state prisoner carries [her] burden of proving that [her] detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution" (quotation marks

omitted)).  Furthermore, "the writ of habeas corpus has historically been regarded as an extraordinary remedy, a bulwark against convictions that violate fundamental fairness." *Brecht*, 507 U.S. at 633-34 (quotation marks omitted).  "[A]n error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment."  *Id.* at 634 (quotation marks omitted).

> In addition, the AEDPA provides:
>
> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).[9]  Thus, "even in the setting where [a federal court] lack[s] a state court merits determination, any state-court findings of fact that bear upon [a] claim are entitled to a presumption of correctness rebuttable only by 'clear and convincing evidence.'"  *(Donald) Grant*, 886 F.3d at 889 (quoting 28 U.S.C. § 2254(e)(1)) (quotation marks omitted, alteration adopted).  "The presumption applies both to explicit findings of fact and to unarticulated findings which are necessary to the state court's conclusions of mixed law and fact."  *Register v. Thaler*, 681 F.3d 623, 629 (5th Cir. 2012) (quotation marks omitted).  The Supreme Court has described the "clear and convincing evidence" standard as "demanding but not insatiable."  *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).  The "clear and convincing evidence" standard "require[s] proof that a claim is

---

[9] Respondent addresses below, in Ground One, Petitioner's arguments that § 2254(e)(1) does not apply in this case (Doc. 227 at 33).

highly probable," and "[h]ighly probable is a standard that requires more than a preponderance of the evidence but less than proof beyond a reasonable doubt." *Bishop v. Warden, GDCP*, 726 F.3d 1243, 1258-59 (11th Cir. 2013) (quotation marks omitted).[10]

While this Court's focus under § 2254(d) would be on the decision of the last reasoned opinion from the state courts, *see Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018), the presumption of correctness mandated by § 2254(e)(1) applies to a finding by *any* state court, including the state district court, *see, e.g.*, *Trice v. Ward*, 196 F.3d 1151, 1169 (10th Cir. 1999) (determining, as to challenge to petitioner's confession, that "any subsidiary factual findings made by the state trial court at the conclusion of the *in camera* hearing are entitled to a 'presumption of correctness' under § 2254(e)(1)").

## ARGUMENT AND AUTHORITY

### GROUND ONE

**PETITIONER DID NOT RECEIVE THE INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL WITH REGARD TO EITHER COUNSEL'S PRETRIAL INVESTIGATION OR COUNSEL'S PERFORMANCE AT TRIAL.**

In Ground One, Petitioner claims that she received ineffective assistance of trial counsel through counsel's "a) failure to fully investigate the cause of death and the timing

---

[10] Petitioner states she must show constitutional violations by only a preponderance of the evidence. Doc. 227 at 29. To the contrary, Congress rejected a preponderance standard in enacting a presumption of correctness in § 2254. *Sumner v. Mata*, 449 U.S. 539, 551-52 (1981) (reasoning that, even pre-AEDPA, Congress's "1966 amendment to 28 U.S.C. § 2254 . . . meant to insure that a state finding not be overturned merely on the basis of the usual 'preponderance of the evidence' standard").

of the injuries attribute [sic] to Petitioner, including the failure to timely consult with and retain expert witnesses, and b) failure to present testimony from the expert witnesses as to the cause and timing of the fatal injuries" (Doc. 226 at 7).[11]  Based on the findings of the state district court following the evidentiary hearing, which Petitioner has failed to rebut with clear and convincing evidence, Petitioner's allegations of ineffective assistance must be rejected.  In particular, trial counsel consulted with two different mainstream medical experts, both of whom reached conclusions unfavorable to the defense; counsel specifically considered consulting a "minority-view" expert on the topic of Shaken Baby Syndrome ("SBS") but decided that such an expert would destroy the defense's credibility in the eyes of the jury; and, faced with overwhelming evidence that A.S. died of recent child abuse, counsel presented a cohesive and coherent defense theory that Mr. Snyder had the opportunity to inflict A.S.'s fatal injuries.  Habeas relief must be denied.

## A.    *Strickland* Standard

To establish constitutionally ineffective counsel, Petitioner must show both (1)

---

[11] Petitioner's brief in support makes a number of additional allegations of ineffective assistance—many of which have nothing to do with the failure to present a medical expert—that are not included as grounds for relief in her Second Amended Habeas Petition.  This violates Rule 2, which requires a habeas petition to "specify all the grounds for relief available to the petitioner."  Rule 2(c)(1), *Rules Governing 2254 Cases*. This Court, as well as Respondent, should not be forced to comb through Petitioner's eighty-two page brief in support to determine the claims she is raising.  This Court should find to be waived any claims of ineffective assistance of counsel that are not specified in Petitioner's Second Amended Habeas Petition as grounds for relief and thus do not comply with Rule 2 (Doc. 226 at 7-14 (listing "six propositions")).  In any event, Respondent addresses below all of Petitioner's allegations of ineffective assistance as raised in her second amended petition and her brief in support.

27

that her attorney's performance was deficient and (2) that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Littlejohn*, 704 F.3d at 859 (applying *Strickland*'s two-prong test to ineffective assistance claim reviewed *de novo*). "These two prongs may be addressed in any order, and failure to satisfy either is dispositive." *Littlejohn*, 704 F.3d at 859 (quotation marks omitted).

As to the deficient performance prong, counsel's behavior is not to be judged by "specific guidelines"; rather, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. Petitioner bears the burden of proving that counsel's performance was unreasonable, and this Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 687, 689. It is axiomatic that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690-91. "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Id.* at 689. Thus, a fully informed strategic decision will be found unreasonable only on the rare occasion when no competent attorney would have made the same choice. *Bullock v. Carver*, 297 F.3d 1036, 1046 (10th Cir. 2002); *see also Moore v. Marr*, 254 F.3d 1235, 1239 (10th Cir. 2001) ("Strategic or tactical decisions on the part of counsel are presumed correct, unless they were completely unreasonable, not merely wrong, so that they bear no relationship to a possible defense strategy." (citations and quotation marks omitted, alteration

adopted)).

Counsel is further "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington v. Richter*, 562 U.S. 86, 107 (2011). Thus, defense lawyers are not required "to scour the globe on the off chance something will turn up" and instead "may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005). Finally, "[t]he reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). Therefore, in assessing counsel's performance, this Court must "eliminate the distorting effects of hindsight" and "reconstruct the circumstances of counsel's challenged conduct." *Strickland*, 466 U.S. at 689.

## B.     State District Court's Findings

Petitioner raised her claim that trial counsel were ineffective in their investigation and presentation of expert medical testimony in her second post-conviction application (Doc. 234, Exhibit 7 at 2-3). Following the evidentiary hearing, the state district court discussed the claim at length before rejecting it on the merits (Doc. 234, Exhibit 10 at 8-18). As previously discussed, any factual findings by the state district court are entitled to a presumption of correctness under § 2254(e)(1):

> In Proposition 1, Petitioner asserts she received ineffective assistance of counsel. She specifically alleges: (A) counsel failed to timely consult with expert witnesses; (B) counsel failed to take any other

29

reasonable actions to learn about the victim's medical issues; (C) counsel failed to present expert testimony at trial; (D) counsel did not adequately cross-examine the State's witnesses[12]; and (E) prejudice has already been determined through the federal court's finding of actual innocence. Petitioner was initially represented in this matter by assistant public defender Jennifer Richard.  Isaac Funderburk and David Slane were jointly retained and entered their appearances as attorneys of record on February 10, 2005.  Eric Reynolds also entered his appearance on behalf of the Petitioner on September 12, 2005.[1]

> [1]Mr. Funderburk passed away in 2010, before Petitioner filed the present post-conviction application. However, Mr. Slane and Mr. Reynolds were available and testified at the evidentiary hearing.

In order to prove ineffective assistance of counsel, Petitioner must show both that counsel's performance was deficient and that the deficiency caused prejudice.  *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). [Extensive discussion of the *Strickland* standard omitted] . . .

A. Failure to Timely Consult with and Present Experts or Otherwise Investigate Medical Issues

At the heart of Petitioner's ineffective assistance claim is her contention that counsel should have consulted with and presented at trial certain witnesses who hold themselves out to be experts on "Shaken Baby Syndrome" (hereinafter, "SBS experts").  Petitioner asserts that Mr. Funderburk was ineffective in that he ignored the requests of Petitioner's supporters that he contact SBS experts and waited to consult with an expert until the eve of trial.  At the evidentiary hearing, Petitioner, her mother, Donna Carmichael, and her friend and the victim's daycare provider, Janus Roth, testified that they had provided Mr. Funderburk with access to an "SBS defense website" and requested that he consult an SBS expert.  One of the SBS experts they specifically identified was Dr. John Plunkett.

---

[12] Petitioner does not raise her claim of inadequate cross-examination in her Second Amended Habeas Petition or brief in support.  However, in resolving this claim, the state district court made factual findings relevant to the claims that Petitioner does raise. Accordingly, Respondent includes the state district court's discussion of this claim.

"[W]hen a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to counsel the power to make binding decisions of trial strategy in many areas." *Faretta v. California*, 422 U.S. 806, 820, 95 S.Ct. 2525, 2534, 45 L.Ed. 2d 562 (1975).

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-691; *see also Knowles v. Mirzayance*, 556 U.S. 111, 125-126 (2009) (finding no ineffectiveness where counsel conducted a thorough investigation, carefully weighed his options, and discussed his strategy with co-counsel).

Petitioner retained Mr. Funderburk's services in this matter in February 2005, when she became dissatisfied with her public defender's representation. (Tr. 3/5/14, 12:17-13:20) Mr. Funderburk, who had only practiced law for a few years, asked Mr. Slane to assist in the case. Mr. Slane had considerable experience as a criminal defense attorney, particularly in murder and child abuse cases, and was known for his willingness to assist young attorneys. (Tr. 12/4/14, 7-8) Mr. Reynolds did not join Petitioner's defense team until approximately two weeks before trial and served primarily as an investigator. (Tr. 12/3/14, 8:11-13) He testified that he was not involved in the investigation or decision-making as it related to medical experts, although Mr. Reynolds did participate in a conference call with Mr. Funderburk and a forensic ·pathologist, Dr. Corrie May. (Tr. 12/3/14, 8:9-13) Mr. Reynolds stated that he understood Mr. Funderburk to be "lead counsel" on Petitioner's defense (Tr. 12/3/14, 10:19-20); however, Mr. Slane testified that he considered himself to be lead counsel as he was the experienced attorney. (Tr. 12/4/14, 67:16-18)

When Mr. Slane and Mr. Funderburk undertook representation of

31

Petitioner, assistant public defender Jennifer Richard provided the case file she had developed, including discovery materials from the State, to Mr. Funderburk.  Ms. Richard had already sent subpoenas for the victim's medical and daycare records and forwarded those items to Mr. Funderburk as she received them.  (Tr. 12/1/14, 26-29)  A receipt signed by Mr. Funderburk and dated February 10, 2005, acknowledges receipt of the following documents: (1) Baptist Hospital Records for [A.S.]; (2) Photographs taken by Oklahoma City Police; (3) Medical Examiner's Report; (4) Police Reports in State of Oklahoma v. Beverly Moore, CF-2004-351; (5) Two videotapes, one of Ms. Moore's interview with the detectives and one of Todd Snyder's interview with detectives; (6) Deaconess Hospital Records for [A.S.]; (7) SoonerStart Records of [AS]; (8) Two records obtained from [A.S.]'s daycare provider, dated September and August, 2003; and (9) Copies of certificates earned by Beverly Moore while incarcerated in the Oklahoma County jail. (Ptr's Exh. 1, p. 7).  Mr. Slane testified that when he first took over the case, he read through all of the police reports before he met with Petitioner.  He met with Petitioner in the Oklahoma County Jail to discuss the case shortly after being retained. (Tr. 12/4/14, 15:9-16:2)  He also read through the ME's reports and medical records, and read scholarly articles from medical journals relating to shaken baby syndrome, detached retinas, and internal compression injuries to prepare for the case.  (Tr. 12/4/14, 70:23-71:12; 73:13-18)

The State's theory of the case was that 22-month-old A.S. died as a result of abusive head trauma caused by shaking and impact and the Petitioner was the perpetrator of the abuse because she was alone with the victim at the time he collapsed, which would have happened instantaneously to the abuse.  Mr. Slane and Mr. Reynolds testified that the initial theory of defense was that the baby died as a result of accidental trauma, potentially from a fall, that occurred before the time he collapsed in Petitioner's care.  (Tr. 12/4/14, 79:20-25)  To support this theory, it was necessary to expand the timeframe from the time the victim was injured until his collapse.  Mr. Slane testified that he and Mr. Funderburk consulted with two different doctors, a male and a female. He did not recall the name of the male doctor, whom they ultimately did not retain.  (Tr. 12/4/14, 26:4-14)  Mr. Slane testified this doctor's opinion would be detrimental to the defense.  (Tr. 12/4/14, 27:24-28:7; 33:4-7)  The female doctor was Dr. Corrie May, a forensic pathologist who worked as a medical examiner in many states and was a professor at the University of Kansas School of Medicine.

32

The defense team did retain Dr. May's services shortly before trial. Mr. Funderburk provided her all relevant records he had relating to the victim's health and death. Dr. May's records reflect that she received the following records for her review; (1) Family health records and day care contract for decedent [A.S.] – 11 pages; (2) Oklahoma County Sooner[S]tart records – 61 pages; (3) Deaconess Hospital Emergency Department medical records from treatment on 12/28/02, 4/29/03, and 10/7/03 – 28 pages; Baptist Medical Center medical records from admission on 1/13/04 to expiration on 1/14/04, and 10/7/03 – 97 pages; (5) Autopsy report prepared by Chai S. Choi, MD – 12 pages; and (6) Photographs (30) of the decedent [A.S.] after autopsy. (Ptr's Exh. 32, p. 66). Petitioner testified at the evidentiary hearing that those were all the records she wanted an expert to review. (Tr. 3/5/15, 94:10-14) Dr. May ultimately concluded that she could not be helpful for the defense, and indeed may have been harmful to Petitioner's case, because she concurred with the findings of the State's medical examiner that the child's injuries were consistent with abuse. She testified that she had adequate time and materials to review the case and form her opinion. (Tr. 1/22/15, 41:16-20; 42:6-9) Although the defense would not be calling her as a witness, Dr. May drove from Kansas City to Oklahoma City at Mr. Funderburk's request to meet with Petitioner's family and to observe the trial testimony of the State's experts.

Dr. May testified at the evidentiary hearing that she was first contacted by Mr. Funderburk about Petitioner's case on September 1, 2005. (Tr. 1 /22/15, 7:13-15) She met Mr. Funderburk on September 3, in Kansas City at which time he delivered the aforementioned records and discussed the case. (Tr. 1/22/15, 12:19-21) Dr. May spent the week reviewing the case and called Mr. Funderburk on September 8. She mailed her final report via FedEx on September 9, and faxed a copy to Mr. Funderburk's office that same day. (Tr. 1/22/15, 20:14) Mr. Funderburk also met Dr. May in person in Kansas City on September 11, at which time she provided a third copy of her final report. (Tr. 1/22/15, 21:20-22:3) There was some conflict in the testimony presented at the evidentiary hearing regarding whom Dr. May spoke to on the phone. Dr. May testified that her notes reflected she only spoke with Mr. Funderburk, Mr. Reynolds, and Mr. Funderburk's assistant, D'Alisa, on the phone. She said she had no recollection of ever speaking with Mr. Slane and met him for the first time when she arrived in Oklahoma City during the trial. (Tr. 1/22/15, 26:5-12) However, Mr. Slane testified that he was part of a [sic] several conference calls with Dr. May. (Tr. 12/4/14, 30:11-18) Mr. Slane was adamant in his

testimony that the defense was aware of Dr. May's opinion prior to the commencement of trial on September 12. (Tr. 12/4/14, 92:21-93:5)

Mr. Slane and Mr. Reynolds both testified that after receiving Dr. May's opinion, they had to alter their defense strategy. (Tr. 12/3/14, 16:5; Tr. 12/4/14, 80:16-23) While it was still necessary to expand the timeframe for when the victim sustained his injuries, the defense strategy changed from accidental injury to someone else abused the child, specifically the victim's father. (Tr. 12/4/14, 48:10-25) Mr. Slane testified that he and Mr. Funderburk discussed whether they should consult a third doctor but ultimately decided not to. He said this decision was not due to the immanency of trial; he would have had no problem seeking a continuance from the court if he felt they needed to consult another doctor. (Tr. 12/4/14, 63:15-20; 64:1-18). But the attorneys decided it was not necessary in this case. Instead, their strategy was to undercut the State's theory through cross-examination of the State's experts. (Tr. 12/4/14, 108:17-25) Mr. Slane testified that he handled all of the cross-examination of the experts because he would not have trusted that to the other lawyers. (Tr. 12/4/14, 51:5-9) They would also present character witnesses to demonstrate that Petitioner was an honest person and a good mother.

During Petitioner's evidentiary hearing testimony, she stated that she wanted an expert without bias, one who would "look at everything together and come up with their own conclusion." (Tr. 3/5/15, 29:15-18) It seems from Petitioner's testimony that she did not believe the doctors listed on the SBS defense website would have a bias in these types of cases. Mr. Slane, apparently of the same mind to not involve a biased expert, testified that he deliberately decided not to involve the kind of doctor that Petitioner characterizes as an "SBS expert" in this case. He explained:

> Well, there are doctors who testify primarily for the defense. There are doctors who testify primarily for the prosecution. And then there's a whole bunch of doctors that are doing their job, like, medical examiners, emergency room physicians, things like that, and those are what I call mainstream doctors. And those doctors are doctors that aren't expert witnesses. They're really coming in -- even though they're experts they're coming in because they've treated so many kids. And they've seen abuse and they've also seen accidental injuries. And so that's what I mean by mainstream. Not somebody that's primarily in the business

34

of traveling around and testifying for defense lawyers.

(Tr. 12/4/14, 34:17-35:3)  Mr. Slane further testified that he was aware of Dr. John Plunkett at the time he represented Petitioner.  He said he had considered using those types of non-mainstream doctors, Dr. Plunkett being the main one, in this case.  (Tr. 12/4/14, 40:1-5)  He explained his ultimate decision not to call upon him in this matter:

> Dr. Plunkett is problematic.  And by that what I mean is he's testified in so many cases that -- that you guys [prosecutors] go get the transcripts from those trials and you cross-examine them with it and it sort of messes up our case.  I mean, in other words we get the opinion that we want oftentimes, but by the time we're done, as a defense lawyer I think we lose credibility with the jury that we've got this doctor that we just hired as a hired gun and it hurts our case.
>
> . . . .
>
> Well, you don't -- you don't make these decisions -- these trial strategy decisions in a vacuum.  There's multiple things you consider.  Your defendant is one of them.  Your expert is one of them.  Your character witnesses are another.  And so on and so forth.  And I thought Beverly – she'd never really been in trouble.  By all indications she was a good mother.  She had worked at the jail so I sort of saw her as law enforcement, police woman or policeperson, somebody that would be respected by the jury.  And I didn't want somebody like a Plunkett to come in and mess that up.  And I was afraid that he would bring that air to the courtroom.  And I just didn't think it would be helpful.

(Tr. 12/4/14, 36:6-13; 37:3-15)

Mr. Slane testified that he actually presented Dr. Plunkett as an expert witness in a child-death case a few years after Petitioner's trial and, for all the reasons he was disinclined to use him in Petitioner's case, it went poorly and his client was convicted. (Tr. 12/4/14, 40-47)  Attorney Robert Estrada, whom Petitioner's family contacted shortly before trial based on his publicized experience with a shaken-baby case, concurred in the view that Dr. Plunkett was in a very significant minority of doctors in this area.

(Tr. 4/14/15, 30:15-20)  Mr. Estrada also agreed that the blunt force trauma the victim suffered would have been problematic to that sort of defense strategy.  (Tr. 4/14/15, 30:21-25)

Particularly problematic to the defense in this case was that the victim had sustained not only head injuries indicative of abusive head trauma, or "Shaking [sic] Baby Syndrome" with impact, but also abdominal injuries.  Mr. Slane reasoned that he believed he would lose credibility with the jury if he attempted to provide different explanations for all the various injuries incurred by the child leading up to his death. (Tr. 12/4/14, 136:7-137: 1).  He testified that when he had tried to use non-mainstream doctors to focus on one injury to the exclusion of others, the strategy had not been successful.  (Tr, 12/4/14, 137:2-6)  In addition to the medical evidence that the victim had been abused, the defense also had to account for Petitioner's admission to detectives that she shook the child and possibly hit his head on the ground.  A redacted video of Petitioner's police interview was admitted at trial over Mr. Funderburk's objection as State's Exhibit 48.  (Trial Tr. III, 21)

That the jury ultimately rejected Petitioner's defense strategy does not, in and of itself, render counsels' performance deficient.  The trial record and evidence presented at the evidentiary hearing support that Mr. Funderburk and Mr. Slane formed their trial strategy after investigating the case, reviewing the relevant medical documentation, and consulting with medical experts prior to trial.  While perhaps it would have been better practice to consult with these experts sooner, Mr. Slane testified that the defense strategy was not time-dependent.  Under the facts and circumstances of this case, the Court cannot find that no competent attorney would have made the same strategy decisions.  Petitioner has failed to demonstrate that Mr. Funderburk, Mr. Slane, or Mr. Reynolds were deficient in this regard.

## B. Inadequate Cross-Examination

Petitioner further contends that the State's expert witnesses at trial were inadequately cross-examined.  She specifically alleges that "Mr. Funderburk did not examine the State's experts on *any* of the issues identified by Dr. May."  Ptr's Br. at 11. In fact, Mr. Funderburk did not cross-examine any of the State's witnesses at all.  The record reflects that Mr. Slane undertook the cross-examination of the State's three medical experts, Dr. Griggs, Dr. Korber, and Dr. Choi.  Mr. Slane testified that he

36

would not have trusted the cross-examination of these experts to the other attorneys, presumably due to his relatively extensive experience. (Tr. 12/4/14, 51:5-9)  Mr. Slane testified that he had received Dr. May's opinion in advance of trial and was able to go over any identified issues in the case, including about how the presence of intercellular iron related to the timing of the victim's injury. (Tr. 12/4/14, 97:15-100:14)

By all accounts, Mr. Slane presented himself professionally and confidently at trial. (Tr. 12/1/14, 185:1-5; Tr. 1/22/15, 38:5-8)  Dr. May, who was present for Mr. Slane's cross-examination of the medical experts observed: "I found [Mr. Slane] to be very professional, experienced.  Asked the typical types of questions of cross-examination of witnesses of this sort.  And seemed to be very knowledgeable in this area." (Tr. 1/22/15, 38:5-8).  Petitioner has not demonstrated that Mr. Slane was unprepared for his cross-examination of the State's expert witnesses.  During the trial, Mr. Slane advised the Court during the re-direct examination of Dr. Choi that Dr. May was present in the courtroom to assist the defense. (Trial Tr. II, 221:23)  Mr. Slane successfully elicited from the State's medical experts that there was some disagreement in the medical community regarding the timing and mechanisms of "shaken baby syndrome."  He was even successful in obtaining concessions from the witnesses that there was a possibility of an expanded timeframe between the time the victim was injured and the onset of symptoms. (*See, e.g.*, Trial Tr. II, 212:17-20; 218:22-219:2; Trial Tr. III, 99:15-20)  The scope of his cross-examinations was reasonably executed to further the defense strategy that someone other than the Petitioner abused the victim.  From the original record and evidence presented at the evidentiary hearing, the Court does not find that Mr. Slane was deficient in his cross-examination of the State's medical experts.

(Doc. 234, Exhibit 10 at 8-19).[13]  The state district court concluded its order denying

---

[13] As to Petitioner's allegation of actual innocence and *Strickland* prejudice, the state district court found:

Petitioner asserts that during the course of her federal habeas proceedings, the federal court has determined that Petitioner is actually innocent. Reviewing the federal record that has been presented, this Court cannot concur in that view.  The Court makes no finding relating to the prejudice prong of *Strickland* based on the parties' agreement that only the issue of deficient performance is presently before the Court at this time.

relief with a series of "specific findings of facts and conclusions of law"[14]:

    1.  Isaac Funderburk associated with David Slane because he was an experienced trial and criminal defense attorney familiar with the types of issues involved in Petitioner's case. Eric Reynolds joined the defense team two weeks before trial to serve as an investigator and attorney on Petitioner's behalf.

    2.  David Slane and Isaac Funderburk shared responsibility for consulting with and retaining medical expert witnesses in relation to this case. Mr. Reynolds had no decision-making responsibilities in this regard.

    3.  Petitioner's attorneys received all relevant medical records for the victim, A.S., either from the State through the discovery process or by subpoena to the custodians of those records.

    4.  The defense did consult with two "mainstream" medical experts, Dr. Corrie May and an unnamed male doctor, prior to Petitioner's trial. Both doctors indicated they would be harmful to Petitioner's defense.

    5.  The defense first retained Dr. May's services on September 1, 2005, and were aware of her opinion that the victim's injuries were consistent with child abuse by September 9, 2005.

    6.  Dr. Corrie May had all relevant medical records which were in the defense's possession available for her review and had adequate time in which to form her opinion.

    7.  It was reasonable for Mr. Funderburk and Mr. Slane to decide they would not keep searching for another doctor in light of the fact that the two neutral doctors they had consulted, as well as the State's medical experts, concluded the victim's injuries were consistent with abuse. The attorneys were under no obligation to continue to "doctor shop" until they found a doctor willing to provide testimony inconsistent with the findings of the five mainstream doctors who reviewed this case.

---

(Doc. 234, Exhibit 10 at 19).

[14] Oklahoma law requires a post-conviction court to issue specific, written findings following an evidentiary hearing.  *See* OKLA. STAT. tit. 22, § 1084 ("The court shall make specific findings of fact, and state expressly its conclusions of law, relating to each issue presented.").

8.   The decision not to present Dr. John Plunkett or other similar "SBS expert" defense witnesses was a tactical decision based on such witnesses' reputations. It was not unreasonable to believe that such witnesses could have hurt Petitioner's credibility with the jury.

9.   The decision not to present such "SBS experts" was particularly reasonable in light of the various injuries the victim sustained that were not indicative of "shaken baby syndrome," i.e. blunt force trauma to the head and compression injuries to the abdomen, and Petitioner's admission to detectives that she shook the victim and possibly hit his head on the ground at the time he went into medical distress.

10.   The strategy of attacking the prosecution's case through cross-examination of the State's medical experts was not objectively unreasonable.

. . . [15]

15.   Neither Mr. Funderburk, Mr. Slane, nor Mr. Reynolds were constitutionally deficient in their representation of Petitioner in this matter.

16.   Because Petitioner has failed to establish that David Slane, Isaac Funderburk, or Eric Reynolds rendered deficient performance, it is unnecessary to address the prejudice prong of *Strickland*.

17.   Petitioner has failed in her burden to demonstrate that she received ineffective assistance of trial counsel.

18.   Because Petitioner's allegations of ineffective assistance of trial counsel are without merit, appellate counsel was not ineffective for failing to raise such claims on direct appeal.

(Doc. 234, Exhibit 10 at 27-30).

---

[15] For the moment, Respondent omits Findings ##11-14 because they are relevant only to Ground Two.

**C.     Trial Counsel Conducted a Reasonable Pretrial Investigation and Presented a Reasonable Defense at Trial**

Petitioner has not carried her burden of showing that trial counsel performed deficiently, with regard to either their pretrial investigation or their defense at trial.  *See Strickland*, 466 U.S. at 687.  Below, Respondent (1) establishes that the state district court's findings with regard to these ineffective assistance claims must be presumed correct; (2) demonstrates Petitioner's failure to overcome the state district court's factual findings by clear and convincing evidence; and (3) addresses Petitioner's individual complaints about counsel.

**(1)     The State District Court's Findings Must Be Presumed Correct**

As quoted above, the state district court made numerous factual findings relevant to Petitioner's ineffective assistance claims that must be presumed correct in this proceeding pursuant to § 2254(e)(1).  Indeed, § 2254(e)(1)'s presumption of correctness has particular potency where a state court, as here, made the findings following an evidentiary hearing.  *See Sharpe*, 593 F.3d at 378-79 (quoted with approval in *(Donald) Grant*, 886 F.3d at 913).

In *Sharpe*, the Fourth Circuit considered the impact of AEDPA's deferential standards on a claim of actual innocence under *Schlup v. Delo*, 513 U.S. 298 (1995), to obtain merits review of procedurally barred ineffective assistance claims.  While the Fourth Circuit held that § 2254(d) did not apply to Sharpe's *Schlup* claim because it was not adjudicated on the merits in the state court, it concluded that § 2254(e)(1) applied

with full force, especially where, as in the present case, a state court had the opportunity to view and hear witnesses, make credibility determinations, and issue detailed findings:

> AEDPA does not make deference to state court fact-finding dependent on the adequacy of the procedures followed by the state court. Nonetheless, the character of the process upon which the state court based its conclusion may have some bearing on whether a petitioner's showing amounts to "clear and convincing" evidence that the state court erred. Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part. This is especially so when the court resolved issues like witness credibility, which are "factual determinations" for purposes of Section 2254(e)(1). For a federal habeas court to overturn a state court's credibility judgments, the state court's error must be stark and clear.

> This all makes sense in the general scheme of things. AEDPA in general and Section 2254(e) in particular were designed "to further the principles of comity, finality, and federalism." *Williams v. Taylor*, 529 U.S. 420, 436, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). Section 2254(e)(1) plainly seeks to conserve judicial resources and reflects Congress's view that there is no reason for a do-over in federal court when it comes to facts already resolved by state tribunals. That section also reflects Congress's respect for principles of federalism, recognizing that a decision to set aside state court factual findings intrudes on the state's interest in administering its criminal law. *See Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003).

*Sharpe*, 593 F.3d at 378-79 (quotation marks and select citations omitted, alterations adopted).

The Fourth Circuit added that a federal court should be all the more deferential to a state court's factual findings when the state court is applying a legal standard that parallels the one to be applied by the federal court:

> The deference Section 2254(e)(1) requires has particular salience when a state court's determinations closely track the legal issues before the

41

> federal habeas court.   Where a state court looks at the same body of relevant evidence and applies essentially the same legal standard to that evidence that the federal court does under *Schlup*, Section 2254(e)(1) requires that the state court's findings of fact not be casually cast aside.   *See Miller*, 474 U.S. at 113, 106 S.Ct. 445 (citation omitted).   Indeed, the cavalier treatment of such findings in federal *Schlup* proceedings would contravene the course of federal-state relations set by the Congress and the Supreme Court with great consistency over a very considerable period of time.

*Id.* at 379 (select citations omitted).   As with Sharpe's *Schlup* claim, the state district court's application of *Strickland* in this case is not entitled to § 2254(d) deference.   However, the fact that the state district court applied *Strickland*, "the same legal standard" as will be applied by this Court, and made credibility determinations and detailed factual findings relevant to that standard, means its "findings of fact [should] not be casually cast aside."   *Sharpe*, 593 F.3d at 379; *see also id.* at 380 ("Given the similarity of the state proceedings to petitioner's habeas claims under *Schlup*, the state court's factual determinations should have exerted a *heavy pull* on the habeas court's adjudication." (emphasis added)).

Based on the evidentiary hearing record developed in state court, and the state district court's findings, Petitioner falls woefully short of demonstrating that no competent attorney would have performed as her attorneys did.   *See Bullock*, 297 F.3d at 1046.   In fact, Petitioner does not appear to dispute that, if the facts found by the state district court stand unrebutted, then she is not entitled to relief under *Strickland* even under *de novo* review.   Rather, Petitioner spills considerable ink attempting to avoid the presumption of correctness in § 2254(e)(1).   Petitioner's arguments are without merit.

42

> (i)   The state district court's alleged lack of jurisdiction is irrelevant under § 2254(e)(1) and, in any event, the court was not without jurisdiction.

Petitioner begins with claiming § 2254(e)(1)'s presumption of correctness does not apply in this case because the OCCA ultimately procedurally barred her claims and thus the state district court allegedly lacked jurisdiction to hold an evidentiary hearing (Doc. 227 at 33).  Petitioner's argument should be rejected at the outset because she ignores the plain language of § 2254(e)(1).  Congress spoke in mandatory terms when it said that "a determination of a factual issue made by a State court *shall* be presumed to be correct." 28 U.S.C. § 2254(e)(1) (emphasis added); *see also Forest Guardians v. Babbitt*, 174 F.3d 1178, 1187 (10th Cir. 1999) ("'*Shall' means shall.* The Supreme Court and this circuit have made clear that when a statute uses the word 'shall,' Congress has imposed a mandatory duty upon the subject of the command." (emphasis in original)).  Furthermore, Congress plainly provided only one exception to this command—where a habeas petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).  Congress's mandatory language leaves no room for a judicially created exception to the presumption of correctness where a state court lacked jurisdiction to make factual findings.

Indeed, Respondent's interpretation of Congress's intent in § 2254(e)(1) is confirmed by the statutory history of § 2254.  Under the pre-AEDPA version of "28 U.S.C. § 2254(d), state-court findings of fact [were] . . . 'presumed to be correct' in a federal habeas corpus proceeding unless one of eight enumerated exceptions applie[d]."

*Miller v. Fenton*, 474 U.S. 104, 105-06 (1985).  Relevant here, § 2254(d)(4) provided an exception where a habeas petitioner established that "the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding."  28 U.S.C. § 2254(d)(4) (1966).  Thus, when Congress, through AEDPA, eliminated this exception to the presumption of correctness based on the state court's lack of jurisdiction, it is clear that Congress intended for no such exception to exist.  Petitioner's interpretation of § 2254(e)(1)—that it does not apply where the state court lacked jurisdiction—contravenes Congressional intent.

In any event, the case relied on by Petitioner in support of this argument is distinguishable.  In support of this argument, she points to a single case, *Lambert v. Blackwell*, 175 F.Supp.2d 776 (E.D. Pa. 2002), *vacated on other grounds by Lambert v. Blackwell*, 205 F.R.D. 180, 182 (E.D. Pa. 2002) (Doc. 227 at 33).  In *Lambert*, the state post-conviction court made findings of fact in denying Lambert's post-conviction petition on the merits.  *Lambert*, 175 F.Supp.2d at 786.  On appeal, however, the Pennsylvania Superior Court held that the post-conviction petition was clearly untimely.  *Id.* Furthermore, under well-settled Pennsylvania law, "a court is without jurisdiction to consider an untimely [post-conviction] petition," and it is "the uniform and unqualified rule under settled Pennsylvania jurisprudence that a judgment reached without jurisdiction is void and must be treated as if it never existed."  *Id.* at 786-87.

Accordingly, the federal district court in *Lambert* determined that it owed no deference to the post-conviction court's findings.  *Id.* at 787.  The court reasoned that

"[t]here appears to be only one exception to this hard and fast rule of federal-state comity, and it comes into play only when the state proceedings are considered a legal nullity and thus void *ab initio*. Because a void judgment is null and without effect, the vacating of such a judgment is merely a formality and does not intrude upon the notion of mutual respect in federal-state interests."

*Id.* (quoting *In re James*, 940 F.2d 46, 52 (3d Cir. 1991)) (alteration adopted). The court concluded that, "because the courts lacked jurisdiction, settled Pennsylvania law holds their factual findings and legal conclusions are a nullity. And because the court proceedings are void, there is no legitimate interest to which we must defer under the AEDPA or in the more generalized name of judge-made comity." *Id.* (footnote omitted).[16]

Lambert is inapposite. In contrast to the jurisdictional time-bar applied in *Lambert*, no jurisdictional time-bar was applied by the OCCA in this case, and indeed Oklahoma law provides no time limitation on the filing of a non-capital post-conviction application. *Moore v. Gibson*, 27 P.3d 483, 484 n. 1 (Okla. Crim. App. 2001). Rather, the OCCA barred Petitioner's claims based on the doctrines of waiver and *res judicata* and the statutory restriction on successive post-conviction applications in OKLA. STAT. tit. 22, § 1086 (Doc. 234, Exhibit 12 at 4).[17] The OCCA never said, however, that the lower court was *without jurisdiction* to decide the merits of Petitioner's claims or that the

---

[16] Respondent respectfully submits that the district court's analysis in *Lambert* was incorrect given Congress's elimination of § 2254(d)(4), as discussed above.

[17] To be clear, Respondent is discussing the OCCA's procedural bars only to refute Petitioner's argument that § 2254(e)(1) is inapplicable, not in a renewed attempt to seek application of those bars by this Court. Respondent fully addresses Petitioner's constitutional claims on their merits below.

lower court's order was *void*.  In fact, the OCCA expressly *affirmed* the lower court's

order (Doc. 234, Exhibit 12 at 10).

At most, the OCCA disagreed with the state district court's determination that

Petitioner fell within an exception or exceptions to § 1086 and the doctrines of waiver

and *res judicata* that allowed merits review of her claims.   But the OCCA never

suggested that such exceptions did not exist or that § 1086, waiver, and *res judicata*

presented absolute, jurisdictional bars to review of Petitioner's claims.   Indeed, as the

OCCA recognized (Doc. 234, Exhibit 12 at 7), § 1086 expressly provides an exception to

the bar on successive applications, providing that such does not apply if "the court finds

. . . sufficient reason [a ground for relief] was not asserted or was inadequately raised in

the prior application."   OKLA. STAT. tit. 22, § 1086.   As to waiver and *res judicata*, the

OCCA noted that these are simply judicially created doctrines of judicial economy and

finality: "'In the interests of efficiency and finality, our judicial system employs various

doctrines to ensure that issues are not endlessly re-litigated.'" (Doc. 234, Exhibit 12 at 9

(quoting *Smith v. State*, 306 P.3d 557, 564 (Okla. Crim. App. 2013)).  Finally, the OCCA

has otherwise recognized that it has the power to not only consider, but grant relief on, a

successive post-conviction application—in spite of the doctrines of waiver and *res

judicata*—where "an error complained of has resulted in a miscarriage of justice, or

constitutes a substantial violation of a constitutional or statutory right."  *Valdez v. State*,

46 P.3d 703, 710-11 (Okla. Crim. App. 2002).[18]

Thus, while the OCCA rejected the state district court's conclusion that Petitioner satisfied an exception to the procedural bars it applied, its discussion of the available exceptions proves that the bars it applied were not equivalent to the mandatory, jurisdictional time-bar at issue in *Lambert*. The OCCA certainly never went so far as to declare the state district court's findings null, void, or without effect. *Compare Lambert*, 175 F.Supp.2d at 787.

Finally, unlike in *Lambert*, where the post-conviction proceedings had been declared a legal nullity, such that it did not violate federal-state comity for the federal court not to give deference to the state court's findings, *id.*, comity does call for deference in this case. Considerable time and resources were expended in state court developing the record on Petitioner's claims. The state district court held an evidentiary hearing that spanned at least fifteen days for the presentation of evidence alone (not to mention the pre-hearing court dates) and included the testimony of more than twenty witnesses, as well as numerous exhibits (Doc. 234, Exhibit 10 at 7; *see generally* E.H. Tr. 12/01/2014;

---

[18] The OCCA noted that the state district court had summarily denied the State's request that Petitioner's claims be procedurally barred (Doc. 234, Exhibit 12 at 3 n. 1). It stands to reason, however, that the state district court agreed with Petitioner's argument that she fell within a statutorily defined exception to § 1086 and the *Valdez* miscarriage of justice exception based on her actual innocence claim (Doc. 234, Exhibit 8 at 3-4). Thus, the state district court apparently relied on recognized exceptions to the procedural bars ultimately applied by the OCCA. The OCCA's disagreement that these exceptions were satisfied does not mean the district court was without jurisdiction to hold an evidentiary hearing.

E.H. Tr. 12/02/2014; E.H. Tr. 12/03/2014; E.H. Tr. 12/04/2014 I[19]; E.H. Tr. 12/04/2014

II; E.H. Tr. 12/05/2014; E.H. Tr. 01/22/2015; E.H. Tr. 03/2/2015; E.H. Tr. 03/03/2015;

E.H. Tr. 03/04/2015; E.H. Tr. 03/05/2015; E.H. Tr. 03/06/2015; E.H. Tr. 03/19/2015;

E.H. Tr. 03/20/2015; E.H. Tr. 04/14/2015; E.H. Tr. 08/04/2015).   The principle of

federal-state comity, especially when considered in light of the Congressional intent

behind § 2254(e)(1), demands that the state district court's findings in this case be

afforded a presumption of correctness.  *See Cullen v. Pinholster*, 563 U.S. 170, 182

(2011) (AEDPA as a whole "demonstrates Congress' intent to channel prisoners' claims

first to the state courts" and "leaves primary responsibility with the state courts"

(quotation marks omitted)); *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977) ("[T]he state

trial on the merits [should be] the 'main event,' so to speak, rather than a 'tryout on the

road' for what will later be the determinative federal habeas hearing."); *(Donald) Grant*,

886 F.3d at 913 ("The presumption-of-correctness language before *and* after AEDPA is

intended to effectuate federalism principles by giving great weight to the considered

conclusions of a coequal state judiciary." (quotation marks omitted, alterations adopted)).

> (ii)    *The state district court's adoption of the State's proposed findings*
> *does not allow Petitioner to escape § 2254(e)(1).*

Petitioner next claims there is "strong reason . . . to question the reasonableness

and correctness of the findings" because the state district court adopted nearly "word-for-

---

[19] The testimony of December 4, 2012, is split between two transcripts—one containing the testimony of Mr. Slane (which Respondent refers to as "E.H. Tr. 12/04/2014 I") and one containing the testimony of Dr. Melvin Pohl (which Respondent refers to as "E.H. Tr. 12/04/2014 II").

word" the State's proposed findings of fact shortly after Petitioner filed a request in this Court to have the stay lifted (Doc. 227 at 41). This argument again ignores the plain language of § 2254(e)(1), which requires "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Petitioner presents the opposite of evidence—she relies on inference and speculation in arguing that this Court should question the validity of the state district court's findings based on their timing and the adoption of the State's proposed findings.

Petitioner also forgets that "federal courts have no authority to impose mandatory opinion-writing standards on state courts." *Johnson v. Williams*, 568 U.S. 289, 298, 300 (2013); *see also Coleman v. Thompson*, 501 U.S. 722, 739 (1991) ("[W]e have no power to tell state courts how they must write their opinions."). In *Williams*, the Supreme Court was sensitive to the "practice of busy state courts," particularly the "heavy" "caseloads shouldered by many state appellate courts." *Williams*, 568 U.S. at 298, 300. While *Williams* was focused on appellate courts, its reasoning applies equally here. Petitioner's evidentiary hearing was conducted by a very busy Oklahoma County trial judge with an active docket (*see, e.g.*, Doc. 234, Exhibit 10 at 7 (noting that the evidentiary hearing had to be rescheduled due to conflicts in the court's docket); E.H. Tr. 03/20/2015 58 (testimony by court reporter for Petitioner's jury trial that the Oklahoma County judges for whom she previously worked presided over an average of *twenty-five to thirty trials per year*)). And when the state district court requested proposed findings from *both* the State *and* the defense, Petitioner's attorney (the same one who represents her presently) never voiced a concern that this practice was objectionable, unusual, or would provide

reason to question the court's findings (E.H. Tr. 08/04/2015 30). The fact of the matter is that Petitioner simply opposes the state district court's agreement with the State's proposed findings instead of her own. But this complaint does not come close to rebutting the court's findings under § 2254(e)(1), especially given federal courts' lack of authority to impose mandatory opinion-writing standards.

* * *

For all of these reasons, the district court's findings in this case must be presumed correct under § 2254(e)(1).

### (2) Petitioner Has Not Presented Clear and Convincing Evidence to Rebut the State District Court's Findings

Petitioner alternatively contends that she can overcome several of the state district court's factual findings by clear and convincing evidence (Doc. 227 at 34-40). Petitioner has failed to meet the "demanding" standard of § 2254(e)(1). To begin with, at bottom, Petitioner simply rehashes the evidence at the evidentiary hearing and disagrees with the state district court's credibility determinations among the various witnesses. But given that the state district court had the opportunity to see and hear these witnesses, Respondent respectfully submits that this Court is no position to overturn that court's credibility determinations. *See, e.g.*, *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) ("[F]ederal habeas courts [have] no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."); *Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011) ("Determining the credibility of

50

witnesses is the province and function of the state courts, not a federal court engaging in habeas review. . . . We consider questions about the credibility and demeanor of a witness to be questions of fact.  And the AEDPA affords a presumption of correctness to a factual determination made by a state court . . . ." (citation omitted)); *Sharpe*, 593 F.3d at 379 (reprimanding the federal district court for second-guessing the state court's credibility determinations where the state "court provided a much more substantial fact-finding process than the district court and was far better positioned to decide the sorts of factual matters that the district court opted to decide for itself"); *Pippin v. Dretke*, 434 F.3d 782, 792 (5th Cir. 2005) ("A trial court's credibility determinations made on the basis of conflicting evidence are entitled to a strong presumption of correctness and are 'virtually unreviewable' by the federal courts." (quoting *Moore v. Johnson*, 194 F.3d 586, 605 (5th Cir. 1999)).

In addition, in multiple instances Petitioner tacitly concedes that there was evidence to support particular findings, but essentially argues that there was also evidence going the other way and that the state district court should have credited the latter.  As numerous courts have held, a showing that there was conflicting evidence, or evidence that could go either way, is insufficient to rebut the presumption of correctness under § 2254(e)(1).  *See, e.g.*, *Rountree v. Balicki*, 640 F.3d 530, 543 (3d Cir. 2011) ("At bottom, the question of how to read this transcript . . . is a question of fact that can be argued either way.  That the transcript can be read in more than one way does not—by itself—rise to the level of 'clear and convincing evidence,' § 2254(e)(1) . . . ."); *Seymour*

*v. Walker*, 224 F.3d 542, 551-52 (6th Cir. 2000) ("[Seymour's] arguments shed some doubt on the credibility of certain witnesses and give interpretations of conflicting evidence that differ from the interpretations of the state court.  However, in light of the deference to be accorded to state-court factfinding under § 2254(e), . . . Seymour's arguments are not sufficient to demonstrate the incorrectness of the state court's findings by clear and convincing evidence."); *Harvin v. Mahally*, No. CV 15-3395, 2019 WL 7606221, at *8 (E.D. Pa. Dec. 30, 2019) (unpublished), *report and recommendation adopted*, No. CV 15-3395, 2020 WL 311166 (E.D. Pa. Jan. 17, 2020) ("Repeating factual allegations rejected by the state courts and arguing that the state courts wrongly failed to find them borne out by the evidence does not prove by clear and convincing evidence that the state courts' findings were erroneous."); *Ybarra v. Aramant*, No. 16-CV-05039-EMC, 2018 WL 1745720, at *5 (N.D. Cal. Apr. 11, 2018) (unpublished) ("There was conflicting evidence about the bike, but showing the existence of conflicting evidence does not satisfy Mr. Ybarra's 'burden of rebutting the presumption of correctness [of the state court's determination of a factual issue] by clear and convincing evidence.' 28 U.S.C. § 2254(e)(1)."); *U.S. ex rel. Jackson v. Chambers*, No. 07 DC 546, 2007 WL 2713374, at *2 (N.D. Ill. Sept. 13, 2007) (unpublished) (where state appellate court noted that evidence was conflicting, "even if that court had expressed doubts about the facts found by the trial court, for the purposes of this proceeding those facts are presumed to be correct unless rebutted 'by clear and convincing evidence.' 28 U.S.C. § 2254(e)(1)."); *Wheeler v. Chesny*, No. CIV. A. 98-5131, 2000 WL 124560, at *8 (E.D. Pa. Jan. 27,

2000) (unpublished) ("In his Objections, Petitioner seeks to revisit conflicting evidence and reargue inferences that are favorable to him.  Given that on habeas review the court . . . may only overturn state court findings of fact upon clear and convincing evidence, this Court agrees with the Report's conclusions and overrules the Objection as to this ground for relief." (citation omitted)).   As the Seventh Circuit put it in a case with conflicting evidence:

> In evidentiary conflicts like this, our standard of review requires that we defer to the state supreme court's decision.  The state court was entitled to accept [the Assistant District Attorney's] testimony about the chronology of events.  [The Petitioner] has not rebutted the AEDPA presumption that the state court's fact-finding is correct; he has simply pointed to evidence supporting his version of the sequence and timing of events. . . . *[I]dentifying conflicting evidence is not enough.*

*Thompkins v. Pfister*, 698 F.3d 976, 985 (7th Cir. 2012) (emphasis added).

With these standards in mind, taking Petitioner's challenges finding by finding, she has not satisfied § 2254(e)(1).

> (i)     Finding #1: Mr. Slane was *"familiar with the types of issues involved in Petitioner's case" (Doc. 234, Exhibit 10 at 27).*

Contrary to Petitioner's suggestion, this finding is fully supported by the record at the evidentiary hearing.  At the time of the evidentiary hearing, Mr. Slane had been practicing criminal defense law for twenty-one years, meaning he had around twelve years' experience at the time of Petitioner's jury trial (E.H. Tr. 12/04/2014 I 7).  Mr. Slane had represented thousands of defendants, had tried numerous types of criminal cases, and stopped counting his jury trials at one hundred (E.H. Tr. 12/04/2014 I 7).  Mr.

Slane kept track of his win/loss record during only one year of his practice, and that year he had sixteen jury trials and secured fourteen acquittals (E.H. Tr. 12/04/2014 I 7).   Mr. Slane had particular experience with murder and child abuse cases and had tried child abuse murder cases with both head injuries and other types of injuries (E.H. Tr. 12/04/2014 I 8).   He estimated that around half of the twenty or so murder cases he had tried were child abuse murder cases (E.H. Tr. 12/04/2014 I 69-70).   In fact, Mr. Slane could not think of another criminal defense attorney in Oklahoma County who had tried as many "dead child cases" as he had (E.H. Tr. 12/04/2014 I 8).   He agreed with the prosecutor's suggestion that they had tried, as opponents, several "dead child cases" together (E.H. Tr. 12/04/2014 I 8).[20]

Petitioner's challenge to the state district court's finding that Mr. Slane was "familiar with the types of issues involved in Petitioner's case" (Doc. 234, Exhibit 10 at 27), largely comes down to a complaint that Mr. Slane could not state with specificity how many of his child abuse murder cases came *before* her trial (Doc. 227 at 35).   This criticism, essentially an attack on Mr. Slane's credibility, does not amount to clear and convincing evidence.   *See Lonberger*, 459 U.S. at 434; *Consalvo*, 664 F.3d at 845; *Sharpe*, 593 F.3d at 379; *Pippin*, 434 F.3d at 792.   In any event, Mr. Slane confirmed that he did think he had tried "shaken baby" or "shaken impact" cases before Petitioner's

---

[20] Co-counsel Mr. Reynolds testified that he knew Mr. Slane to be an extremely experienced, competent criminal defense attorney who was aggressive and smart (E.H. Tr. 12/03/2014 41).

(E.H. Tr. 12/04/2014 I 70).[21]   Moreover, Dr. May observed Mr. Slane's cross-examinations of the medical experts and found him to "very professional, experienced, . . . [and] very knowledgeable in this area" and observed he was asking the questions she would expect (E.H. Tr. 01/22/2015 38).

Petitioner also states, *without any citation whatsoever*, that "[a] review of the court records regarding the cases handled by Mr. Slane do not reveal *any* in which the alleged manner of the death of a child involved shaking" (Doc. 227 at 35 (emphasis in original)). Petitioner's failure to support this argument with any citation to the record should waive the argument.  *See (John) Grant v. Trammell*, 727 F.3d 1006, 1025 (10th Cir. 2013) ("Even a capital defendant can waive an argument by inadequately briefing an issue."). The Tenth Circuit has said in the habeas context that "[w]e do not consider unsupported and undeveloped issues."  *Moore*, 195 F.3d at 1180 n. 17.   Neither this Court nor Respondent is required to ferret through the record to marshal support for Petitioner's arguments.  *See Garrett*, 425 F.3d at 840 ("[T]he court cannot take on the responsibility of serving as the litigant's attorney in constructing arguments and searching the record."); *SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1513 (10th Cir. 1990) (refusing to "sift through the record to find . . . evidence" to support the appellant's argument); *Bradford*, 479 F. App'x at 835 (it is not for the court to make a petitioner's argument or analyze

---

[21] At any rate, the disputed finding is Mr. Slane's familiarity with the issues in Petitioner's case, not that he had tried her type of case before.

issues not adequately presented).[22]  In any event, as explained in footnote 22, Exhibit 139

---

[22] To the extent Petitioner is referring to Petitioner's Exhibit 139, admitted at the evidentiary hearing, this exhibit does not prove by clear and convincing evidence that Mr. Slane was not familiar with the issues involved in Petitioner's case at the time of trial. According to Petitioner's attorneys at the evidentiary hearing, Exhibit 139, a compact disc containing numerous files, includes copies of the docket sheets from all of the felony cases in the Oklahoma state courts and the federal courts in which Mr. Slane has served as counsel (E.H. Tr. 08/04/2014 8-9).  Ms. Cave, Petitioner's current attorney, claimed that her review of the docket sheets showed that Mr. Slane had not taken a child abuse murder case to trial prior to Petitioner's trial (E.H. Tr. 08/04/2014 10-11).  Petitioner's attorneys indicated that they compiled these docket sheets by searching the Oklahoma Supreme Court Network's website, www.oscn.net ("OSCN"), for Mr. Slane's name under the "Attorney" option for "Party Type" (E.H. Tr. 08/04/2014 13).  As the State explained in objecting to the admission of Exhibit 139, however, "OSCN records are only as accurate as what the court clerk types into them" and the search function is not infallible (E.H. Tr. 08/04/2014 16-17).  One of the prosecutors reported that, in just twenty minutes on OSCN in looking through the docket sheets for matters she had recently worked on in post-conviction, she found four examples of attorneys whose search results did not include at least one case that she knew the attorney to have worked on: (1) in Case No. CF-1993-918, *State v. Gary Thompson*, attorney Ken Watson did not show up as counsel of record despite having tried the case twice, first to a hung jury and then again; (2) in Case No. CF-2004-872, a drug trafficking case, Mr. Slane was trial counsel but did not show up as counsel of record; (3) in Case No. CF-2010-4135, a lewd acts case, trial attorney Dustin Phillips did not show up as counsel of record; and (4) in Case No. CF-2010-7236, an embezzlement case, defense counsel Robert Wyatt did not show up as counsel of record (E.H. Tr. 08/04/2014 17-19).  In response, Ms. Cave revised her explanation of what Exhibit 139 was intended to show:

> We are offering them for purposes of showing what the records reflect. And in that case we're saying that OSCN or ODCR, if you go to the non-OSCN counties to search the remaining counties in Oklahoma, or Pacer for the Federal system that these are the -- these are the cases that will show up. I think that we've had testimony in this case that indicates that, yes, there are times that the court clerk apparently doesn't link the attorneys into cases. That's something that we're not disputing. But we are saying, you know, the judicial notice provision which is irrelevant to the docket sheets requires that the Court determine that the facts are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. We're only representing that the facts of the cases reported

does not rebut Mr. Slane's testimony that he believed he had tried such cases by clear and convincing evidence. Nor does this exhibit, or any other evidence cited by Petitioner, establish that Mr. Slane was not familiar with the relevant issues—which is the actual finding Petitioner must rebut.

> (ii)   *Finding #2: "Eric Reynolds joined the defense team two weeks before trial to serve as an investigator and attorney on Petitioner's behalf" (Doc. 234, Exhibit 10 at 27-28).*

Petitioner appears to dispute this finding on grounds that, "at the time of his initial involvement, [Mr. Reynolds] was not going to play any role at all at the trial," but that his "role ultimately changed" (Doc. 227 at 35). Petitioner splits hairs. In any event, there is nothing incorrect in the trial court's statement. Mr. Reynolds testified that he was a criminal defense attorney who joined the defense team about "two weeks prior to the trial date" and identified his entry of appearance filed on September 12, 2005 (E.H. Tr. 08/03/2014 5, 8-9). He both interviewed character witnesses prior to trial and conducted their direct examinations at trial (E.H. Tr. 12/2/2014 154; E.H. Tr. 08/03/2014 42-55). Further, the state district court elsewhere recognized that Mr. Reynolds initially joined the defense team "primarily as an investigator" (Doc. 234, Exhibit 10 at 11).

> (iii)   *Finding #3: "Petitioner's attorneys received all relevant medical records for the victim, A.S., either from the State through the*

as available on OSCN, as available on ODCR and as available on Pacer are reflected in this spreadsheet.

(E.H. Tr. 08/04/2015 19-20). The state district court ultimately admitted Exhibit 139 only reluctantly, noting that the matter was before the court and not the jury and the rules of evidence were relaxed and adding, "I also recognize that OSCN is not accurate many, many times" (E.H. Tr. 08/04/2015 25-26).

> *discovery process or by subpoena to the custodians of those records" (Doc. 234, Exhibit 10 at 28).*

Petitioner suggests this finding is incorrect because the defense team did not obtain all *possible* medical records (Doc. 227 at 36).  But the state district court stated that the defense team received all *relevant* documents, and this is fully supported by the record.  Dr. May testified in detail regarding the materials she was provided by the defense team:

> Those records included 11 pages that I called family health records and a day-care contract about the child.  There was 61 pages from Oklahoma County SoonerStart records.  This may be a social worker or someone seeing the child in the home.  There were 28 pages from Deaconess Hospital Emergency Department.  These were emergency room visits from 12/28/2002, 4/29/2003 and September 7th of 2003; total of 28 pages.  There were 97 pages from the hospitalization when the child was declared brain dead and pronounced dead.  There were—there were a 12-page autopsy report which included a report from the Office of the Chief Medical Examiner, report of investigation by the medical examiner, one page.  And there were a total of 30 printed photographs, two to a page, taken after the autopsy.  So there were 15 pages.  These were in color.  And the total pages of records that I reviewed was . . . 209.

(E.H. Tr. 01/22/2015 Tr. 15-16).  More importantly, Dr. May was very clear that she had received all relevant and necessary documents to evaluate A.S.'s death and specifically testified that she had the benefit of the ME's description of the histological slides and did not need to see the slides herself:

> Q  In your opinion did you have adequate materials to form your opinion?  Did they provide you enough materials to form your opinion?
>
> A  Yes.
>
> Q  You had spoken -- I believe counsel asked you earlier about

58

histological slides and you said microscopic slides.  What are you referring to when you say "microscopic slides"?

A  The pathologist would take biopsy-size specimens of organs at autopsy, then prepare those for examination under a microscope.  I don't review microscopic slides on every case.

Q  Do you believe having access to those types of slides that you described would have made a difference as to your opinion in this case?

[Petitioner's objection overruled following discussion]

THE WITNESS: Well, [Petitioner's counsel does] bring up a point. I don't specifically know what those slides would've shown.  But the findings from this medical examiner are fairly typical of the types of things that we look for.  And unless there's a specific question by an attorney I don't routinely look at microscopic slides on every case.  But the point is well taken that if I don't know what's in the slides then how do I know whether or not that affected my opinion.  From looking at what the pathologist wrote down and the description, these are fairly standard descriptions.  So I wouldn't expect anything out of the ordinary.  That only very, very rarely changes -- something we see in the microscope changes opinions about the cause and manner of death.  That almost never happens.

(E.H. Tr. 01/22/2014 42-43).  Finally, Petitioner's focus on whether Mr. Slane, Mr. Funderburk, or Mr. Reynolds issued any subpoenas (Doc. 227 at 36) ignores that these attorneys took over her case from a public defender who had been representing her for about a year and handed over voluminous documents that she had already gathered via subpoenas and otherwise (Doc. 234, Exhibit 10 at 12).

> (iv)   *Finding #4: "The defense did consult with two 'mainstream' medical experts, Dr. Corrie May and an unnamed male doctor" (Doc. 234, Exhibit 10 at 28).*

Petitioner does not dispute that the defense consulted with Dr. May; rather, she takes issue with the finding that the defense consulted with "an unnamed male doctor"

(Doc. 227 at 36-37).   As Petitioner acknowledges, however, there was evidence to support this finding, in the form of Mr. Slane's testimony (Doc. 227 at 36).   Although Mr. Slane could not remember all of the details, which he candidly admitted, he was firm that he and Mr. Funderburk had consulted with a male expert:

> A      Well, I don't have the benefit -- I can't -- Judge, I'm sorry, I don't have any of my notes.  I don't have any of my stuff.  I don't know if I gave it to Mr. Funderburk or what.  But I don't have anything to refresh my memory.  But I remember there was a male doctor we sent the packet [of medical records] to.  I don't -- there's three numbers that stick out in my mind that was paid to doctors.  $1,000, $2,500 and $5,000.  I don't remember who got what and when.  But I thought that we had sent a packet to a male doctor and asked him to review the information to see if he could help us. And we got a pretty quick response back from him.   And I remember Mr. Funderburk coming to my office -- my office is upstairs -- in my office and getting him on the speakerphone and him being very quick to turn us down.

> [Petitioner's objection overruled]

> THE WITNESS: At any rate we sent the information to the doctor.   The doctor communicated to us pretty quick his findings, his thoughts, his opinion.  Isaac and I both were there.  It was on the speakerphone.

> Q (By Mr. Gieger) Was his opinion helpful or hurtful to the defense?

> [Petitioner's objection overruled]

> THE WITNESS: It was hurtful.

> . . .

> Q (By Mr. Gieger)      Because of what he told you did it make you decide to not use him?

> A   Absolutely. . . . That's right.  And if a doctor's not helpful right away then very quickly we -- I cut ties with that doctor because I don't -- I

don't want that doctor to cost the client any more money than what's
already been paid or whatever the arrangement was.

(E.H. Tr. 12/04/2014 I 28-29).

Petitioner complains that Mr. Slane's "testimony on this point is not credible"
(Doc. 227 at 36). But the state district court, who had the benefit of observing Mr. Slane
on the stand for about five hours (E.H. Tr. 12/05/2014 5), clearly found that Mr. Slane
*was* credible; based on the above-discussed authorities, Petitioner's attack on Mr. Slane's
credibility is insufficient to satisfy his burden under § 2254(e)(1). *See Lonberger*, 459
U.S. at 434; *Consalvo*, 664 F.3d at 845; *Sharpe*, 593 F.3d at 379; *Pippin*, 434 F.3d at 792.

In any event, Petitioner primarily complains that Mr. Slane could not remember
more details about the consultation with the male doctor and that some of his testimony
was inconsistent on certain points with Dr. May's testimony (Doc. 227 at 36-37); but Mr.
Slane was testifying nearly a decade after trial and did not have notes to refresh his
memory. It is hardly surprising that his memory was not perfect. Indeed, one of
Petitioner's own evidentiary hearing experts, criminal defense attorney Robert Wyatt,[23]
testified that he was unsurprised that Mr. Slane could not remember the expert's name
without notes and that he himself could not remember all of the names of experts he had
hired over the years without consulting his case files (E.H. Tr. 03/19/2015 144-45).

Petitioner claims that the male doctor was not mentioned in Mr. Slane's previously

---

[23] Mr. Wyatt initially opined that the defense team was ineffective for hiring Dr. May so
close to the start of trial (E.H. Tr. 03/19/2015 134-36), but Mr. Wyatt's opinion was
revised when on cross-examination he learned more information about the State's
evidence and the defense team's performance, as will be discussed more below.

executed affidavit or Mr. Funderburk's response to her Oklahoma Bar Association ("OBA") complaint (Doc. 227 at 37-38). To the contrary, Mr. Funderburk's response to the bar complaint briefly, though obliquely, references the male expert:

> I retained and sent the appropriate materials to *experts* for their evaluation of the case. Dr. Cory May was a pathologist that I contacted and delivered the information to. She reviewed the material and advised that she could not take the stand in defense of Ms. Moore as it was Dr. May's professional opinion that Ms. Moore was guilty of the crime she was charged with. I made a second trip to Kansas City to meet with Dr. May to discuss the matter at length and try to find something useful for trial. Nothing was ever found that could help our efforts. Dr. May did however come to trial and take notes with regard to medical testimony given on behalf of the State to attempt to assist in formulating a defense and counteracting any damaging medical testimony to the best of our ability.

(E.H. Pet's Ex. 45 at 2-3 (emphasis added)). Mr. Slane's and Mr. Funderburk's interaction with the male doctor was brief, and it makes sense that they would provide more discussion, and have a better memory, of Dr. May, who attended the trial and with whom they met and/or spoke with multiple times. Furthermore, neither of the above-referenced documents purported to be an exhaustive accounting of every action the defense team took in investigating and presenting Petitioner's defense. In fact, Mr. Slane made this point, noting that he did not draft the affidavit himself and that, besides the male doctor, "[t]here's also lots of other things I did in this case that's not in this affidavit either" (E.H. Tr. 12/04/2014 I 84-85).

Petitioner also complains that the evidence as to this finding was conflicting, pointing to testimony by her mother, her friend Janus Roth, and herself that, on particular occasions, Mr. Funderburk did not mention the defense's consultation with the male

doctor (Doc. 227 at 37-38).  But, as already demonstrated, *conflicting* evidence is not *clear and convincing* evidence.  *See Thompkins*, 698 F.3d at 985; *Rountree*, 640 F.3d at 543; *Seymour*, 224 F.3d at 551-52; *Harvin*, 2019 WL 7606221, at *8; *Ybarra*, 2018 WL 1745720, at *5; *Jackson*, 2007 WL 2713374, at *2; *Wheeler*, 2000 WL 124560, at *8.  In *Bishop*, in an analogous situation where the state habeas court heard "conflicting evidence on the timing of [a] plea offer," the critical issue underlying a *Brady*[24] claim, the Eleventh Circuit held that Bishop had not satisfied § 2254(e)(1):

> The record reflects that both [the District Attorney] and [defense counsel] claimed direct knowledge of the timing of the plea offer.  Both were armed only with their own recollections, and neither possessed any additional evidence conclusively documenting the timing of the plea offer.  The state habeas court heard from both witnesses and, as we've said, credited [the District Attorney's] recollection over [defense counsel's].  In the absence of clear and convincing evidence, we have no power on federal habeas review to revisit the state court's credibility determinations.  The state court's factual finding found fair support in the record testimony of [the District Attorney]; there was no clear and convincing evidence to rebut that testimony. 28 U.S.C. § 2254(e)(1).

*Bishop*, 726 F.3d at 1259.  Here, too, Petitioner and her friend and mother offer no definitive proof that the defense team did not consult with a male doctor; the state district court's credibility determination in favor of Mr. Slane must stand.[25]

> (v)     Finding #5: "The defense . . . were aware of [Dr. May's] opinion

---

[24] *Brady v. Maryland*, 373 U.S. 83 (1963).

[25] As an additional matter, contrary to Petitioner's suggestion, her mother, Donna Carmichael, did not testify that, "[a]s of the time Mr. Funderburk came to San Antonio – approximately three weeks before trial, Attorney Funderburk had not hired any experts" (Doc. 227 at 37).  Ms. Carmichael said only that it was her "understanding" that an expert had not been hired at that point, and she did not clarify whether she knew if any experts had been *consulted* but not retained to testify at trial (E.H. Tr. 12/01/2014 177-78).

> *that the victim's injuries were consistent with child abuse by*
> *September 9, 2005." (Doc. 234, Exhibit 10 at 28).*

Petitioner challenges this finding on grounds that, while "Dr. May [testified she] faxed a copy of her report on September 9," "there has been no testimony that Mr. Funderburk or any member of the defense actually read the report or were aware of its contents until Mr. Funderburk met with Dr. May on the evening of September 11, the night before the trial began" (Doc. 227 at 38-39). Petitioner neglects to mention that Mr. Slane testified unequivocally that Dr. May shared her results over the phone with the defense team prior to sending her report (E.H. Tr. 12/04/2014 I 109).[26]

> (vi) *Finding #8: "The decision not to present Dr. John Plunkett or other*
> *similar 'SBS expert' defense witnesses was a tactical decision based*
> *on such witnesses' reputations." (Doc. 234, Exhibit 10 at 29).*

Petitioner's challenge to this finding expressly rests on the argument that Mr. Slane was "not credible" (Doc. 227 at 39). Again, this does not satisfy Petitioner's demanding burden under § 2254(e)(1). *See Lonberger*, 459 U.S. at 434; *Consalvo*, 664

---

[26] Petitioner does not dispute Finding #6 (Doc. 227 at 32). Thus, under § 2254(e)(1), this Court must presume as correct that "Dr. Corrie May had all relevant medical records which were in the defense's possession available for her review and had adequate time in which to form her opinion" (Doc. 234, Exhibit 10 at 28). Petitioner suggests she need not challenge Finding #7, regarding the reasonableness of the defense team's decision not to "doctor shop," because it is a question of law (Doc. 227 at 32; Doc. 234, Exhibit 10 at 28). But finding #7 also included the state district court's factual finding that the defense team made a strategic decision not to seek the advice of a third doctor, and this finding *is* entitled to a presumption of correctness. *See Berryman v. Morton*, 100 F.3d 1089, 1095 (3d Cir. 1996) ("[I]t is apparent that a state court's finding that counsel had a trial strategy is a finding of fact to which the habeas court must afford the presumption of correctness . . . ."); *see also Register*, 681 F.3d at 629 ("The presumption applies both to explicit findings of fact and to unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." (quotation marks omitted)).

F.3d at 845; *Sharpe*, 593 F.3d at 379; *Pippin*, 434 F.3d at 792.   Regardless, the state district court expressly acknowledged that Mr. Slane's personal, and disastrous, experience with using Dr. Plunkett came *after* Petitioner's trial (Doc. 234, Exhibit 10 at 16-17).   As quoted by the state district court, however, Mr. Slane testified clearly that he was well aware of the reputation of minority-view SBS doctors at the time of trial and determined that to use one would be "problematic" and would risk "los[ing] credibility with the jury" (Doc. 234, Exhibit 10 at 16 (quoting E.H. Tr. 12/04/2014 I 34-37)).   The state district court's finding is supported by the record, and Petitioner's attack on Mr. Slane's credibility must fail.

Petitioner also points to Mr. Funderburk's bar complaint response, claiming Mr. Funderburk did not consult an "SBS expert" because "there was no evidence that A.S. had died from being shaken" (Doc. 227 at 40).   She continues that "the State's experts at trial testified that A.S. had suffered injuries that could *only* be explained by shaking" (Doc. 227 at 40 n. 8 (emphasis in original)).   Petitioner has not identified an inconsistency—instead she has identified yet another strategic basis on which the defense team chose not to present an "SBS" expert.

Mr. Funderburk explained in his bar complaint response:

It was my opinion and the opinion of medical expert, Dr. May, that since there was no evidence the baby died as a result of being shaken that the money would be better spent on experts who could potentially offer testimony with regard to the blunt force trauma listed as the cause of death. There was a video taped confession that was the most damaging evidence faced by Ms. Moore.   It graphically depicted Ms. Moore demonstrating how she shook the baby hitting its head repeatedly on the floor.   It is true

that I never employed a "shaken baby syndrome" expert as it was not relevant for the case as the State charged Ms. Moore for the death of the child due to blunt force trauma.  In my professional opinion the money for the experts would be better spent employing a medical expert to try to combat the blunt force trauma issue and a confession expert to see if we could find any type of coercion to get the confession thrown out.

(E.H. Pet's Ex. 45 at 3).[27]

Like Mr. Funderburk, Mr. Slane viewed the case as a "shaken *impact*" case, not simply a "shaken baby" case (E.H. Tr. 12/04/2014 I 59 (emphasis added)).  Indeed, Dr. Choi found evidence of blunt force trauma and opined that A.S. died of head trauma (Tr. Vol. III 89-96).  Thus, the medical controversy over SBS, generated by a small minority of doctors, is ultimately a red herring.  Petitioner acknowledged as much on cross during her evidentiary hearing testimony:

> Q      You understand there's some controversy, and by some, there's a few doctors who go around the country and say that if you shake a child just like this (indicating), an infant, you cannot create enough forces through the laws of physics to cause the kind of eye injuries and head injuries that are often associated with closed head trauma that cause death?  Do you understand that's what shaken baby syndrome means?  Do you understand that?
>
> A      Yes.
>
> Q      Okay. But when you start talking about blunt force trauma, okay, and -- and you understand that as far as shaken baby syndrome goes -- do you understand that there's arguments about the strength of the neck muscles and how you couldn't shake a child strong -- hard enough without having some type of bone injury to the neck to result in the head trauma?  Have you learned at least that much from what [the] shaken baby [website]

[27] As later discussed, Mr. Funderburk did in fact consult a confession expert, who found no evidence of coercion and said that he could not help the defense's case (E.H. Pet's Ex. 45 at 3-4).

66

says or am I past what your understanding of it is?

A    I think you're past.

Q    Okay. That's fine. I'm not trying to hold you to a standard you're not comfortable with.

Can you understand that there's a difference between this mechanism (indicating) and this mechanism (indicating)?   Stop crying. Can you understand that?  Can you see there's a difference between those two things?

A    Yes.

. . .

Q    Okay. Do you understand, ma'am, that Dr. Choi didn't say that the child died from shaken baby syndrome but the child died from head trauma, blunt force head trauma? Do you understand that's what the conclusions was [sic]?

A    Yes, now I do.

. . .

Q    So when Mr. Funderburk is trying to say in his letter to the Bar examiners [sic] -- Bar Association that it really wasn't a shaken baby case, it was a shaking with impact (indicating) case.   Now that I've explained to you the difference, do you understand that he was telling the truth?  Or do you have any reason -- or do you even have an opinion at this point?

A    I believe he was telling the truth. I was never told about that prior to the trial.

Q    Okay. But whenever you and Ms. Roth and your mother -- Ms. Roth printed off, I heard four times, the same information off of the Web site and gave it to him; right?  Four times.  You've got to get a shaken baby person.  Can you begin to understand why going to that Web site with these experts who say you can't do that like this (indicating), do you understand how -- why he might have said: I don't need a doctor who

67

specializes in this (indicating)?  I need a doctor who specializes or has some experience with that (indicating).  Do you understand the difference?

    A    Yes.

(E.H. Tr. 03/05/2015 135-40).

Even Petitioner's witness Robert Estrada, a Texas-based criminal defense attorney who had worked on a few child death cases, testified that the "triad" of injuries present in cases diagnosed as SBS by mainstream doctors—contrary to the opinion of minority-view SBS experts—did not typically involve blunt force head trauma or abdominal injuries, as were present in this case (E.H. Tr. 04/14/2015 24-25).

For all these reasons, it is clear that Petitioner's trial attorneys also avoided a minority-view SBS expert in this case based on their reasonable belief that such an expert could not explain the blunt force trauma that killed A.S.  Finding #8 is unrebutted.[28]

* * *

Based on all of the above, Petitioner has not rebutted the state district court's factual findings by clear and convincing evidence.  These factual findings, reached by the state district court during its application of *Strickland*, should "exert[] a heavy pull on" this Court's consideration of her claims.  *Sharpe*, 593 F.3d at 380.

### (3)    Petitioner Has Not Demonstrated She Received Ineffective Assistance of Trial Counsel

Finally, Respondent turns to Petitioner's individual claims of ineffective assistance

---

[28] Petitioner does not dispute any of the factual findings underlying Finding #9 or Finding #10 (Doc. 227 at 32).  These findings must be presumed correct pursuant to § 2254(e)(1).  Petitioner's challenges to Findings ##11-14 will be addressed in Ground Two.

of trial counsel and demonstrates that she has failed to meet her burden of showing deficient performance.

> (i)     *Trial counsel conducted a reasonable pretrial investigation of the medical evidence.*

Petitioner argues that her trial attorneys did not conduct a reasonable pretrial investigation of the medical issues in the case, and thus, their strategic decisions cannot be considered reasonable (Doc. 227 at 49-54).  To the contrary, as found by the state district court, the defense team consulted with two different medical experts, Dr. Corrie May and an unnamed male doctor (Doc. 234, Exhibit 10 at 28).  Both experts concluded they would be harmful to the defense (Doc. 234, Exhibit 10 at 28).[29]  The defense team considered consulting a third doctor but instead decided on a strategy of creating reasonable doubt through casting blame on A.S.'s father, Todd Snyder, who was with A.S. shortly before his collapse (E.H. Tr. 12/04/2014 I 33-34, 49-50).  The Constitution did not require Petitioner's attorneys to keep hiring experts until they obtained a particular opinion.  *See Davis v. Sharp*, 943 F.3d 1290, 1301 (10th Cir. 2019) ("'[C]ounsel is not required to keep hiring experts until the most favorable one possible is found.'" (quoting *DeLozier v. Sirmons*, 531 F.3d 1306, 1333 (10th Cir. 2008)); *Winfield v. Roper*, 460 F.3d 1026, 1041 (8th Cir. 2006) ("Counsel is not required to shop for experts who will testify in a particular way."); *see also Richter*, 562 U.S. at 108 ("An attorney need not pursue an investigation that would be fruitless, much less one that

---

[29] Dr. May also recalled telling Petitioner personally during a jail visit that her testimony would not be helpful (E.H. Tr. 01/22/2015 55-56).

might be harmful to the defense.").

Trial counsel took additional steps in their pretrial investigation of the medical issues.  The state district court made a finding—not disputed by Petitioner—that Mr. Slane "read through the ME's reports and medical records, and read scholarly articles from medical journals relating to shaken baby syndrome, detached retinas, and internal compression injuries to prepare for the case" (Doc. 234, Exhibit 10 at 12).  Mr. Slane further testified that he and Mr. Funderburk received expert assistance in deciphering the medical records produced by the State (E.H. Tr. 12/04/2014 I 82).

Furthermore, counsel was entitled to defer to Dr. May's medical conclusions, given her emphatic opinion that she had adequate time and materials to evaluate A.S.'s death, and in light of her extensive experience (E.H. Tr. 01/22/2015 41-42).  *See Davis*, 943 F.3d at 1301 (counsel reasonably cut off any further mental health investigation after "an unequivocally unhelpful evaluation from . . . a mental-health professional who routinely evaluates capital defendants"); *Postelle v. Carpenter*, 901 F.3d 1202, 1216 (10th Cir. 2018) (recognizing the reasonableness of a trial attorney's reliance on an expert opinion in evaluating intellectual functioning); *see also Sellers v. Ward*, 135 F.3d 1333, 1344 (10th Cir. 1998) (finding counsel's performance not deficient where there was no evidence counsel was aware his expert may have failed to adequately screen for organic brain damage).  In fact, Dr. May testified she spent about the same amount of time on this case as she does on average for other cases (E.H. Tr. 01/22/2015 41).  Dr. May was also unequivocal that her testimony would be harmful to the case: "I told the attorneys I

70

agreed with the pathologist's opinions and I had no useful information to share or a different opinion from what the medical examiner who performed the autopsy had put forth in the report." (E.H. Tr. 01/22/2015 43).

Petitioner suggests that Dr. May was not "suited" to this type of case (Doc. 227 at 53).  But Dr. May testified that she had substantial experience with SBS:

> [T]his is something that I've lectured on to groups of attorneys, discussed at meetings, and was trained by a forensic pathologist who was also a pediatrician and wrote some of the original book chapters on child abuse and crib death.  So I always, basically because of his influence, had a strong interest in this area even as a training resident physician.

(E.H. Tr. 01/22/2015 44).

Petitioner also complains that Mr. Funderburk waited too close to trial to consult with Dr. May (Doc. 227 at 53).   But this argument ignores the totality of the circumstances.  *See Kimmelman*, 477 U.S. at 381.   Dr. May was the *second* doctor consulted by the defense (E.H. Tr. 12/04/2014 I 29).   Furthermore, as already shown, Dr. May believed she had adequate time to conduct her evaluation (E.H. Tr. 01/22/2015 41-42).   In addition, Mr. Slane testified adamantly that the decision not to consult a third expert had nothing to do with timing and that if he thought the defense team needed more time to prepare, he would have asked for a continuance "even if it meant that [he] got into trouble with the Court" (E.H. Tr. 12/04/2014 I 63-64).

Petitioner further contends that the defense failed to follow up on a "referral to a neuropathologist" by Dr. May (Doc. 227 at 53).  Dr. May did not "refer" the defense team to a particular neuropathologist.  Among other standard recommended points of

follow-up, Dr. May's report noted that the defense could consult a neuropathologist (E.H.

Tr. 01/22/2015 53-54).   Dr. May explained that this was a suggestion she "always" makes

"where a child dies," there is "child abuse" alleged, and "there's head injury involved,"

not based on anything specific to A.S.'s death (E.H. Tr. 01/22/2015 54).   In any event,

the decision whether to consult with a third medical expert ultimately rested with defense

counsel, not Dr. May.   *See Postelle*, 901 F.3d at 1216 ("[A]n attorney [cannot] abdicate

all responsibility for handling scientific or technical evidence.").   Furthermore, other than

to say that a neuropathologist "would have afforded a more thorough examination of the

brain and eyes," Dr. May did not provide any explanation of what a neuropathologist

might have found that the other doctors missed or how likely such a finding would be

(E.H. Pet's Ex. 32 at 51).   In the absence of such, Petitioner's attorneys reasonably

declined to seek out a neuropathologist.   *See Richter*, 562 U.S. at 107 (counsel is "entitled

to formulate a strategy that was reasonable at the time and to balance limited resources in

accord with effective trial tactics and strategies"); *Rompilla*, 545 U.S. at 383 (defense

lawyers are not required "to scour the globe on the off chance something will turn up"

and instead "may draw a line when they have good reason to think further investigation

would be a waste").   This is particularly true where the three State's experts—who were

not hired guns, but merely doctors doing their jobs—agreed with the defense experts.   In

effect, counsel would have been seeking a sixth opinion.

Petitioner also claims that "[n]o one on the defense interviewed any of the State's

medical or fact witnesses" (Doc. 227 at 52).   For obvious reasons, Petitioner cannot show

which witnesses Mr. Funderburk did or did not interview.  *See Burt v. Titlow*, 571 U.S. 12, 22-23 (2013) (silent record cannot overcome presumption of competence).[30]  As to Mr. Slane, he testified only that he could not remember whether he interviewed the medical examiner ("ME"). (E.H. Tr. 12/04/2014 I 72).  With regard to Detective Kirby, Mr. Slane—who was, again, a very experienced criminal defense attorney—explained his failure to interview the detective: "No, typically I never do interview detectives before a murder trial.  As a matter of fact, I don't think I've ever interviewed a detective before a murder trial.  I usually cross them in prelim or I read the reports and go to trial." (E.H. Tr. 12/04/2014 I 115).  In any event, as found by the state district court, Petitioner's attorneys had the reports prepared by the State's medical and law enforcement witnesses as well as Dr. May to advise them on cross-examination (Doc. 234, Exhibit 10 at 12, 14); thus, even assuming no one—including Mr. Funderburk—interviewed the witnesses, Petitioner has failed to demonstrate that this was objectively unreasonable in light of the information available to the defense team.

Petitioner concludes with reference, without citation, to the testimony of Mr. Wyatt that "the failure of trial counsel in [her] case to conduct any meaningful investigation into the case was not reasonable strategy" (Doc. 227 at 54).  Petitioner misrepresents Mr. Wyatt's testimony.  For starters, Mr. Wyatt testified that he believed that it was in fact reasonable strategy for the defense team to avoid minority-view experts

---

[30] Mr. Reynolds was in charge of interviewing the character witnesses (E.H. Tr. 12/04/2014 I 67).

73

and rely on Dr. May; his only criticism was that the defense team waited too close to trial to consult with Dr. May (E.H. Tr. 03/19/2015 134-36).  Furthermore, Petitioner neglects to mention that, after learning on cross-examination about additional elements of the case of which he had not been made aware, Mr. Wyatt substantially revised his opinion:

> Q      . . . Were you aware that Ms. Moore gave an interview where she gave a description of a mechanism of injury, at least for the head trauma, consistent with what the State's medical doctors were saying in this case; did they tell you that?
>
> A      No.
>
> . . .
>
> Q      . . . If during the interview tape Ms. Moore eventually begins to give a description as to what she did to this child, which is shaking, okay?  And then at some point she says, as she's telling the detectives . . . that she did hit his head on the floor . . . .  So if that also is played into this, okay, putting yourself in the position of the trial lawyers that you say were ineffective, would that also be an indication that their decision was not ineffective, in fact they were playing the hand that they were dealt?  They had a client who had confessed to a mechanism of injury that was consistent with the State's medical doctors; they had contacted two doctors from mainstream medicine who said if you put me on the stand, I will ultimately have to agree this child was abused; and despite the iron hemosiderin issue . . . , they had abdominal injuries that were acute in nature that they didn't have an explanation for, okay, do you understand and do you think it's reasonable for them then to adopt, with all of those factors going into it, a "some other person did it" defense?
>
> [Petitioner's objection overruled]
>
> THE WITNESS:    Certainly all of those factors would go into a determination of whether you would use an alternative theory.
>
> Q (By Mr. Gieger)   And I understand that, Mr. Wyatt, that they didn't tell you that for some reason when they asked you to review this?

A     No, I didn't review those things.

Q     With me telling you that, would it potentially change your ultimate opinion that they were ineffective?

A     It could potentially.

(E.H. Tr. 03/20/2015 14-17).

Based on all of the above, trial counsel conducted a reasonable pretrial investigation of the medical issues in this case.

> (ii)     *Petitioner has not demonstrated that trial counsel failed to conduct adequate pretrial interviews.*

Petitioner next alleges that her trial counsel failed "to interview both lay and expert witnesses necessary to prepare to confront the State's case" (Doc. 227 at 54). To begin with, Petitioner does not support this section of her brief with any citation to the evidentiary hearing record and provides only a single citation to the trial record. This Court should deem this allegation of ineffective assistance waived. *See (John) Grant*, 727 F.3d at 1025; *Garrett*, 425 F.3d at 840; *Moore*, 195 F.3d at 1180 n. 17; *SIL-FLO, Inc.*, 917 F.2d at 1513; *Bradford*, 479 F. App'x at 835.[31]

In any event, as discussed above, Petitioner has not shown that either Mr. Funderburk or Mr. Slane failed to interview the ME (E.H. Tr. 12/04/2014 I 72). *See Titlow*, 571 U.S. at 22-23. As to Detective Kirby, Petitioner has not identified a prevailing professional norm that required defense counsel to interview him. In fact,

---

[31] This claim should further be deemed waived because it is not specified in Petitioner's Second Amended Habeas Petition. *See* Rule 2(c)(1), *Rules Governing 2254 Cases*.

quite the opposite, the highly experienced Mr. Slane testified that he never interviews detectives before a murder trial (E.H. Tr. 12/04/2014 I 115).   As to any other State's witnesses Petitioner is complaining about, Petitioner has not actually pointed to any evidence that they were not interviewed, which cannot satisfy her burden of overcoming the presumption of competence.   *See Titlow*, 571 U.S. at 22-23.   Regardless, as previously discussed, assuming some State's witnesses were not interviewed, in light of the materials possessed by the defense in preparation for cross-examination—including reports by the State's witnesses, other State's evidence, and the preliminary hearing transcript—Petitioner has not shown it was objectively unreasonable not to interview these witnesses (Doc. 234, Exhibit 10 at 12).

As to Mr. Reynolds, Petitioner admits that he interviewed her character witnesses but complains that he was a "baby attorney" and did so too close to trial (Doc. 227 at 55). By the time of the evidentiary hearing, however, Mr. Reynolds had been practicing criminal defense law for around twelve years and testified that, in his experience, it was not uncommon to start contacting character witnesses within a couple weeks before trial (E.H. Tr. 12/03/2014 42).   He believed that there was nothing ineffective about what he had done in starting those interviews at that point in Petitioner's case (E.H. Tr. 12/03/2014 42).   Furthermore, with his memory refreshed with the trial transcripts, Mr. Reynolds agreed he elicited every point of testimony from the character witnesses that he planned on and hoped for during their direct examinations (E.H. Tr. 12/03/2014 45-55). He believed that he did a "good job" and "better than [he] remembered" (E.H. Tr.

12/03/2014 55).

Petitioner also neglects to explain the context of some of the later-conducted interviews.  As Mr. Funderburk explained in his bar complaint response, he and Mr. Slane agreed to take Petitioner's murder case for the very modest fee of $35,000 because Petitioner's friend Janus Roth represented that she

> was an attorney who would be doing the majority of the trial preparation, gathering of additional witnesses, etc. and that I and Mr. Slane would not be responsible for that portion of the case.  That is why we were able to take the case at such a low fee, because we would not be required to take so much time away from our regular practice for this one case.

(E.H. Pet's Ex. 45 at 2-3).  Prior to trial, however, Mr. Funderburk learned that

> Ms. Roth had never practiced law and was not qualified to do the things Ms. Carmichael and Ms. Vanderventer[32] insisted she would do in our trial preparation.  Ms. Roth and [sic] had done nothing to prepare the case other than print some material off the internet.  There is an email attached that references that Ms. Roth spent money they had given her and did nothing more than take a trip to Chicago allegedly visiting with her 'best friend' Barry Scheck.  In fact, Ms. Roth perjured herself on the stand during the trial of this case. . . . It became apparent she was either misleading the family or mentally not stable.  When it was apparent that I was going to have to do all of the trial preparation, I explained that this was going to take a lot of extra time that I hadn't planned on taking from my practice to prepare the entire case and that an additional fee would be necessary for me to not take any new cases and concentrate solely on this matter.  Another

---

[32] Fran Vanderventer was a church friend of Petitioner's mother, Ms. Carmichael (E.H. Tr. 03/05/2015 148).  Ms. Vanderventer helped fund Petitioner's defense, including by cashing in on her retirement savings (E.H. Tr. 03/05/2015 148).  However, after hearing the State's evidence at trial, Ms. Vanderventer angrily left the courtroom, having become convinced of Petitioner's guilt (E.H. Tr. 12/02/2014 64-65; E.H. Tr. 03/05/2015 149).  She refused to testify for Petitioner at the evidentiary hearing and informed the prosecutors conducting the evidentiary hearing that "she thinks [Petitioner] got great representation and she was guilty" (E.H. Tr. 03/02/2015 23-24).

$10,000.00 fee[33] to me was agreed upon by Ms. Carmichael and Ms. Vanderventer so that I could afford to concentrate my efforts solely to the preparation of this case and not work on any of my other cases or take on new clients.

(E.H. Pet's Ex. 45 at 2).

Mr. Funderburk's claims regarding Ms. Roth find support in the record.   The employment contract for Mr. Funderburk's representation in Petitioner's case includes a handwritten notation that "Client is responsible for expert fees if the innocence project can't provide funding," (E.H. Pet's Ex. 3 at 2; E.H. Tr. 03/05/2015 126-28), supporting an inference that Ms. Roth had claimed some connection to Mr. Scheck.[34]  Furthermore, at trial, the following exchange occurred on cross-examination of Ms. Roth:

> Q.    Ms. Roth, are you an attorney?
>
> A.    I am not a practicing attorney here.
>
> Q.    Have you told people here that you're a practicing attorney?
>
> A.    No.
>
> Q.    Have you ever told Todd Snyder that you're a practicing attorney?
>
> A.    In Oklahoma?  No.
>
> Q.    Okay. Are you a practicing attorney somewhere else?
>
> A.    No.

---

[33] In fact, it was an additional $15,000, as later shown.

[34] Petitioner, on the other hand. testified at the evidentiary hearing that it was Mr. Funderburk's idea to contact the Innocence Project (E.H. Tr. 03/05/2015 126-28).

Q.      Okay.  So have you told Todd Snyder that you're a practicing attorney somewhere else?

A.      I had a -- yes.

Q.      So that was a lie?

A.      No.

Q.      Okay.   You just said you're not a practicing attorney somewhere else, but you told him that you were.

A.      I'm not currently a practicing attorney anywhere.

Q.      Okay.  And why is that?

A.      I came to Oklahoma, I got into doing foster care.  From that I got into doing child care, and I love it.

Q.      Where was it you were a practicing attorney?

A      In California.

Q      Can you tell me what your bar number was?

A      No.

(Tr. Vol. III 235-36).[35]   At the evidentiary hearing, Ms. Roth admitted she was not a lawyer and now claimed that she had never represented to anyone that she had ever practiced law; she acknowledged her prior testimony but said she "not going to

---

[35] Incredibly, despite hearing Ms. Roth's trial testimony, Petitioner later wrote in correspondence to the OBA: "Mr. Funderburk was never told that Mrs. Roth was an attorney practicing law by me, so where he got that idea I don't know!" (E.H. Pet's Ex. 45 at 8).  Asked about the letter at the evidentiary hearing, Petitioner could not reconcile it with her admission that she heard Ms. Roth testify at the jury trial to being an attorney (E.H. Tr. 03/05/2015 122-25).

characterize it as a lie" (E.H. Tr. 03/02/2015 81-90, 97-98).[36]

Petitioner does not acknowledge that the state district court denied relief on a related claim of ineffective assistance based on "Inadequate Cross-Examination" or attempt to rebut the numerous factual findings made by the court in resolving that claim. As quoted above, among other findings, the state district court determined that "Petitioner [had] not demonstrated that Mr. Slane was unprepared for his cross-examination of the State's expert witnesses" and that his cross-examinations furthered "the defense strategy that someone other than the Petitioner abused the victim" (Doc. 234, Exhibit 10 at 18-19).[37]   Dr. May as well believed that Mr. Slane was well-prepared (E.H. Tr. 01/22/2015 38).

As a final matter, even assuming particular State's witnesses were not interviewed before trial, this is not, in of itself, deficient.   While interviewing the State's witnesses prior to trial might be "best practice[]," the Supreme Court has specifically said this is not

---

[36] Ms. Roth was clearly not credible.   As another example, her testimony claiming to have once seen Mr. Snyder shake A.M., Petitioner's biological son, was all over the place; at different points she claimed to have directly seen the incident, to have seen "movement" only peripherally, and to have heard about it from someone else who saw it (E.H. Tr. 03/02/2015 100-05).   Finally, the state district court had to step in and command Ms. Roth to answer: "Well, this is the thing, ma'am, the question is: Did you see it?   At one time you said I -- I was there.   At one time you say peripherally.   I don't know if that means you saw it or you didn't see it. . . . Just answer the question: Did you see it or not see it?" (E.H. Tr. 03/02/2015 104).

[37] All of the above-described circumstances, combined with the defense's consultation with two different medical experts, distinguish Petitioner's case from *State v. Aragon*, 216 P.3d 276, 280 (N.M. App. Ct. 2009), where counsel was found ineffective for both "fail[ing] to engage an expert for consultation" and "fail[ing] to conduct adequate pretrial interviews of the State's experts" (Doc. 227 at 55).

the measure of competence. *Richter*, 562 U.S. at 105. Petitioner has not shown specifically what trial counsel had to gain by interviewing particular witnesses—especially in light of the materials and resources in counsel's possession, as already discussed—such that the failure to interview them was objectively unreasonable. *Cf.* *Strickland*, 466 U.S. at 691 (recognizing that various factors known to counsel may "considerably diminish[] or eliminate[]" "the need for further investigation").

For all these reasons, Petitioner has not demonstrated that her trial counsel failed to conduct adequate pretrial interviews.

> (iii)  *Trial counsel reasonably decided against presenting a medical expert or a confession expert.*

Petitioner contends that trial counsel rendered ineffective assistance in "[f]ail[ing] to consult with and present testimony from qualified expert witnesses" (Doc. 27 at 56 (formatting omitted)). She focuses on counsel's failure to present a medical expert but also briefly suggests that trial counsel was ineffective in not presenting a confession expert (Doc. 227 at 58). Petitioner has not come close to showing deficient performance.

For starters, as already shown above, trial counsel conducted a reasonable investigation of the medical issues in this case; accordingly, their decision to not present Dr. May or another expert is "virtually unchallengeable." *Hinton v. Alabama*, 571 U.S. 263, 275 (2014) (*per curiam*) ("The selection of an expert witness is a paradigmatic example of the type of strategic choice that, when made after thorough investigation of the law and facts, is virtually unchallengeable." (quotation marks omitted, alteration

adopted)).  Furthermore, as found by the state district court, Dr. May and the male doctor both "indicated they would be harmful to Petitioner's defense" (Doc. 234, Exhibit 10 at 28).  Without question, trial counsel were not ineffective for failing to present a witness who would be harmful to their case.  *See DeLozier*, 531 F.3d at 1332.  Petitioner can certainly not show that no competent attorney would have declined to present Dr. May or the male doctor.  *See Bullock*, 297 F.3d at 1046.  Indeed, her own expert Mr. Wyatt agreed that, as criminal defense attorney, he would not have presented these experts:

> Q     .  .  . If David Slane had contacted two of the more mainstream-type doctors, both of those doctors said if you put me on the stand I'm ultimately going to have to say this child was abused --
>
> A     Now, I'm going to answer that part -- I would not put those people on the stand.

(E.H. Tr. 03/20/2015 13).

Petitioner suggests that her attorneys should have instead sought out and presented a minority-view SBS expert (Doc. 227 at 57).  This claim fails for a number of reasons already discussed.  First, Petitioner's focus on the "controversy" behind SBS is largely misplaced, as A.S. died from blunt force trauma (Tr. Vol. III 89-96).  Second, even Mr. Wyatt conceded that it was a reasonable strategy to avoid minority-view SBS experts given their credibility problems (E.H. Tr. 03/19/2015 134-36).  Third, Petitioner has not pointed to anything suggesting that, at the time of her 2005 trial, prevailing professional norms required the use of a defense expert in a child abuse murder case involving shaking, particularly a minority-view SBS expert.  *See Strickland*, 466 U.S. at 688.

Indeed, her witness Mr. Estrada, another criminal defense attorney, agreed that minority-view SBS experts possess "controversial" views; are in the "very, very significant minority of doctors"; and that he had not had "success hiring local doctors" with this view (E.H. Tr. 04/14/2015 17, 30); *see Rompilla*, 545 U.S. at 383 (defense lawyers are not required "to scour the globe").  In fact, Mr. Estrada admitted his only success in using such a minority-view doctor was in obtaining plea deals for clients, and he had *never presented such a doctor to a jury* (E.H. Tr. 04/14/2015 31).  Mr. Estrada further revealed that, in the one SBS case he tried before a jury, he did *not* present an expert (E.H. Tr. 04/14/2015 31).  Thus, Petitioner's own witness indicated that no prevailing professional norm required counsel to use a minority-view SBS expert, or any expert at all, in this case.  Fourth and finally, the Supreme Court said in *Hinton* that "federal courts" are not in the business of "examin[ing] . . . the relative qualifications of experts hired and experts that might have been hired."  *Hinton*, 571 U.S. at 275.

Citing to *Hinton* herself, Petitioner contends this is a case where the only way to rebut the State's case was through a witness on the defense side (Doc. 227 at 56).  But what *Hinton* said is that "'[c]riminal cases will arise where the only reasonable and available defense strategy requires *consultation* with experts *or* introduction of expert evidence.'"  *Hinton*, 571 U.S. at 273 (quoting *Richter*, 562 U.S. at 106).  As discussed ad nauseum, Petitioner's attorneys did consult with experts and had the benefit of Dr. May's assistance at trial.  Furthermore, the deficient performance in *Hinton* was trial counsel's "failure to request additional funding in order to replace *an expert he knew to be*

*inadequate* because he *mistakenly believed* that he had received all he could get under Alabama law." *Hinton*, 571 U.S. at 274 (emphasis added). The Supreme Court stressed that "the inadequate assistance of counsel . . . [did] not consist of the hiring of an expert *who, though qualified, was not qualified enough*." *Id.* at 274-75 (emphasis added). Petitioner's criticism of Dr. May is, at bottom, that she was not a minority-view SBS expert, *i.e.*, that she was not qualified enough—as *Hinton* demonstrates, this does not show deficient performance.

*People v. Ackley*, 870 N.W.2d 858, 863-65 (Mich. 2015) (Doc. 227 at 56), where counsel was found deficient for consulting only one medical expert in preparation for trial, is distinguishable on a number of grounds. To begin with, the defense team here consulted with two experts, not one (Doc. 234, Exhibit 10 at 28). The attorney in *Ackley* also failed to provide the single expert with all the case materials needed to conduct an evaluation, *Ackley*, 870 N.W.2d at 861, whereas here, Dr. May had adequate materials to complete her evaluation (E.H. Tr. 01/22/2015 41-42). Moreover, in *Ackley*, counsel lacked

> the requisite familiarity with SBS/AHT[38] or short-fall death theories to justify his settling on consulting only [the one expert] . . . [and] failed to consult any of the readily available journal articles on SBS/AHT and short-fall deaths, and did not otherwise educate himself or conduct any independent investigation of the medical issues at the center of the case, beyond his limited consultations with [the single expert].

*Ackley*, 870 N.W.2d at 860-61. Here, as found by the state district court, Mr. Slane, in

---

[38] Abusive Head Trauma.

contrast, "was an experienced trial and criminal defense attorney familiar with the types of issues involved in Petitioner's case" and Mr. Slane educated himself by "read[ing] through the ME's reports and medical records, and read[ing] scholarly articles from medical journals relating to shaken baby syndrome, detached retinas, and internal compression injuries to prepare for the case" (Doc. 234, Exhibit 10 at 12, 27). For all of these reasons, *Ackley* provides Petitioner no relief.

*Com. v. Epps*, 53 N.E.3d 1247, 1259-60 (Mass. 2016) (Doc. 227 at 56-57), where counsel consulted only a single expert, who did not even look at the medical records, is likewise distinguishable. As discussed, trial counsel in this case consulted with two medical experts, both of whom reviewed the packet of materials prepared by the defense (E.H. Tr. 12/04/2014 I 28-29; E.H. Tr. 01/22/2015 41-42). Furthermore, *Epps* specifically declined to decide "whether it was manifestly unreasonable in 2007 for counsel to have failed to find a credible expert who shared the minority view in this scientific controversy" regarding SBS, and instead granted Epps a new trial on a state-law ground. *Epps*, 53 N.E.3d at 1263-66; *see also Flick v. Warren*, 465 F. App'x 461, 464-65 (6th Cir. 2012) (unpublished) (counsel not ineffective for failing to present a minority-view SBS expert where counsel contacted three experts, all of whom concluded they could not be helpful to the case). Thus, *Epps* does not show that prevailing professional norms required counsel to use a minority-view SBS expert in 2005.

Related to counsel's failure to present a minority-view SBS expert, Petitioner also complains that "[a]lthough Dr. May gave counsel a list questions to use in cross-

examining the State's medical witnesses including questions that relate to the presence of intracellular iron, those questions were not asked" (Doc. 227 at 58).[39]  Dr. May's report did offer trial counsel a list of possible questions to ask the ME, including whether the presence of intracellular iron in the microscopic analysis could indicate an age greater than twenty-four hours for A.S.'s injury (E.H. Pet's Ex. 32 at 52).  Mr. Slane testified that he had Dr. May's report in advance of trial, was aware of the presence of intracellular iron and its relationship to timing of the injury, and had been educated by Dr. May specifically on that topic (E.H. Tr. 12/4/14 I 97, 100).  Mr. Slane further explained why he nevertheless declined to pursue this line of cross.  For starters, Dr. May, although noting the iron, did not ultimately believe herself that the injuries were older (E.H. Tr. 12/4/14 I 97).  Furthermore,

> there was not only the head injuries but there was an abdominal or some kind of injury in this -- the chest area that couldn't be explained away.  And I don't recall the details of why, but there was an internal injury there that was unexplainable.  And the way I took some of these questions [suggested by Dr. May] was as a way to sort of try to throw mud against the wall and hope something stuck.  I didn't see these questions as a road map of how to win because, candidly, if she believed that that iron or something could've said the injury was older, and she could've testified with a medical certainty, you bet your bottom dollar I'd put her on. . . I remember asking her if there was any other way to explain away these injuries in her opinion other than the abuse and she said no.

(E.H. Tr. 12/4/2014 I 100-01).  Mr. Slane added:

> You hire them for their expert opinion and what they really believe But

---

[39] Respondent has already refuted above Petitioner's other complaints that Dr. May did not receive adequate records to conduct her evaluation and that counsel did not follow up on her referrals (Doc. 227 at 57-58).

> doctors give you a laundry list of things that could possibly help, but at the
> end of the day you have to take all of that in its totality. And I looked at it
> in its totality and believed I was not going to get around a shaken baby and
> I was not going to get around that blunt force trauma no matter how much I
> tried.

(E.H. Tr. 12/4/14 I 108). Mr. Slane also testified that just because Dr. May made

suggestions for questions to the ME, that did not necessarily indicate a good course of

action in the defense (E.H. Tr. 12/4/14 I 112-13). Mr. Slane acted reasonably in taking

into consideration Dr. May's suggestions for cross-examination questions but ultimately

deciding in his own professional judgment what questions to ask the ME. *See Postelle*,

901 F.3d at 1216 ("[A]n attorney [cannot] abdicate all responsibility for handling

scientific or technical evidence.").

Finally, Petitioner also suggests that trial counsel failed to consult with an expert

on confessions (Doc. 227 at 58). This is incorrect. Mr. Funderburker stated in his

response to the bar complaint:

> I employed Lynn McCumber for a reasonable fee to review and try to come
> up with a defense to the tape video [sic] confession of the Defendant where
> she demonstrates how she beat the child's head on the floor over and over.
> This confession, if seen by the jury, was going to be very detrimental to the
> defense and it was critical to have some argument to combat it. Mr.
> McCumber offered his professional opinion but was not called as a witness
> at trial because it was opinion that the confession was valid and not
> coerced. His taking the stand would not have helped the defense of Ms.
> Moore; in fact it could have potentially hurt us more.

(E.H. Pet's Ex. 45 at 4). Notably, this assessment was shared by Judge Bacharach even

with "new evidence" from Petitioner challenging her confession:

> The Petitioner's argument is unconvincing because: (1) her version

87

of the shaking was inconsistent with the law enforcement officers'
suggestions about what had taken place; (2) the new explanation for her
admissions conflicted with her sworn testimony; and (3) the jury could
reasonably believe her admissions to law enforcement even with the newly
presented evidence.

The Petitioner stated in a declaration that her psychological make-up
had made her vulnerable to acquiesce in the policemen's version of events.
But her account differed from the version of events suggested in the
policemen's questioning.  They suggested that Ms. Moore had lost her
temper and repeatedly shaken A.S. out of frustration.  But Ms Moore
insisted that she had not lost her temper and had shaken the boy mildly only
three or four times.

The Petitioner's current explanation also appears inconsistent with
the one she had given at trial.  There she was asked why she had told the
police that she had shaken A.S.  Ms. Moore answered that she had admitted
to shaking the boy so that Mr. Snyder could return to the hospital to remain
with his son as he lay dying.  Thus, if the jury had the new evidence
together with the old, it could reasonably regard Ms. Moore's explanations
as inconsistent.

(Doc. 135 at 29-30 (footnotes omitted)).   At the evidentiary hearing, Petitioner again

disavowed any claim that her confession was coerced, stating again that she confessed so

that Mr. Snyder could return to the hospital (E.H. Tr. 03/19/2015 88).  She also admitted

that, despite this alleged motive for confessing, she never once asked about whether and

when Mr. Snyder could return to the hospital, despite asking numerous other questions,

including about whether she could be kept from general population in the jail (E.H. Tr.

03/19/2015 25, 29-30).[40]  Given all of these circumstances, counsel was not unreasonable

---

[40] While Judge Bacharach's order and Petitioner's evidentiary hearing testimony were of
course not before counsel at the time of trial, both discuss all of the circumstances that
reasonably factored into counsel's decision not to present a confession expert.  Simply
put, there was no evidence of police coercion.

in not presenting a confession expert who would have been harmful to the case and could not show that the confession was coerced.  *See Davis*, 943 F.3d at 1301.

In sum, counsel acted reasonably in not presenting a medical expert or a confession expert at trial.

### (iv)    Trial counsel presented a cohesive defense

Petitioner's next allegation is that counsel performed deficiently in failing to present a "cohesive" defense theory (Doc. 227 at 59-60).  Petitioner does not actually point to anything in the record of her attorneys' presentation of her defense to the jury to support this claim; rather, she points to the transcript of a motion in limine hearing at the beginning of trial to argue that the trial team was in "disarray" and was "confused about what the defense was going to be at trial" (Doc. 227 at 59-60).  Petitioner's citation solely to the brief motion in limine hearing, in support of a claim that her attorneys failed to present a coherent defense theory across the entire trial, is insufficient on its face.  This claim is so inadequately briefed and supported it should be deemed waived.  *See (John) Grant*, 727 F.3d at 1025; *Garrett*, 425 F.3d at 840; *Moore*, 195 F.3d at 1180 n. 17; *SIL-FLO, Inc.*, 917 F.2d at 1513; *Bradford*, 479 F. App'x at 835.[41]

In any event, Petitioner's claims find no support in the record.  As background, on the first day of jury voir dire, the State filed a motion in limine seeking to exclude evidence referenced by the defense in its Witness and Exhibit List (O.R. 74-75).  In

---

[41] This claim should further be deemed waived because it is not specified in Petitioner's Second Amended Habeas Petition.  *See* Rule 2(c)(1), *Rules Governing 2254 Cases*.

summary, the State requested (1) that it be provided a report or summary of the proposed testimony of Dr. May; and (2) that the defense not be permitted to present lay witness testimony about A.S.'s "tantrums, frequent falls, clumsiness, . . . unusual behavior," prior "self inflicted head trauma," or "developmental delays"—or suggest that A.S.'s injuries were accidental or self-inflicted—without some medical evidence to link these circumstances to his death (O.R. 74-75 (quotation marks omitted)).

At the hearing on the motion in limine, Mr. Funderburk indicated that the primary defense was "that the father could have been the one to [inflict A.S.'s fatal injuries] . . . And that's our defense" (Tr. Vol. I 18).[42]  But the defense also planned to suggest "that this could have been self-inflicted by the child"; when questioned by the trial court, Mr. Funderburk admitted that the defense did not have a medical expert that could testify to that effect (Tr. Vol. I 15).  Mr. Slane noted that Dr. May had been endorsed only "in the abundance of caution" and that "[a]s a practical matter, we probably will not [call her]" (Tr. Vol. I 14).  Mr. Funderburk added, however, that the defense had lay witnesses who could testify to incidents in which A.S. "[threw] temper tantrums or he'd throw himself down over and over and over and over again" (Tr. Vol. I 15).  Mr. Funderburk asserted that the witnesses could also testify to Mr. Snyder's previous "[r]ough playing" with A.S. (Tr. Vol. I 19-20).  When the trial court continued to press the defense on whether it had medical evidence to support its theories, Mr. Funderburk indicated that Dr. May,

---

[42] This aligns with Mr. Slane's testimony at the evidentiary hearing (E.H. Tr. 12/04/2014 I 48).

although she could not agree that A.S.'s injuries could be attributed to "other falls," could testify "that the father could have been the one to" have inflicted the injuries (Tr. Vol. I 18).

The State responded that it had received insufficient notice of these defense theories and that the theories were irrelevant speculation absent some medical testimony to back them up (Tr. Vol. I 20-23).  Mr. Funderburk replied, disagreeing that the defense had not provided adequate notice (Tr. Vol. I 24-25).  The trial court noted it "[didn't] think" the defense gave "adequate notice," but indicated the court's primary "concern" (and what the court discussed the longest) was the defense's failure to present medical evidence, such as through an expert, of a "causal connection between the father roughhousing and the death of this child" (Tr. Vol. I 25-27).  The trial court based its ruling on the latter ground, explaining that, absent such medical evidence, "[A]s of this point, based on what you have told me, I am not going to allow those witnesses to testify to those matters because they're just irrelevant" (Tr. Vol. I 26).[43]

As shown above, the motion in limine hearing does not reflect a "confused" or "unprepared" defense team.  Rather, despite receiving an unfavorable report from Dr. May, the defense team was continuing to keep its options open in an abundance of

---

[43] As demonstrated above, Petitioner's claim that the trial court based its ruling on lack of notice is not borne about by the record.  In fact, the trial court indicated it would be amenable to changing its ruling if medical evidence could be produced (Tr. Vol. I 26 ("And until you can show me through some kind of causal connection, and maybe you have it through your expert witness, the state says you've not given that information, I don't know, we'll address that, but as of right now, I've gotten no connection")).

caution.  Furthermore, while the defense was clearly forced to admit that Dr. May could not support a theory that A.S. died from a prior fall or self-inflicted injury, the defense team reasonably tried to present lay witness testimony that would plant seeds of doubt in the jurors' mind that A.S.'s injuries were not the result of child abuse.  *Cf. Ellis v. Raemisch*, 872 F.3d 1064, 1085 (10th Cir. 2017) (state court reasonably rejected claim of deficient performance where defense attorney chose not to present an expert forensic psychologist for fear "such conflicting expert testimony would have damaged defendant's theory of the case," and "[i]nstead, he chose to elicit the relevant psychological theories—with which he was very familiar—through cross-examination of state witnesses"); *cf. also Richter*, 562 U.S. at 109 ("To support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates.").  That the trial court ultimately granted the State's motion in limine based on the defense's failure to proffer medical evidence that could support this theory does not show that counsel performed deficiently.  *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").[44]

---

[44] When asked at the evidentiary hearing whether Mr. Funderburk was "confused" in his defense of Petitioner, Mr. Slane responded forcefully:

> Isaac Funderburk was not confused about this case.  He knew this case.  He met with me and we came up with the best defense that we could.  Mr.

Despite the trial court's ruling, the defense was still able to present a cogent theory that Mr. Snyder inflicted A.S.'s fatal injuries.   Mr. Funderburk's opening statement described how, just prior to A.S.'s collapse, Mr. Snyder had been alone with A.S. while Petitioner slept; how Mr. Snyder awoke Petitioner and then immediately left to go to the pawn shop; how A.S. was crying but moving around when Petitioner woke up; and how A.S. collapsed shortly thereafter (Tr. Vol. I 56-57).   Mr. Funderburk added: "Conveniently, Todd Snyder was up at the pawnshop getting a pawn ticket, showing exactly where he was during this time period.  Conveniently." (Tr. Vol. I 57-58).

On cross-examination of all three of the State's medical experts, Mr. Slane elicited key concessions that helped expand the timeframe for A.S.'s injuries.   On cross-examination of Dr. Griggs, who treated A.S. and was the head of the pediatric intensive care unit at Integris, the following exchange occurred:

> Q.   (BY MR. SLANE) Is there disagreement within the medical community of how much time can elapse between the shaking and the actual collapse of a child?
>
> A.   Yes.
>
> Q.   And would it be that -- you've indicated a short period of time with respect to the disagreement, could it be that others believe that more time could elapse?

Funderburk is dead.  And if Mr. Funderburk were alive he would come here and tell you the same thing; that we worked on this case, we both knew this case.  We did the best we could with this case.  And he was not confused. He was a little inexperienced. But he was not confused.  He was a lawyer and he was -- in my opinion he was trying to do a good job for Beverly Moore.

(E.H. Tr. 12/04/2014 I 61).

A.      I testified to a short period of time in this case.  And my testimony is specific to this case.  And I'll entertain the question again if you --

Q.      Well, the time between the shaking and an actual child that goes into arrest, there's disagreement about how much time can elapse in cases, isn't there?

A.      Yes.

(Tr. Vol. II 212).  Mr. Slane concluded his cross of Dr. Griggs:

Q.      . . . [W]hat's the longest period of time that you believe could elapse between the child being shaken and collapsing on the floor under this scenario?

A.      No way to know that.

Q.      No way to medically tell us?

A.      No.

        MR. SLANE:        No further questions.

(Tr. Vol. II 218-19).  At the evidentiary hearing, Mr. Slane explained that he saved this

point for last so it would "be left on the jury's mind" (E.H. Tr. 12/04/2014 I 54).[45]

---

[45] Following the cross of Dr. Griggs, Prosecutor McAmis elicited Dr. Griggs's agreement that there existed a group of "five or fewer pathologists," including "Dr. Plunkett and others," "who testify in shaken baby cases throughout the country . . . who disagree with shaken baby syndrome," and that "the American Academy of Pediatrics specifically disagree with this small subset of pathologists" (Tr. Vol. II 219-20).  Ms. McAmis's questions provided a small glimpse of the attack the prosecution would have launched against the presentation of an SBS expert by the defense.  *See Richter*, 562 U.S. at 108-09 (holding that "[e]ven if it had been *apparent* that expert blood testimony could *support* Richter's defense," counsel could reasonably elect against using same given that "making a central issue out of blood evidence would have increased the likelihood of the prosecution's producing its own evidence on the blood pool's origins and composition," creating the "serious risk that expert evidence could destroy Richter's case," and "the

Similarly, on cross-examination of ophthalmologist Dr. Korber, Mr. Slane elicited

testimony that Dr. Korber could not precisely date the hemorrhages in A.S.'s eyes and in

fact could not pinpoint their age any more narrowly than to estimate they happened

within the last "week to a few days" (Tr. Vol. II 265-66).  Mr. Slane again concluded his

cross-examination with obtaining a powerful concession for the defense:

> Q.      All right.  Based upon your review of the eyes and particularly the
> blood vessels and the hemorrhages, would -- would an eye like that having
> gone through that trauma typically in a person would they have to lose
> consciousness immediately?
>
> A.      I cannot -- I cannot answer that one because I do not know that.  It
> would have to be how much brain injury and everything else, and I just
> can't go there.  And I don't know the specifics exactly of it you shake them,
> cause retina damage, if there is brain damage, how much swelling has to go
> before they lose consciousness.  I mean, there's a whole cascade of events
> that has to happen before someone loses consciousness, and I can't put the
> time frame on things like that because I don't know them probably well
> enough to do that.  *And I think if any medical doctor was going to answer
> would probably be reaching to be able to even to answer that.*
>
> MR. SLANE:        Thank you.  No further questions.

(Tr. Vol. II 268 (emphasis added)).

Finally, on Mr. Slane's cross-examination of Dr. Choi, the following exchange

occurred:

> Q.      . . . From the time that a person would shake a child until that child,
> if they were standing or sat down, how many minutes would it take before

possibility that expert testimony could shift attention to esoteric matters of forensic
science, distract the jury from whether [the State's key eyewitness] was telling the truth,
or transform the case into a battle of the experts").  At the evidentiary hearing, Mr. Slane
confirmed this was exactly the counter-attack he was avoiding in not presenting an SBS
expert (E.H. Tr. 12/04/2014 I 55).

they would become unconscious and collapse?

> THE COURT:       Are you saying shaken impact?
>
> MR. SLANE:       Yes.
>
> THE COURT:       Because that's what she's diagnosed here.
>
> MR. SLANE:       Yes.
>
> THE COURT:       Okay.

A.      Well, it depends how child tolerated that.  Usually rapidly.  We're talking minutes.

Q.      (BY MR. SLANE) So when you say "we're talking minutes," it could be one minute, could be three or four, five minutes, correct?

A.      It can be.  No way I was there.

(Tr. Vol. III 99).

During a lengthy closing argument, Mr. Slane asserted, among other things, that the State could not even "stick to [one] theory" as to the timing of A.S.'s injuries, as Dr. Korber suggested no doctor would opine accurately on that matter while Dr. Choi claimed A.S. would likely have collapsed within minutes of receiving his brain injury (Tr. Vol. IV 36-37).  Mr. Slane also highlighted alleged inconsistencies in Mr. Snyder's account of the day of A.S.'s collapse and argued at length Mr. Snyder had the opportunity to inflict A.S.'s injuries and had been inadequately investigated by the police as a possible suspect (Tr. Vol. IV 40-45).

Based on all of the above, it is apparent the defense team presented a cohesive and coherent defense at trial that Mr. Snyder killed A.S. or that, at the very least, the State had

not eliminated all reasonable doubt in that regard.[46]

> (v)     *Trial counsel did not require a continuance.*

Petitioner's next allegation of ineffective assistance is that trial counsel should have requested a continuance to prepare to present a cohesive defense theory (Doc. 227 at 60-61). This allegation of error is, again, entirely unsupported by citation and should be deemed waived by this Court. *See (John) Grant*, 727 F.3d at 1025; *Garrett*, 425 F.3d at 840; *Moore*, 195 F.3d at 1180 n. 17; *SIL-FLO, Inc.*, 917 F.2d at 1513; *Bradford*, 479 F. App'x at 835.[47]

Regardless, this claim fails for many of the same reasons already discussed. As shown above, defense counsel did present a cohesive defense at trial, *see* Ground

---

[46] To the extent Petitioner replies that the state district court did not make sufficient findings for the resolution of this claim, *i.e.*, trial counsel's alleged failure to present a cohesive defense, the reason is clear—this claim is brand new and was not raised to the state district court (Doc. 234 at 34-35). While Respondent recognizes that this Court has overruled the State's procedural arguments, *but see Saunders v. Comm'r, Dep't of Correction*, No. 10 CV 410 MRK, 2011 WL 572313, at *3 (D. Conn. Feb. 15, 2011) (unpublished) ("while a claim of actual innocence might avoid a procedural default, it will not excuse a defendant from exhausting available state remedies"), Petitioner's failure to raise and develop this claim before the state district court matters for another reason: her lack of diligence. Assuming Petitioner asserts that this claim requires an evidentiary hearing in federal court for further findings or credibility determinations, such a request must be denied. *See* 28 U.S.C. § 2254(e)(2) ("[i]f [a habeas] applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim . . . ."). In failing to raise this claim to the state district court, Petitioner was not diligent. While Petitioner has raised a claim of actual innocence, this should not excuse her lack of diligence under the particular circumstances of this case where she was specifically ordered back to state court to exhaust her claims and received the opportunity to develop the record for this claim in state court but failed to do so.

[47] This claim should further be deemed waived because it is not specified in Petitioner's Second Amended Habeas Petition. *See* Rule 2(c)(1), *Rules Governing 2254 Cases*.

One(C)(3)(iv), *supra*, and thus, a continuance was unnecessary.   As to Petitioner's suggestion that counsel should have conducted further investigation as to experts, interviewing witnesses, or pretrial preparation in general, the State previously demonstrated that these claims are without merit, *see* Ground One(C)(3)(i)-(ii), *supra*.

Petitioner also makes some new arguments.   She claims that "Mr. Reynolds testified at the evidentiary hearing that he did not know he would be tasked with the cross-examination of the detective that sponsored Ms. Moore's custodial statement . . . and therefore was not prepared" (Doc. 227 at 60-61).   This is a mischaracterization. Originally Mr. Slane was to cross-examine Detective Kirby, but he had to briefly leave the trial due to a personal matter (E.H. Tr. 12/04/2014 I 114-15).   Mr. Slane was not deficient for failing to foresee an unexpected personal emergency that drew him briefly away from trial.   *See United States v. Harms*, 371 F.3d 1208, 1212 (10th Cir. 2004) ("The Sixth Amendment does not require counsel for a criminal defendant to be clairvoyant."). In any event, Mr. Reynolds was able to cross-examine Detective Kirby, and while he testified this was not originally "part of the plan," he never said he was unprepared (E.H. Tr. 12/03/2015 16-17).   In fact, he had the benefit of Mr. Slane's "notes, police reports and the questions [Mr. Slane] had prepared" for the cross-examination of Detective Kirby (E.H. Tr. 12/03/2015 111; E.H. Tr. 12/04/2015 I 113-14).   A review of the transcript confirms that Mr. Reynolds performed competently in cross-examining Detective Kirby in furtherance of the defense, probing, as examples, whether the police had appropriately considered Mr. Snyder's possible involvement and whether the detectives continued to

interrogate Petitioner even after she had said "more than 15" times that she had done nothing wrong (Tr. Vol. III 37-38, 41). Among other concessions, Mr. Reynolds got Detective Kirby to admit that, even after repeated denials by Petitioner, his partner told her that they were willing to "go over this a hundred thousand times" and that Petitioner "never admitted to anything or demonstrated anything that wasn't demonstrated or told [to] her first" (Tr. Vol. III 43-44, 47).

Petitioner further claims that "[n]one of the attorneys spent time with [her] to fully explore the case and prepare her to testify; therefore, she was unprepared and put on the stand with no preparation" (Doc. 227 at 61). Petitioner's testimony on this matter at the evidentiary hearing was not credible and thoroughly impeached. On direct, Petitioner testified that, after Dr. May revealed she would be unable to testify for the defense, Mr. Slane claimed they had "no defense," there was no "discussion about pursuing and going after Mr. Snyder as a potential perpetrator," and there was no "discussion about whether or not [she] would take the stand" (E.H. Tr. 03/05/2015 68-73).[48] Petitioner claimed she did not learn that she would be testifying until the day she took the stand, that her attorneys informed her of such in the courtroom, that her attorneys intentionally did not prepare her so that she would not "appear rehearsed," and she did not have the opportunity to confer with her attorneys before taking the stand (E.H. Tr. 03/05/2015 74-76). She further asserted that, prior to her testimony, she had not discussed her

---

[48] Mr. Slane testified at the evidentiary hearing that, following Dr. May's unfavorable report, Petitioner was advised of, agreed with, and understood the change in strategy to point the finger at Mr. Snyder (E.H. Tr. 12/04/2014 I 165).

statements from her confession with her attorneys since she first retained them about six months earlier (E.H. Tr. 03/05/2015 76).  In fact, she claimed that, when she first met with Mr. Funderburk, he told her that her confession was "not a big deal" (E.H. Tr. 03/05/2015 33, 55).[49]

On cross-examination at the evidentiary hearing, Petitioner continued to insist that she had no idea, even at the time she took the stand, that the defense theory was to blame Mr. Snyder (E.H. Tr. 03/05/2015 150-55).  She acknowledged that her answers on direct at trial "[made] Todd out to be an untruthful person and the murderer of his child," but claimed it was just a coincidence that this testimony aligned with the defense theory that she did not realize existed (E.H. Tr. 03/05/2015 151-55).  Indeed, at trial, Petitioner stated explicitly that she believed Mr. Snyder inflicted A.S.'s fatal injuries (Tr. Vol. III 165).

Petitioner's claim that her defense team failed entirely to prepare her at all to take the stand, and sprung on her their decision for her to testify in the courtroom shortly before she was to take the stand, strains credulity.  Petitioner is further not credible in light of the fact that she insisted she did not know what the defense theory was despite sitting through Mr. Funderburk's opening statement and Mr. Slane's cross-examination

---

[49] The trial court sustained the State's objection to Petitioner's hearsay account of Mr. Funderburk's statement, but Petitioner subsequently testified to her understanding that Mr. Funderburk believed her confession was "not a big deal" (E.H. Tr. 03/05/2015 33, 55).  Regardless, Petitioner's statement on the stand that her defense attorney told her that her *admissible, videotaped confession to murder* was "not a big deal" speaks volumes about her credibility, especially in light of Mr. Funderburk's bar complaint response describing the confession as, quite accurately, "the most damaging evidence faced by Ms. Moore" (E.H. Pet's Ex. 45 at 3).

questions that were clearly designed to cast blame on Mr. Synder, as shown above, *see* Ground One(C)(3)(iv), *supra*.

For all these reasons, Petitioner has not shown that a continuance was required or that her attorneys were deficient in not requesting one.[50]

> (vi)    *Trial counsel acted diligently.*

Petitioner further claims that trial counsel failed "to act diligently on [her] behalf" (Doc. 227 at 61-62).[51]    This claim is simply a rehashing of Petitioner's previous allegations against counsel discussed above.   As already shown, counsel conducted a reasonable pretrial investigation, presented a coherent defense, and challenged the State's case, *see* Ground One(C)(3)(i)-(iv), *supra*.    This claim should afford Petitioner no relief.[52]

> (vii)    *Trial counsel appropriately communicated with Petitioner.*

Finally, Petitioner claims trial counsel failed to meaningfully communicate with

---

[50] Again, this claim, *i.e.*, trial counsel's failure to request a continuance, was not raised to the state district court (Doc. 234 at 34-35).  Any argument by Petitioner that this claim requires an evidentiary hearing in federal court for further findings or credibility determinations must be denied.  *See* 28 U.S.C. § 2254(e)(2) ("[i]f [a habeas] applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim . . . .").  In failing to raise this claim to the state district court, Petitioner was not diligent.

[51] This claim should be deemed waived because it is not specified in Petitioner's Second Amended Habeas Petition.  *See* Rule 2(c)(1), *Rules Governing 2254 Cases*.

[52] Again, this claim, *i.e.*, trial counsel's failure to act diligently, was not raised to the state district court (Doc. 234 at 34-35).  Any argument by Petitioner that this claim requires an evidentiary hearing in federal court for further findings or credibility determinations must be denied.  *See* 28 U.S.C. § 2254(e)(2).  In failing to raise this claim to the state district court, Petitioner was not diligent.

her in preparing her case for trial (Doc. 227 at 62-63).  Again, Petitioner fails to support this claim with any citations to the record.  This claim is waived.  *See (John) Grant*, 727 F.3d at 1025; *Garrett*, 425 F.3d at 840; *Moore*, 195 F.3d at 1180 n. 17; *SIL-FLO, Inc.*, 917 F.2d at 1513; *Bradford*, 479 F. App'x at 835.[53]

In any event, Petitioner's allegation that her attorneys did not adequately communicate with her ahead of trial is not supported by the record.  Mr. Slane testified that he met with Petitioner at the jail between six and twelve times in the months leading up to trial and that Mr. Funderburk met with her on multiple, additional occasions when Mr. Slane was not present (E.H. Tr. 12/04/2014 I 23-24).  Mr. Slane testified that he had no doubt that he spent a sufficient amount of time with Petitioner to adequately represent her and obtain any information he needed from her (E.H. Tr. 12/04/2014 I 23-24).  Incredibly, Petitioner claimed that she did not receive a single visit from either her attorneys or an investigator between February 2005—when Mr. Funderburk met with her upon being retained—and three days before trial in September 2005—when she met Mr. Slane for the first time (E.H. Tr. 12/04/2014 I 22, 27-28, 38-39).  She claimed that she had tried calling Mr. Funderburk in the intervening months but was successful in reaching him only once (E.H. Tr. 12/04/2014 I 40-41).  She also alleged that Mr. Funderburk "wasn't responding to [her] letters" (E.H. Tr. 12/04/2014 I 47). On cross-examination, Petitioner acknowledged that she previously wrote a letter to the trial court

---

[53] This claim should further be deemed waived because it is not specified in Petitioner's Second Amended Habeas Petition.  *See* Rule 2(c)(1), *Rules Governing 2254 Cases*.

complaining when her first attorney, Jennifer Richard, "wasn't responding to any of [her] letters"; asked if she had written such a letter to the court complaining about Mr. Funderburk, Petitioner admitted, "No" (E.H. Tr. 12/04/2014 I 130).

Petitioner's claim that her attorneys did not communicate with her for six months, save a single phone call that she initiated, is unworthy of belief, especially in light of her lack of credibility on other points, as previously discussed. Petitioner's claim that her attorneys failed to meaningfully communicate with her should afford no relief.[54]

## D.    Conclusion

For all these reasons, Petitioner has not shown deficient performance as to her claim that trial counsel rendered ineffective assistance in allegedly failing to investigate the medical issues in this case and present a medical expert. As shown above, Petitioner's claim rests on factual allegations that were decided against her by the state district court, and these findings have not been rebutted by clear and convincing evidence. To summarize, trial counsel consulted two different medical experts who reported they concurred with the State's doctors, and counsel were faced with both medical evidence and Petitioner's confession showing that A.S. died of blunt force trauma to the head. Given all of the circumstances, counsel reasonably decided against presenting a mainstream medical expert who could not help the case or a minority-view

---

[54] Again, this claim, *i.e.*, trial counsel's failure to communicate with her, was not raised to the state district court (Doc. 234 at 34-35). Any argument by Petitioner that this claim requires an evidentiary hearing in federal court for further findings or credibility determinations must be denied. *See* 28 U.S.C. § 2254(e)(2). In failing to raise this claim to the state district court, Petitioner was not diligent.

SBS expert who would destroy the defense's credibility in the eyes of the jury.   In addition, Petitioner's other allegations of ineffective assistance are unsupported and without merit.   Petitioner's failure to show deficient performance is dispositive of her claim of ineffective assistance of trial counsel.  *See Littlejohn*, 704 F.3d at 859.[55]   Relief

---

[55] To be clear, Respondent does not concede prejudice and disagrees with Petitioner's claim that *Strickland* prejudice has already been established based on the "law of the case" doctrine due to the prior "actual innocence" finding (Doc. 227 at 64).  The law of the case doctrine does not apply to determinations made on a record that was not fully developed.  *See Fish v. Schwab*, 957 F.3d 1105, 1141 (10th Cir. 2020).  Here, while the evidentiary hearing was focused on deficient performance and did not include testimony from Petitioner's habeas experts, the hearing did result in ample evidence and credibility determinations that cut against the prior finding that Petitioner's habeas experts could have resulted in a different outcome at trial.  Judge Bacharach acknowledged that Doctors Griggs and Choi both opined that A.S.'s fatal injuries were very recent, but dismissed this testimony because it was based on "misinformation" that "A.S. had been a perfectly healthy child before January 13, 2004," while Petitioner's "new" and "undisputed" evidence showed prior falls, developmental delays, and lethargy on A.S.'s part (Doc. 135 at 33-34).  But now this evidence *is disputed*.  For instance, Petitioner's habeas expert Dr. Janice Ophoven concluded A.S. suffered a fall and head injury and was "lethargic the week before his death" based on information from Ms. Roth (Doc. 88-31 at 7).  As shown at length above, Ms. Roth was thoroughly impeached at the evidentiary hearing and has no credibility, *see* Ground One(C)(3)(ii), *supra*.  As another example, it appears that Dr. Ophoven is the only one of Petitioner's habeas experts to address A.S.'s abdominal injury and offer any explanation for same other than child abuse.  Dr. Ophoven claimed the injury "was most likely caused when Ms. Moore performed CPR on the child" (Doc. 88-31 at 3 n. 1).  At the evidentiary hearing, however, Petitioner specifically denied that she did CPR "hard" enough to cause A.S.'s abdominal injuries (E.H. 03/05/2015 143-44).  In sum, although Petitioner's habeas experts were not tested under the crucible of cross-examination at the evidentiary hearing, some of the critical information on which they relied was and came up short.  While the evidentiary hearing did not specifically cover prejudice, it certainly developed the record far beyond what was before Judge Bacharach, and his preliminary "actual innocence" determination does not foreclose a finding that Petitioner has not carried her burden on prejudice.  *See Fish*, 957 F.3d at 1141.

The law of the case doctrine does not help Petitioner escape her burden of showing prejudice for another reason.  Judge Bacharach noted that he did not act as "a fact-finder" or determine credibility when reviewing Petitioner's new evidence, and "[b]y definition,

should be denied on Ground One.

## GROUND TWO

**TRIAL COUNSEL ISAAC FUNDERBURK WAS NOT OPERATING UNDER ANY ACTUAL CONFLICTS OF INTEREST.**

In Ground Two Petitioner alleges she received ineffective assistance of counsel

based on a conflict of interest because, at the time of her case, Mr. Funderburk was also

being prosecuted by the Oklahoma County District Attorney's Office and because he

---

a jury could reasonably rely on either side's expert witnesses when resolving the evidentiary conflicts on the existence of trauma." Doc. 135 at 10. At this juncture, however, Petitioner must show a reasonable probability that a jury would have believed her new medical experts and acquitted her, and credibility issues *do* factor into this determination. *See, e.g.*, *Littlejohn v. Royal*, 875 F.3d 548, 565-66 (10th Cir. 2017) (finding lack of prejudice based on counsel's failure to present expert testimony from Dr. Manual Saint Martin regarding brain damage where, *inter alia*, "the prosecution could have cast doubt on Dr. Saint Martin's diagnosis, as well as painted Mr. Littlejohn as a liar, based on Mr. Littlejohn's documented efforts to manipulate mental-health experts"). The evidentiary hearing included overwhelming evidence, and undisputed factual findings, that minority-view experts like Petitioner's habeas experts suffer from significant credibility problems (Doc. 234, Exhibit 10 at 16 (quoting E.H. Tr. 12/04/2014 I 34-37); E.H. Tr. 03/19/2015 134-36; E.H. Tr. 04/14/2015 17, 30). And, again, the witnesses on which her habeas experts relied for information, including Ms. Roth and Petitioner herself, were found not to be credible.

Finally, Petitioner agreed to the bifurcation of the state evidentiary hearing pursuant to which the hearing would proceed to the issue of prejudice only "in the event the Court did find deficient performance or a conflict of interest" (Doc. 234, Exhibit 9 at 8). In consenting to this arrangement, Petitioner ultimately consented to not presenting her alleged newly discovered evidence of the medical doctors and their opinions in State court. Having failed to present the doctors so that their credibility might be tested, Petitioner should not be permitted now to hide behind the law of the case doctrine. For all these reasons, the State does not concede that Petitioner need not be required to show prejudice on her ineffective assistance claim.

allegedly used her trust fund monies for personal expenses (Doc. 226 at 9).[56]  Petitioner has not demonstrated an actual conflict of interest that adversely affected Mr. Funderburk's performance in her case.  Thus, this claim fails as a matter of law.  Habeas relief must be denied.

## A.       Conflict of Interest Standard

"The sixth amendment entitles a criminal defendant to an attorney free of interests that actually conflict with those of the accused."  *United States v. Soto Hernandez*, 849 F.2d 1325, 1328 (10th Cir. 1988).  The Tenth Circuit has said a conflict of interest claim is governed by "a two-part" test: "[T]he client must demonstrate an actual conflict of interest which adversely affected [her] lawyer's performance.  If the client can establish the conflict actually affected the adequacy of his representation, prejudice is presumed."  *United States v. Alvarez*, 137 F.3d 1249, 1251 (10th Cir. 1998) (quotation marks omitted); *see also Mickens v. Taylor*, 535 U.S. 162, 171 (2002) ("'[A]n actual conflict of interest' [means] precisely a conflict *that affected counsel's performance*—as opposed to a mere theoretical division of loyalties." (emphasis in original)).

"An actual conflict of interest results if counsel was forced to make choices advancing other interests to the detriment of his client."  *Alvarez*, 137 F.3d at 1252.  "Without a showing of inconsistent interests, any alleged conflict remains hypothetical,

---

[56] In Ground Two, Petitioner's brief in support again includes additional allegations of ineffective assistance not included as grounds for relief in her Second Amended Habeas Petition.  These additional claims should be deemed waived.  *See* Rule 2(c)(1), *Rules Governing 2254 Cases*.

and does not constitute ineffective assistance." *Id.* Thus, "to demonstrate an actual conflict of interest, the petitioner must be able to point to specific instances in the record which suggest an impairment or compromise of his interests for the benefit of another party." *Id.* (alteration adopted, quotation marks omitted).

## B.    State District Court's Findings

Petitioner raised this claim in her second postconviction application (Doc. 234, Exhibit 8 at 4).  Following the evidentiary hearing, the state district court discussed the claim at length before rejecting it (Doc. 234, Exhibit 10 at 19-26).  As previously discussed, any factual findings by the state district court are entitled to a presumption of correctness under § 2254(e)(1):

### III. Conflict of Interest

Petitioner further asserts that Mr. Funderburk suffered from an impermissible conflict of interest.  Specifically, she alleges that counsel was facing criminal prosecution by the same district attorney's office at the same time as Petitioner's case and that Mr. Funderburk had substance abuse and financial difficulties during his representation of Petitioner.  Petitioner does not allege any conflict of interest with regards to her other two attorneys.  It is fundamental that counsel owes a duty to avoid a conflict of interest in the representation of his client.  In order to prevail on such a claim a petitioner must demonstrate that trial counsel's representation amounted to an *actual* conflict of interest which adversely affected counsel's performance, not just the possibility of one.  *Pickens v. State*, 1996 OK CR 6, ¶ 22, 910 P.2d 1063, 1069 *citing Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333, 350 (1980).  "[A]n actual conflict of interest results if counsel was forced to make choices advancing other interests to the detriment of his client."  *United States v. Alvarez*, 137 F.3d 1249, 1252 (10th Cir. 1998).  "[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance."  *Cuyler*, 446 U.S. at 350, 100 S.Ct. at 1719, 64 L.Ed. 2d at 351.

107

"The mere possibility of a conflict is insufficient to impugn a criminal conviction." *Mayfield v. State*, 1987 OK CR 125, ¶ 15, 738 P.2d 555, 557; *see also Cuyler*, 446 U.S. at 350.

## A. Oklahoma County Prosecution

Petitioner asserts that the most significant conflict of interest in this matter was that Mr. Funderburk was contemporaneously facing criminal prosecution by the Oklahoma County District Attorney's Office during the pendency of Petitioner's case. However, Petitioner has wholly failed to establish that any actual conflict of interest arose from Mr. Funderburk's criminal case. Mr. Funderburk was charged in Oklahoma County Case No. CF-2003-6954 with one count of felony possession of hydrocodone and one count of misdemeanor driving under the influence. (Tr. 12/2/14, 110:16-19) Petitioner has presented no evidence that he actually chose to advance his own case above hers. Nor has she demonstrated that the attorneys or judges involved in Mr. Funderburk's prosecution were even aware of the simultaneous prosecutions such that Mr. Funderburk could have attempted to gain any advantage whatsoever in his case. On the contrary, former assistant district attorneys Jennifer Chance and Cassandra Williams (now Judge Williams), who were the assigned prosecutors on Mr. Funderburk's case, testified at the evidentiary hearing that they were unaware of Mr. Funderburk's representation of Petitioner at the time. (Tr. 12/2/14, 128:23-129:15; Tr. 12/3/14, 119:18-23; 120:20-23) Judge Williams, who was Ms. Chance's supervisor at the time, stated that, unfortunately, it was not unusual for a defense attorney to be prosecuted by the Oklahoma County District Attorney's Office and continue to represent criminal defendants in Oklahoma County. (Tr. 12/3/14, 122-125) Petitioner has presented nothing more than conjecture to support her claim and has, thus, failed in her burden to prove that an actual conflict of interest existed in this regard. This claim is denied.

## B. Substance Abuse Issues

Next, Petitioner asserts that Mr. Funderburk was impaired in his representation of her due to his drug and alcohol dependency. She submitted with her application an affidavit by one of her attorneys, Mr. Reynolds, indicating that Mr. Funderburk seemed to him to be "semi-catatonic" during trial. However, during the evidentiary hearing, Mr. Reynolds retracted that statement once he was given the opportunity to review the trial transcript, which reflected all the actions Mr. Funderburk

took during trial.  (Tr. 12/3/14, 58:5-13)  He testified that he first became aware that Mr. Funderburk was developing a substance-abuse problem in the spring or summer of 2006, months after Petitioner's trial, at which time his behavior changed.   Mr. Reynold's [sic] admitted at the evidentiary hearing that after counsel for the Respondent went over several portions of the trial transcript with him, it was "obvious that [his] memory of what happened at the trial is unclear" because his timeline was running together.  (Tr. 12/3/14, 81:14-25)

Petitioner presented medical experts at the evidentiary hearing to show that Mr. Funderburk would have been impaired in his ability to practice law due to his prescription drug use at the time he represented Petitioner: Dr. Laura Burdette, a pharmacist, Dr. Melvin Pohl, a psychiatrist specializing in addiction, as well as Mr. Funderburk's health care providers.  Neither Dr. Burdette nor Dr. Pohl had personally evaluated Mr. Funderburk—indeed both were consulted after Mr. Funderburk's death in 2010—and based their opinions on documentation provided to them by Petitioner's attorneys.  Dr. Burdette provided lengthy testimony regarding the potential effects of medication that medical records reflect Mr. Funderburk was prescribed.  However, Dr. Burdette acknowledged that she did not have information about whether Mr. Funderburk took the medicine prescribed to him or how such medicine affected him.  (Tr. 1/8/15, 44- 48)  Thus, her testimony is of limited value to the Court in evaluating whether Mr. Funderburk was actually impaired in his ability to practice law at the time he represented Petitioner.

Dr. Pohl testified on direct examination that his practice in evaluating patients is to interview the patient at least five times, contact the patient's physicians and look at his medical records, talk to the patient's friends, family, and co-workers, and run bloodwork for the patient.  (Tr. 12/4/14, 24-27)  On cross-examination, though, he conceded that he did not do what he normally does in reaching his opinion in this case.  (Tr. 12/4/14, 64:24-65:2)  He stated he did not speak with anybody that was around Mr. Funderburk during the time he represented Petitioner, including his girlfriend, Mr. Slane, or Mr. Reynolds, nor did he contact Mr. Funderburk's primary care physician, Dr. Yang, or psychiatrist, Dr. Prater.  (Tr. 12/4/14, 63:2-64:23)  Dr. Pohl's testimony is of little value in assisting this Court in determining whether Mr. Funderburk was under the influence of intoxicating substances at the time he represented Petitioner.

No witness that observed Mr. Funderburk during the pendency of

Petitioner's case testified that they observed behavior which would indicate that Mr. Funderburk was under the influence of intoxicating substances during the relevant time period.  Dr. Yang, who treated Mr. Funderburk monthly from 1998 until 2005, testified as to the medications he prescribed Mr. Funderburk and the reasons for those prescriptions.  He testified that Mr. Funderburk did not complain of fatigue or confusion resulting from the medication he was prescribed.  (Tr. 1/8/15, 144:11-25) On the contrary, Dr. Yang testified that Mr. Funderburk appeared to him to be high-energy and "very Type A personality."  (Tr. 1/8/15, 129:25-130:3)  Dr. Yang said he had no reason to believe that Mr. Funderburk was abusing or addicted to the medication he was prescribed or that his medication impaired his ability to function.  (Tr. 1/8/15, 148:23-149:1; 152:4-8)  Likewise, Dr. Corrie May, who met with Mr. Funderburk in person and spoke with him on the phone in the two weeks leading up to and during trial, testified that she observed no indication whatsoever that he was under the influence of any substance. (Tr. 1/22/15, 39:24-40:3)

Mr. Slane, who worked closely with Mr. Funderburk during the pre-trial and trial proceedings, testified that he did not observe behavior by Mr. Funderburk during the relevant timeframe that would lead him to believe Mr. Funderburk was under the influence of drugs or alcohol.  (Tr. 12/4/14, 128-130)  He stated that he did not think Mr. Funderburk acted unusual or strange, rather he thought "he always acted normal, like another lawyer." (Tr. 12/4/14, 13:13-15)  Both Mr. Slane and Mr. Reynolds testified that had they observed Mr. Funderburk to be impaired, they would have stopped him from continuing in trial. (Tr. 12/3/14, 82:1-83:1; Tr. 12/4/14, 62:10-63:4)  Additionally, Marilyn Hodgen, the court reporter at Petitioner's trial, testified that had she observed Mr. Funderburk to appear to be under the influence of drugs or alcohol, she definitely would have brought it to the trial judge's attention. (Tr. 3/20/15, 59:2-6).  She stated that there were a few times in other cases where she had brought to the attention of the judge that she believed attorneys were under the influence, but she apparently did not find it necessary in this case. (Tr. 3/20/15, 60:9-18)

Petitioner has not met her burden of demonstrating that Mr. Funderburk was impaired by the medications he was prescribed, or any other intoxicating substance, at the time that he represented Petitioner from February to September 2005.  Her claim in this regard is meritless.

## C. Financial Issues

Petitioner further supports her claim that Mr. Funderburk operated under a conflict of interest by asserting that he had substantial financial difficulties at the time of his representation in this case. She suggests that counsel misappropriated money from her client trust for his own personal benefit. Specifically, she alleges, "Mr. Funderburk did not use the $30,000 provided by Ms. Moore's supporters for the use of experts and investigators for the intended purpose, and in fact represented to his co-counsel that there was no money for experts." Ptr's Br. at 14. Mr. Slane testified that Mr. Funderburk handled all of the money in Petitioner's case. (Tr. 12/4/14, 65:23) At the evidentiary hearing, Petitioner presented the testimony of attorney and CPA Jeff Trevillion. Mr. Trevillion provided the ultimate conclusion that of the $43,500 contributed to Petitioner's client-trust fund, Mr. Funderburk misappropriated 98% of the funds, or $42,460. (Tr. 3/3/15, 10:9-24; 1 06:1; 113:29-22)

Petitioner's allegations fall short in a few significant respects. First, Mr. Slane testified that he *was* aware that Petitioner's family had contributed funds for expert witnesses. He stated that funding was not the issue as it related to obtaining experts. (Tr. 12/4/14, 66:12-67:10) Second, despite being provided multiple opportunities, Mr. Trevillion failed to reasonably account for his conclusion that Mr. Funderburk misappropriated 98% of the client-trust fund. Of particular concern, notwithstanding the agreement from Petitioner, her mother, and other parties involved in funding for Petitioner's defense that Mr. Funderburk had orally renegotiated for an additional $15,000 for his attorney fees subsequent to execution of the initial client contract, Mr. Trevillion would not concede that such funds were duly authorized to be paid to Mr. Funderburk as attorney fees. (Tr. 3/3/15, 143:12-144:l; Tr.3/4/15, 27-29) Finally, Mr. Trevillion also conceded he had no knowledge regarding what Mr. Funderburk did with funds withdrawn from Petitioner's client trust account that were made out to "cash." He further conceded it was possible such funds went to pay expert witnesses, although it was not documented. (Tr. 3/4/15, 39:13-22) Similarly, his opinion did not account for funds which may have been withdrawn in relation to trips to Kansas City and San Antonio in relation to Petitioner's case. (Tr. 3/4/15, 42-43)

Reviewing the records presented to the Court, it is clear that Mr. Funderburk was a poor accountant. Nevertheless, Petitioner has failed to establish that Mr. Funderburk misappropriated or stole client funds for his own personal benefit, thereby creating an actual conflict of interest. In fact, it seems the unaccounted-for funds are still just that—unaccounted for.

Moreover, Petitioner has failed to demonstrate that Mr. Funderburk's financial situation in any way inhibited his ability to zealously defend her cause when counsel did consult with at least two forensic pathologists prior to trial and further, according to Mr. Slane and Mr. Reynolds, funding apparently played no role in the defense team's decision not to present an expert witness at trial. Petitioner has failed to establish an actual conflict of interest arose from Mr. Funderburk's handling of funds paid on Petitioner's behalf. Her claim in this regard is meritless.

(Doc. 234, Exhibit 10 at 19-26). At the conclusion of its order denying relief, the district

court made specific findings of fact and conclusions of law relevant to Ground Two:

> 11. While Mr. Funderburk was prosecuted by the Oklahoma County District Attorney's Office at the same time Petitioner's case was pending, there has been no evidence that he advanced his own case to the detriment of Petitioner's. In fact, there has been no evidence presented that Mr. Funderburk's representation of Petitioner was impacted in any manner by his own criminal prosecution.

> 12. There has been no evidence presented that Mr. Funderburk was impaired or under the influence of intoxicating substances at the time he represented Petitioner in this matter. On the contrary, witness testimony supports that Mr. Funderburk was functioning normally throughout the course of his representation.

> 13. While the evidence presented to this Court supports that Mr. Funderburk did not provide an adequate accounting for Petitioner's client-trust fund, there has been no evidence to support Petitioner's allegation that Mr. Funderburk misappropriated those funds for his own benefit.

> 14. Neither Mr. Funderburk, Mr. Slane, nor Mr. Reynolds suffered from an actual conflict of interest at the time they represented Petitioner in this matter.

(Doc. 234, Exhibit 10 at 29-30).

## C.    Petitioner Has Not Demonstrated An Actual Conflict of Interest

Petitioner has not carried her burden of showing an actual conflict of interest.

Thus, her claim must fail. *See Alvarez*, 137 F.3d at 1251. Below, Respondent (1) establishes that the state district court's findings with regard to this claim must be presumed correct; (2) demonstrates Petitioner's failure to overcome the state district court's factual findings by clear and convincing evidence; and (3) addresses Petitioner's individual allegations of a conflict of interest.

### (1)    The State District Court's Findings Must Be Presumed Correct

As quoted above, the state district court made numerous factual findings relevant to Petitioner's claim of ineffective assistance due to conflict of interest that must be presumed correct in this proceeding pursuant to § 2254(e)(1), for all the same reasons and authority discussed in Ground One(C)(1), *supra*. Again, for the reasons already provided, Petitioner's claims that § 2254(e)(1) does not apply to the state district court's findings in this case are without merit.

### (2)    The State District Court's Presumptively Correct Findings

As in Ground One, Petitioner alternatively contends that she can overcome some of the state district court's factual findings by clear and convincing evidence (Doc. 227 at 40-48). Petitioner has not done so.

> (i)    Finding #11: "While Mr. Funderburk was prosecuted by the Oklahoma County District Attorney's Office at the same time Petitioner's case was pending, there has been no evidence that he advanced his own case to the detriment of Petitioner's. In fact, there has been no evidence presented that Mr. Funderburk's representation of Petitioner was impacted in any manner by his own criminal prosecution." (Doc. 234, Exhibit 10 at 29).

This finding is fully supported by the record. Petitioner's case was prosecuted by

Sarah McAmis and Gayland Geiger, while Mr. Funderburk's case was prosecuted by

Jennifer Chance under the supervision of Cassandra Williams.  Mr. Geiger, one of the

prosecutors in the evidentiary hearing, stated on the record as an officer of court: "I can

say in honesty I was second chair in the murder case against Ms. Moore.  If I was aware

that Mr. Funderburk even had a charge against him at the time, I have no recollection of

it" (E.H. Tr. 08/01/2014 8-9).[57]  Ms. Chance and now-Judge Williams both testified that

they were not even aware of Petitioner's case or Mr. Funderburk's participation therein

(E.H. Tr. 12/02/2014; 128; E.H. Tr. 12/03/2014 Tr. 119).   Judge Williams further

testified:

> Q     Did [the Moore prosecution] factor in any way to any of the decisions you made in handling that case?
>
> A     Certainly not.
>
> . . .
>
> Q     . . . as far as your involvement goes do you have any inkling of an idea of the fact that Mr. Funderburk was representing Beverly Moore had -- did one thing have anything to do with the other based upon anything you know directly or indirectly?
>
> A     No aspect of my representation of the State of Oklahoma had anything to do with Mr. Funderburk's responsibilities on any case that he would've had in that office, much less any contact with Ms. Moore.
>
>
> . . .
>
> Q     Do you have any knowledge from the time that you were

---

[57] Ms. McAmis was not called to testify at, nor did she participate in, the evidentiary hearing.

working in the District Attorney's office under [District Attorney Wes] Lane that any type of plea negotiation was ever struck with an attorney that if you do a bad job on this case then we'll give you a better [deal] on your case; anything like that?

A    No, sir.

Q    Have you ever heard of anything like that?

A    No.

Q    Okay.  Would it be offensive to you?

A    It's offensive to me now.

Q    Okay.  And would it end the careers effectively, anyone involved if that ever came to light?

A    I believe so.

Q    And should it?

A    Without a doubt it should.

(E.H. Tr. 12/03/2014 119-21).

As to Petitioner's claim that the prosecution of an attorney would have been a "well-known and talked about" event in the Oklahoma County District Attorney's Office (Doc. 227 at 41), Judge Williams testified that the prosecution of attorneys by the Oklahoma County District Attorney's Office was unfortunately not uncommon (E.H. Tr. 12/03/2014 121-22).   Indeed, she confirmed that a number of attorneys had been prosecuted by that office around the same general time as Petitioner's trial and Mr. Funderburk's prosecution: Dan Murdock, "the former general counsel of the Oklahoma Bar Association," who "became a criminal defense attorney during some of that

115

prosecution"; Mark Clayborne, a "common known criminal defense attorney who was prosecuted by [the Oklahoma County District Attorney's] office and continued to practice during the pendency of that prosecution"; Josh Welch; David Ogle; Sam Kerr; Mark Blasdel, a "criminal defense lawyer" who was "involved in other cases and representing clients in [the Oklahoma County] courthouse" during his prosecution; Frank Kirk; Skip Kelly, "former Oklahoma City Councilman and also a criminal defense attorney"; Lou Keel, an Assistant District Attorney who "became a defense lawyer pending his resolution of all the criminal charges"; Judge Dan Owens, who continued to preside a bench during the pendency of his "DUI" case;  Judge Tammy Bass-Lesure; Charley Holdstock, another criminal defense attorney; Robert Sisson; and Mike Gassaway (E.H. Tr. 12/03/2014 122-24).  Judge Williams confirmed that she was not aware of any instance in which "any of the criminal defendants that these individuals represented were treated unfairly or treated more harshly or anything unethical happened even though [the Oklahoma County District Attorney's] office was prosecuting them in other cases" (E.H. Tr. 12/03/2014 125).

At bottom, Petitioner wishes for this Court to draw the inference that because "Mr. Funderburk was concerned enough about his criminal case," and because he allegedly "failed" to do various things in her case, it must be that Mr. Funderburk's criminal case "impacted" his representation of her (Doc. 227 at 40-41).  But the state district court

rejected such an inference,[58] and Petitioner's speculation is not evidence—much less clear and convincing evidence. Moreover, even if conflicting inferences could be drawn, such is insufficient to satisfy § 2254(e)(1). As already demonstrated in Ground One, *conflicting* evidence is not *clear and convincing* evidence. *See Thompkins*, 698 F.3d at 985; *Rountree*, 640 F.3d at 543; *Seymour*, 224 F.3d at 551-52; *Harvin*, 2019 WL 7606221, at *8; *Ybarra*, 2018 WL 1745720, at *5; *Jackson*, 2007 WL 2713374, at *2; *Wheeler*, 2000 WL 124560, at *8.

> (ii) *Finding #12: "There has been no evidence presented that Mr. Funderburk was impaired or under the influence of intoxicating substances at the time he represented Petitioner in this matter. On the contrary, witness testimony supports that Mr. Funderburk was functioning normally throughout the course of his representation." (Doc. 234, Exhibit 10 at 29-30).*

Petitioner's challenge to this finding consists largely of regurgitating evidence that the state district court rejected (Doc. 227 at 42-46). In particular, as the state district court explained, Petitioner's experts were "of limited value" in determining "whether Mr. Funderburk was actually impaired in his ability to practice law at the time he represented Petitioner" (Doc. 234, Exhibit 10 at 22-23). Petitioner summarizes the medical experts' testimony at length, but she does not engage with the state district court's reasoning for discounting this testimony (Doc. 227 at 42-46). In particular, Petitioner ignores the state district court's very reasonable determination that Dr. Yang and Dr. May, who actually observed Mr. Funderburk during the relevant time period, unlike Petitioner's medical

---

[58] This is also why Petitioner's claim fails legally, as an inference of a conflict is not enough, as discussed below.

experts, offered more reliable accounts of Mr. Funderburk's condition (Doc. 234, Exhibit 10 at 23).  Petitioner has not come close to show clear and convincing evidence of error.

Petitioner also rehashes Mr. Reynolds's descriptions of Mr. Funderburk (Doc. 227 at 43-44), but the state district court specifically found that Mr. Reynolds's memory of Mr. Funderburk was not initially accurate as to timeline and that his observation of problems on Mr. Funderburk's part actually started months after Petitioner's trial (Doc. 234, Exhibit 10 at 21-22).  To the extent Mr. Reynolds's reports of Mr. Funderburk's behavior and condition conflict, or any of the witnesses conflicted as to their observations of Mr. Funderburk, the state district court has already resolved these conflicts adversely to Petitioner and its determinations must not be second-guessed.  *See Thompkins*, 698 F.3d at 985; *Rountree*, 640 F.3d at 543; *Seymour*, 224 F.3d at 551-52; *Harvin*, 2019 WL 7606221, at *8; *Ybarra*, 2018 WL 1745720, at *5; *Jackson*, 2007 WL 2713374, at *2; *Wheeler*, 2000 WL 124560, at *8.

> (iii)    Finding #13: "[T]here has been no evidence to support Petitioner's allegation that Mr. Funderburk misappropriated [trust] funds for his own benefit." (Doc. 234, Exhibit 1 at 30).

Petitioner's challenge to this finding ignores the totality of the state district court's findings on this matter: "*While the evidence presented to this Court supports that Mr. Funderburk did not provide an adequate accounting for Petitioner's client-trust fund*, there has been no evidence to support Petitioner's allegation that Mr. Funderburk misappropriated those funds for his own benefit." (Doc. 234, Exhibit 10 at 30).  Thus, the state district court did not disagree with Petitioner's complaints about Mr. Funderburk's

118

inadequate bookkeeping (Doc. 227 at 47).  Petitioner also rehashes the bar complaint at length (Doc. 227 at 48-48), but she neglects an important detail—the General Counsel for the OBA testified that Mr. Funderburk did not receive any public discipline by the Oklahoma Supreme Court as a result of Petitioner's bar complaint, or otherwise (E.H. Tr. 03/20/15 45-46).  In other words, the Professional Responsibility Commission decided not to file charges against Mr. Funderburk in the Oklahoma Supreme Court based on a finding that an ethical rules violation had not been shown by clear and convincing evidence (E.H. Tr. 03/20/15 46-47).[59]

Finally, Petitioner points to the testimony of Mr. Trevillion (Doc. 227 at 47-48), but the state district court made detailed findings explaining its rejection of Mr. Trevillion's findings that Petitioner does not address or overcome by clear and convincing evidence (Doc. 234, Exhibit 10 at 35).

* * *

Based on all of the above, Petitioner has not rebutted the state district court's factual findings by clear and convincing evidence.  These factual findings, reached by the state district court in its adjudication of Petitioner's claim of ineffective assistance due to conflict of interest, should "exert[] a heavy pull on" this Court's consideration of her claims.  *Sharpe*, 593 F.3d at 380.

**(3)    Petitioner Has Not Demonstrated An Actual Conflict of Interest**

---

[59] Petitioner does not dispute any of the factual findings underlying Findings ##14-18 (Doc. 227 at 33).  These findings stand unrebutted under § 2254(e)(1).

Finally, Respondent turns to Petitioner's individual claims of conflict of interest and demonstrates that she has failed to meet her burden of showing an actual conflict.

> (i)    *The prosecution of Mr. Funderburk did not create an actual conflict.*

Petitioner first argues that Mr. Funderburk suffered from a conflict of interest because he was being prosecuted on drug charges by the Oklahoma County District Attorney's Office at the same time as he was representing her (Doc. 227 at 70-72). This claim should be deemed waived because it is not supported by any citations to the record. *See (John) Grant*, 727 F.3d at 1025; *Garrett*, 425 F.3d at 840; *Moore*, 195 F.3d at 1180 n. 17; *SIL-FLO, Inc.*, 917 F.2d at 1513; *Bradford*, 479 F. App'x at 835. Regardless, Petitioner's claim is without merit.

As shown above, the state district court made a finding that, "[w]hile Mr. Funderburk was prosecuted by the Oklahoma County District Attorney's Office at the same time Petitioner's case was pending, *there has been no evidence that he advanced his own case to the detriment of Petitioner's*" (Doc. 234, Exhibit 10 at 29 (emphasis added)). Furthermore, as already demonstrated, Petitioner has failed to rebut the correctness of this finding by clear and convincing evidence as required by § 2254(e)(1). This finding—that Mr. Funderburk did not advance his own case to the detriment of Petitioner's—is fatal to Petitioner's conflict claim.

Petitioner must "demonstrate an actual conflict of interest which adversely affected [her] lawyer's performance." *Alvarez*, 137 F.3d at 1251 (quotation marks omitted). She must "point to specific instances in the record which suggest an

impairment or compromise of [her attorney's] interests for the benefit of another party." *Id.* (alteration adopted, quotation marks omitted).   In the absence of such, "any alleged conflict remains hypothetical, and does not constitute ineffective assistance." *Id.* at 1252. This is all Petitioner has shown—a hypothetical conflict.   She essentially argues that because "Mr. Funderburk was concerned enough about his criminal case," and because he allegedly "failed" to do various things in her case, it must be that Mr. Funderburk's criminal case "impacted" his representation of her (Doc. 227 at 40-41).   But the law requires Petitioner to show more.   This she has not done.   As the state district court put it, "Petitioner has presented nothing more than conjecture to support her claim and has, thus, failed in her burden to prove that an actual conflict of interest existed in this regard" (Doc. 234, Exhibit 10 at 21).[60]

In *Alvarez*, 137 F.3d at 1252, the Tenth Circuit found no conflicting interests on

---

[60] Petitioner admits that generally a "defendant [who] failed to object to a conflict at trial . . . must show that the conflict adversely affected the representation, . . . *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002)," but asserts that "when, as here, a defendant was not made aware of a conflict and was therefore deprived of the opportunity to object to it, she is not required to show she was adversely affected by it" (Doc. 227 at 67).   This is incorrect.   In fact, this was the heart of the issue in *Mickens*, where the petitioner Mickens's trial attorney did not disclose to Mickens, the trial court, or co-counsel that he was representing Mickens's murder victim on other charges at the time of the murder. *Mickens*, 535 U.S. at 165.   Having not learned of the conflict previously, Mickens did not raise the issue until his federal habeas proceedings.   *Id.*   Mickens argued that, under the circumstances, he needed "only show that his lawyer was subject to a conflict of interest, and need not show that the conflict adversely affected counsel's performance."   *Id.* at 170.   The Supreme Court rejected this argument, holding that Mickens had "to establish that the conflict of interest adversely affected his counsel's performance."   *Id.* at 174. Here, too, Petitioner must show an actual conflict, *i.e.*, a conflict that adversely affected Mr. Funderburk's performance.

121

counsel's part where "[c]ounsel vigorously defended Mr. Alvarez throughout trial." Here, too, as shown at length in Ground One, Petitioner's attorneys conducted a thorough pretrial investigation that included consulting with two medical experts and a confession expert, presented a coherent and cogent defense that Mr. Snyder inflicted A.S.'s fatal injuries, and obtained key concessions from the State's witnesses, *see* Ground One(C)(3)(i)-(iv).  Given counsel's vigorous representation, Petitioner falls far short of showing Mr. Funderburk advanced his interests ahead of her own.

The closest Petitioner comes to arguing an actual instance of conflicting interests is her suggestion that Mr. Funderburk did not seek a continuance of her trial because it would interfere with a motion to quash hearing in his criminal case (Doc. 227 at 71-72). This argument makes little sense.   A motion to quash would not result in Mr. Funderburk's incarceration or the revocation of his bar license, as Petitioner suggests (Doc. 227 at 72).   In any event, Petitioner's speculation does not overcome Mr. Slane's adamant testimony at the evidentiary hearing that, at the time trial began, the defense team had a defense ready to go and that a continuance was not required (E.H. Tr. 12/04/2014 I 63-64).

Petitioner suggests a *per se* rule applies here, citing to a case from the Supreme Court of New Jersey: "[a] defense attorney with a pending criminal charge in the same jurisdiction has an actual conflict of interest" (Doc. 227 at 70-71 (citing *State v. Cottle*, 946 A.2d 550 (N.J. 2008))).   *Cottle* does not aid Petitioner because, although that case did announce a *per se* rule, it expressly based said rule on the New Jersey Constitution, not

the United States Constitution:

> [A]n attorney who is contemporaneously under indictment in the same county as his client, and being prosecuted by the same prosecutor's office, is engaged in a per se conflict of interest, absent a valid waiver by the client.  In such a circumstance, the representation is rendered ineffective *under our State Constitution*.

*Cottle*, 946 A.2d at 564.  In fact, the New Jersey Supreme Court observed that its "rulings have exhibited a much lower tolerance for conflict-ridden representation under the New Jersey Constitution than federal courts have under the United States Constitution," and noted that "the United States Supreme Court held that a presumption of prejudice arises only when the conflict is an 'an actual conflict of interest,' meaning 'a conflict *that affected counsel's performance*—as opposed to a mere theoretical division of loyalties.'" *Id.* at 562 (quoting *Mickens*, 535 U.S. at 171 & n. 5) (emphasis provided by *Mickens*). Petitioner has not cited to any case suggesting that the United States Constitution does not tolerate the representation of a criminal defendant by an attorney who is also under prosecution in the same jurisdiction on an unrelated matter.[61]

---

[61] Petitioner also cites to cases from the Second and Third Circuits (Doc. 227 at 71). These cases likewise do not help Petitioner because the courts found a conflict not based on a *per se* rule, but based on the totality of the circumstances showing that an attorney's prosecution by the same jurisdiction caused an *actual* conflict of interests.  *See United States v. Levy*, 25 F.3d 146, 156-57 (2d Cir. 1994) (reasoning that the defense attorney's "prosecution on unrelated criminal charges by the same office prosecuting Levy" was one of "the myriad connections between [the attorney], Levy, and [the codefendant also represented by the attorney]" that, considered "together," led the court to conclude that the attorney "labored under actual conflicts of interest during the course of his representation of Levy"); *United States v. DeFalco*, 644 F.2d 132, 136-37 (3d Cir. 1979) (holding that actual conflict was shown by "[t]he totality of the circumstances presented here").  Petitioner also cites to "*Alexander v. Rice*, 264 F.3d 878, 886-887 (9th Cir.

Although this claim is governed by *de novo* review, and not subject to 2254(d)(1)'s "clearly established" Supreme Court law requirement, even pre-AEDPA, a habeas petitioner was entitled to relief only if her "conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Whatever the New Jersey Constitution may require, the Sixth Amendment of the United States Constitution does not *per se* forbid representation of a defendant by an attorney who is under prosecution in the same jurisdiction. Petitioner must specifically show "an impairment or compromise of [her attorney's] interests for [his own] benefit," *Alvarez*, 137 F.3d at 1251 (alteration adopted, quotation marks omitted), and this she has not done.

> (ii)    *Mr. Funderburk's alleged financial struggles did not create an actual conflict.*

Petitioner's next claim is that Mr. Funderburk's "drug use, financial struggles, and misappropriation of [her] client trust funds" created an actual conflict of interest (Doc. 227 at 72 (formatting omitted)). This claim should be deemed waived as it includes numerous factual allegations, only one of which is supported by a citation to the record. *See (John) Grant*, 727 F.3d at 1025; *Garrett*, 425 F.3d at 840; *Moore*, 195 F.3d at 1180 n. 17; *SIL-FLO, Inc.*, 917 F.2d at 1513; *Bradford*, 479 F. App'x at 835.

In any event, as already discussed, the state district court made findings that defeat this claim as a matter of law:

---

2001)" (Doc. 227 at 71). The citation provided directs one to *United States v. Cannon*, 264 F.3d 875 (9th Cir. 2001), and Respondent cannot otherwise locate a case called *Alexander v. Rice* from the Ninth Circuit.

> Petitioner has failed to establish that Mr. Funderburk misappropriated or stole client funds for his own personal benefit, thereby creating an actual conflict of interest. . . . Moreover, Petitioner has failed to demonstrate that Mr. Funderburk's financial situation in any way inhibited his ability to zealously defend her cause when counsel did consult with at least two forensic pathologists prior to trial and further, according to Mr. Slane and Mr. Reynolds, funding apparently played no role in the defense team's decision not to present an expert witness at trial.  Petitioner has failed to establish an actual conflict of interest arose from Mr. Funderburk's handling of funds paid on Petitioner's behalf.

(Doc. 234, Exhibit 10 at 25-26).  Indeed, as already shown in Ground One, trial counsel's decisions regarding the defense were based on a reasonable investigation and reasonable strategy, not any financial or funding issues, *see* Ground One(C)(3)(i), (iii).  Given that Petitioner has not shown "an actual conflict of interest which adversely affected [her] lawyer's performance," *Alvarez*, 137 F.3d at 1251 (quotation marks omitted), relief must be denied.

> (iii) *The third party payment arrangement did not create an actual conflict.*

Petitioner claims that an actual conflict of interest was created when Mr. Funderburk and Ms. Vanderventer agreed that he would be paid an additional $15,000 after Ms. Roth was revealed as a fraud who had not investigated the case as promised (Doc. 227 at 74-75).  As an initial matter, this Court should deem this claim waived because Petitioner has supported it with zero citations to the record.  *See (John) Grant*, 727 F.3d at 1025; *Garrett*, 425 F.3d at 840; *Moore*, 195 F.3d at 1180 n. 17; *SIL-FLO,*

*Inc.*, 917 F.2d at 1513; *Bradford*, 479 F. App'x at 835.[62]   In any event, this claim is without merit.

"The Supreme Court has warned of 'the inherent dangers that arise when a criminal defendant is represented by a lawyer hired and paid by a third party.'"  *United States v. Flood*, 713 F.3d 1281, 1286 (10th Cir. 2013) (quoting *Wood v. Georgia*, 450 U.S. 261, 269 (1981)).  However,

> a third-party fee arrangement does not automatically create a conflict of interest.  An actual conflict of interest exists only if counsel was forced to make choices advancing interests to the detriment of his client.  In other words, there must be more than a potential conflict of interest or a mere theoretical division of loyalties.  To prevail, the defendant has the burden of showing specific instances to support [her] claim of actual conflict of interest.

*Id.* at 1286-87 (quotation marks and citations omitted, alteration in original).

Here, Petitioner claims that an actual conflict of interest existed with the third party fee arrangement because, after Ms. Vanderventer paid Mr. Funderburk an additional $15,000, "Attorney Funderburk let Ms. Vanderventer tried [sic] to direct the strategy of the case by redirecting funds dedicated to investigators and experts to himself" (Doc. 227 at 75).  It is clear why Petitioner provides no citations to the record to support this allegation—there is no evidence to support it.  As previously shown, the decisions with respect to experts in this case had nothing to do with finances or funding,

---

[62] This claim should further be deemed waived because it is not specified in Petitioner's Second Amended Habeas Petition (Doc. 226 at 9).  *See* Rule 2(c)(1), *Rules Governing 2254 Cases*.

and everything to do with trial strategy, *see* Ground One(C)(3)(i), (iii), *supra*.
Furthermore, at the evidentiary hearing, the following exchange occurred when Petitioner
was on the stand:

> Q    . . . So based on what you've told everyone, Ms.
> Vanderventer cashed in her retirement and got involved in this case. My
> question to you at this point is: During the pendency of your case what is it
> that she wanted to be done that was inconsistent with what you wanted to
> be done? Because Mr. Trevillion says, if I understood his testimony, that
> Mr. Funderburk committed ethical violations by listening to those two
> ladies [Ms. Carmichael and Ms. Vanderventer] because they had a conflict
> with what you wanted to be done.   What was -- what were you in
> disagreement with her about as to how the money should be spent? . . .
> What is it that she wanted him to do that you did not want him to do?
>
> A    *I don't believe that there was anything that she wanted him to
> do that I didn't want him to do.*

(E.H. Tr. 03/05/2015 149-50 (emphasis added)).  Thus, Petitioner herself agreed that Ms.
Vanderventer did not attempt to direct her case in any way that was inconsistent with
what she herself wanted.  Petitioner has not shown that Mr. Funderburk advanced Ms.
Vanderventer's interests over her own, and this claim affords her no relief.  *See Flood*,
713 F.3d at 1286-87.[63]

> (iv)   *Mr. Funderburk did not forego defense theories to use trust fund*

---

[63] As indicated above, the prosecutor questioned Petitioner about the third-party fee
arrangement because it was criticized by Mr. Trevillion.  However, this claim, *i.e.*,
conflict of interest due to third-party fee arrangement, was not raised to the state district
court (Doc. 234, Exhibit 7 at 4).  Any argument by Petitioner that this claim requires an
evidentiary hearing in federal court for further findings or credibility determinations must
be denied.  *See* 28 U.S.C. § 2254(e)(2) ("[i]f [a habeas] applicant has failed to develop
the factual basis of a claim in State court proceedings, the court shall not hold an
evidentiary hearing on the claim . . . .").  In failing to raise this claim to the state district
court, Petitioner was not diligent.

*money for his personal gain*

Petitioner's next allegation of conflict is that Mr. Funderburk, due to misappropriating trust funds for his own gains, "failed to pursue a reasonable plausible alternative theory" (Doc. 227 at 76). This claim is unsupported by any citation to the record and should be considered waived. *See (John) Grant*, 727 F.3d at 1025; *Garrett*, 425 F.3d at 840; *Moore*, 195 F.3d at 1180 n. 17; *SIL-FLO, Inc.*, 917 F.2d at 1513; *Bradford*, 479 F. App'x at 835.[64] Regardless, this claim fails on its merits.

The Tenth Circuit has held: "[D]efense counsel's performance was adversely affected by an actual conflict of interest if a specific and seemingly valid or genuine alternative strategy or tactic was available to defense counsel, but it was inherently in conflict with his duties to others or to his own personal interests." *United States v. Bowie*, 892 F.2d 1494, 1500 (10th Cir. 1990).

Here, Petitioner contends that Mr. Funderburk misappropriated trust fund money that should have gone to experts for his own gain, and thereby failed to present a defense theory with "an alternate explanation for A.S.'s death" or a theory that Mr. Snyder killed A.S. (Doc. 227 at 76). For starters, it is difficult to see how Petitioner has even alleged a claim under *Bowie*, as there is no "inherent" conflict between Mr. Funderburk's alleged misappropriation of funds and the failure to present an expert. *Bowie*, 892 F.2d at 1500; *compare Porter v. Wainwright*, 805 F.2d 930, 939 (11th Cir. 1986) ("An actual conflict

---

[64] This claim should further be deemed waived because it is not specified in Petitioner's Second Amended Habeas Petition (Doc. 226 at 9). *See* Rule 2(c)(1), *Rules Governing 2254 Cases*.

exists if counsel's introduction of probative evidence or plausible arguments that would significantly benefit one defendant would damage the defense of another defendant whom the same counsel is representing." (quotation marks omitted)) (cited with approval in Bowie, 892 F.2d at 1500).   In any event, as discussed above, the defense team's decisions about experts were based on a reasonable investigation and reasonable trial strategy and had nothing to do with funding or financial issues, *see* Ground One(C)(3)(i), (iii), *supra*.   Furthermore, the defense did in fact present a theory that Mr. Synder had inflicted A.S.'s fatal injuries, *see* Ground One(C)(3)(iv), *supra*.   This conflict claim finds no support in the record and must be denied.[65]

## D.    Conclusion

Based on all of the above, Petitioner has not shown ineffective assistance due to any conflict of interest.   Habeas relief must be denied as to Ground Two.

## GROUND THREE

## THE   STATE   DID   NOT   COMMIT   A   *BRADY* VIOLATION.

In her third ground for relief, Petitioner claims that the State violated *Brady* in suppressing certain allegedly exculpatory evidence (Doc. 226 at 10).   The record shows that the State did not "suppress" the evidence at issue, as it was known and available to

---

[65] This claim, *i.e.*, alleged failure to present defense theories due to conflict of interest, was not raised to the state district court (Exhibit 7 at 4).  Any argument by Petitioner that this claim requires an evidentiary hearing in federal court for further findings or credibility determinations must be denied.  *See* 28 U.S.C. § 2254(e)(2).  In failing to raise this claim to the state district court, Petitioner was not diligent.

the defense.  Habeas relief must be denied.

## A.    *Brady* Standard

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment."  *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *see also Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (clarifying that "regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different" (quotation marks omitted)).  "Evidence is 'favorable to the defense' if it is exculpatory or impeaching."  *Browning v. Trammell*, 717 F.3d 1092, 1094 (10th Cir. 2013).  Evidence is 'material' if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."  *Id.* (quotation marks omitted).  Based on the foregoing, "[t]o establish a *Brady* violation, a defendant must demonstrate that (1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material to the defense."  *Hooks v. Workman*, 689 F.3d 1148, 1179 (10th Cir. 2012) (quotation marks omitted)).  "This test is conjunctive, and failure to satisfy any of the prongs is dispositive."  *Id.*

"Evidence is not suppressed within the meaning of *Brady* if it is made known and available to the defense prior to trial."  *Id.* at 1179-80; *see also United States v. Brown*, 650 F.3d 581, 588 (5th Cir. 2011) ("[E]vidence is not suppressed if the defendant knows

or should know of the essential facts that would enable him to take advantage of it.  To have been suppressed, the evidence must not have been discoverable through the defendant's due diligence." (citations and quotation marks omitted)); *Maharaj v. Sec'y for Dep't of Corr.*, 432 F.3d 1292, 1315 (11th Cir. 2005) ("Our case law is clear that where defendants, prior to trial, had within their knowledge the information by which they could have ascertained the alleged *Brady* material, there is no suppression by the government." (quotation marks omitted, alteration adopted)).  "*Brady* does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant."  *Hooks*, 689 F.3d at 1180 (quotation marks omitted).  Finally, "disclosure need not be in a specific form or manner."  *Id.* (quotation marks omitted).

## B.    The State Did Not "Suppress" Evidence

Petitioner contends that the State violated *Brady* in failing to disclose histological slides and special iron stains possessed by the ME's Office (Doc. 226 at 10; Doc. 227 at 11, 36, 77-78).[66]  As an initial matter, this claim is unsupported by any citation to the record and should be considered waived (Doc. 227 at 77-78).  *See (John) Grant*, 727 F.3d at 1025; *Garrett*, 425 F.3d at 840; *Moore*, 195 F.3d at 1180 n. 17; *SIL-FLO, Inc.*, 917 F.2d at 1513; *Bradford*, 479 F. App'x at 835.  In any event, Petitioner has not shown that

---

[66] Petitioner also very briefly references radiology scans produced by Integris, but she does not develop any argument as to them (Doc. 226 at 10; Doc. 227 at 76-77).  Petitioner's utter failure to offer any argument as to the radiology scans has waived any claim that the State violated *Brady* with respect to this evidence.  *See (John) Grant*, 727 F.3d at 1025; *Garrett*, 425 F.3d at 840; *Moore*, 195 F.3d at 1180 n. 17; *SIL-FLO, Inc.*, 917 F.2d at 1513; *Bradford*, 479 F. App'x at 835.

this evidence was "suppressed" by the State.[67]

At trial, Dr. Choi testified that she took a section for histological slides from the abdomen and the back of the head to help determine if the injuries were the same age (Trial Tr. III 91).   Dr. Choi testified that she examined the brain matter under a microscope (Trial Tr. III 88).   Dr. Choi's autopsy report was in the possession of the defense team (Doc. 234, Exhibit 10 at 12).   The autopsy report was also entered into evidence at the evidentiary hearing by Petitioner through Dr. May, and Dr. May testified that she had the description of the microscopic slides in the autopsy report (E.H. Pet's Ex. 32; E.H. Tr. 01/22/2014 42-43).   The autopsy report clearly reflects that there was microscopic examination completed and specifically that the skin/scalp slides showed "scattered hemosiderin laden macrophages present in the contusion at the back of the head . . . ." (E.H. Pet's Ex. 32 at 30).   Dr. May expressly pointed out this finding to the defense in her recommended cross-examination questions for the ME, stating: "Microscopic analysis of these posterior subgaleal contusions demonstrated the presence of intercellular iron.   Could this finding indicate an age greater than 24 hours for this injury?" (E.H. Pet's Ex. 32 at 52).   She further suggested questions about whether special histologic stains were utilized, and whether there was an attempt to document intracellular iron using trichrome and Prussian blue histologic stains (E.H. Pet's Ex. 32 at 52).

---

[67] Although this claim was raised in Petitioner's second postconviction application, it was not decided by the state district court (Doc. 234, Exhibit 7 at 5).

132

Based on the above, the histological slides and special iron stains were made known and available to the defense prior to trial and, thus, were not "suppressed" within the meaning of *Brady*.  *Hooks*, 689 F.3d at 1179-80.  In light of the autopsy report provided to the defense, Petitioner was clearly made aware of the histologic slides made at the time of the autopsy and the scattered presence of intracellular iron and scattered hemosiderin, which alerted the defense to the possibility of special iron stains.  This evidence was available at the ME's Office and could easily have been obtained by Petitioner at any time (E.H. Pet's Ex. 35 (declaration by ME's Office records custodian that habeas counsel Ms. Cave requested and received the re-cuts of the histological slides)).[68]

In *Hooks*, the Tenth Circuit "[had] no trouble concluding that the State fulfilled its *Brady* obligation" where the prosecutor provided the defense a "brief" memo disclosing the belief of a Department of Corrections employee that petitioner Hooks was intellectually disabled.  *Hooks*, 689 F.3d at 1180.  The Tenth Circuit explained that, although the prosecutor disclosed only an "abbreviated" version of the conversation, "a

---

[68] The same logic applies to Petitioner's waived *Brady* claim regarding the radiology scans from Integris.  These scans were in the possession of a third party and were equally available to the State and the defense, and the State did not "suppress" them.  *See Efurd v. Norris*, No. 5:04CV00117 JLH, 2006 WL 1646166, at *9 (E.D. Ark. June 9, 2006) (unpublished) (finding no *Brady* violation with regard to "chest x-rays performed upon the victim's admission to the hospital" because "*Brady* applies to information exclusively within the prosecutor's control and knowledge, and there can be no *Brady* violation where information was equally available to the defense").  The defense was well aware of the scans, which were discussed in Dr. Griggs's discharge summary paperwork and by him on the stand (E.H. Pet's Ex. 32 9; Tr. Vol. II 173-74).

complete and detailed accounting [was not] required" and "[t]he memo disclosed enough of the conversation with [the Department of Corrections employee] to put counsel for Mr. Hooks on notice that favorable and possibly material evidence was available." *Id.* (quotation marks omitted). Here, too, the State was not required to disclose every "shred" of evidence produced by the autopsy of A.S. The autopsy report expressly alerted the defense of the existence of the histological slides and put the defense "on notice that favorable and possibly material evidence was available" in the form of special stains, *id.*,[69] and this satisfied the State's *Brady* obligation.

## C.    Conclusion

Regardless of whether the histological slides and special iron stains were favorable and material,[70] Petitioner has not demonstrated they were suppressed and, therefore, her *Brady* claim must fail. *See Hooks*, 689 F.3d at 1179. Relief must be denied on Ground Three.

## **GROUND FOUR**

---

[69] Indeed, Petitioner repeatedly admits as much (*see, e.g.*, Doc. 226 at 13 ("medical records indicated that certain tests – including CT scan and histological slides – had been conducted but that the actual material tested was not ever produced to the defense"); Doc. 227 at 80-81 (discussing autopsy report, its documentation of slides prepared by Dr. Choi, and possibility that stains were or were not used)).

[70] It is hard to imagine how the prosecutors could possibly have known that the histological slides and special iron stains were allegedly exculpatory, *i.e.*, favorable, when in the ME's unwavering opinion, A.S. died of acute blunt force trauma, "likely by the mechanism of shaken impact" (E.H. Pet's Ex. 32 at 22), and Petitioner confessed to shaking A.S. and slamming his head into the floor (Tr. Vol. III 30-35). Dr. May also believed that the injuries were recent despite the presence of iron (E.H. Pet's Ex. 32 at 51). In any event, it is clear this evidence was not "suppressed" within the meaning of *Brady*.

## APPELLATE COUNSEL DID NOT RENDER INEFFECTIVE ASSISTANCE IN FAILING TO RAISE THE CLAIM OF INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL ALLEGED IN GROUND ONE.

In Ground Four, Petitioner alleges she received ineffective assistance of appellate counsel when her direct appeal attorney did not raise the claim she alleges in Ground One, that trial counsel was ineffective with regard to the investigation and presentation of medical evidence. Because, as previously shown, Petitioner's trial counsel claim is without merit, her appellate counsel was not ineffective for failing to raise it on direct appeal. Relief must be denied.

## A.  *Strickland* Standard

As with claims of ineffective assistance of trial counsel, the two-part *Strickland* test applies to claims of ineffective assistance of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Therefore, Petitioner must show that appellate counsel's performance was unreasonable and that she suffered prejudice, that is, that there is a reasonable probability that, had the errors now complained of been raised, the result of her appeal would have been different. *Id*. at 285.

If appellate counsel files a brief on the merits, he should not raise every nonfrivolous claim. *Miller v. Mullin*, 354 F.3d 1288, 1298 (10th Cir. 2004). Rather, appellate counsel may select from among claims in order to maximize the likelihood of success. *Id*. Therefore, it is difficult to establish that appellate counsel was ineffective for failing to raise a particular issue. *Id*.

Where a habeas petitioner claims ineffective assistance of appellate counsel for failure to raise a claim of ineffective assistance of trial counsel, and the claim of ineffective assistance of trial counsel is "without merit," then "appellate counsel was not ineffective for failing to raise the claim[] on direct appeal." *Moore v. Gibson*, 195 F.3d 1152, 1180 (10th Cir. 1999).

## B.     Appellate Counsel Was Not Ineffective

Petitioner argues that appellate counsel should have raised a claim of ineffective assistance of trial counsel for "failing to consult with, retain, and present expert testimony on the medical issues presented in this case" (Doc. 227 at 78).[71]   Petitioner has once again failed to support a claim with any citations to the record; this claim should be deemed waived (Doc. 227 at 77-78).  *See (John) Grant*, 727 F.3d at 1025; *Garrett*, 425 F.3d at 840; *Moore*, 195 F.3d at 1180 n. 17; *SIL-FLO, Inc.*, 917 F.2d at 1513; *Bradford*, 479 F. App'x at 835.  Regardless, Petitioner has shown neither deficient performance nor

---

[71] In her second postconviction application, Petitioner's final ground for relief alleged that appellate counsel was ineffective for not raising her foregoing grounds for relief on direct appeal.  The state district court rejected Petitioner's appellate counsel claim on grounds that Petitioner's other grounds for relief were "meritless" and "[a]ppellate counsel could not have been ineffective for failing to raise a non-meritorious claim" (Doc. 234, Exhibit 10 at 27).  In the section of its order disposing of the appellate counsel claim, the state district court did not expressly state any findings of fact.  Nevertheless, the factual findings the court made with regard to Petitioner's other grounds for relief would necessarily underlie its adjudication of Petitioner's appellate counsel claim and must be presumed correct under § 2254(e)(1).  *See Register*, 681 F.3d at 629 ("The presumption applies both to explicit findings of fact and to unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." (quotation marks omitted)).

prejudice.

As shown at length in Ground One, Petitioner's underlying claim of ineffective assistance of trial counsel with regard to counsel's investigation and presentation of medical evidence is without merit.  To summarize, trial counsel conducted a reasonable pretrial investigation of the medical evidence, *see* Ground One(C)(3)(i), *supra*, and reasonably decided against presenting a medical expert, *see* Ground One(C)(3)(iii), *supra*.  Thus, for all the reasons discussed in Ground One, Petitioner failed to show deficient performance on the part of trial counsel.  Thus, her trial counsel claim is without merit, and appellate counsel's failure to raise same was neither deficient nor prejudicial. *See Moore*, 195 F.3d at 1180.[72]

## C.      Conclusion

Because Petitioner's claim that trial counsel performed incompetently in their investigation and presentation of medical evidence is without merit, her claim of ineffective assistance of appellate counsel for failing to raise the former claim also fails. Habeas relief must be denied as to Ground Four.

## GROUND FIVE

## APPELLATE   COUNSEL   DID   NOT   RENDER INEFFECTIVE ASSISTANCE IN FAILING TO RAISE

---

[72] Notably, appellate counsel obtained partial relief for Petitioner on direct appeal, raising an instructional error that resulted in the OCCA favorably modifying Petitioner's sentence from life imprisonment without the possibility of parole to life imprisonment with the possibility of parole (Exhibit 1 at 2-5).  *See Richter*, 562 U.S. at 111 ("[I]t is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy.").

## THE CLAIM OF INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL ALLEGED IN GROUND TWO.

In Ground Five, Petitioner alleges she received ineffective assistance of appellate counsel when her direct appeal attorney did not raise the claim she alleges in Ground Two, that trial counsel was ineffective in operating under conflicts of interest. Because, as previously shown, Petitioner's trial counsel conflict claim is without merit, her appellate counsel was not ineffective for failing to raise it on direct appeal. Relief must be denied.

### A.     *Strickland* Standard

The *Strickland* standard governing claims of ineffective assistance of appellate counsel is provided in Ground Four(A), *supra*. To summarize, Petitioner must show deficient performance and prejudice. *Smith*, 528 U.S. at 285. Where a claim of ineffective assistance of trial counsel claim is without merit, a claim that appellate counsel was ineffective for not raising that claim on direct appeal is likewise without merit. *Moore*, 195 F.3d at 1180.

### B.     Appellate Counsel Was Not Ineffective

Petitioner argues that appellate counsel should have raised the claims of ineffective assistance of trial counsel based on alleged conflicts of interest as argued in Ground Two (Doc. 227 at 79).[73] Petitioner does not support this claim with any citations to the record, and it should be regarded as waived (Doc. 227 at 79). *See (John) Grant*,

---

[73] As with Ground Four, any implicit factual findings in the state district court's rejection of this claim must be presumed correct under 2254(e)(1). *See Register*, 681 F.3d at 629.

727 F.3d at 1025; *Garrett*, 425 F.3d at 840; *Moore*, 195 F.3d at 1180 n. 17; *SIL-FLO, Inc.*, 917 F.2d at 1513; *Bradford*, 479 F. App'x at 835.   In any event, Petitioner has shown neither deficient performance nor prejudice.

As demonstrated in Ground Two, Petitioner's underlying claims regarding Mr. Funderburk's alleged conflicts of interest are unsupported.   In summary, the state district court found that "there has been no evidence that [Mr. Funderburk] advanced his own case to the detriment of Petitioner's" (Doc. 234, Exhibit 10 at 29), and this finding is fatal to Petitioner's trial counsel claim because she must show an actual conflict of interest that adversely affected counsels' performance.   *Alvarez*, 137 F.3d at 1251.[74]   As to Mr. Funderburk's alleged financial issues, the state district court found that these issues did not in any way inhibit his "ability to zealously defend [Petitioner's] cause when counsel

---

[74] Petitioner cites to no authority binding on the OCCA that Mr. Funderburk's prosecution in the same jurisdiction would have created a *per se* actual conflict.   In other words, she has not demonstrated that, had appellate counsel raised a conflict of interest claim in this regard, the OCCA would have presumed a conflict and prejudice.

She does cite to *Allen v. State*, 874 P.2d 60 (Okla. Crim. App. 1994), arguing that, where "a defendant was not made aware of a conflict and was therefore deprived of the opportunity to object to it, she is not required to show she was adversely affected by it" (Doc. 227 at 67).   *Allen* is inapposite.   There the OCCA did not require Allen to show an adverse effect from the conflict of interest because of "the specific circumstances of [the] case," which involved "successive representation of codefendants with conflicting interests."   *Allen*, 874 P.2d at 64.   The OCCA's conclusion that "a defendant who did not know of a conflict cannot be held to a standard requiring him or her to have objected to such conflict" was specific to the context of joint representation.   *See id.* at 63-64 ("Where there is an actual conflict of interest and *the trial court permits or requires joint representation over timely objection*, reversal will be warranted absent a showing of prejudice." (emphasis added)).   Petitioner's allegations of conflict are nothing like that at issue in *Allen*; thus, even if appellate counsel had raised her conflict claims on direct appeal, *Allen* would not have relieved her of her burden of showing an actual conflict that adversely affected counsel's performance.

139

did consult with at least two forensic pathologists prior to trial and further . . . funding apparently played no role in the defense team's decision not to present an expert witness at trial" (Doc. 234, Exhibit 10 at 26).  Again, Petitioner failed to show an actual conflict of interest that adversely affected counsels' performance.  *Alvarez*, 137 F.3d at 1251.[75]  Thus, for all the reasons discussed in Ground Two, Petitioner failed to show on actual conflict on the part of trial counsel.  Accordingly, her trial counsel claims are without merit, and appellate counsel's failure to raise these claims was neither deficient nor prejudicial.  *See Moore*, 195 F.3d at 1180.

## C.    Conclusion

Because Petitioner's claims that Mr. Funderburk operated under an actual conflict of interest are unsupported and meritless, her claim of ineffective assistance of appellate counsel for failing to raise these claims also fails.  Relief should be denied as to Ground Five.

<u>**GROUND SIX**</u>

**APPELLATE   COUNSEL   DID   NOT   RENDER INEFFECTIVE ASSISTANCE IN FAILING TO RAISE THE *BRADY* CLAIM ALLEGED IN GROUND THREE.**

In Ground Six, her final ground for relief, Petitioner alleges she received ineffective assistance of appellate counsel when her direct appeal attorney did not raise

---

[75] Petitioner does not appear to raise any claim that appellate counsel should have raised alleged conflicts of interest based on the third party pay arrangement or trial counsel's alleged failure to pursue a reasonable plausible alternative theory (Doc. 227 at 79).  To the extent she does, such a claim fails for the same reasons as the underlying trial counsel claims, *see* Ground Two(C)(3)(iii)-(iv), *supra*.

the *Brady* claim she alleges in Ground Three, that the State failed to disclose certain medical evidence to the defense.  Because, as previously shown, Petitioner's *Brady* claim was without merit because the State did "suppress" the evidence at issue, her appellate counsel was not ineffective for failing to raise this *Brady* claim on direct appeal.  Relief must be denied.

## A.    *Strickland* Standard

The *Strickland* standard governing claims of ineffective assistance of appellate counsel is provided in Ground Four(A), *supra*.  To summarize, Petitioner must show deficient performance and prejudice.  *Smith*, 528 U.S. at 285.  Where the claim Petitioner contends that counsel should have raised is meritless, the claim of ineffective assistance of appellate counsel is likewise without merit.  *Moore*, 195 F.3d at 1180.

## B.    Appellate Counsel Was Not Ineffective

Petitioner argues that appellate counsel should have raised the *Brady* claim alleged in Ground Three (Doc. 227 at 79).  Petitioner does not support her claim of ineffective assistance of appellate counsel with any citations to the record (although she cites to two documents from this habeas proceeding), and this Court should deem her claim waived for inadequate briefing (Doc. 227 at 79).  *See (John) Grant*, 727 F.3d at 1025; *Garrett*, 425 F.3d at 840; *Moore*, 195 F.3d at 1180 n. 17; *SIL-FLO, Inc.*, 917 F.2d at 1513; *Bradford*, 479 F. App'x at 835.  Regardless, Petitioner has shown neither deficient performance nor prejudice.

As shown in Ground Three, Petitioner has not demonstrated that the State

"suppressed" any evidence within the meaning of *Brady*. *See Hooks*, 689 F.3d at 1179-80.  The State was not required to disclose every "shred" of evidence produced by the autopsy of A.S.  The autopsy report expressly alerted the defense of the existence of the histological slides and put the defense "on notice that favorable and possibly material evidence was available" in the form of special stains (E.H. Pet's Ex. 32 at 30), *id.* at 1180, and this satisfied the State's *Brady* obligation.  As to the radiology scans produced by Integris, these were in the possession of a third party and equally available to the State and the defense (E.H. Pet's Ex. 32 9; Tr. Vol. II 173-74), and the State did not "suppress" them, *see Efurd*, 2006 WL 1646166, at *9.  As Petitioner's *Brady* claim fails, appellate counsel neither performed deficiently nor prejudiced her in failing to raise it on direct appeal.  *See Moore*, 195 F.3d at 1180.

## C.      Conclusion

Petitioner's claim of ineffective assistance of appellate counsel affords her no relief because her underlying *Brady* claim is meritless.  Habeas relief must be denied as to Ground Six.

## CONCLUSION

Based on the above and foregoing law and reasoning, federal habeas corpus relief is unwarranted.  Petitioner's petition for federal habeas corpus relief should therefore be denied in its entirety by this Court.

Respectfully submitted,

**MIKE HUNTER**
**ATTORNEY GENERAL OF OKLAHOMA**

**s/ CAROLINE E.J. HUNT_____**
**CAROLINE E.J. HUNT, O.B.A. #32635**
**ASSISTANT ATTORNEY GENERAL**
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Fax: (405) 522-4534
**Service email: fhc.docket@oag.ok.gov**

**ATTORNEYS FOR RESPONDENT**

## CERTIFICATE OF SERVICE

**X**      I hereby certify that on the 15th day of June, 2020, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Andrea Miller
Christine Cave

s/ Caroline E.J. Hunt